TERRENCE COLLINGSWORTH
(DC Bar # 471830)
International Rights Advocates
621 Maryland Ave NE
Washington, D.C. 20002
Tel: 202-543-5811
E-mail: tc@iradvocates.org

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| Issouf Coubaly, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Sidiki Bamba, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Tenimba Djamoutene, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Oudou Ouattara, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Ousmane Ouattara, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Issouf Bagayoko, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Arouna Ballo, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; and Mohamed Traore, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002<br><br>Plaintiffs, | Case No. 1:21-cv-00386<br><br><br>**[CORRECTED] CLASS COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br><br>**JURY TRIAL DEMANDED** |

v.

NESTLÉ U.S.A., 1812 N Moore St, Arlington, VA 22209; CARGILL, INCORPORATED, 15407 McGinty Rd W, Wayzata, MN 55391; CARGILL COCOA, 12500 W Carmen Ave, Milwaukee, WI 53225; BARRY CALLEBAUT USA LLC, 600 W. Chicago Ave, Ste 860, Chicago, IL 60654; MARS, INCORPORATED, 6885 Elm St, McLean, VA; MARS WRIGLEY CONFECTIONARY, 800 County Rd 517, Hackettstown, NJ 07840; OLAM AMERICAS, INC., 25 Union Pl, 3rd Floor, Summit, NJ 07901; HERSHEY COMPANY, 1025 Reese Ave, Hershey, PA 17033; MONDELĒZ INTERNATIONAL, INC, 3 Parkway N #300, Deerfield, IL 60015; AND CORPORATE DOES 1-10.

Defendants.

## I.    NATURE OF THE ACTION

1.    As is demonstrated in this Complaint, forced child labor and the trafficking of child workers in the cocoa sector of Côte d'Ivoire are endemic. There are numerous credible studies and sources that repeatedly confirm this. Most recently, in October 2020, a comprehensive study of child labor in the cocoa sector conducted by NORC at the University of Chicago and funded by the U.S. Department of Labor (hereinafter NORC Study) concluded that 1.56 *million* child laborers were involved in cocoa production and harvesting in cocoa growing areas of Côte d'Ivoire and Ghana in 2018/19 growing season, and increase of 14 percent, and 1.48 *million* child laborers engaged in hazardous work during this period.[1] This represents an increase in both child labor and children engaged in hazardous work since the 2015 study funded by the Department of Labor. This is 19 years after Defendants admitted child labor was prevalent in their cocoa supply chains and made public commitments to stop it. Defendants Nestlé, U.S.A. ("Nestlé"); Cargill, Incorporated ("Cargill, Inc.") and  Cargill Cocoa (together as "Cargill"); Barry Callebaut USA LLC ("Barry Callebaut "), Mars, Incorporated and Mars Wrigley Confectionary (together as "Mars"), Olam Americas, Inc. ("Olam"), the Hershey Company ("Hershey"), and Mondelēz International, Inc ("Mondelēz") ("Defendants") have knowingly profited from the forced labor of children performing hazardous work harvesting Defendants' cocoa all of this time and,

---

[1] http://iradvocates.org/sites/iradvocates.org/files/FINAL%202020%20NORC%20CHILD%20LABOR%20Cocoa%20Report.pdf at 10,12.

rather than at least make progress, the abuse of child workers has increased. Defendants have engaged in various schemes to mislead the public by explicitly promising to "phase out" their use of forced child labor and ultimately stop, but the reality is they continue to profit from the labor of millions of children harvesting cocoa for these multinational giants. Mirroring the startling conclusions of the NORC Report, in conducting field work for this case, Plaintiffs' legal team easily and routinely found children using machetes, applying chemicals and performing other hazardous tasks on cocoa plantations producing for one or more of Defendants. The following are photos of young children, none of whom are Plaintiffs in this case, harvesting cocoa that were taken by Plaintiffs' research team during their 2017–19 trips to Côte D'Ivoire:







    2.      The eight Plaintiffs, Issouf Coubaly, Sidiki Bamba, Tenimba Djamoutene, Oudou Ouattara, Ousmane Ouattara, Issouf Bagayoko, Arouna Ballo, and Mohamed Traore (collectively referred to herein as the "Former Child Slave Plaintiffs") are all former child slaves of Malian origin who were trafficked from Mali and subjected to forced labor harvesting and cultivating cocoa beans on farms in Côte d'Ivoire, which supply cocoa beans to the Defendant companies named herein. All of these Plaintiffs were forced to perform hazardous work. The Former Child Slave Plaintiffs bring this action on behalf of themselves and all other similarly situated former child slaves of

Malian origin against Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz for the trafficking and forced labor they endured and suffered as a result of the wrongful conduct caused and aided and abetted by these corporate entities. Specifically, the Former Child Slave Plaintiffs assert claims for trafficking and forced labor of children who were forced to perform labor in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 *et. seq.* Plaintiffs also seek relief based on common law claims of negligent supervision, intentional infliction of emotional distress and unjust enrichment.

3. The Former Child Slaves Plaintiffs bring their claims in the United States because such claims cannot be maintained in their home country of Mali, as currently there is no law in Mali whereby such Plaintiffs can seek civil damages for their injuries against the major exporters of cocoa operating outside of the country. Nor could claims be brought in Côte d'Ivoire as the judicial system is notoriously corrupt and would be unresponsive to the claims of foreign children against major cocoa corporations operating in and bringing significant revenue to Côte d'Ivoire. It is also likely that both Plaintiffs and their attorneys would be placed in danger due to ongoing civil unrest in Côte d'Ivoire and the general hostility by cocoa producers in the region where Plaintiffs were forced to work. Further, the Former Child Slave Plaintiffs bring their claims in the United States, as the U.S. has provided a forum for such human rights lawsuits with the passage of the TVPRA, which specifically provides for extraterritorial jurisdiction. *See* 18 U.S.C. § 1596.

4.     The Former Child Slave Plaintiffs have concerns about whether they will face retaliation against themselves and their families by those persons who trafficked them into Côte d'Ivoire; the owners of farms on which they were enslaved; and by the local buyers, who are employees and/or agents of the Defendants. Plaintiffs' case not only threatens to expose criminalized elements within the cocoa sector, but also to dismantle the source of its significant profits: cheap labor procured through forced child trafficking. However, these eight Former Child Slave Plaintiffs hope that by speaking out publicly about the horrors of trafficking and child slavery they can better educate the public, consumers and government regulators so they can directly work to end these abhorrent practices.

## II.     JURISDICTION AND VENUE

5.     The primary claim in this case is brought under the TVPRA, 18 U.S.C. § 1596 for violations of 18 U.S.C. §§ 1581, 1584, 1589, and 1590, and the offenders are nationals of the United States or present in the United States, irrespective of nationality, providing this Court with federal question jurisdiction pursuant to 28 U.S.C. § 1331. 18 U.S.C. § 1596 specifically grants U.S. courts extraterritorial jurisdiction for Plaintiffs' TVPRA claims, all of which accrued after December 23, 2008, the effective date of § 1596.[2]

---

[2] *See Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017), cert. denied, No. 16-1461, 2017 WL 2463601 (U.S. Oct. 2, 2017).

6.     Plaintiffs' state law claims arise out of the same case or controversy as their federal law claims and involve a common nucleus of operative facts.  All injuries Plaintiffs suffered were the result of their being trafficked and subjected to harsh conditions performing forced labor. Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship. All Plaintiffs are foreign nationals and citizens and residents of Mali, and each of their claims for damages exceeds $75,000. All Defendants are U.S. corporations headquartered in the United States.

8.     This Court has personal jurisdiction over Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz because they are all U.S. resident companies and they do substantial and continuous business within the District of Columbia. The long arm statute of the District of Columbia, D.C. Code § 13-423(a)(1), uses the same standard as the due process clause of the Constitution, whether there are "minimum contacts." "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements and thus to merge into a single inquiry." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). "[The] 'transacting any business' clause has been interpreted to provide jurisdiction to the full extent allowed by the Due Process Clause. Therefore, the 'statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry here.'" *United States v. Ferrara*, 54 F.3d 825, 828 (D.C.

Cir. 1995). *See also Toumazou v. Turkish Republic of Northern Cyprus*, 71 F. Supp. 3d 7, 15-16 (D.D.C. 2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (the "transacting business" requirement of D.C. Code § 13-423(a)(1) requires that a defendant "'purposefully avail[ed] itself of the privilege of conducting business within the forum state and that it has established sufficient minimum contacts in the forum state so that it should reasonably anticipate being hailed into court there.'"). All of the Defendants conduct significant business in the District of Columbia, including selling their products and also running business operations, such that they have well more than the "minimum contacts" required for this Court to exercise personal jurisdiction over them.

9. Venue over the collective Defendants is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(3) and (c)(2). Based on subsection (b)(3), venue is proper because there is no single judicial district where all Defendants are headquartered, and this judicial district is one where all Defendants are subject to personal jurisdiction. Further, based on subjection (c)(2), all Defendants are deemed to reside in this judicial district because they are all subject to personal jurisdiction in this district.

### III.   <u>PARTIES</u>

#### A.  <u>Former Child Slave Plaintiffs</u>

10.     Plaintiff Issouf Coubaly is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves trafficked into Côte d'Ivoire from Mali and then forced to perform hazardous work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

11.     Plaintiff Sidiki Bamba is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali and then forced to perform hazardous work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

12.     Plaintiff Tenimba Djamoutene is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali and then forced to perform hazardous work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

13.     Plaintiff Oudou Ouattara is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves trafficked into Côte d'Ivoire from Mali and then forced to perform hazardous

work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

14.    Plaintiff Ousmane Ouattara is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali and then forced to perform hazardous work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

15.    Plaintiff Issouf Bagayoko is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali and then forced to work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

16.    Plaintiff Arouna Ballo is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali and then forced to perform hazardous work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

17.    Plaintiff Mohamed Traore is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali and then forced to

11

perform hazardous work on a farm and/or farmer cooperative that provided cocoa beans to one or more of the Defendants named herein.

**B.  Former Child Slave Plaintiffs' Class Action Allegations**

18.     The Former Child Slave Plaintiffs bring this action individually, and pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of the following class:

> All individuals during the period February 15, 2011 through the present who reside or did reside in the country of Mali, West Africa, and who were trafficked from Mali to any cocoa producing region of Côte d'Ivoire and forced to perform labor as children under the age of 16 on any farm and/or farmer cooperative within any cocoa producing region of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Divo, Grabo, Daloa, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro, for the purpose of harvesting and/or cultivating cocoa beans that were supplied to any of the named Defendants herein; or were children under the age of 16 who were forced to perform hazardous work on any farm and/or farmer cooperative within any cocoa producing region of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Divo, Grabo, Daloa, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro, using

12

dangerous tools or applying chemical pesticides and herbicides, as all of the Plaintiffs herein did.

19.     The class is so numerous that joinder of all members is impractical. Based on extensive objective research done on child trafficking and child labor in Côte d'Ivoire, there is uniform agreement that there are thousands of children for former child workers that would qualify as class members.

20.     There are questions of law and fact common to the class. Key common questions include, but are not limited to, the following:

a) Whether Plaintiffs and Proposed Class Members were unlawfully trafficked for purposes of forced child labor, in violation of International Labor Conventions 138 and 182, so as to work on cocoa farms, which supplied cocoa beans to the named Defendants herein?

b) Whether Defendants caused and/or aided and abetted the trafficking of Plaintiffs and Proposed Class Members and then forced them to perform hazardous work on cocoa plantations by either providing logistical support to the supplier farms and/or failing to provide sufficient logistical support and/or take adequate action to prevent and stop such forced child labor in violation of international law, federal law and California state law?

c)  Whether injunctive relief can be fashioned to prevent further trafficking of children and forcing them to perform hazardous work on

cocoa plantations supplying cocoa to one or more of the Defendants herein?

21.     The Former Child Slave Plaintiffs' claims are typical of the claims of the class. They seek redress for the same conduct that has affected all class members and press legal claims which are the same for all class members.

22.     The Former Child Slave Plaintiffs named herein will fairly and adequately represent the class.  These Plaintiffs do not have conflicts of interest with members of the class and have retained counsel who are experienced in complex litigation, including class actions and international litigation, and who will vigorously prosecute this action.

23.     A class action is the superior method for adjudication of this controversy. In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions, particularly in the case of Mali where class claims are not recognized. Moreover, if a class is not certified, many meritorious claims will go un-redressed as the individual class members are not able to prosecute complex litigation against large defendant corporations.

## C.  Chocolate Importer Defendants

24.     Nestlé, U.S.A. is a U.S. corporation that is a subsidiary of Nestlé, S.A. Nestlé, U.S.A. is headquartered in Virginia and is one of the largest food and beverage companies in the U.S. with 21,000 employees nationwide, 42 manufacturing facilities, 6

distribution centers, and 58 sales offices across the country. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America.

25.     Defendant Cargill, Incorporated Company ("Cargill, Inc.") is one of the largest privately held corporate providers of food and agricultural products and services worldwide with over 100,000 employees in 59 countries. Its activities include cultivating and processing grain, oilseeds, and other agricultural commodities, including cocoa for distribution to food producers. Headquartered in Wayzata, Minnesota and incorporated in Delaware, it is a family business that is tightly controlled and centrally managed. Upon information and belief, in 1992, the business was restructured to ensure that managers making decisions about buying and selling commodities had ties to Cargill Headquarters in Minnesota and would receive instructions from there.

26.     Cargill Cocoa is a subsidiary of Cargill, Inc. incorporated in Pennsylvania. It is a major cocoa bean originator and processor. It offers a wide range of high-quality cocoa powder, butter and liquor products under the Gerkens and Wilbur brands to leading manufacturers of food, chocolate, and confectionery products worldwide, including processors and manufacturers of cocoa and cocoa products in California. Products are sold through an international network of offices, agents, and distributors. Its facilities include a production facility in Côte d'Ivoire for the production of cocoa liquor, butter, powder, and origination of cocoa beans. Cargill Cocoa & Chocolate North America is responsible for partnerships with farmers in the Ivory Coast, including a program to train farmers in crop protection.

15

27.     Defendant Barry Callebaut USA LLC is a U.S. company that is a subsidiary of Barry Callebaut AG. Barry Callebaut USA LLC has production and sales facilities all over the U.S. The U.S. headquarters is at 600 W. Chicago Ave., Suite 860, Chicago IL 60654. Barry Callebaut markets and sells cocoa produced in Côte d'Ivoire in the United States with brands such as Barry Callebaut, Bensdrop, and Cacao Barry.

28.     Defendant Mars, Incorporated is a privately held corporation with its U.S. headquarters at 6885 Elm Street, McLean, Virginia. It operates its cocoa business and sales in the United States through Defendant Mars Wrigley Confectionary, which is headquartered in Chicago, Illinois.  Mars sells and markets cocoa products all over the United States with cocoa produced in Côte d'Ivoire.

29.     Defendant Olam International Americas. Inc. does business and sells and promotes its cocoa products with cocoa produced in Côte d'Ivoire all over the United States. It is headquartered at 25 Union Place, 3rd Floor, Summit, New Jersey 07901. It has over 5,000 employees at 24 locations in the United States.

30.     Defendant the Hershey Company is an international chocolate producer headquartered at 1025 Reese Ave., Hershey, Pennsylvania 17033. It manufactures, distributes and sells its cocoa products with cocoa produced in Côte d'Ivoire all over the United States.

31.     Defendant Mondelēz International, Inc, is a U.S.-based international chocolate producer headquartered in Deerfield, Illinois. Its predecessor was Kraft Foods, and in October 2012, Mondelēz was spun off with a focus on food products.

