# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ISSOUF COUBALY, *et al.*,

> *Plaintiffs*,

v.

CARGILL, INCORPORATED, *et al.*,

> *Defendants*.

Civil Action No. 21-0386 (DLF)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

LEGAL STANDARD...................................................................................................... 6

ARGUMENT .................................................................................................................. 7

I.     Plaintiffs Lack Article III Standing.................................................................7

       A.     Plaintiffs' alleged injuries are not fairly traceable to Defendants........................... 8

       B.     Plaintiffs are not entitled to seek injunctive relief under the TVPRA or
              Article III ........................................................................................ 11

II.    The Complaint Fails to State a Claim for Relief under the TVPRA .................................13

       A.     Defendants did not participate in a TVPRA venture ........................................... 14

              1.     Plaintiffs fail to plead a "venture" under the TVPRA ............................. 15

              2.     Neither downstream purchases from a supply chain nor sourcing
                     cocoa from local suppliers constitutes "participation" in a venture
                     under the TVPRA ...................................................................... 18

       B.     Plaintiffs fail to allege that each Defendant had the requisite knowledge of
              forced labor ..................................................................................... 23

              1.     Plaintiffs fail to allege that each Defendant knew or should have
                     known about forced labor violations involving Plaintiffs........................ 23

              2.     Plaintiffs cannot rely on general reports of child labor to satisfy the
                     knowledge requirement.............................................................. 26

       C.     The complaint fails to allege that Defendants obtained a "knowing[ ]
              benefit" from a violation of the TVPRA.............................................................. 28

III.   Plaintiffs' TVPRA Claims are Impermissibly Extraterritorial .........................................30

       A.     The TVPRA contains no clear, affirmative indication of congressional
              intent to create extraterritorial civil liability ....................................... 31

       B.     This case does not involve a domestic application of the TVPRA...................... 36

IV.    Plaintiffs' Common-Law Claims Must be Dismissed .......................................37

A.    The complaint fails to adequately plead any common-law claim.........................37

    1.    The complaint fails to state a claim for unjust enrichment......................38

    2.    The complaint fails to state a claim for negligent supervision .................40

    3.    The complaint fails to state a claim for intentional infliction of emotional distress....................................................................................42

B.    Plaintiffs' common-law claims are facially barred by the applicable statutes of limitations ............................................................................................44

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.B. v. Hilton Worldwide Holdings, Inc.*,
  484 F. Supp. 3d 921 (D. Or. 2020) ................................................................24, 25

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
  2021 WL 1235241 (D. Or. Mar. 31, 2021) ...........................................................24

*Abafita v. Aldukhan*,
  2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019).......................................................33

*Abafita v. Aldukhan*,
  2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019).........................................................33

*Acosta Orellana v. CropLife Int'l*,
  711 F. Supp. 2d 81 (D.D.C. 2010) .................................................................40, 42

*Adhikari v. KBR Inc.*,
  2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) .................................................33, 37

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) ...........................................................................33

*Alexander v. AmeriPro Funding, Inc.*,
  848 F.3d 698 (5th Cir. 2017) ...........................................................................19

*Angus v. Shiley Inc.*,
  989 F.2d 142 (3d Cir. 1993)............................................................................44

* *Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ......................................................................9, 10

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989)......................................................................................13

* *Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................7, 22

*Aston v. Johnson & Johnson*,
  248 F. Supp. 3d 43 (D.D.C. 2017) ..................................................................39

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
  2020 WL 4368214 (N.D. Cal. July 30, 2020)................................................21, 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................7, 42

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
   339 F. Supp. 2d 52 (D.D.C. 2004) ................................................................28, 34

*California v. Texas*,
   141 S. Ct. 2104 (2021) ...........................................................................................9

*Chambliss v. Nat'l RR Passenger Corp.*,
   2007 WL 581900 (D.D.C. Feb. 20, 2007) ............................................................44

*Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*,
   763 F. Supp. 2d 759 (W.D.N.C. 2011) ................................................................17

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ...............................................................................................12

*Coal. for Mercury-Free Drugs v. Sebelius*,
   725 F. Supp. 2d 1 (D.D.C. 2010) ...........................................................................6

*Common Cause v. Dep't of Energy*,
   702 F.2d 245 (D.C. Cir. 1983) ............................................................................13

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
   82 F. Supp. 3d 344 (D.D.C. 2015) ......................................................................40

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .............................................................................................29

*de Sousa v. Embassy of Republic of Angola*,
   267 F. Supp. 3d 163 (D.D.C. 2017) ....................................................................43

*Dist. of Columbia v. Hampton*,
   666 A.2d 30 (D.C. 1995) ................................................................................40, 41

*Doe #9 v. Wyndham Hotels & Resorts, Inc.*,
   2021 WL 1186333 (S.D. Tex. Mar. 30, 2021) ....................................................24

*Doe v. Nestlé, S.A.*,
   2017 WL 6059134 (C.D. Cal. Mar. 2, 2017) .......................................................18

*Doe I v. Nestle USA, Inc.*,
   788 F.3d 946 (9th Cir. 2015) ...............................................................................35

*Doe I v. Nestlé USA, Inc.*,
   766 F.3d 1013 (9th Cir. 2014) .............................................................................25

*Doe S.W. v. Lorain-Elyria Motel, Inc.*,
   2020 WL 1244192 (S.D. Ohio Mar. 16, 2020) ....................................................20

*E.S. v. Best W. Int'l, Inc.*,
   2021 WL 37457 (N.D. Tex. Jan. 4, 2021) ...........................................................24

*Exhaustless Inc. v. FAA*,
   931 F.3d 1209 (D.C. Cir. 2019) .........................................................................13

*Fei Guan v. Bing Ran*,
   2017 WL 2881363 (E.D. Va. July 6, 2017) ........................................................31

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) .....................................................................7, 9, 11

*Friends of the Earth, Inc v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ...........................................................................................12

*Fulani v. Brady*,
   935 F.2d 1324 (D.C. Cir. 1991) .........................................................................13

*Geiss v. Weinstein Co. Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019) ...........................................................20, 29

*Gerlich v. U.S. Dep't of Justice*,
   659 F. Supp. 2d 1 (D.D.C. 2009) .......................................................................12

*Giles v. Shell Oil Corp.*,
   487 A.2d 610 (D.C. 1985) ..................................................................................42

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
   185 F. Supp. 2d 9 (D.D.C. 2001) .........................................................................6

*H.G. v. Inter-Cont'l Hotels Corp.*,
   489 F. Supp. 3d 697 (E.D. Mich. 2020) .............................................................25

*H.H. v. G6 Hosp., LLC*,
   2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) .....................................................21

*Henao v. Smiths Detection, Inc.*,
   2019 WL 2476631 (D.D.C. June 13, 2019) ........................................................45

*Hi-Tech Pharm., Inc. v. Hahn*,
   2020 WL 3498588 (D.D.C. June 29, 2020) ..........................................................6

*Hindi v. ExxonMobil Oil Corp.*,
   2008 WL 11337374 (S.D. Cal. Sept. 10, 2008) ..................................................43

*Hull v. Eaton Corp.*,
   825 F.2d 448 (D.C. Cir. 1987) ...........................................................................41

*J.B. v. G6 Hospitality, LLC*,
    2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) ....................................................................21

*J.L. v. Best W. Int'l, Inc.*,
    2021 WL 719853 (D. Colo. Feb. 24, 2021) ........................................................................25

*Jama v. Immigration & Customs Enforcement*,
    543 U.S. 335 (2005) ............................................................................................................34

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ........................................................................................................17

*John Roe I v. Bridgestone Corp.*,
    492 F. Supp. 2d 988 (S.D. Ind. 2007) ................................................................................34

*Johnson v. Sheriff of Cook Cty.*,
    2015 WL 1942724 (N.D. Ill. Apr. 24, 2015) .....................................................................26

*Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*,
    575 U.S. 650 (2015) ............................................................................................................33

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) .......................................................................................................34, 37

*Kiwanuka v. Bakilana*,
    844 F. Supp. 2d 107 (D.D.C. 2012) ...................................................................................38

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ................................................................................................................31

* *Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................................7, 8

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ..............................................................................21

*In re Managed Care Litig.*,
    135 F. Supp. 2d 1253 (S.D. Fla. 2001) ..............................................................................16

*McQueen v. Woodstream Corp.*,
    244 F.R.D. 26 (D.D.C. 2007) .............................................................................................45

*Menoken v. Miles*,
    270 F. Supp. 3d 200 (D.D.C. 2017) .....................................................................................8

*Morton v. Mancari*,
    417 U.S. 535 (1974) ............................................................................................................28

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
   436 F. Supp. 3d 1150 (N.D. Ill. 2020) ................................................36

* *Nestlé USA, Inc. v. Doe*,
   141 S. Ct. 1931 (2021) ..............................................17, 31, 35, 37

*News World Commc'ns, Inc. v. Thompsen*,
   878 A.2d 1218 (D.C. 2005) ..............................................38, 44

*Owino v. CoreCivic, Inc.*,
   2020 WL 1550218 (S.D. Cal. Apr. 1, 2020) ..............................12, 13

*Paavola v. United States*,
   459 F. Supp. 3d 21 (D.D.C. 2020) ..............................................40, 42

*Plaintiff A v. Schair*,
   2014 WL 12495639 (N.D. Ga. Sept. 9, 2014) ........................................33

*In re Princo Corp.*,
   486 F.3d 1365 (Fed. Cir. 2007) ..............................................15

*Prosser v. Fed. Agric. Mortg. Corp.*,
   593 F. Supp. 2d 150 (D.D.C. 2009) ..............................................8

*Raflo v. United States*,
   157 F. Supp. 2d 1 (D.D.C. 2001) ..............................................38

*Ratha v. Phatthana Seafood Co.*,
   2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) ........................................20

*Ratha v. Phatthana Seafood Co.*,
   2016 WL 11020222 (C.D. Cal. Nov. 9, 2016) ........................................33

*Republic of Sudan v. Owens*,
   194 A.3d 38 (D.C. 2018) ..............................................44

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ..............................................19

*Ricchio v. McLean*,
   853 F.3d 553 (1st Cir. 2017) ..............................................20

* *RJR Nabisco, Inc. v. European Cmty.*,
   136 S. Ct. 2090 (2016) ..............................................31, 32, 34, 35, 36, 37

*RJR Nabisco. Roe v. Howard*,
   917 F.3d 229 (4th Cir. 2019) ..............................................35, 36

*Robbins v. U.S. Dep't of Housing & Urban Dev.*,
  72 F. Supp. 3d 1 (D.D.C. 2014) ....................................................................8

*In re S. White Transp., Inc.*,
  725 F.3d 494 (5th Cir. 2013) ......................................................................19

\* *S.J. v. Choice Hotels Int'l, Inc.*,
  473 F. Supp. 3d 147 (E.D.N.Y. 2020) .....................................................23, 24

*S.Y. v. Naples Hotel Co.*,
  476 F. Supp. 3d 1251 (M.D. Fla. 2020) ......................................................26

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*,
  60 F. Supp. 3d 36 (D.D.C. 2014) ...............................................................39

*Salazar v. Islamic Republic of Iran*,
  370 F. Supp. 2d 105 (D.D.C. 2005) ............................................................43

*Sebelius v. Cloer*,
  569 U.S. 369 (2013) ...................................................................................15

*Siegel v. U.S. Dep't of Treasury*,
  304 F. Supp. 3d 45, 54 (D.D.C. 2018) ........................................................10

*Simms v. Dist. of Columbia*,
  699 F. Supp. 2d 217 (D.D.C. 2010) ............................................................42

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) .......................................................................................7

*Slinski v. Bank of Am., N.A.*,
  981 F. Supp. 2d 19 (D.D.C. 2013) ..............................................................40

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .................................................................................7

*St. Louis v. Perlitz*,
  2016 WL 1408076 (D. Conn. Apr. 8, 2016) ...............................................33

*Steorts v. Am. Airlines, Inc.*,
  647 F.2d 194 (D.C. Cir. 1981) ....................................................................44

*TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*,
  808 F. Supp. 2d 60 (D.D.C. 2011) ..............................................................38

*Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
  2012 WL 5378742 (C.D. Cal. Aug. 27, 2012) ............................................37

*Toumazou v. Turkish Republic of N. Cyprus,*
    71 F. Supp. 3d 7 (D.D.C. 2014) ................................................................23

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ..............................................................................7, 8

*UFCW Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.,*
    719 F.3d 849 (7th Cir. 2013) ......................................................................16