16

Its major cocoa products containing cocoa produced in Côte d'Ivoire include Cadbury Chocolates and Dairy Milk. It manufactures, distributes, and sells its cocoa products with cocoa produced in Côte d'Ivoire all over the United States

32.    As the paragraphs below establish, all the above-described Defendants knowingly produce cocoa in Côte d'Ivoire that is cultivated and harvested by children doing hazardous work, including those who were trafficked into forced labor from Mali. These Defendants have engaged in various deceptive practices to avoid taking responsibility for their long-term profiting from various forms of child slavery. Defendants realize a financial benefit from their use of child laborers to harvest cocoa, as this keeps the price of cocoa cheaper than it would be if cocoa were harvested by paid adult workers who are given proper protective equipment.

## D.  **Unknown Corporate Defendants**

33.    Plaintiffs are currently unaware of the true names and capacities of Defendants sued herein as Corporate DOES 1-10, and therefore they sue these Defendants by using fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Upon information and belief, each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and the injuries to Plaintiffs herein alleged were proximately caused in relation to the conduct of the named Defendants, as well as Corporate Does 1-10.

# IV.   FACTUAL ALLEGATIONS

**A. The trafficking of children to Cote D'Ivoire and forcing them and other children to perform hazardous work in cultivating and harvesting cocoa is well-documented by highly credible sources.**

34.     Trafficking in human beings is a massive and growing scourge around the world. The United States government estimates that there are currently more than 20 million victims of human trafficking.[3]  Human traffickers prey on the most vulnerable members of society.[4] As was the case with the Plaintiffs herein, traffickers often trick, coerce, or win the confidence of their victims through promises of jobs that are substantially different from what was promised.[5]  Victims are often lured with false promises of good jobs with good pay and better lives, and then are instead forced to work under terrible conditions.[6]

35.     In order to combat trafficking, the United States became a party to the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons, along with 163 other nations. In addition, Congress enacted and repeatedly reauthorized the TVPRA.

---

[3] U.S. Dep't of State, Trafficking in Persons Report 2 (2014) [hereinafter "TIP 2014"]; U.S. Dep't of State, Trafficking in Persons Report 45 (2012) (estimate of modern slavery worldwide increased from 12.3 million victims in 2005 to 20.9 million victims in 2012).

[4] U.S. Dep't of State, Trafficking in Persons Report 8 (2009).

[5] U.S. Dep't of State, Trafficking in Persons Report 27 (2011).

[6] U.S. Dep't of Justice, Attorney General's Annual Report to Congress and  Assessment of U.S. Government Activities to Combat Trafficking in Persons, Fiscal Year 2012 1 (2014).

36.     The U.S. State Department, the U.S. Department of Labor, the International Labor Organization (ILO), and UNICEF, among others, have recognized since the late 1990s the existence of child slavery in the cocoa sector in Côte d'Ivoire with documented reports and statistics.  Notable non-governmental organizations have also independently confirmed that many, if not most, of the children working on Ivorian cocoa plantations are being forced to work as slaves without any remuneration.

37.     In 1997, UNICEF reported that children from the neighboring countries of Mali and Burkina Faso are being trafficked to Côte d'Ivoire to harvest cocoa beans. *See* Carol Bellamy, *The State of the World's Children 1997: Focus on Child Labour*, Oxford University Press for UNICEF (1996).  The ILO estimates there are 378,000 children working in Côte d'Ivoire in various sectors of the economy.  International Programme on the Elimination of Child Labour, ILO, *Combating Trafficking in Children for Labour Exploitation in West and Central Africa* (2001).  The U.S. State Department has also estimated that there were at least 15,000 child laborers working on cocoa, coffee, and cotton farms in 2004.  Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Country Reports on Human Rights Practices, 2004: Côte d'Ivoire* (2004).

38.     Children on Ivorian cocoa plantations are subjected to what the International Labor Organization (ILO) prohibits with Convention No. 182 governing the "Worst Forms of Child Labor" – including trafficking, slavery, and exposure to toxic chemicals and hazardous tools.[7]

---

[7] https://www.ilo.org/ipec/facts/WorstFormsofChildLabour/lang--en/index.htm.

39.     A study conducted in 2015 by Tulane University concluded that the number of Ivorian children engaged in the Worst Forms of Child Labor on cocoa plantations substantially *increased* between 2009 and 2014. During the 2013–14 harvest season, 1,203,473 child laborers aged 5 to 17 were found to be working on cocoa farms in Côte d'Ivoire, with 95.9 percent engaged in hazardous work in cocoa production. The work children engage in on the cocoa farms includes burning and clearing fields, cutting down trees to expand cocoa plantations, spraying pesticides, using sharp tools to break pods, and transporting heavy loads of cocoa pods and water.[8] After the Tulane Report was issued, the companies renewed their false assurances to consumers and regulators that they would initiate programs to reduce child labor in their supply chains. Rather than make progress, child labor in cocoa production dramatically increased again. In October 2020, the NORC Report, a follow on of the Tulane Report and also funded by the U.S. Department of Labor, released its updated research and found that child labor had *increased again* in cocoa production. Child labor in cocoa production in Côte d'Ivoire and Ghana rose to 1.56 million children in the 2018/19 harvest season and the prevalence rate of children involved in hazardous child labor in the cocoa sector rose to 1.48 million children.[9] This is an overwhelming indicator of the lawlessness of the cocoa sector that resulted in Plaintiffs being trafficked into a system of forced child labor.

---

[8] https://www.dol.gov/sites/default/files/images/ilab/child-labor/CotedIvoire.pdf, at p. 1.
[9]  NORC Report at 10.

20

40.     The U.S. Department of Labor describes the conditions of forced labor

in chilling detail:

> [s]ome children are sold by their parents to traffickers, some are kidnapped, and others migrate willingly but fall victim to traffickers who sell them to recruiters or farmers, where they end up in conditions of bonded labor. Some farmers buy the children and refuse to let them leave the farm until the debt of their purchase has been worked off. The children are frequently not paid for their work; some of their wages are paid to the recruiter or trafficker. These children are held against their will on isolated farms, are locked in their living quarters at night, and are threatened and beaten if they attempt to escape. They are punished by their employers with physical abuse. They are forced to work long hours, including overtime, and are required to work even when they are sick. Some children are denied sufficient food by their traffickers and employers.[10]

41.     With its workforce of children performing hazardous labor, many of them

trafficked from Mali, like Plaintiffs herein, and Burkina Faso, Côte d'Ivoire has emerged

as the largest exporter of cocoa in the world, providing 70% of the world's supply. A

majority of this cocoa is imported to the U.S. by the named Defendants herein. Indeed,

journalist Carol Off explains in her 2006 book "*Bitter Chocolate: Investigating the Dark Side*

*of the World's Most Seductive Sweet*" that the "dirty work" of buying and selling cocoa beans

in this conflict-ridden country has become the domain of large multinationals such as

Defendants. Since the 1990s, Côte d'Ivoire cocoa production has been controlled by

these companies with the unilateral goal of finding the cheapest sources of cocoa.

42.     In *DOE I v. Nestlé USA Inc.*, the Ninth Circuit stated:

> The use of child slave labor in the Ivory Coast is a humanitarian tragedy. Studies by International Labour Organization, UNICEF, the Department of State, and numerous other organizations have confirmed that thousands of

---

[10] https://www.dol.gov/sites/default/files/documents/ilab/EO_Report_2014.pdf, at p. 12.

children are forced to work without pay in the Ivorian economy.  Besides the obvious moral implications, this widespread use of child slavery contributes to poverty in the Ivory Coast, degrades its victims by treating them as commodities, and causes long-term mental and physical trauma.

766 F.3d 1013, 1017 (9th Cir. 2014).

43.    There are two films by Miki Mistrati in the public realm that reveal in shocking detail the realities of child slavery in the cocoa sector, *The Dark Side of Chocolate* and *Shady Chocolate*. Defendants knew or should have known about the graphic horrors of child slavery in their supply chains as shown in these films.

44.    The Washington Post recently published a major exposé on the continued and extensive use of children, many of them trafficked into forced labor, performing hazardous work harvesting cocoa for Defendants in Côte d'Ivoire.[11]

## B. Defendants and other major cocoa producers knowingly profit from and benefit from the use of trafficked and forced child labor.

45.    All Defendants, with their businesses dependent on cocoa from Côte d'Ivoire, have a major presence in Côte d'Ivoire. All of them have managers stationed there and send buyers and others to interact with the farmers, including to provide support and training as described herein. Further, through their membership and participation in industry groups like the World Cocoa Foundation (WCF) and the International Cocoa Initiative (ICI), both of which have offices in Abidjan and act on

---

[11] https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/?utm_term=.6cb753bcb6f8

behalf of Defendants and their other members, Defendants have knowledge of all public reports, such as those referenced in the preceding section. Indeed, Defendants, through WCF and ICI, were given advance access to the NORC Report before it was made available to the public. These Defendants are constantly monitoring all aspects of child labor in the cocoa sector, not because they care about the children, but to try to manage their public relations. They also have specific knowledge based on having significant numbers of staff charged with researching and knowing the conditions on cocoa plantations in Cote D'Ivoire.

46.     As the Court of Appeals for the Ninth Circuit stated in *Doe I. v. Nestlé USA, Inc.* (*Doe I*), 766 F.3d 1013 (9th Cir. 2014), with reference to allegations made in a pending ATS case against Defendants Nestlé and Cargill, but equally applicable to the other Defendants herein, Plaintiffs' allegations that the major cocoa companies knowingly benefited from the use of child slave labor in Côte d'Ivoire are credible:

> [T]he Ivory Coast remains a critical part of the international chocolate industry, producing seventy percent of the world's supply of cocoa. The defendants in this case dominate the Ivorian cocoa market. Although the defendants do not own cocoa farms themselves, they maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms. The defendants are largely in charge of the work of buying and selling cocoa and import most of the Ivory Coast's cocoa harvest into the United States. The defendants' involvement in the cocoa market gives them economic leverage, and along with other large multinational companies, the defendants effectively control the production of Ivorian cocoa.
>
> To maintain their relationships with Ivorian farms, the defendants offer both financial assistance and technical farming assistance designed to support cocoa agriculture. The financial assistance includes advanced payment for cocoa and spending money for the farmers' personal use. The technical support includes

23

equipment and training in growing techniques, fermentation techniques, farm maintenance, and appropriate labor practices. The technical support is meant to expand the farms' capacity and act as a quality control mechanism, and either the defendants or their agents visit farms several times per year as part of the defendants' training and quality control efforts.

The defendants are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations.

**Despite their knowledge of child slavery and their control over the cocoa market, the defendants operate in the Ivory Coast "with the unilateral goal of finding the cheapest sources of cocoa." The defendants continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions will facilitate the use of forced child labor**. The defendants have also lobbied against congressional efforts to curb the use of child slave labor. In 2001, the House of Representatives passed a bill that would have required United States importers and manufacturers to certify and label their products "slave free." The defendants and others in the chocolate industry rallied against the bill, urging instead the adoption of a private, voluntary enforcement mechanism. A voluntary enforcement system was eventually adopted, a result that, according to the plaintiffs, "in effect guarantee[d] the continued use of the cheapest labor available to produce [cocoa]—that of child slaves."

*Doe I,* 766 F.3d at 1017-19 (quotations to Plaintiffs' First Amended Complaint) (emphasis added).

47.    The Ninth Circuit further commented:

**The defendants' control over the Ivory Coast cocoa market further supports the allegation that the defendants acted with the purpose to facilitate slavery**. According to the complaint, the defendants had enough control over the Ivorian cocoa market that they could have stopped or limited the use of child slave labor by their suppliers. The defendants did not use their control to stop the use of child slavery, however, but instead offered support that facilitated it. Viewed alongside the allegation that the defendants benefitted from the use of child slavery, the defendants' failure to stop or limit child slavery supports the inference that they intended to keep that

system in place. ***The defendants had the means to stop or limit the use of child slavery, and had they wanted the slave labor to end, they could have used their leverage in the cocoa market to stop it. Their alleged failure to do so, coupled with the cost- cutting benefit they allegedly receive from the use of child slaves, strongly supports the inference that the defendants acted with purpose.***

The defendants' alleged lobbying efforts also corroborate the inference of purpose. According to the complaint, the defendants participated in lobbying efforts designed to defeat federal legislation that would have required chocolate importers and manufacturers to certify and label their chocolate as "slave free." As an alternative to the proposed legislation, the defendants, along with others from the chocolate industry, supported a voluntary mechanism through which the chocolate industry would police itself. The complaint also alleges that when the voluntary enforcement system was eventually put into practice instead of legislation, it "in effect guaranteed the continued use of the cheapest labor available to produce [cocoa]—that of child slaves."

***

***Thus, the allegations suggest that a myopic focus on profit over human welfare drove the defendants to act with the purpose of obtaining the cheapest cocoa possible, even if it meant facilitating child slavery. These allegations are sufficient to satisfy the mens rea required of an aiding and abetting claim under either a knowledge or purpose standard.***

*Id.* at 1024-27 (emphasis added).

48.     Trafficked or forced child labor is akin to child slavery, and this provides

Defendants with cheap—in most cases free—and pliant labor to harvest their cocoa.

**C. Knowing that they are financially benefiting from trafficked children who perform hazardous forced labor, and having the industry control to effectively end child slavery, Defendants have willfully continued to use forced child labor and have acted to prevent effective measures to address forced child labor so they could continue to benefit from the cheap labor of child slaves.**

49.     The Ninth Circuit found in *Doe I* that the Plaintiffs there sufficiently alleged that Defendants "control the production of Ivorian cocoa" and that they "had the means to stop or limit the use of child slavery."  766 F.3d at 1017, 1025. This is equally true with respect to all Defendants herein—they control the production and could, if they wanted to, stop profiting from child labor. Instead they chose to delay taking action by creating ineffective programs that provide public relations cover for their obviously failed efforts.  The reason is clear, as the *Doe I* Court found: "[r]eading the allegations in the light most favorable to the plaintiffs, one is led to the inference that the defendants placed increased revenues before basic human welfare and intended to pursue all options available to reduce their cost for purchasing cocoa. Driven by the goal to reduce costs in any way possible, the defendants allegedly supported the use of child slavery, the cheapest form of labor available." *Id.* at 1024.

50.     The history and methodology of the exploitation of child slaves in Côte d'Ivoire by the Defendants and other multinationals is virtually undisputed. Defendants were able to obtain an ongoing, cheap supply of cocoa by maintaining exclusive supplier/buyer relationships with local farms and/or farmer cooperatives in Côte d'Ivoire.  Through these exclusive supplier/buyer relationships, maintained in the form

of memorandums of understanding, agreements, and/or contracts, both written and oral, Defendants are able to dictate the terms by which such farms produce and supply cocoa to them, including specifically the labor conditions under which the beans are produced. Despite this control and their specific knowledge of the pervasive use of child labor by the farmers harvesting cocoa for them, Defendants have failed to stop the illegal use of forced child labor in cocoa harvesting.

51.     Defendants, through their staff and agents operating within Cote D'Ivoire, control such conditions by providing local farmers and/or farmer cooperatives with, *inter alia*, ongoing financial support, including advance payments and personal spending money to maintain the farmers' and/or the cooperatives' loyalty as exclusive suppliers; farming supplies, including fertilizers, tools, and equipment; and training and capacity building in particular growing and fermentation techniques and general farm maintenance to grow the quality and quantity of cocoa beans they desire. The training and quality control visits occur several times per year and require frequent and ongoing visits to the farms either by Defendants directly or via their contracted agents. Defendants and their agents constantly witness illegal child labor on the plantations under their control.