*United States v. Afyare,*
    632 F. App'x 272 (6th Cir. 2016) ...........................................................20, 21

\* *United States v. Papagno,*
    639 F.3d 1093 (D.C. Cir. 2011) ..................................................................19

*United States v. Ron Pair Enter, Inc.,*
    489 U.S. 235 (1989) ....................................................................................33

*United States v. Toviave,*
    761 F.3d 623 (6th Cir. 2014) ......................................................................28

*Venetian Casino Resort, L.L.C. v. N.L.R.B.,*
    793 F.3d 85 (D.C. Cir. 2015) ......................................................................18

*Vulcan Golf, LLC v. Google Inc.,*
    552 F. Supp. 2d 752 (N.D. Ill. 2008) ..........................................................16

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................................8, 9

*White v. Wash. Intern Student Hous.,*
    2019 WL 1858298 (D.D.C. Apr. 25, 2019) ................................................45

*Wood v. Neuman,*
    979 A.2d 64 (D.C. 2009) ............................................................................43

**STATUTES**

18 U.S.C. § 1581 ...............................................................................................14

18 U.S.C. § 1583 ...............................................................................................14

18 U.S.C. § 1584 ...............................................................................................14

18 U.S.C. § 1585 ...............................................................................................34

\* 18 U.S.C. § 1589 ............................................................................6, 14, 15, 27, 28

\* 18 U.S.C. § 1590 .................................................................................6, 15, 27

18 U.S.C. § 1591 ...................................................................................15, 20, 27

18 U.S.C. § 1594 ..............................................................................................14

* 18 U.S.C. § 1595 ..................................................2, 6, 12, 14, 15, 23, 29, 32

18 U.S.C. § 1595A ...........................................................................................12

18 U.S.C. § 1596 ........................................................................................31, 33

18 U.S.C. § 1962 ..............................................................................................32

18 U.S.C. § 1964 ..............................................................................................32

18 U.S.C. § 3271 ..............................................................................................36

22 U.S.C. § 7101 ..............................................................................................13

29 U.S.C. § 212 ................................................................................................28

29 U.S.C. § 213 ................................................................................................28

D.C. Code § 12-301 .........................................................................................44

Pub. L. No. 106–386, § 112, 114 Stat. 1464 (2000) ......................................13

**RULE**

Fed. R. Civ. P. 44.1 ...........................................................................................5

**OTHER AUTHORITIES**

Am. Heritage Dictionary of the English Language (4th ed. 2000) ............................15, 19

Black's Law Dictionary (7th ed. 1999) ......................................................16, 19

Coffee-Cocoa Council, *Document for the Implementation of Internal and External Marketing Mechanisms* (Oct. 2020) ....................................................4, 5

Coffee-Cocoa Council, *Note to Exporters, Processors, Cooperative Companies and Cocoa Buyers* (Mar. 29, 2021) ..............................................................5

H. Amend. 142. H.R. 2330 (2001) (in 147 Cong. Rec. H3781 (daily ed. June 28, 2001)) .....................................18

H.R. Rep. No. 106-939 (Oct. 5, 2000) .............................................................27

H.R. Rep. No. 110-430 (2007) .........................................................................33

Harkin-Engel Protocol (2010) .........................................................................35

x

NORC Final Report (Oct. 2020) ............................................................................4, 22, 27, 30

WCF, Our Members,
    https://www.worldcocoafoundation.org/about-wcf/members/ ................................................17

**INTRODUCTION**

Plaintiffs are citizens of Mali who allege that, as minors, they were compelled to work on cocoa farms in Côte d'Ivoire.  But Plaintiffs do not allege that these cocoa farms were owned by Defendants.  Nor do Plaintiffs allege that the individuals who employed them, who promised them these jobs, who transported them to the cocoa farms, or who forced them to work had *any* relationship with Defendants.  Plaintiffs nonetheless seek to hold Defendants—U.S. companies that purchase cocoa—liable for human trafficking and forced labor under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and common law.  Plaintiffs' claims are based on the theory that, by failing to eradicate child labor from Côte d'Ivoire, Defendants have "knowingly benefited" from "participating" in a trafficking "venture" that injured Plaintiffs.

Defendants strongly condemn the use of forced labor.  Moreover, as the complaint concedes, Defendants are also working to address the distinct issue of non-forced child labor in the cocoa supply chains, which reflects a serious and complex global socioeconomic challenge that requires the combined efforts of governments, NGOs, and industry stakeholders to solve.

The facts alleged in the complaint, however, do not plausibly support a cause of action against Defendants.  Plaintiffs' theory of TVPRA venture liability would mean that any person purchasing products or materials produced in a particular country—including consumers and retailers who may "benefit" from allegedly lower prices—could be held liable based on purported trafficking carried out by unknown producers anywhere in that country.  Because there is no legal support for such a limitless theory, Plaintiffs' complaint should be dismissed.

*First*, Plaintiffs lack Article III standing.  Plaintiffs have not alleged an injury fairly traceable to any alleged conduct by Defendants.  At most, Plaintiffs allege they worked on cocoa farms located in "areas" of Côte d'Ivoire that ultimately supply cocoa beans to (some) Defendants.  They do not allege that Defendants owned or had any relationship with the specific farms on which

Plaintiffs worked or the unidentified individuals who trafficked or employed them.  Nor do they allege that Defendants had any direct role in causing their alleged harm.  To the contrary, the complaint itself alleges that the "vast majority" of cocoa beans make their way to Defendants through "untraceable channels."  Corrected Complaint, ECF No. 2 ("Compl.") ¶ 74.  Because Plaintiffs cannot allege that they suffered injuries fairly traceable to any individual Defendant's actions, their claims cannot satisfy Article III.

*Second*, the complaint does not state a claim under the TVPRA.  The TVPRA allows victims of certain trafficking offenses to bring a civil action "against the perpetrator (or whoever knowingly benefits, financially or receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." 18 U.S.C. § 1595(a).  Courts have interpreted this provision to allow individuals to sue their traffickers and those who directly assist their traffickers as part of a "venture."  Unlike those cases, however, Plaintiffs try to allege that *all individuals and entities* connected in any way to the Ivorian cocoa market are part of a single, coordinated trafficking venture.  The complaint offers no facts to support the existence of a massive global trafficking venture; nor does it allege any connection between Defendants and the traffickers that allegedly harmed Plaintiffs.  The absence of any well-pled link between Defendants and the farms or individuals that employed Plaintiffs is fatal to their TVPRA claim.

At bottom, Plaintiffs seek to hold Defendants liable under the TVPRA simply because, although Defendants have engaged in decades-long efforts to help combat and mitigate child labor in Côte d'Ivoire, those efforts have not succeeded in eliminating child labor.  But it would be inconsistent with the TVPRA's plain text, and contrary to the law's purpose, to interpret the TVPRA to impose liability on companies based on their efforts to remedy complex global labor

challenges.  Such an interpretation would deter similar efforts for fear that it would make companies vulnerable to a TVPRA action like this one if the problem persists.  Moreover, the complaint conflates the issue of *forced* labor (which is covered by the TVPRA) with the distinct, complex challenges posed by underage workers who were not coerced into the labor market (which is not covered by the TVPRA).

*Third*, even if Plaintiffs had adequately alleged their TVPRA claims, those claims are impermissibly extraterritorial because they seek to impose civil liability on Defendants for injuries suffered overseas at the hands of unknown foreign actors.  U.S. statutes are presumed not to apply to extraterritorial conduct, and nothing in the text of the TVPRA's civil liability provision defeats that presumption.  Because Plaintiffs' claims arise from events overseas, they are not actionable under the TVPRA.

*Finally*, Plaintiffs' common law causes of action also fail.  The complaint does not allege any connection between Plaintiffs or the individuals who caused their harm and any Defendant, and therefore Plaintiffs cannot state a claim for unjust enrichment, negligent supervision, or intentional infliction of emotional distress.  Those claims also are barred by the three-year statute of limitations.

Defendants not only have clear policies against forced labor, but are actively investing resources and leading efforts to improve labor conditions in the global cocoa market.  Their efforts should not subject them to TVPRA liability.  The complaint should be dismissed with prejudice.

## BACKGROUND

The majority of the world's cocoa supply originates in West Africa.  Cocoa beans are grown and harvested on farms, most of them small and family-owned, in countries such as Côte d'Ivoire.  Farmers in Côte d'Ivoire then sell their cocoa beans to farming cooperatives and certain licensed third parties.  Cocoa suppliers can then purchase cocoa beans and either process them into

cocoa products or chocolate, or sell them to companies that use cocoa in their products and sell those products to consumers.[1]

Plaintiffs are eight citizens of Mali.  They allege that, as minors in Mali, they encountered various unnamed individuals who offered them jobs, which they accepted, in Côte d'Ivoire. Compl. ¶¶ 127–148.  They allege they were transported to various regions around Côte d'Ivoire and given work on cocoa plantations, only to have their pay denied or withheld.  *Id.*  Though the amount of time Plaintiffs remained in Côte d'Ivoire varies from a few months to several years, *e.g.*, *id.* ¶¶ 141, 147, they allege they all ultimately left the cocoa farms and returned to Mali. Plaintiffs seek to represent a class of all individuals who were trafficked by any person or group from Mali to the cocoa-producing regions of Côte d'Ivoire and forced to perform labor while under the age of 16.  *Id.* ¶ 18.

Defendants are U.S.-based companies that are among the furthest downstream in the global cocoa supply chain.  Cargill, Incorporated, Cargill Cocoa, and Olam International Americas, Inc. are cocoa suppliers that purchase cocoa beans from intermediaries, process them, and sell the processed cocoa to companies that use cocoa in their consumer products.  Compl. ¶¶ 25, 26, 29. Nestlé USA, Inc., Barry Callebaut USA, Mars, Incorporated, The Hershey Company, and Mondelēz International, Inc. are cocoa processors and food and beverage manufacturers that use cocoa purchased from various suppliers.  *Id.* ¶¶ 24, 27, 28, 30, 31.  Plaintiffs do not allege that Defendants own or operate any cocoa farms in Côte d'Ivoire; they simply allege that Defendants purchase cocoa originating from there.

In purchasing cocoa, Defendants are subject to Ivorian law.  Among the regulations

---

[1] *See, e.g.*, NORC Final Report at 9 (Oct. 2020); Appendix B (Coffee-Cocoa Council, *Document for the Implementation of Internal and External Marketing Mechanisms* (Oct. 2020)).

imposed on the cocoa supply chain by the Ivorian government are price restrictions:  there is a minimum price, set by the national government, that farmers must be paid for the cocoa they produce and sell.  *See, e.g.*, Appendix B (Coffee-Cocoa Council, *Document for the Implementation of Internal and External Marketing Mechanisms* (Oct. 2020)); Appendix D (Coffee-Cocoa Council, *Note to Exporters, Processors, Cooperative Companies and Cocoa Buyers* (Mar. 29, 2021)).[2]

The complaint attempts to fault Defendants for Plaintiffs' injuries by alleging that "Defendants have failed to stop the illegal use of forced child labor in cocoa harvesting," and that Defendants "maintain[ ] exclusive supplier/buyer relationships" with unspecified farms and farming cooperatives in Côte d'Ivoire.  Compl. ¶¶ 50–51.  Notably missing, however, is any allegation connecting any specific Defendant with any farm on which any Plaintiff allegedly worked.  Instead, the complaint alleges at most that some (but not all) Plaintiffs worked in "area[s]" that supplied cocoa to some (but not all) Defendants.  *Id.* ¶¶ 127, 130, 133, 136, 139, 143, 146. The complaint does not allege that any Defendant had any relationship—direct or indirect—with the unnamed individuals who offered jobs to Plaintiffs, the unknown individuals who transported them to Côte d'Ivoire, or the unidentified individuals who denied them pay for their work.  It also does not allege that Plaintiffs had an employment relationship with any Defendant, or that Defendants took any action that caused Plaintiffs to seek out jobs in Côte d'Ivoire.

By contrast, the complaint *does* allege that Defendants have joined a variety of industry groups and established clear policies prohibiting their suppliers from using child labor in cocoa production.  Compl. ¶¶ 63–125.  These efforts have included implementing a Child Labor

---

[2] The appendix includes documents from Côte d'Ivoire's Coffee-Cocoa Council that the Court may consider as evidence of foreign law.  *See* Fed. R. Civ. P. 44.1.

Monitoring and Remediation System, *id.* ¶¶ 71, 85, 96, piloting new efforts to improve the traceability of cocoa beans, *id.* ¶ 90, and providing awareness training to communities, *id.* ¶ 97.