52.     Defendants have acted to prevent effective measures to end their profiting from child slavery and have enacted programs designed mainly to allow them to stall, delay and continue profiting from child slavery. In 1999, various labor rights and consumer groups, including the International Labor Rights Fund and the Child Labor

Coalition, began a campaign in the U.S. to pressure the companies to stop using child labor and to pay the adult workers a living wage. They worked with (then) Congressman Bernie Sanders and Rep. Elliot Engel to introduce legislation to ban the importation of cocoa (and other products) harvested by child labor. In 2001, that bill passed by a 291-115 vote in the House and went to the Senate, where Senator Tom Harkin sponsored it. However, the pending legislation, known as the Harkin-Engel bill, was halted before a Senate vote due to intense industry lobbying against a mandatory program with real consequences. Once the lobbyists were done with the bill, it was transformed to the 2001 Harkin-Engel Protocol, a "voluntary" initiative that gave the participating companies until 2005 to "phase out" the use of child labor.

53.    In 2005, cocoa industry leaders representing Defendants and other chocolate companies producing in Côte d'Ivoire admitted the goals would not be "fully met" by the 2005 deadline, but assured Sen. Harkin and Rep. Engel they were "committed to achieving a certification system…within three years."[12] Then, in 2008, industry leaders, including Defendants, again unilaterally extended their self-imposed deadline by two years.[13] In 2010, the industry delayed the implementation date by a full decade to 2020, and this time the goal was changed to merely reducing by 70% the use of child labor in the cocoa industry. At the 8th Annual WCF Meeting in July 2018 the

---

[12]http://www.cacao.gouv.ci/commun/documents/jointstatementSenateurTomHarkin.pdf.
[13]http://www.csrwire.com/press_releases/14132-Joint-Statement-from-U-S-Senator-Tom-Harkin-Representative-Eliot-Engel-and-the-Chocolate-and-Cocoa-Industry-on-the-Implementation-of-the-Harkin-Engel-Protocol-#

industry admitted it could not make its 2020 or even 2025 goal of eradicating child labor in the cocoa supply chain. Defendants are all key members of and participants in the WCF. Effectively abandoning any set date, the WCF admitted it was not likely it would meet its "aspiration for 2020" nor other targets "for the eradication of child labor by 2025."[14]

54.    Defendants' repeated delays in stopping their use of child slaves across **19 years** of falsely promising to do so in the Harkin-Engel Protocol while continuing to claim to be "committed" and "concerned" about the welfare of children demonstrates without doubt that Defendants are knowingly benefiting from forced child labor and are continuing to benefit from it as long as they can get away with it. Their "voluntary" initiative is a sham, and they are getting away with and profiting from an international human rights crime while claiming they are making progress. This was irrefutably demonstrated by the 2020 NORC Report showing that illegal child labor has increased since 2015 and there are now 1.6 million children harvesting cocoa. This lawless environment allows Defendants to continue to benefit from the forced child labor of Plaintiffs and members of the class.

55.    All of the Defendants are leaders of the WCF and are founding members of and participants in the WCF's "CocoaAction Plan." Among other things, the CocoaAction Plan purports to include a monitoring system, the Child Labor

---

[14] https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8thannual-meeting-remarks/

Monitoring and Remediation System (CLMRS), to ensure that there are no children working on Defendants' cocoa plantations. Like the Harkin-Engel Protocol, the CocoaAction Plan and the CLMRS are ineffective. Defendants know them to be so and purposefully set them up to be narrow and uncomprehensive. The CLMRS "monitoring," like the CocoaAction Plan, extends only to the small percentage of Defendants' supply chains. Further, CLMRS does not have any form of independent monitoring, and there are no consequences for a farmer using child slaves. Finally, there is no effective remediation for children found to be working as slaves and/or performing hazardous work using dangerous tools and spraying pesticides and herbicides without any protective equipment.

56.    In March 2019 interviews with the WCF, the ICI, and the Fair Labor Association (FLA), Plaintiffs' counsel learned that, at most, 20-30% of any producer's cocoa, including the Defendants' production, comes from plantations that are in cooperatives and that are participants in the CocoaAction Plan. The remaining 70-80% comes from the "free zones" where there is no monitoring of anything and there is a high incidence of forced child labor, including trafficked child labor. Defendants, as well as the WCF and ICI, are misleading the public and consumers by creating the false impression that the CocoaAction Plan extends to more than a small minority of farmers in their supply chains. In doing so, they willfully fail to disclose the scale of the overall use of child labor in cocoa harvesting. As previously noted, the NORC Report found that over 2 million children are harvesting cocoa, a number that dramatically dwarfs the

misleading numbers published by Defendants. In addition, there is still pervasive use of child labor in the subset of plantations in the CocoaAction Plan that the companies explain away by claiming without a factual basis that the child laborers are the children of the plantation owners. Further, regardless of whether some child workers are family members of the farmer using them, these children are performing hazardous work that no children are permitted to do under international standards.

57.     As a graphic example of the willful and ongoing use of child labor within the CocoaAction Plan, on September 2, 2015, the Fair Labor Association (FLA) released the results of its audit performed for Nestlé, one of the developers and promoters of the CocoaAction Plan.  The FLA explained that "[f]or Nestlé in Ivory Coast, the FLA has been monitoring since 2013 a growing portion of its cocoa supply served by the Nestlé Cocoa Plan (NCP). As of mid-2015, the NCP represented around 25 percent of Nestlé's total cocoa supply chain." In other words, Nestlé had the FLA audit the subset of its supplying cocoa farms where it had engaged in the most efforts to eradicate child and slave labor.  The FLA assessors visited a sample of 260 farms, less than 1% of the 30,000 that supply Nestlé in the Ivory Coast.

58.     The 2015 FLA report found that "[c]hildren younger than 15 continue to work at cocoa farms connected to Nestlé, more than a decade after the food company promised to end the use of child labour in its supply chain."  These children "were expected to work in hazardous conditions and carry out dangerous tasks, including using machetes and transporting heavy loads."  And the Fair Labor Association "found

evidence of forced labour, with a young worker not receiving any salary for a year's work at a farm."

59.    Further, groups like "Fair Trade" and Rainforest Alliance (which absorbed UTZ, the third labeling initiative) participate in this fraud by labeling all of their company partners' cocoa as  meeting their standards when they know that only 20 to 30 percent at most is even being partially monitored. Additionally, these so-called "fair trade" initiatives mislead the public by creating the false impression that they are certifying cocoa as child-labor-free when they do not in fact assess the extent of child labor in their member companies' production. The *Washington Post* recently exposed the reality of these sham programs that do little more than mislead consumers into thinking that "fair trade" means child labor free.[15]

60.    Any doubt that Defendants' child labor programs are shams intended to continue to mislead consumers and regulators while the companies continue to profit from child labor was removed by the NORC Report's finding in October 2020 that 1.56 million child laborers are working in cocoa production. [16]

---

[15]   https://www.washingtonpost.com/business/2019/10/23/chocolate-companies-say-their-cocoa-is-certified-some-farms-use-child-labor-thousands-are-protected-forests/
[16]   NORC Report at 10.

**D.** **Defendants all knowingly make misleading and false claims about their success in or intention of eradicating the use of child labor in order to allow them to continue to benefit from child slavery without consequence.**

61.     At least prior to the October 2020 release of the NORC Report, each of the Defendants boasted of programs purporting to be reducing or ending their reliance on child slaves to harvest their cocoa in Cote D'Ivoire, but, as the NORC Report has conclusively established, the so-called programs were less than useless and resulted in significant ***increases*** in child labor in cocoa production. Defendants are intentionally misleading regulators and the public to falsely portray the problem as resolved or minimized. This allows them to continue using and profiting from trafficked and forced child labor without consequence and to delay incurring actual costs of compliance with their own standards. Among other things, these company "standards" are Defendants' admissions that using trafficked or forced child labor is illegal and violates their policies. That they continue to do so establishes that they are knowingly benefiting from this admittedly illegal and horrific use of child slaves.

1.     **Defendant Nestlé**

62.     Nestlé acknowledges, as it must, that "there are children working on farms in Côte d'Ivoire in areas where we source cocoa."[17] Specifically, Nestlé acknowledges that "[t]oo many children are involved in hazardous farming tasks or

---

[17]http://www.Nestlécocoaplan.com/infographic-tackling-child-labour-in-our-cocoa-supply-chain/.

work on farms instead of going to school," that "there are situations of children carrying out unsafe tasks, using dangerous tools, carrying loads that are too heavy, suffering injuries and missing out on schooling," and that "[s]ome producers are also known to seek cheap labour by illegally using forced child or adult labour." The NORC Report confirms forced labor is an issue but declined to quantify the numbers.[18] But rather than take effective measures to stop using child labor and to help the children it has enslaved and profited from, Nestlé bombards the public with nice-sounding policies that are merely false assurances of its compliance with its own standards and universally recognized prohibitions on trafficking and using children to perform hazardous work.

63.     Nestlé's "Code of Business Conduct" states in section 1: "We respect the law at all times. Nestlé and its employees are bound by the law. Compliance with all applicable laws and regulations must never be compromised."[19] Nestlé's ongoing and admitted profiting from child slaves harvesting its cocoa violates universally recognized law prohibiting the use of young children to perform any work and certainly hazardous work.

64.     Nestlé's Responsible Sourcing Standard provides in section 2.2.5:

> "Minimum Age for Employment. In accordance with international labour standards, no person shall be employed under the age of 15 or under the age for completion of compulsory education, whichever is higher, except in the strict frame of the Family Farm Work described in 4.2.1: If the Supplier

---

[18]  NORC Report at 2.
[19] https://www.nestle.com/asset-library/documents/library/documents/corporate_governance/code_of_business_conduct_en.pdf

employs young workers, defined as between the ages of 15 and 18, it shall demonstrate that the employment of young people contributes to their personal education and does not expose them to undue physical risks that can harm physical, mental or emotional development."[20]

65.     Nestlé's known suppliers systematically violate this standard, and Nestlé profits from cocoa it obtains from the "free zone" in Côte d'Ivoire, where Nestlé knows the cocoa is produced by young children forced to perform hazardous work with many of them trafficked from Mali and Burkina Faso.

66.     Nestlé has published its Nestlé Cocoa Plan,[21] where it proclaims its professed goal and provides some numbers:

> **We believe that every child deserves the chance to create their own future**
>
> **40,728**
> 5-17 year olds are currently being monitored by the Nestlé Cocoa Plan CLMRS with scale-up continuing
> **5,232**
> Children being helped to date in the upstream supply chain by the Nestlé Cocoa Plan CLMRS
> **1/3**
> Around one third of Nestlé's total global cocoa supply is currently bought from Nestlé Cocoa Plan producers
> **7,002**
> Children identified as working on farms or in communities covered by the Nestlé Cocoa Plan

67.     Nestlé's Cocoa Plan admits that, at best, its monitoring activities extend to "1/3" of its supply chain. Officials at the WCF, the ICI and FLA admitted that

---

[20]https://www.nestle.com/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf.
[21] https://www.nestlecocoaplanreport.com/

35

number is high and that, at most, 20-30% of any member's cocoa supply chain is within any of their programs. Further, in another section of the Nestlé Cocoa Plan, Nestlé admits that out of the 70 co-operatives in Côte d'Ivoire that supply the small amount of traceable cocoa bought by Nestlé, only 22 co-operatives have implemented CLMRS.[22] In other words, even in the small number of cooperatives where the cocoa is traceable to known farmers, monitoring activities through the Nestlé Cocoa Plan CLMRS system take place in only a fraction of them.

68.     But even if Nestlé's 1/3 figure is accepted despite the facts, Nestlé is still slyly, implicitly admitting that 2/3 of its cocoa supply chain is **not** within its program, and officials at the WCF, ICI and FLA acknowledge that child labor is rampant in the "free zones" of cocoa production and that trafficked children also work in those areas. Exposing the true magnitude of Nestlé's sham program requires some digging and reading the fine print, something Nestlé hopes that most consumers and regulators simply won't do. In a different area of the Nestlé Cocoa Plan, Nestlé casually mentions that 1.9 *million* is the number of "Ivorian children estimated to be in child labour in cocoa growing areas" (emphasis added). This number is only for Côte d'Ivoire and does not even include Ghana, which rivals Côte d'Ivoire for producing cocoa with child labor. The NORC Report puts the total number of children harvesting cocoa at 1.56 million.[23] Knowing the actual numbers of children involved in cocoa production

---

[22] http://www.nestlecocoaplan.com/better-lives/
[23] NORC Report at 10.

certainly puts in cynical perspective Nestlé's claim to have "helped" 5,232 children in their cocoa supply chain (which also includes Ghana). This is .002%—that is, two-one thousandths of one percent—of the child labor in Côte d'Ivoire alone, less than a mere pittance, that one of the world's largest corporations is "helping" among the children it has been enslaving and profiting from for decades.

69.     The "Nestlé Cocoa Plan" is a clear attempt to vindicate the company to the public without requiring it to take tangible actions to eradicate this widespread scourge. The plan thus deceives consumers into believing that buying Nestlé's products will benefit farmers in Côte d'Ivoire and misleads them into thinking the products are child-labor- and slave-labor-free.

70.     Nestlé makes false assurances that it is "determined to tackle the problem"[24] and that its Nestlé Cocoa Plan is helping to "eliminate the use of child labour" and to "stamp out forced labour practices" in the Ivorian cocoa industry. Nestlé also claims that it is "helping the lives of farmers" through the Plan. However, Nestlé's profiteering off of child labor does not help the lives of farmers. **_Child labor has increased in Côte d'Ivoire since Nestlé instituted its "Cocoa Plan."_**[25] Nestlé has

---

[24] http://www.nestlecocoaplan.com/betterlives
[25] NORC Report at 10-12; School of Public Health and Tropical Medicine Tulane University, "Survey Research on Child Labor in West African Cocoa Growing Areas", Tulane University, 30 July 2015, at page 35.
https://makechocolatefair.org/sites/makechocolatefair.org/files/newsimages/tulane_university_-_survey_research_on_child_labor_in_the_cocoa_sector_-_30_july_2015.pdf.

yet to commit to paying farmers a fair price for their cocoa and does not currently have any long-term plans to support farmers achieving a living income.

71.     Even within the small percentage of plantations actually covered by Nestlé's Cocoa Plan, there is no effective monitoring or remediation. The sole monitoring is done with Nestlé's own Child Labor Monitoring and Remediation System (CLMRS), which purports to be a community-based monitoring system to identify and remediate child labor. Nestlé's plan relies on Community Liaison People (community auditors) to spot children engaged in labor activities, or on the children themselves who can self-declare that they are engaging in a hazardous activity.[26] There are no trained independent monitors and no consequences for farmers who use child slaves to harvest Nestlé's cocoa.

72.     Moreover, the Nestlé Cocoa Plan does not even try to certify that children are not being used as forced labor. Rather, it purports to include a voluntary reporting and monitoring system for identifying child labor. As of 2017, Nestlé claimed it had identified over 7,000 children working on farms covered by the Nestlé Cocoa Plan.[27] However, that number is deceptively understated. The World Cocoa Foundation states that: "The organized supply chains of a handful of companies reach only a fraction of

---

[26] http://www.nestlecocoaplan.com/better-lives/

[27] https://www.nestle.com/asset-library/documents/creating-shared-value/responsiblesourcing/nestle-cocoa-plan-child-labour-2017-report.pdf at p. 6.

the entire cocoa-growing population of Côte d'Ivoire and Ghana, and efforts to date have only reached a fraction of the farmers in those supply-chains."[28]

73.     Further, there is no indication of what happened to the 7,000 children supposedly identified by Nestlé as working on their farms. Any internationally acceptable monitoring program must include information regarding the status of children found to be performing hazardous labor. Were they simply fired and left to fend for themselves after Nestlé profited from their free labor? Did they simply continue working? Nestlé doesn't say.

74.     Nestlé, like the other Defendants, has been forced to admit that the vast majority of Nestlé's cocoa is sourced through untraceable channels, where absolutely no monitoring takes place and where forced child labor and trafficking occur on a widespread basis.