Most of these efforts have been pursuant to the Harkin-Engel Protocol, a groundbreaking public-private partnership involving the U.S. Department of Labor; the governments of Côte d'Ivoire and Ghana; and the cocoa industry, represented by the World Cocoa Foundation ("WCF"). The WCF is a 501(c)(3) organization that is actively engaged in efforts to eliminate child and forced labor. Despite these efforts, the complaint implausibly alleges that, because they continue to purchase cocoa sourced from Côte d'Ivoire, Defendants—many of which are direct competitors—have somehow joined together in a "cocoa supply chain 'venture'" and agreed to profit from forced labor. Compl. ¶¶ 155, 157. The complaint brings claims under the TVPRA, 18 U.S.C. §§ 1589, 1590, 1595, as well as common-law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress.

## LEGAL STANDARD

"Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). To survive a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of "establish[ing] by a preponderance of the evidence that the Court has jurisdiction." *Coal. for Mercury-Free Drugs v. Sebelius*, 725 F. Supp. 2d 1, 7 (D.D.C. 2010), *aff'd*, 671 F.3d 1275 (D.C. Cir. 2012). A "[p]laintiff's factual allegations in the complaint … will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Hi-Tech Pharm., Inc. v. Hahn*, 2020 WL 3498588, at *3 (D.D.C. June 29, 2020) (quotation marks omitted).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.  Plaintiffs Lack Article III Standing

Article III standing "'is an essential and unchanging' predicate to any exercise" of a federal court's jurisdiction. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To meet the "irreducible constitutional minimum of standing," there must be "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560. It must also be "likely," rather than "merely speculative," that a plaintiff's "injur[ies] will be redressed by a favorable decision." *Id.* at 561.

The burden lies with Plaintiffs to "clearly … allege facts demonstrating" standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quotation marks omitted). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts … exercise 'their proper function in a limited and separated government.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citations omitted).

The requirements of Article III apply with equal force in the class action context. *See*

7

*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976); *TransUnion*, 141 S. Ct. at 2208. It is not enough for Plaintiffs to point to generalized allegations regarding the cocoa industry, conditions on cocoa farms, and entities within the cocoa supply chain.  Nor can they rely on injuries that unnamed members of the putative class may have suffered.  Instead, *each* Plaintiff must adequately allege that he "personally" suffered injuries fairly traceable to a particular Defendant's conduct.  *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  Because Plaintiffs cannot make this showing, their claims should be dismissed.

### A.    Plaintiffs' alleged injuries are not fairly traceable to Defendants

Article III demands "a 'fairly traceable' injury and not an attenuated connection."  *Robbins v. U.S. Dep't of Housing & Urban Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014) (quoting *Lujan*, 504 U.S. at 560–61).  The complaint does not satisfy that standard.

**No Direct Connection.**  The complaint does not allege that any Defendant had any direct connection to any Plaintiffs or their alleged traffickers.  It does not allege that Defendants own or operate cocoa farms, offered Plaintiffs jobs on cocoa farms, transported them across international borders, required them to perform hazardous labor, or denied them pay for their work.  In short, it alleges no traceable connection between Plaintiffs' alleged injuries and the specific acts of any Defendant named in the complaint.  The absence of any such allegations defeats Article III standing because "[t]here is no allegation that the defendants control or controlled [the alleged wrongdoers], and no claim or allegation that the defendants actually caused [Plaintiffs'] direct injury at all."  *Prosser v. Fed. Agric. Mortg. Corp.*, 593 F. Supp. 2d 150, 155 (D.D.C. 2009); *see also Menoken v. Miles*, 270 F. Supp. 3d 200, 213 (D.D.C. 2017) (no standing where plaintiff "expressly attribute[d] her alleged injuries to actions by … third-parties not now before the Court"), *aff'd sub. nom Menoken v. Kerner*, 741 F. App'x 817 (D.C. Cir. 2018) (unpublished).

**No Indirect Connection.**  Nor does the complaint plausibly allege that any Defendant's

conduct indirectly harmed Plaintiffs.  Although in some circumstances Article III standing can be established where the alleged harm is caused by a third party, it is "substantially more difficult" in such cases "to meet the minimum requirement of [Article] III."  *Warth*, 422 U.S. at 505; *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021).   In such a case, a plaintiff must present "substantial evidence of a causal relationship between [Defendants' conduct] and the third-party conduct, leaving *little doubt as to causation*."  *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (emphasis added); *see also Fla. Audubon Soc'y*, 94 F.3d at 663 ("Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." (citations omitted)).

Plaintiffs cannot satisfy this standard, because the complaint does not allege that any Defendant interacted with their alleged traffickers or purchased cocoa that originated on any farm on which Plaintiffs worked.  Instead, the complaint alleges that four Plaintiffs worked on cocoa farms in "frontier" or "free zone[s]," which the complaint describes as unregulated and unmonitored—and thus impossible to connect to any Defendant.  Compl. ¶¶ 130, 139, 143 (describing allegations of Plaintiffs Sidiki Bamba, Ousmane Ouattara, Issouf Bagayoko, and Arouna Ballo); *see also id.* ¶ 56 (describing "'free zones'").

The remaining Plaintiffs allege vaguely that they worked in an "area" in Côte d'Ivoire that ultimately supplied cocoa to one or more (but not all) Defendants.  Compl. ¶¶ 127, 133, 136, 146 (describing allegations of Plaintiffs Issouf Coubaly, Tenimba Djamoutene, Oudou Ouattara, and Mohamed Traore).  The mere allegation that Plaintiffs worked in the same "area" of a country where a Defendant sourced cocoa falls short of the "substantial evidence of a causal relationship" between Defendants' conduct and their injuries.  *Arpaio*, 797 F.3d at 20 (quotation marks omitted).  To the contrary, the complaint itself alleges that tracing cocoa from the specific farms at which

Plaintiffs worked to Defendants is difficult, because the "vast majority" of Defendants' cocoa "is sourced through untraceable channels."  Compl. ¶ 74; *see also id.* ¶¶ 67 (alleging there is only a "small amount of traceable cocoa" in the supply chain); 89 (quoting WCF report stating that "[t]he organized supply chains of a handful of companies reach only a fraction of the entire cocoa-growing population of Côte d'Ivoire and Ghana"); 91 (alleging "there is no way" Defendants "could know" where their cocoa beans originated).

Courts routinely dismiss for lack of Article III standing in similar circumstances.  For example, in *Siegel v. U.S. Department of Treasury*, the court concluded that plaintiffs lacked Article III standing where their injuries "flow[ed] from the responses of third parties to [d]efendants' actions."  304 F. Supp. 3d 45, 54 (D.D.C. 2018).  The plaintiffs alleged that their properties were unlawfully seized by the Israeli military, and that the Treasury Department caused those injuries by funding the Israeli initiative under which those properties were seized.  *Id.* at 48–49.  But Judge Moss found Article III traceability lacking because plaintiffs' causation theory would impermissibly require "the Court [to] speculate about the actual path of the funds, the various intermediate steps, the ultimate recipients, and their relationship to the control of [p]laintiffs' property."  *Id.* at 53.

Here, the connection is even more attenuated than in *Siegel*.  Rather than allege a connection between Defendants and the farms on which Plaintiffs worked, the complaint asserts that Defendants are responsible for Plaintiffs' injuries because they purportedly "failed to stop the illegal use of forced child labor in cocoa harvesting" generally.  Compl. ¶ 50.  Plaintiffs do not explain how Defendants can be held liable for ongoing labor conditions at specific farms in Côte d'Ivoire when Defendants do not control those farms and are not alleged to have even purchased cocoa directly from those farms.  *See Arpaio*, 797 F.3d at 20 (Article III requires "substantial

10

evidence of a causation relationship" between a defendant's conduct and third parties that caused a plaintiff's injuries (quotation marks omitted)).  Moreover, Article III's causation requirement cannot be satisfied by the complaint's theory that Defendants' alleged failure to unilaterally eliminate the risk of forced labor from Côte d'Ivoire makes them responsible for all alleged unlawful labor conditions on every farm throughout the country—particularly in the absence of factual allegations that Defendants have a relationship with the farms or individuals engaging in unlawful practices.

Plaintiffs' allegations would require the Court to speculate that their injuries were caused by Defendants' continued purchases of cocoa grown anywhere in Côte d'Ivoire, rather than by the individuals responsible for misleading or mistreating Plaintiffs.  The "protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged act[] to the asserted particularized injury." *Fla. Audubon Soc'y*, 94 F.3d at 670.

The theory of causation asserted in the complaint is far too expansive and uncertain to support Article III standing.  If accepted, Plaintiffs' theory would extend to any manufacturer, retailer, and even consumer—anyone who purchases cocoa or a cocoa-based product knowing of the possibility of unlawful labor conditions on foreign farms that are part of a global supply chain. But Article III bars such sweeping theories, and for good reason:  Plaintiffs' theory would overwhelm federal courts with cases seeking broad socioeconomic reforms divorced from any concrete case or controversy between the actual litigants.  The complaint should be dismissed on this ground, and the Court need go no further.

## B. Plaintiffs are not entitled to seek injunctive relief under the TVPRA or Article III

Plaintiffs' claim for injunctive relief, *see* Compl. ¶ 193(h), is barred by the TVPRA and the

Constitution.  *First*, the TVPRA does not authorize private plaintiffs to seek an injunction.  The civil remedy provision of the TVPRA permits an individual who is a victim of a TVPRA violation to bring a civil action to "recover damages and reasonable attorneys fees."  18 U.S.C. § 1595(a).  By specifying the permissible remedies, and not mentioning injunctive relief, the statutory text makes clear that it does not authorize private parties to obtain injunctive relief.  And the TVPRA provision that specifically addresses civil injunctions provides only that "the Attorney General may bring a civil action in a district court of the United States seeking an order to enjoin such act."  18 U.S.C. § 1595A(a).  The express provision for that remedy in actions filed by the Attorney General further confirms that the statute does not authorize private plaintiffs to obtain injunctive relief through a TVPRA action.

*Second*, the complaint does not allege that Plaintiffs face "a sufficient likelihood that [they] will again be wronged in a similar way," which Article III requires for an injunctive claim.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Friends of the Earth, Inc v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").  Plaintiffs do not allege that they have any current involvement with cocoa production or that they face any current or future risk of trafficking or forced labor.  Nor can they base Article III standing to seek injunctive relief on an alleged threat of harm to unnamed putative class members.  Named plaintiffs that lack standing to seek injunctive relief for themselves also lack standing to seek injunctive relief on behalf of others.  *See Gerlich v. U.S. Dep't of Justice*, 659 F. Supp. 2d 1, 19 (D.D.C. 2009).

For this reason, the court in *Owino v. CoreCivic, Inc.*, 2020 WL 1550218 (S.D. Cal. Apr. 1, 2020), dismissed claims for injunctive relief in a TVPRA action brought by former detainees at an immigration facility who allegedly had been subjected to forced labor.  The court held that the

plaintiffs lacked standing to seek injunctive relief because they "'were released from CoreCivic's custody prior to the filing of their original complaint'" and included no allegations in the complaint "regarding [their own] likelihood of being detained at a CoreCivic facility in the future." *Id.* at *9–10. Here, too, the complaint contains no allegations to suggest that any Plaintiff faces a sufficient likelihood of future trafficking or forced labor, and the claims for injunctive relief must be dismissed.

*Third*, Plaintiffs cannot satisfy Article III's redressability requirement for their claims for injunctive relief. "[T]raceability and redressability overlap as two sides of a causation coin." *Exhaustless Inc. v. FAA*, 931 F.3d 1209, 1212 (D.C. Cir. 2019) (quotation marks omitted). And the D.C. Circuit "has denied standing where 'the plaintiff seeks to change the defendant's behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury.'" *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)). Although Defendants fully support eradicating the labor conditions described in the complaint, Plaintiffs plead no facts suggesting that enjoining Defendants' conduct would prevent unidentified individuals in Mali or Côte d'Ivoire who are not before this Court from engaging in unlawful labor practices. The claim for injunctive relief should therefore be dismissed. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (finding no standing where redressability "depends on the unfettered choices made by independent actors not before the courts").