75.     In the face of its empty promises, Nestlé still had the chutzpa to oppose a proposed law in Australia that would require companies to report on child slaves in their supply chain. In late April 2019, Nestlé issued a warning against the proposed legislation that would require them to report on their efforts to weed out slavery within their company. The company claimed the cost of checking to see if they are forcing people to work against their will would end up being passed on to the consumer. There is no way for Nestlé to tell if it is on the verge of ending the use of child slaves, as it

---

[28]https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8thannual-meeting-remarks/.

claims, if it deliberately refuses to count or survey its operations. This refusal amounts to willful blindness.

76. In Nestlé's comprehensive "Nestlé in Society Full Report 2014," Paul Bulcke, Chairman of the Board of Directors of Nestlé S.A., is quoted as stating to the United Nations Annual Forum on Business and Human Rights that

> "[h]aving the right policies, procedures and management systems is good and necessary but it is not enough. It is the implementation, how you behave on the ground and the relationships you establish with different stakeholders, which create the trust necessary to be successful over time, as a company and as a society."[29]

77. Plaintiffs agree fully with this statement, and Nestlé has willfully failed to meet its own standard in this regard as well.

## 2.    Defendant Cargill

78. There is objective evidence in the public record that Defendant Cargill has a long record of environmental devastation, significant encroachment on and deforestation of delicate ecosystems that are home to indigenous peoples and endangered species, negative impact on small family farmers, and, of course, a long history of profiting from child slavery in cocoa production. Cargill is widely known as a company that puts out policy positions that are well-crafted by public relations experts and then ignored in the field.

---

[29] Nestlé in Society Full Report 2014, 214, http://storage.Nestlé.com/Nestlé-society-full-2014/index.html#195/z (last visited Aug. 17, 2015).

79.     Defendant Cargill has a major presence in Côte d'Ivoire. As Carol Off, author of *Bitter Chocolate*, notes, Cargill is possibly the largest privately-owned corporation in the world and its influence over the food we eat, in terms of where it comes from and how it is produced, is staggering. Cargill has a more visible presence in Côte d'Ivoire than the other Defendants, and there are numerous cocoa cooperatives large and small that have an exclusive relationship with Cargill. At one large cooperative in Duekoue that produces for Cargill, the owner told counsel for Plaintiffs that a local representative from Cargill visited his cooperative on a weekly basis and that a Cargill representative from the company headquarters visited about once a year.

80.     As part of their ongoing and continued presence on the cocoa farms in Côte d'Ivoire for purposes of quality control, pesticide eradication, cultivation assistance, harvesting, and packing and shipping, among other activities and assistance to the farmers, Cargill has first-hand knowledge of the widespread use of child slave labor in harvesting cocoa on the farms they were working with and purchasing from.

81.     Cargill, like the other Defendants, has knowledge of the widespread use of child labor harvesting cocoa on the farms they were working with and purchasing from based on the numerous, well-documented reports of child labor by both international and U.S. organizations.

82.     Since the Harkin-Engel Protocol was signed in 2001, Cargill has posted a series of promises and pledges about its intention to stop using child slaves in its supply chain. These promises and pledges were largely misleading: none of the stated objectives

for solving the child labor problem or reducing its incidence in Cargill's supply chain were met. Cargill's claims from 2005 to 2015 are detailed in the Second Amended Complaint in *Doe v. Nestle*, Case No. CV 05-5133-SVW-MRW (C.D. CA 2016) at ¶¶ 40 and 59.

83.     Cargill has recently rolled out a new set of promises and pledges to stop using child slaves that are likewise misleading and empty. On Cargill's "Ethics and Compliance" webpage, it lists a number of important guiding principles. Their number one stated principle is "**We obey the law.** Obeying the law is the foundation on which our reputation and Guiding Principles are built. As a global organization privileged to do business all over the world, we have the responsibility to comply with all of the laws that apply to our businesses."[30] Cargill's ongoing and admitted profiting from child slaves harvesting cocoa in its supply chain violates universally recognized law prohibiting the use of young children to perform any work and certainly hazardous work.

84.     Cargill also rolled out a new gimmick called the Cargill Cocoa Promise, which states, "We realize there is still a very long way to go before the future of cocoa and chocolate is truly secure. We are committed to doing more and, in 2017, we introduced five goals underpinned by measurable targets to be reached by 2030."[31] Goal

---

[30] https://www.cargill.com/about/ethics-and-compliance
[31] https://www.cargill.com/sustainability/cargill-cocoa-promise.

Two of the "Cargill Cocoa Promise" is "Community Wellbeing," with the specific goal of "Zero incidents of child labor in our supply chain by 2025."[32]

85.     On Cargill's website, the company describes its efforts to address the known child labor in its supply chain in Côte d'Ivoire that it and the other large cocoa companies promised to end back in 2001 when the Harkin-Engel Protocol was signed:

> The innovative model for child labor prevention and response, called Child Labor Monitoring and Remediation System (CLMRS), allows Cargill to go a step further in its efforts to eradicate child labor and is based on best practices developed by ICI. The system will be embedded in the monitoring and evaluation program for the Cargill Cocoa Promise, the company's responsible and sustainable cocoa program, and will be piloted this year in eight farmer cooperatives in Côte d'Ivoire reaching nearly 7,000 cocoa farming households. The system will help Cargill identify and understand incidences of child labor so that appropriate remediation activities can be undertaken. [33]

86.     As previously alleged in paragraph 55, *supra*, the CLMRS does not even purport to be a monitoring and certification system. There are no independent monitors, there are no surprise inspections, and there are no consequences to farmers or Cargill when child slaves are found to be working in Cargill's supply chain. These are the most basic foundations of a credible monitoring system.

87.     As part of the CLMRS, Cargill reports that:

> "[i]n September 2016, ICI started training Cargill's network of 'lead farmers,' a group of reliable and influential members of farmers' cooperatives working with the company, to serve as child labor agents and lead interventions that help children escape child labor. As trusted members of the community and cocoa farmers themselves, these lead farmers have been trained by ICI to conduct regular household interviews, collect and share relevant socio-

---

[32] Cargill-Cocoa-Promise-Report-2016-17.pdf at 7.
[33] https://www.cargill.com/2017/cargill-and-ici-improve-childrens-lives.

economic data via mobile technology and to provide education on the dangers of child labor."[34]

88.    Relying on farmers who have been using child slaves to now become "child labor agents" is an incredibly cynical example of hiring the fox to guard the chicken coup.

89.    The Cargill Cocoa Promise also assures consumers that Cargill "piloted [the company's responsible and sustainable cocoa program] this year in eight farmer cooperatives in Côte d'Ivoire reaching nearly 7,000 cocoa farming households."[35] Following **19 years** of doing virtually nothing since promising to do so in accepting the Harkin-Engel Protocol, Cargill's claim now that its objectively faulty program will reach "nearly 7,000 farming households" is shockingly inadequate. Cargill is clearly hoping that consumers and regulators without knowledge of the cocoa industry will be impressed that Cargill is reaching out in any way to 7,000 farms. But as Cargill well knows, that number represents a miniscule number of the farms producing cocoa. The WCF admits that: "The organized supply chains of a handful of companies reach only a fraction of the entire cocoa-growing population of Côte d'Ivoire and Ghana, and efforts to date have only reached a fraction of the farmers in those supply-chains. . . . There are approximately two million cocoa farmers in Côte d'Ivoire and Ghana representing 6-8 million children under the age of 18."[36] Cargill's "nearly 7,000 farms"

---

[34] https://www.cargill.com/2017/cargill-and-ici-improve-childrens-lives.

[35] https://www.cargill.com/2017/cargill-and-ici-improve-childrens-lives.

[36]https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8thannual-meeting-remarks/.

in its illusory Cocoa Promise program represents .0035 percent of the cocoa farms in Côte d'Ivoire and Ghana.

90.    Cargill also claims it is implementing an innovative "bar code" system to track bags of cocoa produced within the CLMRS system.[37] Again, even if this system worked perfectly, CLMRS is only operating in a small portion of Cargill's supply chain, and the rest of their cocoa comes from the unregulated free zone. Cargill admits that it is "piloting a program with farmers *in its direct supply chain* to create transparent systems that can follow more and more cocoa beans back to their source (emphasis added)."[38] This vague language is intended to exclude more than 70-80% of Cargill cocoa coming from the free zone. Further, based on an investigation by Plaintiffs' counsel in March 2019, the owner of one major Cargill cooperative of over 1,000 member farms admitted that he had not yet received training for the bar code system. He showed the bar code electronic device brand new in the box to Plaintiffs' counsel.

---

[37] https://www.cargill.com/story/building-a-traceable-sustainable-future-for-cocoa.
[38] https://www.cargill.com/story/building-a-traceable-sustainable-future-for-cocoa.



91.     The Cargill cooperative owner also admitted that there is no way that Cargill could know if farmers put cocoa beans in the Cargill bags that were produced outside of the CLMRS system. Without effective monitoring, farmers would be free to purchase beans from the free zone and pass them off as CLMRS beans and receive whatever premium Cargill offers for CLMRS beans.

92.     Cargill clearly has a long way to go to meet its stated goal of "Zero incidents of child labor in our supply chain by 2025."[39] But based on the long history of Cargill and the other Defendants doing virtually nothing since signing the Harkin-

---

[39] Cargill-Cocoa-Promise-Report-2016-17.pdf at 7.

Engel Protocol *19 years ago*, the goal is not to stop profiting from child slavery. The goal is to deceive regulators and the public and create the false impression that the Cargill Cocoa Promise is not yet another empty promise.  The alarming results of the NORC Report conclusively demonstrate that child labor is increasing while Cargill is touting its clearly broken "Cocoa Promise."

### 3.      Defendant Barry Callebaut

93.      In its "Forever Chocolate 2017/2018 Report," Defendant Barry Callebaut admits, as it must, that its current system is not sustainable and that cocoa farming is in dire need of systematic change to lift farmers out of poverty and to finally stop child labor. The company acknowledges its moral obligation to tackle the cocoa supply chain issues that perpetuate child labor, including structural poverty.[40]

94.      Defendant Barry Callebaut claims that it is now working to make sustainable chocolate the norm. With its "Forever Chocolate" plan, Barry Callebaut pledges that by 2025, they will have eradicated child labor, as well as lifted 500,000 farmers out of poverty.[41] Again, this is a firm admission that, at least until 2025, child labor and other abuse will still be present in the company's supply chain. Given the

---

[40] BARRY CALLEBAUT, FOREVER CHOCOLATE REPORT 2017-2018, https://www.barry-callebaut.com/en/group/media/news-stories/barry-callebaut-publishes-forever-chocolate-progress-report-201718 (Last visited January 27, 2020).

[41] BARRY CALLEBAUT, FOREVER CHOCOLATE STRATEGY, https://www.barry-callebaut.com/en/group/forever-chocolate/forever-chocolate-strategy/thats-what-forever-chocolate-all-about (Last visited April 24, 2019).

broken promises of all Defendants since 2001 to end the exploitation of child labor in their supply chains, these new promises by Barry Callebaut and some of the other Defendants to end exploitation by 2025 are very likely going to be broken as well.

95.    In its Forever Chocolate Plan, Barry Callebaut claims that they have started rolling out a cloud-based geo-traceability app that is enabling them to track a bean to the individual farmer and that this system will help them achieve a high level of traceability in major cocoa sourcing countries to meet their 2025 goal of having 100 percent sustainable ingredients in all their products.[42] However, there is no indication of how they will ensure that the farmers whose beans they are purporting to track are not using child labor.

96.    Barry Callebaut does claim that their use of the Child Labor Monitoring and Remediation Systems (CLMRS) and awareness training in collaboration with the International Cocoa Initiative (ICI) and the World Cocoa Foundation (WCF) will provide the necessary monitoring to back up their supply chain transparency. However, as previously alleged in paragraph 55, *supra*, CLMRS appears to be a scam to merely create the appearance of meaningful monitoring and remediation. CLMRS does not provide for independent monitoring or remediation, and there are no consequences for farmers using child slaves. Most fundamentally, CLMRS is being applied to a very small percentage of Defendants' supply chains. Reading the fine print of Barry Callebaut's

---

[42] BARRY CALLEBAUT, FOREVER CHOCOLATE PLAN, (November 2016), https://www.barry-callebaut.com/sites/default/files/2019-01/barry-callebaut-forever-chocolate-plan-book.pdf (Last visited April 24, 2019)

claims demonstrates this graphically. The company claims to have deployed monitoring and remediation in 21 farmer groups in Ghana and Côte d'Ivoire conjointly, covering a total of 12,018 farmers in 2017/2018. This represents at most only 12 percent of the farmer groups from which they **_directly_** source in these two countries.[43] As the ICI and the WCF admit, farmers in Defendants' direct supply chains are only about 20-30 percent of their supply chains, and the CLMRS program is not being applied to the remaining 70-80 percent of farmers in the "free zone" that make up the vast majority of the beans any Defendant, including Barry Callebaut, utilize.

97.    Barry Callebaut admits that it has found 4,230 cases of child labor in its supply chain during 2017-18.[44] In 2016/2017, its program had touched a minimal number of farmers, representing 3.2 percent of its farmer groups,[45] making any further claims of sustainability unfounded. Barry Callebaut claims to tackle the issue of child labor through awareness training in farmers' communities. According to the company, systematic change must happen from within farming communities who need to be aware "of the consequences of the worst forms of child labor for a child's development, education, and quality access to primary, secondary and vocational education."[46] The report also sheds light on its plan to "create a movement" by signing letters of intent with the Ivorian and Ghanaian governments to "spell out a commitment to increase

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*

cooperation on the eradication of the Worst Forms of Child Labor."[47] These self-policing measures have been failing miserably for years.

98.     Barry Callebaut's Supplier Code of Conduct confirms that it knows what the legal requirements are that prohibit the use of child labor in cocoa harvesting. Its code directs that its suppliers are prohibited from using child labor in their operations and must respect and realize the principles set forth in the ILO convention Nos. 138 and 182, respectively, on the minimum age for employment and on the worst forms of child labor.[48] Barry Callebaut claims to reserve the right to terminate its business relationship with the supplier if it does not take action to remediate non-compliance issues.[49] Barry Callebaut's Code of Conduct accordingly condemns forced labor, child slavery and other practices that exploit children or expose them to harmful conditions.[50] There is no record of enforcement of these clear objectives, and given that Barry Callebaut's supply chain is still riddled with child slavery, its Code of Conduct serves only to be a clear admission that the company is **_knowingly_** violating fundamental laws and principles as it continues to profit from child slavery. The NORC Report confirms that, rather than make progress on even reducing child labor, it has increased since Barry Callebaut rolled out its clearly unenforced Code of Conduct.

---

[47] *Id.*
[48] BARRY CALLEBAUT, SUPPLIER CODE OF CONDUCT (February 2018), https://www.barry-callebaut.com/sites/default/files/2019-01/barry_callebaut_supplier_code_en_final_1.pdf (Last visited April 24 2019) at 5.
[49] *Id.* at 9.
[50] BARRY CALLEBAUT, CODE OF CONDUCT (2016), https://www.barry-callebaut.com/sites/default/files/2019-01/coc_2016_english.pdf (Last visited April 24, 2019) at 9.

4.      **Defendant Mars**

99.      Defendant Mars, by far the largest manufacturer of chocolate in the world,[51] likewise must admit the ongoing existence of child labor and forced child labor in its supply chain. After years of knowingly benefiting from child slavery, it claims it is trying to fix the problem with its "5 Principle Plan."[52] These 5 principles are "Quality, Responsibility, Mutuality, Efficiency and Freedom to life every day."[53] Mars has developed a "Global human rights approach" to focus its principles on issues of human rights violations.  Specifically, Mars states that its "Supplier Code of Conduct outlines our global human rights expectations of all first-tier suppliers, including workplace standards and guidelines aligned with the International Labour Organization's Fundamental Principles and Rights at Work. It prohibits the use of prison, slave, bonded, forced and indentured labor and human trafficking."[54] This includes "Child labor, forced labor, including slavery and human trafficking, and migrant labor."[55] As with the other Defendants, these high-minded words and standards merely serve to prove that Mars admits its ongoing use of child slavery violates all of these standards.