## II.     The Complaint Fails to State a Claim for Relief under the TVPRA

Congress enacted the TVPRA "to combat trafficking in persons," which it found was being "increasingly perpetrated by organized, sophisticated criminal enterprises." 22 U.S.C. § 7101(a), (b)(8). To this end, Congress imposed enhanced criminal penalties for certain offenses related to peonage, slavery, involuntary servitude, sex trafficking, and forced labor. *See* Pub. L. No. 106–

13

386, § 112(a)–(b), 114 Stat. 1464, 1486–90 (2000) (amending 18 U.S.C. §§ 1581, 1583, and 1584, and codifying §§ 1589–1594). Section 1595, the civil remedies provision, states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

A civil claim under Section 1595 therefore must rest on a predicate violation of one of the criminal offenses contained in Chapter 77 of Title 18. *See* 18 U.S.C. § 1595(a). Here, the complaint alleges two predicate violations: Section 1589 (the forced labor provision) and Section 1590 (the trafficking provision). A Section 1595 claim against someone other than the perpetrator of these predicate violations requires proof that the defendant: (1) "knowingly benefit[ted]" (2) from "participation in a venture" (3) that violated Section 1589(a) or Section 1590(a), and (4) knew or should have known that the "venture" in which it participated committed such a violation. *Id.* §§ 1589, 1590, 1595(a). Because the complaint does not allege facts that would establish any of these elements, it fails to state a claim under the TVPRA.

## A. Defendants did not participate in a TVPRA venture

The TVPRA claim fails at the outset because the complaint does not allege that any Defendant unlawfully "participated" in a "venture" within any reasonable meaning of those terms. It alleges only that Defendants, who are unaffiliated entities—and, in some cases, direct competitors—purchased cocoa from a cocoa market in which other unnamed persons or entities allegedly engaged in wrongdoing. Moreover, although the complaint describes the "venture" as a "cocoa supply chain," Plaintiffs include in that supposed venture every cocoa farm in Côte d'Ivoire, every entity that purchases from Ivorian farmers, every entity that buys or sells Ivorian-

14

grown cocoa in downstream markets, and every entity that uses Ivorian-grown cocoa in end products. Nothing in the statutory text permits such an expansive and boundless theory.

### 1.  *Plaintiffs fail to plead a "venture" under the TVPRA*

Plaintiffs' TVPRA claims face a threshold problem: the complaint fails to plead the existence of a plausible venture involving Defendants. The sole purported "venture" alleged in the complaint is a single, overarching "cocoa supply chain" venture encompassing every person or entity involved in the production, supply, importation, and purchase of cocoa from Côte d'Ivoire across a ten-year period. Compl. ¶ 154. The tactical reason for pleading a single venture is obvious: Plaintiffs do not identify any of the alleged traffickers who harmed them and cannot tie any of those unidentified individuals to Defendants. Nor can Plaintiffs connect their specific farms to Defendants, as opposed to the numerous other cocoa suppliers and chocolate manufacturers around the world. To overcome these pleading deficiencies, Plaintiffs try to sweep every entity involved in the supply or purchase of cocoa—including multiple *direct* competitors—into a single, massive "supply chain" venture.

Plaintiffs' reliance on the existence of a single venture is fatal to their TVPRA claims. The relevant provisions of the TVPRA (Sections 1589, 1590, and 1595) do not define the term "venture," so the term should be given its ordinary meaning. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).[3] The ordinary meaning of "venture" is "[a] business enterprise involving some risk in expectation of gain." Am. Heritage Dictionary of the English Language (4th ed. 2000); *accord*

---

[3] Section 1591 of the TVPRA defines "venture" as "two or more individuals associated in fact," 18 U.S.C. § 1591(e)(6), but that definition does not apply to other provisions of the TVPRA, *id.* § 1591(e)(1) (defining terms as used "[i]n this section"); *see also In re Princo Corp.*, 486 F.3d 1365, 1368 (Fed. Cir. 2007) (statutory "definitions limited to one section should not be applied to another"). Even if the Section 1591 definition of venture were applicable, it would make no difference because Plaintiffs do not allege that the hundreds of disparate entities in the global cocoa supply chain are "associated in fact" with one another for a common purpose.

Black's Law Dictionary (7th ed. 1999) ("[a]n undertaking that involves risk; esp., a speculative commercial enterprise").  This definition is reinforced by the concept of a *joint venture*:  an undertaking by multiple people bound together by "an express or implied agreement" and "a common purpose."  *Id.*

Plaintiffs' attempt to plead a single all-encompassing "cocoa supply chain" as a venture cannot satisfy the statutory requirement.  As Plaintiffs recognize, the "cocoa supply chain" is actually countless different individuals and entities that farm, transport, distribute, process, supply, import, and purchase cocoa originating in Côte d'Ivoire.  *See, e.g.*, Compl. ¶¶ 50, 57.  The complaint pleads no facts plausibly suggesting that all of these disparate individuals and entities are connected with one another in a single, coordinated "business enterprise," with an express or implied agreement and a shared purpose.  Nor do Plaintiffs allege that Defendants and other purchasers of cocoa cooperated with each other in some single commercial endeavor.  To the contrary, Defendants are independent companies that in many cases directly *compete* with one another, both as buyers and sellers of cocoa and cocoa products.  *See id.* ¶¶ 24–31.

Defendants are not aware of any court that has found competing, unrelated businesses to be part of a single TVPRA "venture"—let alone an entire supply chain for a particular ingredient. In an analogous context, courts in RICO cases have rejected the claim that "an entire nationwide or regional industry or profession may constitute an enterprise."  *In re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1262 (S.D. Fla. 2001).  If plaintiffs' "nebulous, open-ended description" of the venture were sufficient to state a plausible TVPRA claim, it could potentially subject "millions of entities and individuals" to civil and criminal liability.  *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 785 (N.D. Ill. 2008) (quotation marks omitted); *see also UFCW Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) (holding that a

"normal commercial relationship" involving the purchase and sale of a good does not qualify as an "enterprise").

Because Plaintiffs cannot allege that the entire cocoa supply chain worked together as a single business enterprise, they resort to claiming that Defendants formed a venture by participating in industry coalitions such as the WCF. Compl. ¶ 155. But the WCF has a particular and limited focus—addressing policy issues associated with labor practices in cocoa-supplying regions. It does not coordinate the growing, purchase, and sale of cocoa—which, of course, would be unlawful under the antitrust laws.

And Plaintiffs' claim about the WCF has things precisely backwards. As Plaintiffs acknowledge, the WCF is an organization that has taken steps to *monitor and remediate* improper labor practices in the cocoa supply chain. Compl. ¶ 155. The complaint does not explain how an organization that seeks to *stop* improper labor conditions should be deemed an unlawful trafficking venture under the TVPRA.[4] Moreover, the WCF has 92 total members, including financial institutions, cocoa processors, chocolate manufacturers, warehousing companies, transportation companies, and retailers.[5] The complaint contains no facts suggesting that all of these disparate entities combined to form a single business enterprise, let alone one that supposedly injured Plaintiffs. *See Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759, 765

---

[4] Treating the members of an industry group as an unlawful trafficking venture because they have attempted to improve a complex and intractable socioeconomic problem would discourage companies from participating in global efforts to combat human rights violations. Congress could not have intended such a result. *See Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1939 (2021) ("Companies or individuals may be less likely to engage in intergovernmental efforts if they fear those activities will subject them to private suits."); *cf. Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1406 (2018) (warning that adopting a permissive standard for claims based on foreign human rights violations "might deter the active corporate investment that contributes to the economic development that so often is an essential foundation for human rights").

[5] *See* WCF, Our Members, https://www.worldcocoafoundation.org/about-wcf/members/.

(W.D.N.C. 2011) ("Corralling so many disparate entities into a concerted criminal enterprise would necessitate such organization and cooperation as to be practically impossible, let alone implausible.").

Finally, even if the complaint had plausibly alleged some connection between Defendants' participation in the WCF and the alleged trafficking of Plaintiffs, such an allegation would run headlong into the *Noerr-Pennington* doctrine.  According to the complaint, Defendants acted through the WCF to lobby against legislation.[6]  Compl. ¶ 52; *see also id.* ¶¶ 155–156.  Under *Noerr-Pennington*, however, lobbying "constitutes a direct petition to government" and "is shielded from liability by the First Amendment." *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F.3d 85, 87 (D.C. Cir. 2015).  Thus, to the extent that Plaintiffs seek to hold Defendants liable for any alleged efforts to modify (or prevent modification of) federal law governing labor conditions, Plaintiffs' claims would be barred under *Noerr-Pennington*.

### 2.  Neither downstream purchases from a supply chain nor sourcing cocoa from local suppliers constitutes "participation" in a venture under the TVPRA

Even if every person or entity involved in the buying and selling of cocoa grown in Côte d'Ivoire could constitute a "venture," the complaint fails to establish that Defendants "participated" in that so-called venture.  Plaintiffs do not and cannot allege that Defendants engaged in any forced labor or trafficking themselves.  Rather, Plaintiffs' theory of "participation" consists of the conclusory allegations that "Defendants control the production of Ivorian cocoa"

---

[6] Contrary to Plaintiffs' assertions, the proposed legislation referenced in the complaint did not impose any mandates on cocoa imports, let alone that they be slave free. *See* Compl. ¶¶ 46, 52. The bill would have authorized a $250,000 appropriation to the Food and Drug Administration to research a voluntary "slave free" label for cocoa products, and thus would not have compelled Defendants to take any action. *Doe v. Nestlé, S.A.*, 2017 WL 6059134, at *6 n.9 (C.D. Cal. Mar. 2, 2017) (citing H. Amend. 142. H.R. 2330 (2001) (in 147 Cong. Rec. H3781 (daily ed. June 28, 2001)).

and provide "material support that keeps these farmers in business without requiring them to stop their illegal use of forced child labor."  Compl. ¶¶ 49, 157.  This is insufficient to state a claim under the TVPRA.

The common meaning of the term "participation" from the time of the TVPRA's passage is "[t]he act of taking part in something, such as a partnership."  Black's, *supra*; *see also* Am. Heritage, *supra* ("[t]o … take part" or "share in something").  To "participate" thus refers to *active* engagement.  *See Reves v. Ernst & Young*, 507 U.S. 170, 178–89 (1993) (rejecting argument that "aid" equals "participation"); *In re S. White Transp., Inc.*, 725 F.3d 494, 497 (5th Cir. 2013) ("[T]he word 'participation' connotes activity, and not mere nonfeasance.").

The purchase of a product at wholesale does not constitute "participation" in a business venture that produces and sells that product.  Nor does providing support for a business venture.  As the D.C. Circuit explained in *United States v. Papagno*, "the terms 'assistance' and 'participation'" are "not equivalent."  639 F.3d 1093, 1098 (D.C. Cir. 2011).  For example, "[t]he company that provides electricity to power the sound system at our oral arguments assists the proceedings, but its employees are not ordinarily said to have participated in the oral argument." *Id.*  And "[a] health insurance company may pay for a patient's operation, but the insurer does not participate in the operation at the hospital."  *Id.*; *see also Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 710 (5th Cir. 2017) (bank's secondary market purchase of mortgages does not constitute "'participation' whatsoever in [a co-defendant's] decision to extend credit to any of its applicants").

Applying these principles, Plaintiffs' TVPRA claims fail because they do not and cannot allege that by purchasing cocoa that originated from Ivorian farmers—or providing support and training to unspecified Ivorian farms—Defendants themselves "engaged in some aspect of the

[TVPRA violation]." *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (plaintiff must prove that defendants "engage[d] in sex trafficking together" or "associated for the purpose of furthering the sex trafficking"); *see also, e.g.*, *Ratha v. Phatthana Seafood Co.*, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (no participation absent allegations of "directing or participating in [primary violator's] labor recruitment, [its] employment practices, or the working conditions"); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) (requisite "participation" must be "participation *in a sex-trafficking venture*, not participation in other activities engaged in by the sex trafficker that do not further the sex-trafficking aspect of their venture" (citing *Afyare*, 632 F. App'x at 286)).