---

[51] https://www.icco.org/about-cocoa/chocolate-industry.html
[52] Mars, "The Five Principles" at https://www.mars.com/about/five-principles
[53] Id.
[54] Mars, "California Transparency in Supply Chain Act," at https://www.mars.com/legal/ca-upply-chain-act
[55] Id.

100.   Mars continuing to profit from child slavery violates the sacred and fundamental principles to which Mars purports to adhere. Such admissions can be found in their Human Rights Policy statement:

> Significant, complex and systemic human rights issues persist in the global economy and affect people in a number of extended supply chains that we ultimately rely on as a business. These challenges are often linked with poverty, weak rule of law or the vulnerability of migrant workers. For example, the International Labour Organization (ILO) estimates that more than 85 million children are working under hazardous conditions, most in the agriculture sector, and that more than 21 million people are victims of forced labor around the world. Mars does not control and has very limited influence over operations in our extended supply chains. Nevertheless, we believe these practices are unacceptable and that we must renew our individual and collective efforts to take action, boldly test new approaches and form new collaborations to drive sustained progress.[56]

> In consultation with human rights experts and through thorough review of publicly-available data we have identified forced labor and child labor as the human rights issues that may pose the most severe risk to people in our extended supply chains.[57]

> At Mars, we seek to promote and respect human rights across our entire value chain. From factory workers in Chicago to farmers in Cote D'Ivoire, we believe everyone touched by our business should be treated with dignity, fairness and respect.[58]

101.   Mars claims to have a plan to address its ongoing use of child slavery in 5 steps.[59] First, Mars will work on verifying the supply chain, not through traceability, but

---

[56] Mars, "Human Rights Position Statement" at https://www.mars.com/global/about-us/policies-and-practices/human-rights-position-statement
[57] *Id.*
[58] Mars, "Our Approach to Respecting and Promoting Human Rights" at https://www.mars.com/sustainability-plan/thriving-people/promoting-human-rights
[59] Mars, "California Transparency in Supply Chain Act," at https://www.mars.com/legal/ca-supply-chain-act

by giving the third-party cocoa suppliers Mars' "supplier code of conduct" and encouraging suppliers to implement relevant systems. Additionally, it "periodically engage[s] suppliers in training and awareness raising to drive continuous improvements." Second, Mars is aiming to fix human rights abuses by auditing suppliers. "If a supplier repeatedly fails to meet our Code and other verification standards and does not credibly commit to meeting them in a given time period, we may terminate our relationship." Third, Mars is promoting the certification of suppliers, only requiring that "suppliers . . . maintain transparent records to demonstrate compliance with applicable law and regulations." Fourth, Mars aims to build international accountability, which is done through "purchasing teams and buyers . . . tak[ing] a course in responsible sourcing and hav[ing] related criteria embedded in their personal development plans." Finally, Mars aims to increase training for Mars associates. This self-monitoring that relies on training for the people who have knowingly profited from child slavery—and continue to do so—is nothing more than a public relations ploy to hide Mars' ongoing use of child slavery. While WCF lists Mars as one of the nine companies committed to "CocoaAction,"[60] Mars does not discuss this sham program, *see* paragraphs 55-57, *supra,* in its own materials.

---

[60] https://www.worldcocoafoundation.org/blog/tackling-child-labor-in-the-cocoa-sector-an-industry-viewpoint-of-a-work-in-progress/

102.   Mars, while admitting it still has child slaves in its supply chain, doubles down on emphasizing that the use of child slavery violates international law, U.S. law, California law, and Mars' own standards:

> In accordance with the UN Guiding Principles, we will implement a due diligence process to identify, mitigate and prevent adverse impacts on human rights and appropriate mechanisms for remediation. No matter where we operate, Mars strives to comply with the spirit and the letter of the law. Where local laws are less stringent than our Policy, we will operate in accordance with our standards. If there is a lack of clarity on the competing claims of rights bearers, we will work with stakeholders to seek resolutions that are consistent with this Policy.[61]

> We are seeking to advance respect for human rights in our extended agricultural supply chains, which reach past our first-tier suppliers all the way to the farm or fishery level. Some of the most serious human rights issues in our value chain may be at the farthest ends of our agricultural supply chains, where our influence and visibility are typically low.[62]

> Our Supplier Code of Conduct . . . includes 10 workplace standards that meet or exceed International Labour Organization guidelines. The content in the Code is aligned with the U.K. Bribery Act, the U.S. Foreign Corrupt Practices Act and the California Supply Chain Transparency Act. It sets our global expectations prohibiting the use of child labor in accordance with ILO Minimum Age Convention No. 138 and in the areas of health and safety, the environment and ethical business practices.[63]

103.   In emphasizing new promises to improve compliance in its supply chain, Mars fails to inform the public and regulators what it knows: according to WCF and ICI, Mars, like the other Defendants, gets 70 to 80 percent of its cocoa from the "free

---

[61] Mars Human Rights Policy, found at: https://www.mars.com/global/about-us/policies-and-practices/human-rights-policy
[62] Mars, "Our Approach to Respecting and Promoting Human Rights" at https://www.mars.com/sustainability-plan/thriving-people/promoting-human-rights
[63] Mars Human Rights Policy, at: https://www.mars.com/global/about-us/policies-and-practices/human-rights-policy

zone," and there is absolutely nothing in Mars' sham plan to address the child slavery and trafficking in the "free zone." And as the NORC Report makes clear, child labor has dramatically increased in the years since Mars launched its failed program.

### 5.      Defendant Hershey

104.    According to the International Cocoa Organization, Hershey is the fifth largest manufacturer of chocolate products in the world, ahead of Defendant Nestle.[64] Hershey's own materials about its programs and its use of child slaves are deceptive and incomplete. There is not even a mention of Côte d'Ivoire or child labor on its official website, https://www.thehersheycompany.com. While WCF lists Hershey as one of the nine companies committed to "CocoaAction,"[65] Hershey does not discuss this sham program, *see* paragraphs 55-57, *supra*, in its own materials. However, there is no question that Hershey is one of the WCF companies that has endorsed CocoaAction, but Hershey appears to hope that lying low and not making claims about what it is doing, and more importantly, ***not*** doing, in Côte d'Ivoire to stop profiting from child slavery will divert attention from the issue. Hershey uses significant cocoa from Côte d'Ivoire, including cocoa from the "free zones." Hershey, like the other Defendants, is profiting from child slavery.

---

[64] https://www.icco.org/about-cocoa/chocolate-industry.html.
[65]https://www.worldcocoafoundation.org/blog/tackling-child-labor-in-the-cocoa-sector-an-industry-viewpoint-of-a-work-in-progress/

105.   The only facts that can be learned from the Hershey website are that it knows that profiting from child slavery violates international law, U.S. law, and its own code of conduct and supplier standards. In its *Statement Against Slavery and Human Trafficking*, Defendant Hershey states that it is "committed to having a responsible, sustainable and ethical supply chain."[66] This document also states that:

> Hershey is committed to purchasing 100% certified and sustainable cocoa, and each certification program prohibits the use of forced and illegal child labor. (p. 1)

> Hershey uses independent, third-party auditors to conduct social audits of our own manufacturing sites, contract manufacturers and our suppliers. These audits are conducted to the SEDEX Member Ethical Trade Audit (SMETA) standard developed by the Associate Auditor Group of the Sustainable Ethical Data Exchange (SEDEX). SMETA is a prescriptive audit procedure that is a compilation of effective ethical audit techniques covering Health and Safety, Labor Standards, Environment and Business Ethics, and other criteria such as forced labor and human trafficking. We share the audits of our facilities with our customers through SEDEX, a platform that facilitates swift exchange of audit information. We also request social audits of our suppliers and partners to ensure compliance with our Supplier Code of Conduct. We will continue to regularly conduct these audits at our own facilities and will continue to request these audits of our suppliers as we expand into new geographies around the world. (p. 1)

> Our Code of Conduct is distributed to all Hershey employees and is supplemented by targeted training and communications addressing the values set forth within it. Every year, employees must complete training modules or acknowledge the standards, guidelines and practices set forth in our Code of Conduct. Non-compliance with the Code of Conduct and related Company policies may subject employees to discipline, up to and including termination. (p. 3)

---

[66]Available at https://www.thehersheycompany.com/content/dam/corporate-us/documents/pdf/HSY_Statement_Against_Human_Trafficking_and_Slavery.pdf.

106.    In this _Code of Conduct_,[67] Defendant The Hershey Company states that:

> Our business is built on a long, interdependent supply chain, and we want every link to be solid and strong. We have zero tolerance for the worst forms of child labor as defined by International Labor Organization Conventions 138 and 182 and expect suppliers to support and participate in industry efforts aimed at eliminating these kinds of practices wherever they exist. We respect the rights of every individual and believe that anyone employed by Hershey or Hershey suppliers should be treated with dignity and respect, paid a fair wage based on applicable law and assured of safe working conditions. (p. 11)

> As a company, we respect the rights of every individual and abide by the employment laws in the markets where we operate. We support the principles established under the United Nations Universal Declaration of Human Rights and do not knowingly conduct business with any individual or company that participates in the exploitation of children (including child labor), physical punishment, forced or prison labor or human trafficking. (p. 11)

> Hershey encourages its employees to "[f]ollow the employment laws where you work, be alert to abuses and speak up if you see or suspect possible labor law or human rights violations." (p. 11)

107.    Hershey also has available on its website its _Supplier Code of Conduct_,[68] which it describes as the "backbone of Hershey's commitment to a responsible and sustainable supply chain." _Statement Against Slavery and Human Trafficking_ (p. 1). The _Supplier Code of Conduct_ lays out Hershey's policies with regard to, among other things, child labor:

- Hershey is committed to the elimination of the "worst forms of child labor," as defined by International Labor Organization (ILO) Convention 138 & 182, from its supply chain. We expect our suppliers to support and participate in industry efforts aimed at the elimination of such practices wherever they exist in the supply chain.
- Children should not be kept from school to work on the farm.

---

[67] Available at https://www.thehersheycompany.com/content/dam/corporate-us/documents/investors/code-of-conduct.pdf
[68] Available at https://www.thehersheycompany.com/content/dam/corporate-us/documents/partners-and-suppliers/supplier-code-of-conduct.pdf

- Children should not carry heavy loads that harm their physical development.
- Children should not be present on the farm while farm chemicals are applied.
- Young children, generally considered to be under 14 years of age, should not use sharp implements.
- Trafficking of children or forcing children to work are included among the Worst Forms of Child Labor (WFCL). (p. 4)

108.   The Code further states:

Suppliers should have adequate monitoring and record keeping systems to ensure compliance with the Code. The Hershey Company reserves the right to monitor, review and verify compliance with the Code. (p. 7)

109.   Hershey states that for suppliers who do not comply with the Code, "corrective actions will be set forth, in order to comply with laws and regulations. The Hershey Company reserves the right to terminate its business relationship with a Supplier who is unwilling to comply with the Code." (p. 7)

110.   Hershey's website further states, on its Responsible Sourcing page,[69] that its Global Sourcing Policies include dedication to "a transparent supply chain." Hershey promises that "[w]e are committed to complying with the California Transparency in Supply Chains Act of 2010, as well as the United Kingdom Modern Slavery Act. As part of our commitment to Good Business practices, we constantly strive to ensure our supply chains are responsibly managed."

---

[69] https://www.thehersheycompany.com/en_us/shared-goodness/shared-business/responsible-sourcing.html

111.   Hershey, like the other Defendants, knows that it has been profiting from child slavery for years, and since 2001, when it endorsed the Harkin-Engel Protocol through the Chocolate Manufacturers Association and later through the WCF, it has failed to take effective action to stop profiting from child slavery. The NORC Report dramatically establishes that Hershey, like the other Defendants, has continued to benefit from increased numbers of child workers in its cocoa supply chain.

**6.      Defendant Mondelēz International, Inc**

112.   Defendant Mondelēz International states:

> Ending child labor across the West African cocoa sector is more than Mondelēz International can do alone, so we collaborate with all actors of the cocoa supply chain. Through our involvement with the <u>World Cocoa Foundation (WCF)</u> and the <u>International Cocoa Initiative (ICI)</u>, we support a systemic approach to address the root causes of child labor and call for strong public-private partnerships with governments, development partners and civil society organizations.[70]

113.   Defendant Mondelēz International thus admits that there is still child slavery in its supply chain, and indirectly, that it is still profiting from child slavery. Like most of the other Defendants, it is doing nothing to stop profiting from child slavery. It instead chooses to refer the public and regulators to the "Cocoa Life" program, which relies upon the "monitoring" and "remediation" of the "CLMRS" system, which, as established in paragraph 55, *supra*, is a sham. There is no independent monitoring, no

---

[70] https://www.cocoalife.org/the-program/child-labor.

remediation, no consequences for using child slaves, and it applies, at most, to 20 to 30 percent of Defendant Mondelēz International's supply chain. Hoping to deceive or distract the consuming public and regulators, Defendant Mondelēz International goes on at length to describe its sham programs.

114.    Following the link to its Cocoa Life website, one can find an entire section dedicated to child labor.[71] This *Child Labor* page states that:

> Respecting and promoting human rights is a key principle of our framework as part of our work to ensure our cocoa communities are empowered and inclusive. Central to this work are our efforts to eliminate child labor and protect the rights of children.
>
> Cocoa Life is working with its partners to tackle child labor at its root causes with a holistic, community-centric approach. For instance, we are improving farmer livelihoods and empowering women—all of which help communities thrive, so that children can focus on education.

115.    Defendant Mondelēz International cites to studies it has commissioned that confirm "a high risk of child labor in the cocoa sectors of Côte d'Ivoire and Ghana—the world's two largest cocoa-producing countries." *Id.* Its strategy is to focus on "**prevention, monitoring and remediation**, with a heavy emphasis on addressing the root causes of child labor." *Id.* Mondelēz International lays out the key elements of its strategy:

> Cocoa Life's holistic approach addresses the root causes of child labor around poverty and lack of rural development: Through our Community Action Plans, we develop interventions to:

---

[71] https://www.cocoalife.org/the-program/child-labor.

- Increase income from cocoa farming as well as additional sources
- Empower communities to advocate for their own development
- Empower women at household and community level

Prosperous cocoa farms mean farmers are less likely to rely on their children to support in their work. Empowered women and communities, who understand their development needs, will push for their children to remain in school.

When we say 'community-based', we mean that like Cocoa Life, the CLMRS is centered on communities. To ensure the CLMRS are sustainable and able to run independently of Cocoa Life in the long-term, they also focus on building the capacity of the communities themselves, as well as that of public authorities to support them and fulfil their duty to protect human rights. That means, as part of our CLMRS, we:

- Set up and train Child Protection Committees to become the focal point within the community and primary liaison to school and district authorities
- Use government-developed tools to support national policies and avoid the creation of parallel systems
- Share all data with the authorities and refer identified cases for remediation whenever needed
- Take a broader lens and consider child rights beyond child labor, for instance setting up child reading clubs to empower children to advocate for their own rights

116. Defendant Mondelēz International also goes to great lengths to demonstrate that it knows that child slavery and profiting from child labor are abhorrent, illegal and unethical. The company states on its *Impact* page that its "future is rooted in helping people snack in balance and enjoy life with products that are safely and sustainably sourced, produced, and delivered."[72] It promises that "authenticity, integrity, and transparency guide us in every aspect of our business to create meaningful, lasting impact – for people and our planet." *Id.*

---

[72] https://www.mondelezinternational.com/impact.