Even those courts that have found "participation" under the TVPRA without active participation in the underlying TVPRA violation have required, at a minimum, actions indicating tacit agreement to the unlawful aspects of the venture. *See Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (citing allegations that defendants knew about trafficking and "wished to reinstate" their business of renting rooms to the trafficker, as evidenced by "high fives" with the traffickers and discussion of "getting this thing going again" (quotation marks omitted)); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, at *6 (S.D. Ohio Mar. 16, 2020) ("participation" in sex trafficking venture requires that "the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement" regarding the illicit activities).[7]

_____

[7] Many of these cases involve Section 1591, which covers the TVPRA's sex trafficking offense. Unlike Sections 1589 and 1590 (the forced labor and trafficking provisions invoked by Plaintiffs), Section 1591 contains explicit definitions of "venture" and "participation in a venture." Although these definitions do not apply to Sections 1589 and 1590, *see* 18 U.S.C. § 1591(e)(1) (defining terms "[i]n this section"); *Ratha*, 2017 WL 8293174, at *4, they are consistent with the above cases in that they require a close connection between the association and the end goal of violating the TVPRA, *see* 18 U.S.C. § 1591(e)(4) ("'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)"); *id.* § 1591(e)(6) ("'venture' means

Here, the complaint does not plausibly allege that Defendants entered into any tacit agreement condoning forced labor with any trafficker or farmer. To the contrary, the complaint is replete with allegations concerning Defendants' policies, codes of conduct, initiatives, and partnerships—all aimed at *reducing* and *eliminating* problematic labor practices from the cocoa supply chain. To be sure, Plaintiffs assert that "Defendants were able to obtain an ongoing, cheap supply of cocoa" from farms in Côte d'Ivoire. Compl. ¶ 50. But purchasing cocoa in a supply chain where labor issues may be occurring upstream at some unknown number of unidentified Ivorian farms does not constitute "tacit agreement" with the individuals on those farms. Expanding "participation" to include mere downstream purchases, as Plaintiffs seek to do, would mean that countless entities worldwide—including manufacturers, retailers, and consumers—could be sued for similar TVPRA violations based on the benefit they allegedly receive from purchasing cocoa or cocoa products. Such a limitless reach has no support in precedent or the plain meaning of the statutory text. *See B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *5 (N.D. Cal. July 30, 2020) (dismissing TVPRA claim because complaint was "devoid of any facts linking" hotel chains "to the sex trafficking of this Plaintiff" (emphasis omitted)); *J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020) (TVPRA requires a showing of

---

any group of two or more individuals associated in fact, whether or not a legal entity"). And several courts have required evidence of a "tacit agreement" in applying Section 1595 (the civil liability provision), even with respect to a predicate violation of Section 1591. *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969–70 (S.D. Ohio 2019); *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *4 (S.D. Ohio Dec. 6, 2019). Because the ordinary definitions of "participation" and "venture" under Section 1589 are consistent with those in Section 1591, the cases interpreting Section 1591 narrowly are instructive: If there is no liability under Section 1591, there certainly would be none under Section 1589. *Afyare*, for example, refers to the need for a "sex-trafficking venture" in a case brought based on Section 1591. 632 F. App'x at 287. Under that approach, Plaintiffs must be able to identify a venture, or an aspect of a venture, that has the unlawful conduct as its purpose, and then show that Defendants participated in *that*. The result is the same.

"interaction with a specific venture" engaged in specific violations).

Plaintiffs' conclusory allegations that Defendants control the production of cocoa in Côte d'Ivoire by "maintaining exclusive supplier/buyer relationships with local farms" and providing those farms with "ongoing financial support" (Compl. ¶ 50; *see also id.* ¶ 51) are also insufficient to establish "tacit agreement" with an unlawful venture.  Even if those allegations were credited, Plaintiffs do not allege that Defendants maintained exclusive relationships with or provided financial support to any farms that engaged in trafficking or forced labor.  The bare allegation that Defendants provided financial support to an unspecified number of unidentified farms in Côte d'Ivoire does not plausibly suggest that Defendants participated in a TVPRA venture, much less one that harmed Plaintiffs.[8]

Finally, Plaintiffs' "participation" allegations should be rejected for an additional, independent reason:  they are textbook examples of impermissible group pleading.  Group pleading is unacceptable under Rule 8 because it does not satisfy a plaintiff's duty to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Plaintiffs rely on group pleading throughout their complaint, but their allegations are particularly deficient with respect to what each Defendant supposedly did to facilitate unlawful labor conditions at farms in Côte d'Ivoire.  Defendants operate in different parts of the global cocoa market, and Plaintiffs' own allegations suggest that

---

[8] Furthermore, Plaintiffs' allegation that Defendants control the production of Ivorian cocoa is not remotely plausible given that cocoa is the product of hundreds or thousands of small farms dispersed across the country.  *See* NORC Final Report at 9 ("The median farm size of households was 12.5 acres … in Côte d'Ivoire."); Compl. ¶ 57.  And even if it were credited, Defendants do not "support" local farms to further their supposed use of forced labor.  To the contrary, as the materials cited in the complaint make clear, Defendants have policies against labor violations and provide support to local farmers as part of their efforts to *eliminate* the root causes of child labor.  *See, e.g.*, Compl. ¶¶ 64, 85, 93, 102, 107, 115, 124.

Defendants source cocoa from different areas in Côte d'Ivoire.  *See* Compl. ¶¶ 127, 130, 133, 136, 139, 143, 146.  Plaintiffs thus fail to plausibly allege that each Defendant individually participated in the alleged venture within the meaning of the TVPRA.  *See Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) ("Generally, a plaintiff cannot satisfy the minimum pleading requirements under Rule 8 of the Federal Rules of Civil Procedure by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." (quotation marks omitted)).

### B.  Plaintiffs fail to allege that each Defendant had the requisite knowledge of forced labor

Plaintiffs' TVPRA claims should also be dismissed because they do not plausibly allege that each Defendant knew or should have known of the forced labor violations that injured Plaintiffs.  Although Plaintiffs attempt to impute knowledge to Defendants based on general reports of child labor in the cocoa supply chain, those reports have nothing to do with Plaintiffs themselves or the particular farms where they worked.  These reports also cannot provide the factual underpinning for Plaintiffs' TVPRA claims because the TVPRA applies only to cases of *forced* labor—but not to cases of non-coerced *child* labor, which is the subject of those reports. For either reason, Plaintiffs do not plausibly allege that Defendants possessed the requisite knowledge.

### 1.  *Plaintiffs fail to allege that each Defendant knew or should have known about forced labor violations involving Plaintiffs*

To state a claim under the TVPRA, Plaintiffs must plausibly allege that each Defendant "knew or should have known" about the venture's trafficking violations that injured them.  18 U.S.C. § 1595(a).  Allegations of knowledge about a "general[ ] trafficking problem … do[ ] not satisfy the *mens rea* requirement of the TVPRA."  *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020).  Rather, the TVPRA requires Plaintiffs to allege "facts sufficient to

establish that the defendant knew or should have known about the trafficking of *the plaintiff in particular*." *Doe #9 v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1186333, at *1 (S.D. Tex. Mar. 30, 2021) (emphasis added); *E.S. v. Best W. Int'l, Inc.*, 2021 WL 37457, at *4 (N.D. Tex. Jan. 4, 2021) (requiring allegations that "Defendants knew or should have known that Plaintiff was being trafficked"); *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 939 (D. Or. 2020) ("Plaintiff must allege facts showing how [defendants] received notice that Plaintiff A.B. was trafficked at their respective properties.").

Plaintiffs do not satisfy this requirement. The complaint describes the labor conditions Plaintiffs endured at farms in Côte d'Ivoire. But there is not a single factual allegation plausibly suggesting that any Defendant should have known that *Plaintiffs* were being subjected to those conditions on those farms. Plaintiffs do not allege, for example, that Defendants directly acquired cocoa from those farms, had a commercial agreement with those farms, directly monitored those farms, communicated with the proprietors of those farms, or even knew that those farms existed. Instead, Plaintiffs confine themselves to carefully worded assertions that they worked in the "area" or "free zone" from which certain Defendants ultimately acquired their cocoa. Compl. ¶¶ 127, 130, 133, 136, 139, 143, 146.

The vague assertion that (some) Defendants acquired cocoa from "areas" where Plaintiffs worked falls well short of establishing that Defendants should have known about the forced labor violations that injured Plaintiffs. To conclude otherwise "unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess.'" *S.J.*, 473 F. Supp. 3d at 154; *see also A.B. v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1235241, at *7 (D. Or. Mar. 31, 2021) (generalized allegations of unlawful activity "do not plausibly allege that Defendants knew or should have known about Plaintiff's sex trafficking"); *B.M.*, 2020 WL 4368214, at *6 (dismissing

TVPRA claim where "Complaint fails to allege facts as to how" the defendant "knew or should have known Plaintiff was being trafficked" (emphasis omitted)); *J.L. v. Best W. Int'l, Inc.*, 2021 WL 719853, at *8 (D. Colo. Feb. 24, 2021) (dismissing TVPRA claims where plaintiff's allegations failed to show that the defendant "should have known about what happened to *this plaintiff*" (emphasis added)).

The decision in *H.G. v. Inter-Continental Hotels Corp.*, 489 F. Supp. 3d 697 (E.D. Mich. 2020), is instructive.  There, the plaintiff alleged that a hospitality company should have known of trafficking at one of its hotels because it was "located in an *area* 'known for a high incidence of crime and prone to sex trafficking activity.'" *Id.* at 704–06 (emphasis added).  The court dismissed the TVPRA claim because "allegations that Defendants were generally aware of" trafficking in a particular area "fall[ ] short of establishing that Defendants knew or should have known of sex trafficking" that harmed the plaintiff.  *Id.* at 706.  Similarly, in *A.B.*, 484 F. Supp. 3d 921, the plaintiff alleged that several hotel franchisors "were generally aware that acts of sex trafficking take place in their branded hotels," citing "publicly available news articles and online reviews which describe sex trafficking occurrences at Defendants' branded hotels across the United States." *Id.* at 938.  The court dismissed the TVPRA claim because the complaint cited no circumstances that would have put Defendants on notice of "the alleged trafficking of [the] Plaintiff" at "the specific hotel properties at issue in this case." *Id.*

This Court should reach the same result.  Just like in *H.G.* and *A.B.*, the complaint contains no facts indicating that each Defendant should have known about Plaintiffs' particular situations. Plaintiffs' TVPRA claims should be dismissed on this ground alone.[9]

---

[9] Plaintiffs cannot establish that Defendants had knowledge of their labor conditions by citing background dicta from the Ninth Circuit's opinion in *Doe I v. Nestlé USA, Inc.*, 766 F.3d 1013

### 2. *Plaintiffs cannot rely on general reports of child labor to satisfy the knowledge requirement*

Unable to connect Defendants to the farms where Plaintiffs allegedly worked, Plaintiffs attempt to fill the gap by citing public sources describing instances of child labor in the cocoa supply chain.  For example, Plaintiffs cite governmental reports and other publicly available information that purports to show the presence of child labor at cocoa farms in Côte d'Ivoire.  *See* Compl. ¶¶ 36–40, 43, 58.  Although Defendants agree that the risk of child labor is a serious global social challenge and are committed to combatting it to the best of their abilities (Compl. ¶ 61), those allegations fail to establish that Defendants possessed the knowledge required by the TVPRA.

*First*, as explained above, the TVPRA requires Plaintiffs to allege facts sufficient to show that Defendants knew or should have known about the specific harms they suffered.  *See S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1259 (M.D. Fla. 2020) (concluding allegations "regarding sex trafficking in general and its relationship with the hospitality industry" were irrelevant to plaintiff's TVPRA claim).  None of the general reports about child labor cited in the complaint connect Defendants to Plaintiffs, their employers, or their farms—let alone show that Defendants had knowledge of the specific harms Plaintiffs suffered.  If such general reports were enough to

---

(9th Cir. 2014), *rev'd Nestlé*, 141 S. Ct. 1931.  The Ninth Circuit's decision was reversed by the Supreme Court and involved different plaintiffs, a different statute (the Alien Tort Statute), an entirely different time period (1996–2009), and allegations involving only two Defendants.  *See Nestlé*, No. 19-416, JA25–29 (U.S. filed Aug. 31, 2020).  Even as to those two Defendants, the quoted portions of the opinion were not factual conclusions; the case was at the motion-to-dismiss stage, and the court's statements were based entirely on allegations in the complaint.  Plaintiffs cannot show that Defendants should have known about particular instances of forced labor by lifting vague, nonspecific allegations from an entirely different lawsuit regarding different plaintiffs and a different time period.  *See Johnson v. Sheriff of Cook Cty.*, 2015 WL 1942724, at *2 (N.D. Ill. Apr. 24, 2015) (A "complaint must allege facts," not a "cursory reference to a 'widespread practice' as alleged in another case.").

establish knowledge under the TVPRA, virtually every manufacturer, supplier, or consumer that sells or purchases chocolate or chocolate products could be exposed to civil and criminal liability under the TVPRA.