117.   Defendant Mondelēz International also proclaims its adherence to the ideal that "everyone should be treated fairly and with dignity in both our own operations and supply chain."[73] In support of this proclamation, it references Cocoa Life, one of its "signature programs," which it states "is a holistic, verified program working to transform the lives and livelihoods of cocoa farmers, create thriving communities and inspire the next generation," and whose "$400 million, 10-year commitment aims to empower more than 200,000 farmers and more than 1 million people in cocoa farming communities in Côte d'Ivoire, Ghana, Indonesia, Brazil, the Dominican Republic and India." [74]

118.   Defendant Mondelēz International promises that it is "committed to do business the right way and to its responsibility to respect human rights."[75] In support of this, it states that it has "policies that prohibit child and forced labor as noted in [its] Code of Conduct."[76] That Code of Conduct states that child labor "is exactly the opposite of what Mondelēz International stands for."[77]

---

[73]https://www.mondelezinternational.com/impact/sustainable-resources-and-agriculture/responsible-sourcing.

[74] https://www.mondelezinternational.com/impact/sustainable-resources-and-agriculture/agricultural-supply-chain.

[75] https://www.mondelezinternational.com/About-Us/Compliance-and-Integrity.aspx#humanRights.

[76] https://www.mondelezinternational.com/About-Us/Compliance-and-Integrity.aspx#supplierContract.

[77] Available at https://www.mondelezinternational.com/~/media/mondelezcorporate/uploads/downloads/employeecodeofconduct.pdf.

119.    Defendant Mondelēz International further cites to its published supplier contract provisions, which include the following:[78]

- **Forced Labor.**  Supplier will not use any forced labor, which means any work or service performed involuntarily under threat of physical or other penalty.  Supplier shall respect the freedom of movement of its workers and not restrict their movement by controlling identity papers, holding money deposits, or taking any other action to prevent workers from terminating their employment.  If workers enter into employment agreements with Supplier, workers should do so voluntarily.

- **Child Labor.**  Supplier will not directly (or indirectly through the use of its subcontractors) employ any children under the age of 18 years unless legal, necessary, and appropriate and the following are met:

    o    Supplier will comply with the minimum employment age limit defined by national law or by International Labor Organization ("ILO") Convention 138, whichever is higher. The ILO Convention 138 minimum employment age is the local mandatory schooling age, but not less than 15 years of age (14 in certain developing countries), subject to exceptions allowed by the ILO and national law.

    o    Supplier will ensure that employees working in facilities that are manufacturing or packaging Mondelēz International finished products, serving as temporary employees to Mondelēz International, or present at Mondelēz International facilities, are at least 15 years of age (and no exceptions allowed by the ILO or national law will apply).

    o    Supplier must demonstrate that their employment does not expose them to undue physical risks that can harm physical, mental, or emotional development

- **Safety and Health.** Supplier will (i) endeavor to provide safe working conditions, (ii) provide its employees with appropriate protection from exposure to hazardous materials, and (iii) provide its employees with access to potable water and clean sanitation facilities.

- **Business Integrity.** Supplier will promote honesty and integrity in its business conduct by raising ethical awareness among its employees and providing direction and education on ethical issues.  Further, Supplier will not: pay or accept bribes, arrange or accept kickbacks, or participate in illegal inducements in business or government relationships.

---

[78] https://www.mondelezinternational.com/About-Us/Compliance-and-Integrity.aspx#supplierContract

120.    Mondelēz International's website contains numerous other sections with similar representations about its policies with regard to respecting and promoting human rights, ethical and sustainable sourcing, and child welfare. There is no question that Defendant Mondelēz International knowingly benefits from child labor and is extremely aware that its own failure to stop this practice is universally condemned in the world. The NORC Report confirms its failure to even manage to reduce child labor in its supply chain.

### 7.    Defendant Olam

121.    Defendant Olam holds itself out as "one of the world's leading suppliers of sustainable cocoa."[79] On its website, Olam International claims to be "against all forms of child exploitation" and actively working to "prevent its existence" through its Child Labor Monitoring and Remediation Systems and specific trainings, and by increasing farmers' incomes.[80] According to Olam, these efforts are designed to help farmers employ laborers so that they do not have to rely on their own children to do this work. In early 2017, the Head of Cocoa Sustainability at Olam boasted that "100% of our farmer groups in Cote de Ivoire now hav[e] in place a Child Labour Monitoring and Remediation System."[81]

---

[79] OLAM COCOA SUSTAINABILITY, https://www.olamgroup.com/products/confectionery-beverage-ingredients/cocoa/cocoa-sustainability.html  (last visited Jan. 27, 2020).
[80] *Id.*
[81] Simon Brayn-Smith, *Progress on Cocoa Sustainability*, OLAM INSIGHTS,  Jan. 1, 2017, https://www.olamgroup.com/investors/investor-library/olam-insights/issue-1-2017-scaling-and-

122.    In its 2017 Cocoa Sustainability report, Olam pledges to take "immediate action" if it finds "any instance of labour law violation in any part" of its supply chain.[82] The company claims to "investigate as a matter of urgency" whenever there is indication that "any inappropriate labor practices are taking place" in contravention of international law. Olam International acknowledges the existence of child labor on smallholder farms in West Africa, but points to its own "stringent requirements within its cocoa supply chain" and "adherence to all applicable national and international labour laws."[83] In addition, Olam International emphasizes its founding membership in groups like the World Cocoa Foundation, CocoaAction, and the International Cocoa Initiative. As of 2017, Olam International claimed to have built 18 schools in Côte d'Ivoire and to have constructed additional residences for teachers at existing schools.[84]

123.    In addition, Defendant Olam reported:

> We have also been active in setting up Child Labour Monitoring and Remediation Systems (CLMRS). With the support of FLA, manufacturer customers and ICI, we conducted a pilot CLMRS programme with 3 cooperative suppliers in 2013, after which CLMRS have since been established at 140 cooperatives in Côte d'Ivoire. Each cocoa producing community or cooperative section has a representative delegate on the CLMRS in order to ensure implementation and effectiveness and this same system is now being expanded to cooperatives in Ghana. To ensure the correct functioning of the CLMRS committees, we are now financing the salaries of the Group Administrators, CLMRS personnel and Farmer Trainers

---

transforming-olam-cocoa-to-spur-growth/the-value-drivers-behind-bean-origination/progress-on-cocoa-sustainability.html.
[82] OLAM COCOA,  OLAM COCOA SUSTAINABILITY 18 (2017),
https://www.olamgroup.com/content/dam/olamgroup/pdffiles/Olam-Cocoa-Sustainability-Overview-2017.pdf.
[83] *Id.*
[84] *Id.*

at 110 cooperatives. If any cases of child labour are identified by CLMRS then we ensure the appropriate sensitization and remediation is conducted, namely the facilitation of obtaining birth certificates, payment of school fees, distribution of school kits, and alternative Income Generation Activities (IGA) for families. These activities are now being taken on by the respective cooperatives and we request that 30% of the certification premium received by the cooperative is spent on these specific social actions.[85]

124.   In June 2018, Olam again represented itself as a leader in the fight to "eradicate" child labor in the West African cocoa sector.[86] The Head of Sustainability for Olam Cocoa frankly acknowledged that more needed to be done to address the massive child labor program, but nonetheless found it "fair to say that companies such as Olam and our industry group partners like World Cocoa Foundation (WCF), CocoaAction, and ICI are making progress on the issue of child labour." Olam described its efforts to combat child labor as including the following:

[W]e work with local farming cooperatives to not only pay sustainability premiums to farmers but also channel investment into social infrastructure projects that help prevent child labour, such as building local schools and hiring teachers. For example, in the Ivory Coast, our teams on the ground work to support 10 sustainability programmes, involving 85,000 farmers and paid over USD$23 million in sustainable crop premiums to over 185 cooperatives across the country.

Shifting cultural attitudes around child labour is crucial and requires a hefty investment of time and resources. We have been active in developing the Child Labour Monitoring and Remediation Systems (CLMRS), a system that involves each cocoa producing community or cooperative electing a representative body to ensure implementation and effectiveness of the identification and remediation focused programme. In partnership with the

---

[85] *Id.* at 17.
[86] Simon Brayn-Smith, *Child Labour in Cocoa: Why it's so Hard to Combat and What We're Doing About It*, OLAM BLOG, June 12, 2018, https://www.olamgroup.com/news/all-news/blog/child-labour-in-cocoa.html (last visited Jan. 27, 2020).

Fair Labor Association (FLA), the International Cocoa Initiative (ICI) and manufacturer customers, 180 cooperatives in the Ivory Coast have established CLRMS initiatives with our support. However, there is still a lot more work to be done to build community trust that they won't be punished for reporting an instance of child labour. Instead, it's about remediation in the form of helping parents obtain the birth certificates they need to send children to school, paying school fees and offering alternative income sources like soap making or rearing small livestock.

Technology is a crucial tool for dealing with the myriad issues at play when it comes to child labour. The Olam Farmer Information System (OFIS) collects farm level data via a smartphone to identify where vital social infrastructure like schools are lacking alongside details of farmer families, like the number and age of children, if they are attending school or living within proximity of one. With this data, working with the cooperatives, we can identify any issues and find solutions. Currently, we have 100,000 cocoa farmers in Africa registered on the OFIS platform.

125.    Olam professes that its goal is to "achieve 100% traceable and sustainable cocoa volumes from [its] direct origination supply chain by 2020."[87] Defendant Olam thus admits that there is child slavery in its supply chain, but is, once again, making a hollow, patently false promise to at some point, perhaps by 2020, stop profiting from child slavery. The NORC Report confirms that not only did Olam and the other companies fail to stop using child labor by 2020, the incidence of child labor has actually increased.

126.    Olam also admits that it knows that using child labor is illegal, abhorrent, and unethical. Defendant Olam also admits that, like most of the other Defendants, it

---

[87] Olam Cocoa,  https://www.olamgroup.com/products/confectionery-beverage-ingredients/cocoa.html (last visited Jan. 27, 2020). Note the video featured on this website as well, which makes it sound like Olam supports all of its farmers to improve their lives.

is relying on the "monitoring" and "remediation" of the "CLMRS" system, which, as established in paragraph 55, *supra*, is a sham because there is no independent monitoring, no remediation, no consequences for using child slaves, and it applies, at most, to 20-30% of Defendant Olam's supply chain. Defendant Olam is thus still profiting from child slavery and has no viable plan to stop the practice. It is hoping to deceive the public and regulators so that it can continue to profit from child slavery and avoid the costs of actual compliance with the promise it made, along with the other Defendants, **years ago** to stop profiting from child slavery.

## V.      HARM TO THE INDIVIDUAL PLAINTIFFS

### A. Former Child Slave Plaintiffs

127.   Plaintiff Issouf Coubaly is from Djoumatene in the Department of Kadilio, Mali. He thinks he was born late in 1996. In 2012, when he was 15 years old, he was working in a field near his home in Mali and a man approached and offered him a job. The man falsely promised a good paying job in Côte d'Ivoire and offered to pay Plaintiff's transport there. They went together to the bus terminal in Sakasso. The man bought his ticket and also boarded the bus. They arrived in Daloa, Côte d'Ivoire, a major cocoa production area where all Defendants obtain cocoa. There they were met by another man who bought him a bus ticket to another village. He did not know exactly where, but it was very isolated. The second man went with him. From there they went to a plantation and he met the man who apparently owned or managed the plantation.

He came to know the man's name was Lassina Coubaly. He also came to know that the plantation was called the Guezouba plantation. This was a small plantation of 8 hectares. He was isolated and was the only worker there. While all Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, the area this Plaintiff worked in was primarily supplying cocoa to Defendants Nestle, Cargill and Olam.

128.   Issouf Coubaly was told that he would be fed and would be paid his wages at the end of the season when the cocoa was harvested. He was directed by Lassina Coubaly and was required to work long days, from around 6 am until 4 or 5 pm. At first, he cleared brush with a machete and tended the plants. When the cocoa was ready to harvest, he picked the pods and opened them with a machete to remove the cocoa beans. He was also required to apply pesticides and herbicides without any safety instruction or protective gear. He was forced to live under horrible conditions. He slept on the plantation alone under a ragged tarp. He was exposed to insects and snakes. He was given very little food and was often hungry. At the end of the year he was not paid. He asked for money to leave and Lassina told him that if he wanted to live, he had to stay and keep working. He had absolutely no money and did not know where he was. He did as he was told by Lassina and kept working so that he could eat the little food they gave him and not starve to death. He worked under these conditions for five years. At the end of the fifth season, in 2017, he was desperate and could not continue doing

the difficult and hazardous work only to be fed barely enough food to stay alive. He confronted Lassina and said that he wanted to be paid all of the wages he was due and that he was going to leave. Lassina said he had no money, but finally gave him 20,000 CFA (about $33.00) for transport, and he left. It took some time to get back to Mali because 20,000 CFA was not enough money to even cover transport home. He did some odd jobs in Pogo, the border town in Côte d'Ivoire, to earn enough money to get a bus back to Mali. He arrived home in early March 2017.

129.   Plaintiff Issouf Coubaly brings this action on behalf of himself and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including, but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

130.   Plaintiff Sidiki Bamba is also from Djoumatene in the Department of Kadilio, Mali. He thinks he was 16 when, completely destitute, he was in Komogho, Mali looking for work. There, when he was wandering around, a man named Seydou falsely told him he had a brother in Côte d'Ivoire who could give him a good job on a cocoa plantation. Sidiki Bamba agreed and Seydou bought him a bus ticket to Abidjan, and then on to Aboisso, Côte d'Ivoire. When he got there, Madou Kone, Seydou's brother, met him and took him in the night to a plantation Sidiki Bamba later found out was called "Karou." The small plantation was isolated and he had no idea where he was. Madou first said he had to work to pay off bus fare. Sidiki worked for a year, to the end of the season, and asked to be paid. Madou said he had to keep working and that he would pay him 12,500 CFA (approximately $21.00) per month going forward but would only pay at the end of the season when the cocoa was sold. He worked with six other children, and though he could not communicate with them because they spoke some other dialect (Senoufo), he learned they were not being paid either. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and the area this Plaintiff worked in was on the frontier in an area that  supplied cocoa to all Defendants.

131.   Sidiki Bamba cleared brush with a machete and tended the plants. When the cocoa was ready to harvest, he picked the pods and opened them with a machete to remove the cocoa beans. He also applied pesticides and herbicides without any safety

instruction or protective gear. At the end of the next year, Madou told him the same thing again. He worked one more season and was still not paid for almost 3 years of work. He complained and Madou beat him. Shortly thereafter, Madou gave him CFA 20,500 ($34.00) and told him how to get a bus to Abidjan. Until he received this small amount of money from Madou, he was unable to leave the plantation because he did not have a single CFA in his pocket and did not even know where he was. He had no identification and no idea how to get help. When he got to Abidjan, he did not have enough money to get a ticket home, so he found a job at a construction site paying CFA 1,500 ($2.50) per day. He worked about 15 days and then had enough money to purchase his ticket home to Mali.

132.    Plaintiff Sidiki Bamba brings this action on behalf of himself and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child

laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

133.   Plaintiff Tenimba Djamoutene is from Kouroussandougou, Mali. He was 11 years old when he was approached near the bus station by a man named Brahima who falsely promised him a good-paying job in Côte d'Ivoire. He went with Brahima, who bought him a bus ticket to the Mali/Côte d'Ivoire border town of Zegoa in Mali. There were 4 or 5 other children with him when he got on the bus. In Zegoa, they got off the bus and Brahima arranged for small motor bikes to take them across the border beyond the check point as they did not have identification papers. They crossed the border and went to Pogo, the Côte d'Ivoire border town. From there, they all went on a bus to Sinfra. There, Brahima handed Tenimba Djamoutene over to Madou Kone, who took him to a house to sleep. Then Madou's brother came and took him to a plantation called Yofla near Sinfra, which is a major cocoa-producing region in Côte d'Ivoire. He went alone, but 2 other small children came within a few days. He was promised CFA 25,000 ($46.00) per month and Fridays (a religious holiday) off, but he was then forced to work every day and was not paid. He was threatened and told he would not be fed if he refused to work. While all Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, the area this Plaintiff worked in was primarily supplying cocoa to Defendants Nestle, Cargill, Barry Callebaut, and Olam.