*Second*, even accepting Plaintiffs' allegations regarding those reports as true, they do not support Plaintiffs' TVPRA claim. Those reports focus exclusively on incidents of *child* labor, which is distinct from *forced* labor.[10] Defendants do not condone child labor and are actively working to combat child labor in the cocoa supply chain. But Congress specifically chose to prohibit only *forced* labor—not non-coerced child labor—in the TVPRA. Sections 1589 and 1590 define "forced labor" as obtaining labor "by means of" (i) "force, threats of force, physical restraint, or threats of physical restraint," (ii) "serious harm or threats of serious harm," (iii) "the abuse or threatened abuse of law or legal process," or (iv) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a); *id.* § 1590(a).

Nothing in those provisions could be interpreted to create automatic TVPRA liability whenever someone obtains physical labor from a person below the age of majority.[11] This contrasts with Section 1591—the TVPRA's sex-trafficking provision—which imposes a lesser burden on a plaintiff (eliminating the obligation to show the defendant knew of the use of force) when the victim "has not attained the age of 18 years." 18 U.S.C. § 1591(a). The fact that

---

[10] *See, e.g.*, NORC Final Report at 2 (cited at Compl. ¶¶ 1, 39, 45, 54, 61, 98, 103, 111, 120) ("This research focuses on child labor and hazardous child labor, not forced child labor/child slavery.").

[11] Legislative history confirms that Congress specifically *refused* to include in this definition of "forced labor" a reference to "obtain[ing] labor or services of minors" due to "concerns … that [such a] provision might have criminalized conduct that is currently regulated by labor law." H.R. Rep. No. 106-939, at 100–01 (Oct. 5, 2000).

Congress created automatic liability based on a victim's age in Section 1591, but choose not to do so in Sections 1589 and 1590, further confirms that the TVPRA's forced labor provisions do not encompass all labor by underage persons.  *See Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (quotation marks omitted)); *cf. United States v. Toviave*, 761 F.3d 623, 623, 625 (6th Cir. 2014) (holding that "[f]orced labor" "obviously does not extend to requiring one's children to … do household chores," even if the "treatment of the children [is] reprehensible").[12]

Because Sections 1589 and 1590 encompass child labor only if such labor is compelled "by means of" an employer's threats of force or harm, 18 U.S.C. § 1589(a), Plaintiffs' allegations based on reports about non-coerced child labor do not support their TVPRA claims.  Accordingly, although Defendants have dedicated substantial resources to addressing child labor, reported incidents of child labor in Côte d'Ivoire do not support any plausible inference that Defendants knew or should have known about forced labor—at the farms where Plaintiffs worked or elsewhere.

### C.    The complaint fails to allege that Defendants obtained a "knowing[ ] benefit" from a violation of the TVPRA

The complaint also fails to allege facts supporting any viable "benefit" theory under the TVPRA.  Section 1595 allows civil claims only against a party who "knowingly benefits,

---

[12] Congress has enacted a separate statutory regime—the Fair Labor Standards Act ("FLSA")—that expressly prohibits the shipment of goods produced in the United States in which "oppressive child labor has been employed."  29 U.S.C. § 212(a).  But the FLSA does not contain a private cause of action and applies only to domestic child labor.  *Id.* §§ 212(b), 213(f).  It would make little sense for Congress to explicitly limit the FLSA in such a manner, while implicitly opening federal courts to wide-ranging civil litigation over extraterritorial child labor claims under the TVPRA.  *See Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

financially or by receiving anything of value from participation" in an unlawful TVPRA venture. 18 U.S.C. § 1595(a).   A benefit is an "advantage" or "profit." Am. Heritage, *supra* ("an advantage"); Black's, *supra* ("[a]dvantage; … [p]rofit or gain").   To satisfy this element, Plaintiffs must plausibly allege "a causal relationship between affirmative conduct" by a defendant that "further[ed] the [ ]trafficking venture and receipt of a benefit, with actual or … constructive knowledge of that causal relationship." *Geiss*, 383 F. Supp. 3d at 168–69.   No such facts are alleged here.

Plaintiffs do not plausibly allege that any Defendant received a benefit from any (non-existent) relationship with traffickers or farms using forced labor.   Any benefit derived from the trafficking and forced labor alleged in the complaint flows to the traffickers and farmers, not to Defendants.   Plaintiffs' theory is that the market price for cocoa is lower than it otherwise would be if forced labor did not exist in Côte d'Ivoire, and thus that Defendants "get raw cocoa … without having to pay a reasonable price for the labor required to harvest this labor-intensive product." Compl. ¶¶ 159–160.   But Plaintiffs do not allege any facts suggesting that farmers who engage in forced labor pass on their savings on labor costs to customers by charging lower prices for their cocoa—as opposed to pocketing those savings and charging the same price as farmers who do not use forced labor.   *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344–45 (2006) (taxpayer plaintiffs lack standing to challenge tax credit based on "speculation" that, if the tax credit were abolished, "legislators w[ould] pass along the supposed increased revenue in the form of tax reductions").

Nor could Plaintiffs allege such facts:  Farmers who use forced labor *cannot* charge lower prices, because the Ivorian government sets minimum cocoa prices by law.  *See supra* 4–5.  Under Ivorian law, in other words, Defendants cannot pay less for cocoa from farms that engage in forced

labor—and Plaintiffs do not plausibly allege otherwise.

Moreover, even if Plaintiffs had plausibly alleged that forced labor or trafficking results in lower prices for cocoa from farms that engage in such practices, that would not constitute a "benefit" for Defendants. The complaint does not allege that Defendants chose to purchase lower-cost cocoa produced in violation of the TVPRA instead of more expensive cocoa produced without unlawful labor conditions—or even that Defendants could choose to do so. To the contrary, the complaint alleges that "the vast majority" of Defendants' "cocoa is sourced through *untraceable* channels." Compl. ¶ 74 (emphasis added); *see also id.* ¶¶ 55–56, 67. And even with respect to cocoa sourced from areas subject to monitoring, the complaint does not allege that this cocoa is an alternative source available to Defendants. Instead, the complaint alleges that farmers could themselves "purchase beans from the free zone and pass them off" as beans subject to monitoring. *Id.* ¶ 91.

Finally, the complaint and the documents incorporated by reference therein show that—far from benefitting from forced labor or trafficking—Defendants have spent significant sums to combat problematic labor practices. *See, e.g.*, NORC Final Report at 48 ("To help raise farmers out of poverty, companies have supported in 2020/21 the new Living Income Differential pricing policy of Côte d'Ivoire and Ghana that will provide an estimated $1.2 billion in additional revenues for cocoa farmers on top of official market prices."). Because the TVPRA was never intended to sweep so broadly and indiscriminately, the Court should reject the conclusory allegations of a "benefit" where no supporting facts have been adequately alleged.[13]

## III.  Plaintiffs' TVPRA Claims are Impermissibly Extraterritorial

The complaint fails to state a TVPRA claim for an additional, independent reason: the

---

[13] Even if the text and structure of the TVPRA did not squarely foreclose Plaintiffs' claims for

presumption against extraterritoriality.  "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016).  The Supreme Court's "precedents reflect a two-step framework for analyzing extraterritoriality issues."  *Nestlé*, 141 S. Ct. at 1936 (quotation marks omitted).  First, the court must decide whether "the statute gives a clear, affirmative indication that it applies extraterritorially."  *RJR Nabisco*, 136 S. Ct. at 2101.  Second, if the statute does not, the court must "determine whether the case involves a domestic application of the statute."  *Id.*

Neither step is satisfied here.  As to the first, Section 1595 (the TVPRA's private right of action provision) does not contain a clear, affirmative indication of extraterritorial application.  By contrast, Section 1596 expressly addresses and authorizes extraterritorial jurisdiction only for *criminal* violations of Sections 1589 and 1590.  *See* 18 U.S.C. § 1596(a).  Nor does this case satisfy the second step, because it does not involve a "domestic" application of the TVPRA:  Plaintiffs' allegations involve conduct that occurred entirely in Côte d'Ivoire and Mali.  Because Plaintiffs' TVPRA claims are impermissibly extraterritorial, they should be dismissed.

## A.      The TVPRA contains no clear, affirmative indication of congressional intent to create extraterritorial civil liability

*RJR Nabisco* provides the governing framework for the first step of the extraterritoriality analysis.  There, the Supreme Court considered the extraterritorial application of RICO, which is structured in the same way as the TVPRA.  Like the TVPRA, RICO contains a variety of

---

relief, "any ambiguity in the statute" must be construed in favor of Defendants.  *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).  Although this case arises in the civil context, the TVPRA "is a criminal statute, and it has both criminal and noncriminal applications."  *Id.*  In such cases, "the rule of lenity applies" to ensure that the statute is interpreted "consistently" in both contexts.  *Id.*; *see Fei Guan v. Bing Ran*, 2017 WL 2881363, at *4 (E.D. Va. July 6, 2017) (under rule of lenity, Section 1591 "must be strictly construed").

substantive prohibitions, which criminalize conduct related to racketeering activity, *see* 18 U.S.C. § 1962, as well as a civil remedies provision, which authorizes persons "injured … by reason of a violation of section 1962" to recover damages, *see id.* § 1964(c).

*RJR Nabisco* emphasized that "the presumption against extraterritoriality must be applied *separately* to both RICO's substantive prohibitions and its private right of action." *RJR Nabisco*, 136 S. Ct. at 2108 (emphasis added). The Court held that the presumption was rebutted as to the relevant underlying criminal provisions, because "RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct." *Id.* at 2101. But the Court held that the presumption was *not* rebutted as to the private right of action. It was "not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries." *Id.* Because nothing in the text "clear[ly]" indicated that RICO's private right of action provision applied extraterritorially, it did not. *See id.* at 2108–11.

Applying *RJR Nabisco*, this suit is barred unless Section 1595 (the private right of action) applies extraterritorially. *See* 136 S. Ct. at 2099–2100. Because it does not, Plaintiffs' civil claims arising from foreign conduct are barred.

Section 1595, the TVPRA's private right of action provision, contains no express authorization for a civil claim based on conduct abroad. Like RICO's civil remedies provision, it authorizes a plaintiff who is injured by a violation of a substantive criminal provision to sue and recover damages and reasonable fees. *Compare* 18 U.S.C. § 1595(a), *with id.* § 1964(c). And, like RICO's civil remedies provision, "[n]othing in" Section 1595 "provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *RJR Nabisco*, 136 S. Ct. at 2108. Section 1595 neither expressly refers to extraterritorial application nor contains any terms that indicate Congress's intent to provide a cause of action for

foreign injuries or conduct.  Under a straightforward application of *RJR Nabisco*, Section 1595 "lacks those clear indications" that can overcome the presumption against extraterritoriality. *Adhikari v. KBR Inc.*, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017).