73

134.    Tenimba Djamoutene cleared brush with a machete and tended the plants. When the cocoa was ready to harvest, he picked the pods and opened them with a machete to remove the cocoa beans. He also applied pesticides and herbicides without any safety instruction or protective gear. He worked for a year this way and was told he would be paid after the next year. He was given breakfast in the morning and then worked all day without food. He was once bitten by a snake and got sick because they did not give him medical care. He could not leave on his own because he had no money, did not speak the local language, and had no idea where he was. After 2 years, Madou took him to the bus station in Sinfra and bought him a bus ticket back to Mali. Madou gave him some extra money for food, but the guards at the border took it when he did not have any identification.

135.    Plaintiff Tenimba Djamoutene brings this action on behalf of himself and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each

Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

136.   Plaintiff Oudou Ouattara was 14 years old in early 2009 when he was approached near Sikasso, Mali, by Omar Traore who falsely told him he could get him good-paying work on a cocoa plantation in Côte d'Ivoire. Omar then introduced him to a lorry driver in Sikasso, Mali, and the driver took him to Divo, Côte d'Ivoire. When they got to Divo after a 12-plus hour drive, he met the owner of the plantation, Madou Kone. Divo is a major cocoa-producing area from which all Defendants obtain cocoa. He was taken by motorbike to the plantation. The owner promised him 90,000 CFA (approximately $180) at the end of the harvest season. The owner showed him around and left him with the other workers, 3 kids and 1 older man, all from Mali. The owner lived in Divo and did not work the plantation himself. The 3 kids were from a different area of Mali, and he could not understand their dialect. The older man, who was in charge, did not want him to speak with the other kids, and he kept everyone working separately. The kids were all afraid of the older man. While all Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, the area this Plaintiff worked in was primarily supplying cocoa to Defendants Barry Callebaut and  Olam, which supplied Defendant Nestle.

137.   Oudou Ouattara slept in a small, open hut on the plantation. He ate bananas, pineapple, and cassava roots. He was always hungry. He did everything on the plantation, including clearing brush, cutting down and opening cocoa pods, and applying pesticides. He has visible scars from cuts on his hands and arms from machete accidents. He was always bitten by bugs. The owner came once a week or so to check on things. At the end of the year, the owner was visiting and Oudou Ouattara asked for the 90,000 CFA he was promised. The owner said he did not have the money to pay anyone but would pay once he had it. Oudou Ouattara wanted to leave, but he had not one CFA in his pocket. He did not know where he was, but knew he was a very long distance from Mali, and there was no one he could ask for help. He was very afraid but saw no option other than continuing to work for food and hope he would get paid. He worked another year through the next harvest and was again told by the owner there was no money to pay the workers. The owner said he would get all his money soon. Oudou Ouattara worked another three to four months to avoid starvation, and then met Baba Bambara Dioula on the plantation, who was originally from Burkina Faso and owned a neighboring plantation. Oudou Ouattara told Baba his story and he took him to the lorry park and introduced him to a driver who was heading to Mali and the driver took him for no charge. He returned to Mali at the end of 2011.

138.   Plaintiff Oudou Ouattara brings this action on behalf of himself and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of

76

Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

139.  Plaintiffs Ousmane Ouattara and Issouf Bagayoko were trafficked together from Mali to the cocoa plantations of Côte d'Ivoire. They were friends from childhood. Ousmane Ouattara was born in 1998. Issouf Bagayoko does not know his birthdate, but he does know he is one year younger than Ousmane Ouattara, so he was likely born in 1999. In 2013, when Ousmane Ouattara was 14 and Issouf Bagayoko was 13 they were approached by a labor broker known as Nou, who falsely told them he could send them both to Côte D'Ivoire to get good jobs on a cocoa plantation. They said they had no money. Nou said that he would pay for everything and that the plantation owner would pay him back out of their first pay. Nou then took them to a bus, and he clearly knew the driver. He explained to the driver what was going on and paid the driver some amount of money. This first bus took them all the way to

Yamoussoukro, which is the ancient capital of Côte D'Ivoire and about 150 km North of Abidjan. The trip took at least 12 hours. The bus driver fed them and also paid off the border guard at the Côte d'Ivoire/Mali border crossing. There, the bus driver took them over to a different bus and spoke to the driver. They got on the new bus and first stopped in San Pedro and then went on to Grabo, which is in the far Southwest of Côte d'Ivoire just a few miles from the border with Liberia. This area is known as the "wild west" of the cocoa production areas and there are lots of unregulated, free zone plantations in that area. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all the Defendants purchase free zone cocoa for 70 to 80 percent of their cocoa, and much of it comes from this area.

140.   The owner of the plantation for which the Plaintiffs were destined, Salif Djamoutene, met Plaintiffs Ousmane Ouattara and Issouf Bagayoko in Grabo. Salif was on a bicycle and he rode beside them as they walked about six to seven hours to the small isolated village of Souroudouga. They were not given any food and they were only able to drink water out of a river. The planation was just outside of the village. It was a big plantation, maybe 12 hectares in size. Salif explained the entire process of harvesting cocoa and caring for the trees. He offered them 100,000 CFA each (approximately $200) to work for the year until the harvest, when they would be paid. He did say that he would pay for Nou and all the travel expenses out of the first pay,

but he did not specify the amount. Salif came about once a week to check on them, and they were the only two workers. He yelled at them a lot and said they needed to do better if they wanted to be fed. He brought their food when he visited, feeding them mainly yams, bananas, and cassava. They did everything on the plantation, including clearing brush, applying pesticides and fertilizer (without any protective gear), cutting down the pods, opening them, collecting the beans and drying them. Both have visible scars from machete accidents.

141.   At the end of the season, Plaintiffs Ousmane Ouattara and Issouf Bagayoko asked to be paid. They worked for about 7 months. They told Salif that they wanted to be paid what they were owed and that they wanted to go home. They were afraid of staying because the owner of a neighboring plantation had been killed due to a land conflict in the area. Salif told them he had no money to pay them and that they owed a lot to Nou. When Salif left, the boys decided to try to get home. They had absolutely no money. They walked on the dirt road that led to the plantation back to Grabo. At the bus station they met a driver who agreed to take them to San Pedro. There they got another driver to take them to Abidjan because one of them had a relative there. In Abidjan, the relative who was from Mali took them to the bus station and introduced them to a driver, also from Mali, who was going to Sikasso. The bus driver took them, gave them food, and paid to get them through the checkpoint at the Mali border.

142.   Plaintiffs Ousmane Ouattara and Issouf Bagayoko bring this action on behalf of themselves and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

143.   Plaintiff Arouna Ballo is still suffering from physical and mental trauma to this day attributable to his four years of working on a cocoa plantation in Côte d'Ivoire.  He has never been to school. He was born in 1998. He went to work in 2012, when he was 14. He is from the village of Nionodjassa, Mali. A man came to his village and falsely told Arouna Ballo that he could get him a good job in Côte d'Ivoire. The man took Arouna Ballo on a motorbike to the bus station in Sikasso. The man, who seemed to know the driver, paid for the bus and told Arouna Ballo the costs would be taken out of his first pay. Like Plaintiffs Ousmane Ouattara and Issouf Bagayoko, he

took the bus route to Grabo. When he got there, he met Sidibe, the plantation owner. They walked about two hours from the bus station to the plantation. Sidibe showed him how to do the work. He did everything on the plantation from clearing brush, trimming trees, harvesting and opening pods, and applying pesticides. He remembered a brand of pesticide called "72" that he used. He was not given any protective gear. He cut himself many times.  Sidibe came once a week and brought food and gave him direction for the week. Sidibe often yelled and gave him harsh directions for doing the work, including that if he did not do what he was told, he would not be given food. He worked alone. At the end of the first year, Sidibe said he did not have any money but would eventually pay him. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all the Defendants purchase free zone cocoa for 70 to 80 percent of their cocoa, and much of it comes from this area.

144.   Arouna Ballo continued this arrangement for four years. He had no idea where he was or where he could go. He did not have any money nor any identification. One day, after 4 years, he got very sick and lost consciousness, later waking up in a local hospital. He thinks Sidibe brought him there. He attributes this occurrence to exhaustion and hunger. Though Arouna Ballo does not know exactly how, a relative, Drissa Ballo, was summoned to get him. Drissa took him by bus back to Mali and to a hospital there where he spent one night. The doctor said he was suffering from

traumatic stress. He recalls that during the worst part of the trauma he endured while working on the plantation for 4 years without pay, he dreamed of getting a bicycle and a radio when he finally got paid.

145.    Plaintiff Arouna Ballo brings this action on behalf of himself and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

146.    Plaintiff Mohamed Traore is a very observant Muslim and knows only the Koranic calendar. He went to work in 2006 when he was 13 and worked for five years. A man named Soumaila Kone came to his village, Domogodjassa, and falsely promised him 125,000 CFA ($250) per year to work on a cocoa plantation in Côte d'Ivoire. Soumaila was originally from Burkina Faso. He said he did not know the man but really

needed to earn money, so he went to the bus station in Sikasso with him. Soumaila spoke to and paid the bus driver. Mohamed Traore was taken by bus to Divo, Côte d'Ivoire, a major cocoa producing area from which all Defendants obtain cocoa. Divo is at least 12 hours by bus from Sikasso. At Divo, Mohamed Traore was met by the owner of the plantation, Sekou Traore. From the bus station they went by a cocoa truck to the plantation near the village of Niama. The plantation was about 10 to 11 hectares in size. Sekou showed him how to do the work. He completed all tasks on the plantation and has terrible scars on his arms from the machete. There was one other Malian boy there as well as another boy from Burkina Faso. The owner separated Mohamed Traore from the Malian boy so they could not talk. They worked in different parts of the plantation. While all Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, the area this Plaintiff worked in was primarily supplying cocoa to Defendants Barry Callebaut and  Olam, which supplied Defendant Nestle.

147.   Mohamed Traore fell victim of the same basic scheme as the other Plaintiffs – each year the owner said he had no money, but he told Mohamed Traore to keep working if he wanted to be fed, and he would eventually be paid. Mohamed Traore had no money, did not know how to get home or even where he was, as it was long drive from Mali. After five years, he got angry and demanded that he be paid so he could leave. The owner paid him only 125,000 CFA, a small portion of what he had

been promised, but it was enough money to purchase a bus ticket back to Mali. He walked to the bus station and went back to Mali.

148.   Plaintiff Mohamed Traore brings this action on behalf of himself and all other similarly situated current and former child slaves trafficked from Mali. The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Divo, Grabo, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants in the "venture," specifically defined in paragraphs 154-58, *infra*, are jointly and severally liable for the illegal forced labor and trafficking of Plaintiffs and other children described herein, and all Defendants have sourcing relationships within one or more of those areas. Collectively these Defendants source about 70 percent of the cocoa harvested in Côte D'Ivoire. These Defendants collectively, and each Defendant individually, have utilized substantial amounts of cocoa harvested with trafficked child laborers or with children who were forced to work and perform hazardous tasks in harvesting cocoa, including members of the class.

VI.    **CLAIMS FOR RELIEF**

**COUNT I**
**FORCED LABOR BY ALL FORMER CHILD SLAVE PLAINTIFFS**
**AGAINST ALL DEFENDANTS**
**TVPRA, 18 U.S.C. §§ 1589 & 1595**

149.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

150.   As children younger than 15, the Former Child Slave Plaintiffs were deprived of their freedom, separated from their families, and forced to suffer severe physical and mental abuse by being forced to perform hazardous work without pay on cocoa farms that supply the cocoa venture, described in paragraphs 155-58, *infra*, comprised of the Defendants as well as other major cocoa producers. All of the Plaintiffs were coerced into working through trickery and deception. They were required to perform hazardous work with dangerous tools, as well as apply pesticides and herbicides without proper training and without safety equipment. Plaintiffs also were especially vulnerable to being tricked into forced labor because they lacked education, they could not read and write, and their families were too poor and too isolated to look for them once they were captured by the forced labor scheme.

151.   To keep them from refusing to work or escaping, the cocoa farmers subjected Plaintiffs to psychological coercion and the very real threat that if they did not work as required they would not be fed. The farmers orchestrated a lack of options: Plaintiffs were kept on isolated cocoa plantations in Côte d'Ivoire; they lacked any form

of identification or travel documentation; they had no idea where they were or how to get back to their homes; they had absolutely no money and were told they had to pay back the transport costs and other costs and fees allegedly incurred to get them to cocoa plantations in Côte d'Ivoire; and they did not speak the local dialects where they were working. They were required to live in squalid conditions in isolation and to regularly perform dangerous acts. In addition, for the first years of working, they were kept working by the false promise that they would be paid "at the end of the harvest." They were never paid; this was a deliberate scheme by the plantations to take advantage of young, uneducated, frightened, and naïve young children.

152.   Labor exacted from children through the means described herein, including trickery and coercion, financial deprivation, the use of labor brokers, the constant threat of malnourishment or starvation, and, most significantly, the requirement that the child workers perform "hazardous work" that qualifies as one of the "worst forms of child labor" within ILO Convention No. 182, combined,  are clearly within the range of "forced labor" under § 1589 of the TVPRA. Physical, mental, and financial harm are "serious harms" under § 1589(c)(2), which trigger liability under §§ 1589 and 1595. Further, Defendants with their constant presence in the cocoa-producing areas of Côte D'Ivoire, as well as with their accumulated knowledge across decades of schemes admitting to using child labor while claiming to be working to end it, knew or recklessly disregarded the facts about this systematic forced and abusive labor endured by Plaintiffs and tens of thousands of other children.

153.   Under §§ 1589 and 1595 of the TVPRA, Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz are liable if they (1) participated in a venture; (2) knowingly "receiv[ed] anything of value" from the venture; and (3) knew or should have known that the venture had engaged in forced labor as defined by § 1589. As previously alleged, Defendants knowingly benefitted from forced child labor in the cocoa sector of Côte D'Ivoire, and the three elements required for liability under the TVPRA are easily satisfied in this case.

## The Cocoa Supply Chain Is a "Venture"

154.   Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz are the major and most influential of the cocoa companies that participate in harvesting cocoa from Côte D'Ivoire. They are not merely purchasers or users of cocoa from Côte D'Ivoire; they are the architects and defenders of the cocoa production system of Côte D'Ivoire. The Defendant companies formed, operate and control a cocoa supply chain "venture" to provide them with the benefit of cheap cocoa they know or certainly should know is harvested by forced and/or trafficked child labor.