The TVPRA does contain a provision—Section 1596—that authorizes extraterritorial actions, but it applies only to criminal prosecutions, not private civil actions.  In Section 1596, Congress granted U.S. courts "extra-territorial jurisdiction over any *offense* (or any *attempt* or *conspiracy* to commit an *offense*) under section 1581, 1583, 1584, 1589, 1590, or 1591," when the alleged offender has a sufficient connection to the United States.  18 U.S.C. § 1596(a) (emphases added).  The term offense "is most commonly used to refer to crimes."  *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 658–59 (2015) (noting that the term "appears hundreds of times in Title 18" but "the Solicitor General" was unable "to find a single provision" using it "to denote a civil violation").  And that is how Section 1596 uses the term, as Section 1596(b) makes clear.  That subsection limits "prosecution[s]" that Section 1596 would otherwise authorize.  18 U.S.C. § 1596(b).  The legislative history, which notes that Section 1596 "provides jurisdiction … for prosecution of certain slavery and trafficking offenses committed abroad," confirms the Section's plain text.  *See* H.R. Rep. No. 110-430, pt. 1, at 51, 55 (2007).[14]

---

[14] A few district courts addressing the distinct question whether Section 1596 applies retroactively have indicated that it applies to civil suits and concluded that plaintiffs may sue for extraterritorial TVPRA violations under Section 1595.  Most of these courts did not analyze the statutory text. *See St. Louis v. Perlitz*, 2016 WL 1408076, at *2 n.1 (D. Conn. Apr. 8, 2016); *Plaintiff A v. Schair*, 2014 WL 12495639, at *6 (N.D. Ga. Sept. 9, 2014); *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019), *report and recommendation adopted*, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019) (citing *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 204 (5th Cir. 2017)).  One court reasoned that because Section 1596 was enacted after two district courts declined to apply Section 1595 extraterritorially, Congress must have meant for *Section 1596* to displace the presumption *as to Section 1595*.  *See Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *5 (C.D. Cal. Nov. 9, 2016).  But there is no such indication in the text, or even in the legislative history.  *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 246 (1989) (noting that a holding

Congress's express authorization in Section 1596 for the federal government to prosecute extraterritorial crimes sharply contrasts with the absence of any such authorization in Section 1595, which provides for private civil actions. "Where Congress knows how to [displace a presumption] but chooses not to, its silence is controlling." *Brendsel*, 339 F. Supp. 2d at 65 (quotation marks omitted); *see also Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005); *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1002 (S.D. Ind. 2007) ("Congress knows how to legislate with extraterritorial effect" and "has done so expressly when it has intended to do so.").[15]

Moreover, as with the RICO statute at issue in *RJR Nabisco*, the distinction between criminal prosecutions and civil actions makes sense. Congress's decision to authorize the federal government to prosecute extraterritorial offenses involves an entirely different set of policy choices than whether civil plaintiffs may use the U.S. courts to pursue civil claims arising from overseas activities. "'Each of the decisions' involved in defining a cause of action based on 'conduct within the territory of another sovereign carries with it significant foreign policy implications.'" *RJR Nabisco*, 136 S. Ct. at 2106 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013)) (alteration omitted). The federal government can exercise prosecutorial discretion to avoid adverse foreign policy consequences. But if Section 1596 or 1595 authorized private suits by foreign actors for foreign injuries, private plaintiffs could dictate when U.S. courts must sit in judgment of how foreign governments or other foreign actors addressed (or did not)

---

"recognized by only a few courts and often dependent on particular circumstances" is not the kind of "'rule' that we assume Congress was aware of"). And to the extent Congress was aware of and disapproved of those cases, it could have expressly abrogated them by addressing civil liability in Section 1596. It did not, which further supports the conclusion that extraterritoriality is limited to criminal liability.

[15] Similarly, Section 1585, another predicate TVPRA offense, addresses overseas activity relating to the capture of persons for slavery, applying to persons who "on any foreign shore seize[ ] any person with intent to make that person a slave." 18 U.S.C. § 1585; *see Bridgestone*, 492 F. Supp. 2d at 1002 n.7 (collecting additional examples).

alleged wrongdoing.  And if Congress intended to "permit enforcement without the check imposed by prosecutorial discretion," it would have said so.  *Id.*

This case highlights the international friction that could result from applying the TVPRA's civil remedies provision abroad.  For example, recognizing claims like Plaintiffs' would effectively "allow[ ] a single plaintiff's civil action to effect an embargo" of purchasing cocoa from Côte d'Ivoire, "forcing the judiciary to trench upon the authority of Congress and the President." *Doe I v. Nestle USA, Inc.*, 788 F.3d 946, 947 (9th Cir. 2015) (Bea, J., dissenting from denial of rehearing en banc).  Moreover, Plaintiffs contend that Defendants formed a venture to convince Congress to adopt the Harkin-Engel Protocol, Compl. ¶ 155, "a partnership … between the Department of Labor, [Defendants], and the Government of Ivory Coast," *Nestlé*, 141 S. Ct. at 1939 (opinion of Thomas, J.).[16]  "Under that partnership, [Defendants] provide material resources and training to cocoa farmers in Ivory Coast—the same kinds of activity that [Plaintiffs] contend make [them] liable" under the TVPRA.  *Id.*; *see* Compl. ¶ 157 (criticizing Defendants for providing "financial and technical support" to cocoa farmers).  If adopted, Plaintiffs' theory would make companies "less likely to engage in intergovernmental efforts," *Nestlé*, 141 S. Ct. at 1939, thereby undermining the foreign policy of the United States.  Worse, it would implicate the Department of Labor and the Ivorian government themselves in an unlawful "venture," since those governmental entities are key partners in the Harkin-Engel Protocol.  In this setting, "the need to enforce the presumption is at its apex." *RJR Nabisco*, 136 S. Ct. at 2107.

Although a Fourth Circuit panel held that Section 1595 can reach certain extraterritorial actions, it relied on reasoning that the Supreme Court rejected in *RJR Nabisco*.  *Roe v. Howard*,

---

[16] *See* Harkin-Engel Protocol, at 2 (2010), https://www.dol.gov/sites/dolgov/files/ILAB/legacy/files/CocoaFrameworkAction.pdf ("This group includes the national, district, and local government agencies of Côte d'Ivoire and Ghana.").

917 F.3d 229 (4th Cir. 2019).  The panel stated that, "even absent an express statement of extraterritoriality, a statute may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory provision that applies extraterritorially."  *Id.* at 242.  Section 1595, according to the panel, "directly incorporates predicate offenses that govern foreign conduct," which the panel said "provid[ed] strong textual evidence of its extraterritorial effect when applied to those predicates."  *Id.* at 241.  It is impossible to square this approach with *RJR Nabisco*.  *See* 136 S. Ct. at 2108 ("It is not enough to say that a private right of action must reach abroad because the underlying [criminal] law governs conduct in foreign countries.  Something more is needed."); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 436 F. Supp. 3d 1150, 1156 (N.D. Ill. 2020) ("In the wake of *RJR Nabisco*, it is clear that just because a federal statute establishes extraterritorial reach in a criminal context, a private right of action based on similar acts does not necessarily also have extraterritorial reach.").[17]  This Court should follow *RJR Nabisco* and reach the same holding with respect to Section 1595.

### B.    This case does not involve a domestic application of the TVPRA

Because Section 1595 does not contain a "clear, affirmative indication" that Congress displaced the presumption against extraterritoriality, this suit cannot be maintained unless this case involves a *domestic* application of Section 1595.  *RJR Nabisco*, 136 S. Ct. at 2101.  It does not.

To determine "whether the case involves a domestic application of the statute," courts "look[ ] to the statute's 'focus.'"  *RJR Nabisco*, 136 S. Ct. at 2101.  "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial

---

[17] *Roe* can also be distinguished.  The panel there relied on a different provision, not relevant here, that applies to U.S. government employees who violate the TVPRA while abroad.  *See* 917 F.3d at 244 (applying 18 U.S.C. § 3271).  Thus, its holding was "limited in scope."  *See id.* (explaining that, "[b]y the [TVPRA]'s own terms, this extraterritorial application" of Sections 1589 and 1590 "applies only to persons employed abroad by the federal government").

application regardless of any other conduct that occurred in U.S. territory." *Id.* As multiple courts have recognized, the "focus" of the TVPRA is "where the forced labor occurred and to where [the] victims were trafficked." *Adhikari*, 2017 WL 4237923, at *3 (quotation marks omitted); *see also Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012) ("[T]he focus of § 1590 is the trafficking of people to perform labor in violation of any provision of the [TVPRA], including § 1589.").

The complaint does not allege that Plaintiffs were trafficked to or forced to labor in the United States. Nor does it allege other injuries in the United States. The claims here involve alleged conduct in Mali, where unidentified traffickers allegedly offered Plaintiffs jobs, and in Côte d'Ivoire, where Plaintiffs allegedly worked for little or no pay on cocoa farms. Compl. ¶¶ 127–148. Those countries are also where all of the alleged traffickers and farm owners were located. *See id.* At most, Defendants made decisions about cocoa purchases or other corporate activity from their U.S. offices. But "allegations of general corporate activity—like decisionmaking—cannot alone establish domestic application" of the statute. *Nestlé*, 141 S. Ct. at 1937. "Because 'all the relevant conduct'" here "'took place outside the United States,'" that ends the inquiry. *RJR Nabisco*, 136 S. Ct. at 2101 (quoting *Kiobel*, 569 U.S. at 124).

## IV.   Plaintiffs' Common-Law Claims Must be Dismissed

Along with the TVPRA claims, the complaint asserts common-law causes of action for (i) unjust enrichment, (ii) negligent supervision, and (iii) intentional infliction of emotional distress. The complaint fails to state a plausible claim for relief under any common-law theory. In addition, Plaintiffs' common-law claims are barred by the statutes of limitations applicable to these claims under D.C. law.

### A.   The complaint fails to adequately plead any common-law claim

District of Columbia choice-of-law rules determine which jurisdiction's substantive law

applies to Plaintiffs' common-law claims. *Raflo v. United States*, 157 F. Supp. 2d 1, 4 (D.D.C. 2001). Those rules require that the Court "1) identify[ ] the governmental policies underlying the applicable laws; and 2) determin[e] which state's policy would be most advanced by having its law applied to the facts of this case." *Id.* at 5 (tort claims); *see also Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 119 (D.D.C. 2012) (unjust enrichment).

The complaint appears to assume that California state law applies, *see* Compl. ¶ 20(b), but offers no explanation for why this would be so. The complaint alleges that Defendants are incorporated or have their principal places of business in various states across the country—including Pennsylvania, Virginia, Delaware, New Jersey, Minnesota and Illinois—but does not allege that *any* party in the case has ties to California. *See id.* ¶¶ 24–31. That said, and although the common law is not the same in each of these states, the claims alleged in the complaint fail under the laws of any of these states and of D.C. Accordingly, although Defendants reserve the right to brief choice of law at a later stage, the Court need not decide that issue here, because the claims fail under any potentially applicable law. *See, e.g.*, *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 65 (D.D.C. 2011).

### 1. *The complaint fails to state a claim for unjust enrichment*

Plaintiffs' claim for unjust enrichment fails because Plaintiffs have not sufficiently alleged that each Defendant received any identifiable "benefit" from Plaintiffs' alleged forced labor on cocoa farms in Côte d'Ivoire. Unjust enrichment requires plausible allegations that "(1) the plaintiff conferred a benefit on the [particular] defendant [sued]; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).

As discussed above, Plaintiffs have not plausibly alleged any connection at all between Plaintiffs and the Defendants in this case—much less that each Defendant in this case received an

38

identifiable "benefit" as a result of each Plaintiff's own forced labor.  At most, some (but not all) Plaintiffs have alleged that they worked on cocoa farms located in "areas" from which some (but not all) Defendants indirectly sourced cocoa.  Plaintiffs further allege that Defendants were able to purchase cocoa at "low[er] prices" than would otherwise be possible because of the general existence of forced labor in the Ivorian cocoa sector.  Compl. ¶ 176.  But Plaintiffs themselves repeatedly allege that tracing the cocoa from the farms where they worked to particular Defendants is nearly impossible.  *See, e.g.*, *id.* ¶¶ 55–56, 67, 74.  What is more, as discussed above, Plaintiffs' allegation that Defendants were able to pay "low[er] prices" due to the existence of forced labor is conclusory and speculative, *see supra* 29—and it is yet more speculative to conclude that any Defendant (let alone each Defendant) paid an identifiably lower price for any cocoa purchase as a result of *Plaintiffs' own* forced labor.  Such "remote and speculative" allegations of a benefit conferred on a defendant cannot "support an unjust enrichment claim."  *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56 (D.D.C. 2017) (dismissing claim alleging that defendants received indirect benefits from plaintiff's purchases).

Plaintiffs' allegations make clear that the benefit they conferred—the value of their manual labor—was conferred on third parties not before the court, namely, the owners of the farms in Côte d'Ivoire on which they worked.  Even assuming that benefit ultimately resulted in a different kind of benefit flowing to Defendants (i.e., lower cocoa prices)—and, again, nothing in the complaint makes that assumption plausible—that sort of indirect "benefit" would not suffice to state a claim.  *See Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 36, 42 (D.D.C. 2014) (dismissing unjust enrichment claim where "[n]ot a single factual allegation" connected the defendants' alleged benefits received from a third party to plaintiff's interactions with that third party).  The complaint plainly establishes that Plaintiffs have "neither had any 'dealings' with any

[D]efendants … nor conferred any benefits upon them.  As a result, … [D]efendants have not unjustly retained such a benefit.  Accordingly, there can be no unjust-enrichment claim." *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 359 (D.D.C. 2015).

### 2.    *The complaint fails to state a claim for negligent supervision*

The complaint does not state a claim for negligent supervision because the conclusory assertions of an agency relationship between Defendants and cocoa farmers in general do not plausibly allege that Defendants exercised day-to-day control over any of the particular cocoa farms on which Plaintiffs worked.  To state a claim for negligent supervision, a plaintiff must allege facts showing "that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Paavola v. United States*, 459 F. Supp. 3d 21, 40 (D.D.C. 2020) (quotation marks omitted).