155.   As previously alleged, Defendants' agreement since at least 2001 to delay or remain indifferent to taking any effective action to stop the systematic use of child forced and/or trafficked child labor began a "venture" within the scope of section 1595 of the TVPRA to allow them to receive the benefit of cheap cocoa harvested by these children. Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and

Mondelēz created and are the leaders of a formal association, the WCF, to create the false impression of effective action to stop using child labor. Their joint participation in the WCF likely amounts to a criminal cartel, and at a minimum constitutes an association in fact that is a cocoa supply chain "venture" within the meaning of §§ 1589 and 1595 of the TVPRA. Defendants, as key members of and participants in their cocoa supply chain venture, had leading roles in shaping the WCF's response to the Harkin-Engel Protocol, in essence a plan of delay and misrepresentation. In addition, they took a leading role in developing the various "plans" launched by the Defendants to create the false impression that they are taking action to stop and prevent ongoing use of forced or trafficked child labor. These Defendants created the ICI to serve as an "NGO" able to raise funds from international donors and the U.S. Dept. of Labor to implement the Harkin-Engel Protocol, but that has not done much more than open an expensive office with highly paid staff in Geneva, Switzerland.  Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz together developed the Child Labor Monitoring and Remediation System (CLMRS), a sham system that is designed to further mislead the public and allow the Defendant companies to continue their cocoa supply chain venture that is based on a system of child labor. Defendants' venture was purposefully formed to, among other things, allow Defendants to participate in collective action to preserve and protect their cocoa supply chain that, as they all knew, was dependent upon child labor. Defendants' cocoa supply chain is, by design, hidden and secretive to allow all participants to profit from cheap cocoa

harvested under hazardous conditions by desperate children forced to perform hazardous labor without safety equipment of any kind. That the NORC Report revealed in 2020 that there are 1.56 million children working in cocoa harvesting, representing a significant increase in the number of illegal child workers in the cocoa supply chain,[88] is conclusive evidence that Defendants' cocoa supply chain venture has succeeded in continuing its illegal purpose.

156.   Defendants' receipt of a financial benefit derived from their forced child labor scheme amounts to "venture" conduct covered under § 1589. Defendants have an active role in the venture to ensure their maximum return from the cocoa plantations that Defendants know or should have known depend upon forced child labor to harvest Defendants' cocoa. Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz provide the Côte d'Ivoire cocoa plantations with financial support, training, and technological innovation to promote the farmers' capacity to produce cocoa products, which Defendants then buy from the farmers. Defendants gain significant financial advantage from their involvement in the cocoa production process: By providing support for the plantations, Defendants are able to rely on the plantations as the source of their cocoa products, through which they have become some of the world's wealthiest private companies in the food services industry. Together, these Defendants, operating as leaders of the venture, account for more than 70 percent of the cocoa exported from Côte D'Ivoire. Just as Defendants' venture perpetuates the

---

[88] *See* NORC Report at 10.

child labor-based cocoa supply chain, Defendants' power and control over that supply chain would have allowed them to stop the use of child labor in harvesting cocoa. Indeed, these Defendants, in derailing effective regulation of their cocoa supply chain venture in favor of the voluntary Harkin-Engle Protocol, affirmatively committed to ending child labor in the cocoa sector. However, Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz then made a conscious choice within their venture to continue relying on the cheap labor of child workers for as long as they possibly could.

157.   Defendants' ongoing support through purchasing cocoa from farmers using forced child labor is material support that keeps these farmers in business without requiring them to stop their illegal use of forced child labor. Defendants' substantial economic presence and control over the Cote D'Ivoire cocoa market directly correlates to the control over which they have to substantially reduce the incidence of forced child labor. Their repeated failure to eliminate forced child labor reinforces the fact that Defendants have no intention to end it; rather, they purposefully choose to reap its financial benefits for as long as they can. Only through Defendants' financial and technical support have the cocoa farmers been able to sustain their farming operations, making Defendants, through their venture, directly responsible for the Former Child Slave Plaintiffs' being compelled to work without pay on the farms.

158.   Defendants' conduct has established and maintained an organized venture that depends upon a steady supply of forced or trafficked child laborers, including Plaintiffs and Members of the Class.

## Defendants knowingly received something of value from the "venture."

159.   Based on section 1595 of the TVPRA, "whoever knowingly benefits" from forced labor as defined by section 1589 is liable. As previously alleged, all Defendants knowingly benefitted from the ongoing forced labor of children in the cocoa sector and have intentionally engaged in various schemes to continue benefiting from forced child labor by delaying their specific commitment made in 2001 to take effective action to stop profiting from child labor. Defendants are able to purchase cocoa for significantly lower prices because the cocoa is largely harvested by children who are forced to work without pay. Defendants' venture also benefits from operating in an unregulated way that allows Defendants to obtain cocoa from adult workers who are not paid a livable wage and to obtain cocoa from illegal plantations, often operating on national park lands. Defendants, through their venture, fiercely resist any form of regulation of cocoa production, including an effective ban on child labor, that would result in increased prices for cocoa.

160.   Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz all gain significant financial advantage from their participation through their managers, officers, employees and agents in the various schemes described herein that

91

allow them to continue using child labor to harvest their cocoa. These companies get raw cocoa, the one ingredient that is absolutely essential to produce their chocolate products, without having to pay a reasonable price for the labor required to harvest this labor-intensive product. In short, the low price of cocoa is largely due to the systematic exploitation of child workers.

## **Defendants knew or should have known that their respective ventures had engaged in forced labor as defined by § 1589.**

161.    As previously alleged in detail, Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz each have extensive knowledge or should have known that their cocoa supply chains are based on forced and trafficked child labor. *See* paragraphs 49-126, *supra*. Defendants' repeated admissions since at least 2001 that they are still using child labor but are trying to phase it out are conclusive evidence that Defendants know or should have known that they are profiting from forced and trafficked child labor in their supply chains. Defendants' corporate policies, supply chain policies, and employee trainings indicate that they each have specific knowledge that their cocoa supply chains profit from forced and trafficked child labor. This knowledge extends further than mere general awareness of forced child labor in the cocoa farming industry—it documents current knowledge of Defendants' use of forced child labor that has yet to be eliminated.

162.    Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz all knowingly aided and abetted and benefitted enormously from a system that forces impoverished children, including the Plaintiffs and others similarly situated, to perform extremely hazardous work without safety equipment of any kind. Plaintiffs are not paid for their labor but instead are forced to work under slavery-like conditions. They work under the threat that their traffickers will withhold their food and other necessities and are told they must work to pay off the debt associated with their travel costs and arranging for their jobs.

163.    The forced labor perpetuated by the venture that all Defendants are responsible for has caused the Former Child Slave Plaintiffs to sustain significant injuries, as well as pain and suffering, extreme and severe mental anguish, and emotional distress.  The Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

164.    All Defendants as key members of and participants in the cocoa supply chain venture are liable for the injuries caused to the Plaintiffs by the venture's forced labor system. Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked child labor in the cocoa supply chain. As these Defendants are responsible for more than 70 percent of the cocoa exported from Côte D'Ivoire, it is more likely than not that each Plaintiff was forced to harvest cocoa for one or more of the Defendants operating within the venture.

## COUNT II

**TRAFFICKING WITH RESPECT TO FORCED LABOR BY ALL FORMER CHILD SLAVE PLAINTIFFS AGAINST ALL DEFENDANTS TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1590 & 1595**

165.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

166.   As previously alleged, Plaintiffs were all subjected to forced work on cocoa plantations that produce cocoa in the cocoa supply chain venture created and perpetuated by Defendants. In addition, all Plaintiffs were under the age of 15 when they were brought from Mali to Côte d'Ivoire by a labor broker who knowingly misrepresented the nature and terms of the work they would be doing if they came with him.  The labor brokers all had relationships with cocoa farmers and fulfilled the farmers' requests for child workers. The labor brokers brought the Plaintiffs to the Côte d'Ivoire cocoa plantations and transferred control over the trafficked children to the cocoa farmers, who forced them to work without pay, as previously alleged.  The farmers therefore knowingly harbored the Former Child Slave Plaintiffs as trafficked children, who they coerced into working on the cocoa plantations for the purpose of obtaining their unpaid labor.

167.   Defendants, as chocolate retailers, are involved in the cocoa production process that occurs in Côte d'Ivoire, which is a fundamental element of their business enterprise. Specifically, they provide the cocoa plantations in Côte d'Ivoire with

financial and technological support so as to improve the efficiency and success of the plantations' cocoa production process.  By providing such support to the farmers, Defendants derive significant financial profit through the products that they are then able to sell internationally, including in the United States. All of the Plaintiffs were coerced into working by trickery and deception and they were required to perform hazardous work with dangerous tools and apply pesticides and herbicides without proper training or safety equipment. Plaintiffs also were especially vulnerable to being tricked into forced labor because they lacked education, they could not read and write, and because their families were too poor and too isolated to look for them once they were captured by the forced labor scheme.

168.   All of the Plaintiffs were tricked and deceived by labor brokers to travel with the brokers to Côte d'Ivoire to get "good" jobs harvesting cocoa. Instead, when they arrived from Mali, as previously alleged, Plaintiffs were forced to perform hazardous work under horrible conditions. As part of this system, Plaintiffs were placed on remote cocoa plantations with no idea where they were. They had no legal identification or funds, could not speak the local dialect, and were essentially told to work or starve. They all had no choice but to work until they could figure out what to do and how to escape.

169.   Defendants provide the Côte d'Ivoire cocoa plantations with financial support, training, and technological innovation to promote the farmers' capacity to produce cocoa products, which Defendants then buy from the farmers.  Defendants

gain significant financial advantage from their involvement in the cocoa production process: By providing support for the plantations, Defendants are able to rely on the plantations as the primary source of their cocoa products, through which they have become some of the world's wealthiest private companies in the food services industry.

170.   Defendants' ongoing support through purchasing cocoa from farmers using forced child labor is material support that keeps these farmers in business without requiring them to stop their illegal use of forced child labor, including the Former Child Slave Plaintiffs. Only through Defendants' financial and technical support have the cocoa farmers been able to sustain their farming operations, making Defendants, through their venture, directly responsible for the Former Child Slave Plaintiffs' being compelled to work without pay on the farms.

171.   Based on section 1595 of the TVPRA, "whoever knowingly benefits" from trafficking as defined by section 1590 is liable. As previously alleged in paragraphs 49-126, 161-64, *supra*, all Defendants knowingly benefitted from the ongoing forced labor of children in the cocoa sector and have intentionally engaged in various schemes to continue benefiting from forced child labor by delaying their specific commitment made in 2001 to take effective action to stop profiting from child labor.

172.   As previously alleged in paragraphs 155-58, *supra*, Defendants are all participants in a cocoa supply chain "venture" that they "knew or should have known" engaged in the trafficking of child workers to feed the system they created that required the free labor of large numbers of children. As previously alleged, their agreement since

at least 2001 to delay any effective action to stop profiting from child labor, and their creation of and participation in formal associations, including the WCF and ICI, to create the false impression of effective action to stop using child labor likely amounts to a criminal cartel, and at a minimum constitutes an association in fact.

173.   Defendants' conduct has established and maintained an organized system that depends upon the free labor of children, many of whom, like Plaintiffs, are trafficked from Mali. This system for which all Defendants are responsible has caused the Former Child Slave Plaintiffs to sustain significant injuries as well as pain and suffering, extreme and severe mental anguish, and emotional distress. The Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

174.   All Defendants as key members of and participants in the cocoa supply chain venture are liable for the injuries caused to the Plaintiffs by the venture's forced labor system. Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked child labor in the cocoa supply chain. As these Defendants are responsible for more than 70 percent of the cocoa exported from Côte D'Ivoire, it is more likely than not that each Plaintiff was forced to harvest cocoa for one or more of the Defendants operating within the venture.

## COUNT III

### UNJUST ENRICHMENT BY ALL PLAINTIFFS
### AGAINST ALL DEFENDANTS

175.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

176.     To the detriment of Plaintiff and Class Members, Defendants have been and continue to be unjustly enriched as a result of the wrongful conduct alleged herein. Defendants are and have been for decades purchasing cheap cocoa in Côte D'Ivoire that has been harvested by children, including Plaintiffs and the Class Members, performing hazardous work. Defendants are paying prices for cocoa that reflect that the cocoa is harvested by children and other systems of abuse. Defendants have unjustly benefited by receiving cocoa at low prices that would not have been possible absent the wrongful conduct.  Between the parties, it would be unjust for Defendant to retain the benefits attained by their wrongful actions at the expense of Plaintiffs and Class Members who were forced to perform hazardous work.

177.     Accordingly, Plaintiffs and Class Members seek full restitution of Defendant's enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged herein.

178.     All Defendants as key members of and participants in the cocoa supply chain venture have been unjustly enriched by the venture's forced labor system. Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon

forced or trafficked child labor in the cocoa supply chain.

## COUNT IV

### NEGLIGENT SUPERVISION BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

179.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

180.   When engaging in the wrongful conduct alleged herein, plantation owners who supplied the Defendants with cocoa were agents of Defendants.   Defendants exercised control over their agents and provided direction as to the quality and harvesting of cocoa supplied to them.

181.   Defendants knew or reasonably should have known that the farmers who supplied them were using forced and trafficked child labor and that Plaintiffs would suffer injuries as alleged herein if forced into the system of cocoa harvesting created by Defendants and dependent upon forced and trafficked child labor.

182.   Defendants had the authority to supervise, prohibit, control, and/or regulate the farmers who were their suppliers, and indeed, all Defendants boast of this control in their recently launched (but sham) programs allegedly designed to stop the use of child labor so as to prevent the acts and omissions described herein from occurring.   Defendants also had the ability to cease operations until such time as the violations alleged herein were stopped and/or prevented.

183.   Defendants knew or reasonably should have known that unless they intervened to protect Plaintiffs and properly supervise, prohibit, control and/or regulate the conduct described herein, Plaintiffs would suffer the injuries alleged herein.

184.   Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate their employees and/or agents, and also failed to make appropriate investigations into the possible negative impact on Plaintiffs and others similarly situated who were forced to harvest cocoa for Defendants' suppliers. As a direct and proximate result of Defendants' negligent supervision, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be ascertained at trial.

185.   All Defendants as key members of and participants in the cocoa supply chain venture are liable for the injuries caused to the Plaintiffs by the venture's forced labor system. Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked child labor in the cocoa supply chain.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

186.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

187.   By intentionally and continuously participating in a venture that relies upon using Plaintiffs and members of the class as child slaves to increase their profits, Defendants engaged in outrageous conduct which went beyond all bounds of decency.

188.   By supporting and enabling a system that relies on child slaves for higher profits, Defendants committed acts described herein which were intended to cause Plaintiffs to suffer severe emotional distress.  In the alternative, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiffs to suffer severe emotional distress. Plaintiffs were present at the time the outrageous conduct occurred, and Defendants knew that Plaintiffs were present.

189.   The outrageous conduct of Defendants was the cause of severe emotional distress and physical damage suffered by the Plaintiffs.

190.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be ascertained at trial.

191.   All Defendants as key members of and participants in the cocoa supply chain venture are liable for the injuries caused to the Plaintiffs by the venture's forced labor system. Further, Defendants are all jointly and severally liable for the injuries

caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked child labor in the cocoa supply chain.

## VII.   **DEMAND FOR JURY TRIAL**

192.   Plaintiffs demand a trial by jury on all issues so triable.

## VIII.  **PRAYER FOR RELIEF**

193.   WHEREFORE, Plaintiffs pray this Court will enter an order:

    a.   Entering judgment in favor of each of the Plaintiffs on all counts of the Complaint;

    b.   Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to fees and costs paid, debts incurred, and wages promised but not paid;

    c.   Awarding each of the Plaintiffs consequential damages, including but not limited to the loss of assets and of educational and business opportunities as a result of Defendants' illegal conduct;

    d.   Awarding each of the Plaintiffs damages for the mental anguish and pain and suffering Plaintiffs experienced as a result of being trafficked and forced to labor against their will;

    e.   Awarding each of the Plaintiffs punitive and exemplary damages;

f.   Awarding Plaintiffs any and all other damages allowed by law according to proof to be determined at time of trial in this matter;

g.   Awarding Plaintiffs reasonable attorneys' fees and costs;

h.   Awarding all Plaintiffs injunctive relief, disgorgement of all profits resulting from these unfair business practices alleged herein such that restitution is made to the general public;

i.   Awarding class-wide relief based on the award to the individual Plaintiffs; and

j.   Awarding such other relief as the Court deems just and equitable.


Respectfully submitted this 12th day of February 2021

/s/ *Terrence P. Collingsworth*
Terrence P. Collingsworth
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE
Washington, D.C. 20002
202-543-5811
tc@iradvocates.org
Attorneys for Plaintiffs