Plaintiffs' claim depends on their allegation that the "plantation owners who supplied the Defendants with cocoa were agents of Defendants."  Compl. ¶ 180.  But that is a conclusory label not entitled to the presumption of truth at the motion-to-dismiss stage.  *Slinski v. Bank of Am., N.A.*, 981 F. Supp. 2d 19, 31 (D.D.C. 2013) ("The existence of an agency relationship is a legal conclusion, which the court need not accept unless it is supported by factual allegations.").

Plaintiffs have not alleged actual *facts* that would establish an agency relationship between Defendants and the unidentified owners of the unknown farms on which Plaintiffs worked. Determination of an agency relationship turns on several factors, including "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 110 (D.D.C. 2010) (quoting *Dist. of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C. 1995)).  The determinative factor is usually

40

the right to control.  *Hampton*, 666 A.2d at 38.

Plaintiffs nowhere allege that any Defendant (let alone *each* Defendant) selected and hired the unnamed individuals who ran the unspecified cocoa farms where Plaintiffs worked and who supervised their labor conditions.  Plaintiffs nowhere allege that any Defendant (let alone *each* Defendant) paid these individuals' wages or had the power to discharge them.  And Plaintiffs' conclusory allegation that Defendants have the right to control the owners of the unidentified farms where they worked, Compl. ¶ 182, is contradicted by numerous other allegations.  For example, the complaint alleges that "there is no effective monitoring or remediation" of plantations allegedly within Defendants' supply chains.  *Id.* ¶ 71.  Although Defendants dispute those allegations, they nonetheless confirm the lack of "day-to-day control" that Defendants would have had to exercise over the plantations in question to establish a principal-agent relationship.

Rather, the complaint's allegations as to Plaintiffs' experiences on the cocoa farms demonstrate that owners have free rein to run their operations.  *See, e.g.*, Compl. ¶¶ 136–137 ("*The owner* promised [Ouattara] 90,000 CFA (approximately $180) at the end of the harvest season. … *The owner* came once a week or so to check on things.  At the end of the year … *[t]he owner* said he did not have the money to pay anyone but would pay once he had it." (emphases added)).  Nowhere do Plaintiffs allege that any Defendant (let alone *all* Defendants) was involved in any way in the daily operations of the cocoa farms where they worked.  *See Hull v. Eaton Corp.*, 825 F.2d 448, 458 (D.C. Cir. 1987) (denying agency relationship where purported agent made its own hiring and firing decisions, set its own business hours, and sold equipment manufactured by other manufacturers than the purported principal).

Even Plaintiffs' allegation that Defendants sometimes "provided … financial support, training, and technological innovation" to unnamed Ivorian cocoa plantations "to promote the

farmers' capacity to produce cocoa products, which Defendants then buy from the farmers," Compl. ¶ 156, falls far short of pleading the requisite control over the operations of the farms where Plaintiffs actually worked.  *See Acosta Orellana*, 711 F. Supp. 2d at 112 (inference from allegations that purported principal and agent shared common interest in promoting agrochemical did not show adequate control under agency principles); *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) ("[T]he right to inspect [and] the right to set standards by which the station operated, etc.—are not indicia of control.  They in no way indicate that appellee had the right to control the day-to-day operation of the station or the day-to-day performance of its employees.").

As Plaintiffs offer only a "formulaic recitation of the elements" in support of their negligent supervision claim, *Twombly*, 550 U.S. at 555, and do not allege facts as to the alleged agency relationship among Defendants, the farmers, or the alleged traffickers, the Court should dismiss this claim.  *Simms v. Dist. of Columbia*, 699 F. Supp. 2d 217, 226 (D.D.C. 2010) (negligent supervision claim "must fail" where there could be no "fail[ure] to adequately supervise" by defendant given lack of employment relationship with purported employee (quotation marks omitted)); *Giles*, 487 A.2d at 613 (finding that absence of master-servant relationship precluded plaintiff's theory of liability based on negligent hiring or supervision).

### 3. *The complaint fails to state a claim for intentional infliction of emotional distress*

Plaintiffs do not state a viable claim for intentional infliction of emotional distress because they do not allege extreme or outrageous conduct *by Defendants*, directed *at Plaintiffs* in particular, that caused them to suffer severe emotional distress.  A plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress."  *Paavola*, 459 F. Supp. 3d at 41 (quotation marks omitted; alteration in original).  The plaintiff must show "conduct" by the defendant "so outrageous

42

in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wood v. Neuman*, 979 A.2d 64, 77 (D.C. 2009) (quotation marks omitted).  This requirement is "not an easy one to meet." *de Sousa v. Embassy of Republic of Angola*, 267 F. Supp. 3d 163, 172 (D.D.C. 2017).

Plaintiffs point to Defendants' "participati[on] in a venture" as outrageous conduct. Compl. ¶ 187.  As detailed above, Plaintiffs have not adequately alleged that Defendants are engaged in a venture.  For this reason alone, Plaintiffs' claim should be dismissed.

To the extent the complaint includes concrete allegations about Defendants' actions, all of those acts amount to ordinary business conduct.  *E.g.*, Compl. ¶¶ 41 (importing cocoa to the United States); 45 (stationing managers and sending buyers to Côte d'Ivoire to interact with farmers); 55 (setting up a monitoring system for child labor).  Business conduct such as this does not rise to the level of "outrageous" conduct necessary to support a claim for intentional infliction of emotional distress—even if the conduct of the nonparties who allegedly trafficked Plaintiffs and held them in bondage would so qualify.  *See Hindi v. ExxonMobil Oil Corp.*, 2008 WL 11337374, at *5 (S.D. Cal. Sept. 10, 2008).  Further, as Plaintiffs acknowledge, Defendants have taken steps to *prevent* problematic labor practices in the cocoa supply chain.  *E.g.*, Compl. ¶¶ 55, 72.  In short, Defendants' alleged conduct—as opposed to the alleged conduct of the nonparty traffickers—does not rise to the high level required to state a claim for intentional infliction of emotional distress.

Moreover, a claim for intentional infliction of emotional distress requires a showing that a defendant's alleged conduct "targeted the plaintiff" *personally*, and not a broad and amorphous category of people to which the plaintiff belongs.  *See Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) ("As a general rule, to state a claim for intentional infliction of emotional distress, the outrageous and extreme conduct must have been directed at

43

the plaintiff"); *Chambliss v. Nat'l RR Passenger Corp.*, 2007 WL 581900, at *30 (D.D.C. Feb. 20, 2007) (dismissing IIED claim where "Plaintiff [was] … unable to point to any evidence that Defendant … engaged in 'extreme and outrageous' conduct directed at Plaintiff himself"); *accord Angus v. Shiley Inc.*, 989 F.2d 142, 147 (3d Cir. 1993) (observing that IIED is restricted to situations where "defendants [are] accused of wrongful conduct … aimed specifically at the plaintiffs … as distinguished from a large group of persons").[18]  Plaintiffs have made no such allegation here—they have not alleged that Defendants intentionally directed any conduct at *them* (as opposed to children in West Africa generally).  Because they have not pleaded facts essential to state a claim for intentional infliction of emotional distress, the claim should be dismissed.

**B.**     **Plaintiffs' common-law claims are facially barred by the applicable statutes of limitations**

Under the District of Columbia's choice-of-law rules, "the question whether an action is barred by a statute of limitations ... is governed by the statute of limitations of the forum." *Steorts v. Am. Airlines, Inc.*, 647 F.2d 194, 197 (D.C. Cir. 1981) (quotation marks omitted).  Thus, even if the Court were to determine that the law of another jurisdiction governs the merits of Plaintiffs' common law claims, the District of Columbia's statutes of limitations would still apply.  *Id.*

Under D.C. law, the statute of limitations for each of Plaintiffs' common-law claims— unjust enrichment, negligent supervision, and intentional infliction of emotional distress—is three years.  *News World Commc'ns, Inc.*, 878 A.2d at 1222; D.C. Code § 12-301(8).  The limitations period for each claim began to run no later than the last date on which the Plaintiffs allegedly worked on the cocoa farms.  *See News World Commc'ns*, 878 A.2d at 1225 (unjust enrichment

---

[18] The sole exception is where the defendant "direct[s] their extreme and outrageous acts at a third person and … [causes] severe emotional distress to a member of that person's immediate family who is present at the time." *Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018) (quotation marks omitted).  This exception is inapplicable here, as Plaintiffs do not allege that Defendants directly targeted their family members.

claim limitations period began to run no later than when plaintiff had "performed her last service" and "had been definitively told that she would not be paid"); *Henao v. Smiths Detection, Inc.*, 2019 WL 2476631, at *3 (D.D.C. June 13, 2019) (three-year limitations period for negligence actions "begins to run on the date of the plaintiff's injury"); *White v. Wash. Intern Student Hous.*, 2019 WL 1858298, at *11 (D.D.C. Apr. 25, 2019) (intentional infliction of emotional distress claim predicated on conduct in workplace accrued on date plaintiff's employment was terminated).

Accordingly, Plaintiffs could bring these claims only if their last day of work on the cocoa farms was within the three years prior to February 12, 2021—the date of the filing of their initial complaint. But the dated allegations in the complaint are all much earlier. Plaintiff Coubaly allegedly "arrived home" at the conclusion of his labor on the farm "in early March 2017," Compl. ¶ 128, almost four years before filing the complaint. Other Plaintiffs' allegations of trafficking and forced labor date back even earlier. *See id.* ¶¶ 137 (Oudou Ouattara), 141 (Ousmane Ouattara and Issouf Bagayoko), 143–144 (Arouna Ballo), 146–148 (Mohamed Traore).[19]

Where, as with those Plaintiffs, the "facts that give rise to the [statute of limitations] defense are clear from the face of the complaint," defendants may raise the defense via Rule 12(b)(6), and the "court should grant [the] motion to dismiss" where the "complaint on its face is conclusively time barred." *McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 31 (D.D.C. 2007). The Court should dismiss Plaintiffs' common-law claims as time barred.

## CONCLUSION

For these reasons, this Court should dismiss Plaintiffs' complaint under Rule 12(b)(1) and Rule 12(b)(6) with prejudice.

---

[19] With respect to Plaintiffs Bamba and Djamoutene, the complaint fails to plead the material dates when they stopped working on the cocoa farms. *See* Compl. ¶¶ 130–135.

July 30, 2021

Respectfully submitted,

*/s/ Perlette Michèle Jura*
Theodore J. Boutrous Jr. (D.C. Bar No. 420440)
Perlette Michèle Jura (D.C. Bar No. 1028959)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000
pjura@gibsondunn.com

*Counsel for Nestlé USA, Inc.*

John E. Hall (D.C. Bar No. 415364)
Henry Liu (D.C. Bar No. 986296)
Carlton E. Forbes (D.C. Bar No. 1656612)
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, D.C.  20001
(202) 662-6000

*Counsel for Barry Callebaut USA*

Andrew J. Pincus (D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC  20006
(202) 263-3000

*Counsel for Cargill, Incorporated and
Cargill Cocoa*

Daniel S. Ruzumna (D.C. Bar No. 450040)
Steven A. Zalesin (*pro hac vice* forthcoming)
Jonah M. Knobler (*pro hac vice* forthcoming)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036
(212) 336-2000

*Counsel for The Hershey Company*

Stephen D. Raber (D.C. Bar No. 400999)
David Forkner (D.C. Bar No. 464337)
David M. Horniak (D.C. Bar No. 998649)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC  20005
(202) 434-5000

*Counsel for Mars, Incorporated and
Mars Wrigley Confectionary US, LLC*

Craig A. Hoover (D.C. Bar No. 386918)
David M. Foster (D.C. Bar No. 497981)
Danielle Desaulniers Stempel
  (D.C. Bar No. 1658137)
  (D.D.C. admission pending)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C.  20004
(202) 637-5694

*Counsel for Mondelēz International, Inc.*

Paul C. Rosenthal (D.C. Bar No. 234252)
Bezalel A. Stern (D.C. Bar No. 1025745)
KELLEY DRYE & WARREN LLP
3050 K Street N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Lauri A. Mazzuchetti (*pro hac vice*)
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, NJ  07054
(973) 503-5900

*Counsel for Olam Americas, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 30, 2021, I electronically filed the foregoing with the United States District Court for the District of Columbia by using the CM/ECF system, which will send a notice of filing to all registered users, and emailed a copy of this filing to all parties that did not receive notice through the Court's electronic filing system.

July 30, 2021                                     Respectfully submitted,

                                                 */s/ Perlette Michèle Jura*
                                                 Perlette Michèle Jura (D.C. Bar No. 1028959)