# APPENDIX

**Document**                                                                                                           **Tab**

Le Conseil du Café-Cacao, *Projet document d'opérationnalité* (Oct. 2020)..................................A

Coffee-Cocoa Council, *Document for the Implementation of Internal and External Marketing Mechanisms* (Oct. 27, 2020) (certified translation)...........................................B

Le Conseil du Café-Cacao, Exportateurs - Dispositions commercialisation cacao campagne intermédiaire (Mar. 29, 2021)............................................................................C

Coffee-Cocoa Council, Note to Exporters, Processors, Cooperative Companies, and Cocoa Buyers (Mar. 29, 2021) (certified translation)........................................................D

**A**



Le Conseil du Café-Cacao
Le Conseil de Regulation, de Stabilisation et de Developpement de la Filiere Café-Cacao

ARRIVEE
27 OCT. 2020
GEPEX

22431

# DOCUMENT D'OPERATIONNALITE DE LA MISE EN ŒUVRE DES MECANISMES DE COMMERCIALISATION INTERIEURE ET EXTERIEURE

# SOMMAIRE

*AVANT-PROPOS* ................................................................................................................ *7*

*PREAMBULE* .................................................................................................................... *8*

*PARTIE I : 11*

*OPERATIONNALITE DU MECANISME DE COMMERCIALISATION EXTERIEURE ET*
*INTERIEURE DU CAFE ET DU CACAO* ........................................................... 11

1. *MECANISME DE COMMERCIALISATION EXTERIEURE* ................................ 12
1.1  Problématique ................................................................................................................12
1.2  Principes et mode de fonctionnement du mécanisme de commercialisation extérieure ...................12
   *1.2.1  Les acteurs du mécanisme* ....................................................................................12
   *1.2.2  Principes de base du système de commercialisation* ..............................................13
   *1.2.3  Présentation de la vente aux enchères* .................................................................14
   *1.2.4  Présentation de la vente à différentiel* ................................................................16
   *1.2.5  Modalités de vente, d'allocation et d'exécution du volume réservé aux opérateurs internationaux* ....16
   *1.2.6  Calcul des reversements et soutiens* ....................................................................17
   *1.2.7  Fonds de réserve* ...............................................................................................17
   *1.2.8  Procédures d'exportation et d'exécution des contrats* ...........................................18
2. *MECANISME DE COMMERCIALISATION INTERIEURE* ............................... 18
2.1  Principes et mode de fonctionnement du mécanisme de commercialisation intérieure ...................18
   *2.1.1  Acteurs de la commercialisation intérieure* .........................................................18
   *2.1.2  Amélioration de la qualité des produits* ...............................................................19
   *2.1.3  Fixation du prix minimum d'achat garanti* ..........................................................20
   *2.1.4  La péréquation transport* ...................................................................................20
   *2.1.5  Détermination des barèmes de coûts garantis* ......................................................21
   *2.1.6  Contrôle des prix pratiqués et de la qualité bord champ* .......................................21
   *2.1.7  Documents de Contrôle et de Vérification* ..........................................................22
   *2.1.8  Plafonnement des achats* ....................................................................................22
   *2.1.9  Contrôle de la qualité des produits à l'entrée des usines* .......................................23
   *2.1.10  Gestion des produits sous-grade , hors norme, déchetset des residus* .....................24
   *2.1.11  Principes et modes de fonctionnement du cadre reglementaire relatif à la mise en œuvre des projets*
   *de certification et des programmes de durabilité à prime* .............................................24
   *2.1.12  Estimation des récoltes* .....................................................................................26
   *2.1.13  Gestion de la sacherie brousse* ..........................................................................26
   *2.1.14  Mesures étatiques d'appui* ................................................................................27
3. *SECURISATION DE LA COMMERCIALISATION ET GESTION DES RISQUES* ............ 27
3.1  Dispositif lié à la commercialisation extérieure .............................................................27
   *3.1.1  Identification des risques liés au système de commercialisation* .............................27
   *3.1.2  Gestion des risques liés au système de commercialisation* .....................................28
3.2  Dispositif lié à la commercialisation intérieure .............................................................29
*PARTIE II :* ................................................................................................................... 31
*REGLES DE GESTION DES OPERATIONS COMMERCIALES ET TECHNIQUES* ............ 31
1. *CAMPAGNE* ............................................................................................................. 32
2. *INVENTAIRE DES STOCKS, DECLARATIONS DES ACHATS ET TRANSACTIONS* ....... 32
2.1.  Inventaire des stocks .....................................................................................................32
   *2.1.1.  Détermination des stocks théoriques et rapprochement aux résultats d'inventaires physiques* ....33
   *2.1.2.  Nature des produits concernés par les inventaires* ...............................................33
   *2.1.3.  Stock report* ....................................................................................................33
   *2.1.4.  Traitement des stocks hors normes appartenant aux exportateurs de fèves « good fermented »* ....33
2.2.  Déclarations d'achats ....................................................................................................34
   *2.2.1.  Déclarations d'achats bord champs* ...................................................................34
   *2.2.2.  Déclarations d'achats à l'entrée des usines* ........................................................34
2.3.  Contrôle qualité ...........................................................................................................34
   *2.3.1.  Contrôle qualité bord champ* ............................................................................34
   *2.3.2.  Contrôle qualité entrée-usine* ...........................................................................35
   *2.3.3.  Contrôle qualité export* ....................................................................................35
   *2.3.4.  Gestion des produits hors norme café* ................................................................35
2.4.  Déclaration d'usinage ...................................................................................................35
2.5.  Déclaration des ventes locales ......................................................................................36

| | | |
|---|---|---|
| 2.6. | Transactions loco-magasins | 36 |
| 2.7. | Pesage des produits | 37 |
| 2.8. | Correction des achats, des déclarations d'achat et des transactions loco-magasin | 37 |
| 3. | **VENTES** | **37** |
| 3.1. | Définition de la vente | 37 |
| 3.2. | Accès au système de vente | 38 |
| 3.3. | Prix plancher | 38 |
| | 3.3.1. *Vente par messagerie* | 38 |
| | 3.3.2. *Vente à différentiel* | 39 |
| 3.4. | Détermination du prix CAF café par grade | 39 |
| 3.5. | Définition des grades de café à l'exportation | 39 |
| 3.6. | Quantité et qualité autorisées à la vente | 40 |
| 3.7. | Destinations à la vente | 40 |
| 3.8. | Fiscalité et parafiscalité | 40 |
| 3.9. | Contrat de Vente (CV) | 40 |
| 3.10. | Opération d' « Annule et remplace » de contrat d'exécution (CE) ou A/R de CE | 41 |
| 3.11. | Caution bancaire | 41 |
| 3.12. | Délais | 42 |
| | 3.12.1. *Délais de vente* | 42 |
| | 3.12.2. *Délai de dépôt et de traitement des liasses documentaires* | 42 |
| | 3.12.3. *Délai de ventilation et de confirmation des contrats* | 43 |
| 4. | **APUREMENT DES CE ET OPERATIONS D'EMBARQUEMENT** | **43** |
| 4.1. | Apurement des CE | 43 |
| | 4.1.1. *Annule et remplace de Formule* | 44 |
| | 4.1.2. *Tolérance de 2% sur tonnage* | 44 |
| | 4.1.3. *Décote* | 44 |
| 4.2. | Embarquement | 45 |
| 4.3. | Report d'embarquement | 46 |
| 4.4. | Traitement des contrats de vente en cas de non agrément ou de défaillance d'un opérateur | 46 |
| 4.5. | Mainlevée de caution | 47 |
| | 4.5.1. *Caution bancaire de vente* | 47 |
| | 4.5.2. *Caution bancaire d'agrément* | 47 |
| 4.6. | Traitement des soutiens/reversements | 47 |
| 4.7. | Traitement des stocks report | 48 |
| *PARTIE III :* | | **49** |
| *PROCEDURES D'EXECUTION DES CONTRATS DE VENTES* | | **49** |
| 1. | *MECANISME DE DETERMINATION DU REVERSEMENT ET DU SOUTIEN* | **50** |
| 2. | *EDITION DES CONTRATS D'EXECUTION (CE)* | **50** |
| 3. | *COMPENSATION DES REVERSEMENTS ET SOUTIENS* | **50** |
| 3.1. | Compensation des CE reportés ou anticipés | 51 |
| 3.2. | Compensation des ccontrats des opérateurs internationaux | 51 |
| 4. | *APUREMENT DES CONTRATS* | **51** |
| 5. | *TRAITEMENT DES FACTURES DE SOUTIEN, D'EXONERATION ET DES AJUSTEMENTS* | **51** |
| 5.1. | Traitement des factures de soutien | 51 |
| 5.2. | Traitement des factures d'exonération | 52 |
| 5.3. | Les ajustements de postes au barème | 52 |
| | 5.3.1. *La sacherie export* | 52 |
| | 5.3.2. *Le Transit* | 52 |
| | 5.3.3. *L'Assurance maritime* | 53 |
| | 5.3.4. *Le poids* | 54 |
| | 5.3.5. *Le contrôle qualité export* | 54 |
| | 5.3.6. *L'usinage* | 54 |
| 6. | *GESTION DES TAXES ET AUTRES PRELEVEMENTS* | **54** |
| 6.1. | Fiscalité (Taxes d'enregistrement et DUS) | 54 |
| 6.2. | Redevances parafiscales | 54 |
| 6.3. | Reversement | 55 |
| *ANNEXES* | | **56** |

## AVANT-PROPOS

Le présent document présente l'opérationnalité des mécanismes de commercialisation applicable à compter du 1er Octobre 2020. Il se compose de trois parties qui sont :

> Partie I : Opérationnalité du mécanisme de commercialisation extérieure et intérieure du café et du cacao
>
> Partie II : Règles de gestion des opérations commerciales et techniques
>
> Partie III : Procédure d'exécution des contrats de vente.

Le document aborde essentiellement :

1. Le mécanisme de commercialisation extérieure ;
2. Le mécanisme de commercialisation intérieure ;
3. La sécurisation de la commercialisation et la gestion des risques ;
4. Les règles de gestion des opérations commerciales et techniques ;
5. Les dispositions pratiques d'exécution des contrats et de suivi des opérations.

## PREAMBULE

L'Etat de Côte d'Ivoire a mis en œuvre un mécanisme de stabilisation des prix d'achat bord-champ aux producteurs de café et de cacao depuis la campagne 2012/2013.

*Cette volonté de l'Etat vise à garantir aux producteurs un revenu fixe par campagne égal au moins à 60% du prix CAF. A partir des ventes de la campagne 2020/2021, un Différentiel de Revenu Décent (DRD) fixé à USD/TM 400 sera intégré au prix des contrats dénoués avec les différents acheteurs. Une proportion du DRD sera éventuellement ajoutée au prix bord champs qui découlera prix CAF de référence selon le niveau du marché.*

Pour atteindre cet objectif, le mécanisme mis en place vise l'optimisation de la mise à marché par les ventes aux enchères à travers une messagerie électronique et/ou par des ventes à différentiel ainsi que la maîtrise des risques par la gestion des cautions et des contrats de contrepartie.

Dans ce contexte, les mécanismes d'opérationnalité de la commercialisation extérieure et intérieure ci-dessous résumés sont proposés.

### Commercialisation Extérieure

Le mécanisme de commercialisation extérieure est défini par l'Etat qui assure aux opérateurs finaux la bonne exécution des contrats de vente.

La commercialisation extérieure se fait par un système informatisé de ventes aux enchères et/ou par des ventes à différentiel.

La jonction entre la commercialisation extérieure et la commercialisation intérieure se fait au travers du **prix CAF de référence et du « Barème de coûts »**, qui permettent de stabiliser le prix garanti au producteur par le **mécanisme du reversement et soutien.**

Sur chaque campagne, il est déterminé un prix moyen CAF de référence garanti sur la base de toutes les ventes effectuées (hors DRD) aux opérateurs. Toute réalisation au-dessus de celui-ci donne lieu à un reversement. A l'inverse, toute réalisation en dessous, donne lieu à un soutien.

### Commercialisation Intérieure

Les opérations d'achat sont effectuées par les opérateurs agréés.

Le Conseil du Café-Cacao effectue essentiellement les opérations suivantes :

- Le contrôle de la qualité du physique dans les magasins et usines des opérateurs ;
- Le contrôle du respect du **prix garanti** aux producteurs sur la base de **reçus et registres d'achat** présentés par les collecteurs de physique que sont les sociétés coopératives et les acheteurs ;
- Le suivi des stocks physiques des sociétés coopératives et acheteurs.

Un dispositif de suivi des flux physiques permet à l'entrée des usines de disposer des informations appropriées, notamment le poids et la qualité des produits.

Avant d'aborder les points d'opérationnalité, il convient de rappeler brièvement, les grandes lignes des propositions contenues dans le document de stratégie adopté par le gouvernement. Ces propositions peuvent être résumées comme suit :

1- **Au titre de la production :**
- L'amélioration de la productivité et de la qualité des produits marchands ;
- La formation des producteurs pour l'adoption des techniques d'intensification et des bonnes pratiques agricoles favorisant la préservation de l'environnement ;
- La sécurisation foncière ;
- L'appui à la recherche-développement (recherche variétale, lutte contre les maladies et insectes nuisibles, etc.) ;
- La relance caféière.

2- **Au titre de l'économie cacaoyère et caféière durable :**
- La mise en place d'une plateforme de Partenariat Public-Privé (PPP) en vue de créer un cadre de concertation avec le secteur privé sur les questions liées à la durabilité des filières ;
- La mise en place d'un cadre règlementaire pour le suivi et le contrôle des projets de certification et des programmes de durabilité ;
- L'élaboration et la mise en œuvre de la Norme Africaine pour la durabilité du cacao ;
- La recherche de sources de financements complémentaires (profits de cession des actifs, budget de l'Etat, appuis des partenaires au développement, partenariat public-privé) en vue de garantir la pérennité de la filière ;
- Le renforcement et l'amélioration des activités prévues dans le cadre du Fonds d'Investissements en Milieu Rural (FIMR), notamment la réhabilitation et l'ouverture de pistes de desserte agricole en liaison avec les autres filières agricoles (hévéa , palmier à huile) en vue de faciliter les activités de commercialisation intérieure et d'assurer le respect du prix minimum garanti.

3- **Au titre de la transformation, de la valorisation et de la consommation des produits :**
- L'établissement de convention avec les transformateurs pour la transformation locale des produits hors normes ;
- La réalisation de campagnes de communication et d'actions promotionnelles pour encourager la consommation locale et régionale du café et du cacao.

4- **Au titre de la fiscalité, de la parafiscalité et du financement :**
- Le maintien d'un niveau maximum de fiscalité et de parafiscalité à 22% du prix CAF, conformément aux engagements pris par le Gouvernement vis-à-vis des partenaires au développement ;
- La révision des avantages sur le DUS accordés par l'Etat aux transformateurs après étude et analyse des impacts sur l'activité ;
- La recherche de sources de financements complémentaires (appuis des partenaires au développement, partenariat public-privé) en vue de garantir la pérennité de la filière.

5- **Au titre de la représentativité et la professionnalisation des producteurs et de leurs organisations**

- La désignation de représentants, qui siègent au Conseil d'Administration du Conseil de Régulation, de Stabilisation et de Développement de la Filière Café-Cacao ;
- L'assainissement du mouvement coopératif dans la filière par l'identification et l'évaluation des coopératives ;
- Le renforcement des capacités des producteurs et de leurs organisations par la formation, l'encadrement et le suivi de leur gestion ;
- La vulgarisation de l'Acte Uniforme de l'OHADA relatif aux Sociétés Coopératives.

6- **Au titre du cadre institutionnel et de la gouvernance :**
- La mise en place d'une structure unique de gestion de la filière qui sera contrôlée par l'Etat et l'interprofession ;

- La mise en œuvre de la réforme par la concertation entre tous les acteurs ;

- L'instauration d'un fonds de réserve pour sécuriser le système de stabilisation géré par Le Conseil du Café-Cacao sous le contrôle des ministères de tutelle et destiné à payer les soutiens éventuels en cas d'insuffisance des soldes de stabilisation ;

- La mise en place d'un cadre de rapprochement des données de la commercialisation, entre Le Conseil du Café-Cacao, la structure chargée des statistiques de pesage, la douane et les impôts ;

- L'évaluation du système d'information du Conseil du Café-Cacao pour vérifier la crédibilité des informations fournies ;

- La validation en début de chaque campagne, du programme d'actions, et du budget de fonctionnement et d'investissement par le Conseil d'Administration qui seront approuvés par les Ministères de tutelle ;

- La réalisation de contrôles externes à travers le commissariat aux comptes et les audits indépendants que pourrait commanditer le Conseil d'Administration du Conseil du Café-Cacao ou le Gouvernement en vue de crédibiliser le système mis en place.


Le Document d'Opérationnalité fixe le cadre général de gestion des opérations techniques et commerciales.
Les procédures et opérations qui y sont décrites sont susceptibles d'aménagements ultérieurs tenant compte de l'environnement et de l'évolution du marché. Des Décisions et Notes en préciseront le contenu en cas de besoin.

# PARTIE I :

# OPERATIONNALITE DU MECANISME DE COMMERCIALISATION EXTERIEURE ET INTERIEURE DU CAFE ET DU CACAO

## 1. *MECANISME DE COMMERCIALISATION EXTERIEURE*

### 1.1 *Problématique*

Le système de commercialisation libéralisé était assujetti à la fluctuation des prix sur le marché mondial. La répercussion de la volatilité de ces prix sur celui du producteur ne garantissait pas à ce dernier un revenu minimum. En outre, les prix indicatifs fixés n'étaient pas toujours respectés par les acheteurs de produits.

Le producteur percevait le prix résiduel et apparaissait donc comme le maillon le plus faible de la chaîne de commercialisation. Le nouveau système mis en place doit donc permettre de garantir le revenu du producteur contre les fluctuations du prix international mais aussi de le protéger contre les autres opérateurs.

### 1.2 *Principes et mode de fonctionnement du mécanisme de commercialisation extérieure*

Il s'agit d'un système de ventes anticipées à la moyenne qui permet de tirer avantage du marché. Les ventes à terme envisagées dans le cadre de la réforme reposent sur un certain nombre d'acteurs et respectent des principes majeurs.

#### 1.2.1 *Les acteurs du mécanisme*

Les acteurs du mécanisme se composent comme suit:

1. Le Conseil du Café-Cacao ;
2. Les acheteurs internationaux ;
3. Les opérateurs locaux.

Les opérateurs autorisés à participer au mécanisme décrit devront faire l'objet d'agrément préalable.

##### 1.2.1.1 *Le Conseil du Café-Cacao*
(Voir missions dans ordonnance)

##### 1.2.1.2 *Les acheteurs internationaux*

Il s'agit des opérateurs non installés sur le territoire ivoirien. Ces entreprises ne sont pas de droit ivoirien et ne sont pas immatriculées au Registre du Commerce et du Crédit Mobilier (RCCM) ivoirien.

Les acheteurs internationaux admis au mécanisme sont des transformateurs mondiaux de café et de cacao, des négociants et autres opérateurs des marchés spéculatifs.

Tous les acheteurs internationaux qui désirent participer au mécanisme de vente sont agréés selon des critères bien définis. Les éléments du dossier d'agrément sont listés en annexe 4.

##### 1.2.1.3 *Les opérateurs locaux*

Ils se composent des opérateurs installés sur le territoire ivoirien, immatriculés au RCCM ivoirien. Il s'agit essentiellement :

- Des exportateurs (filiales de grands groupes et opérateurs nationaux);
- Des sociétés coopératives exportatrices ou COOPEX ;
- Des transformateurs locaux.

Les opérateurs locaux font l'objet d'agrément et sont assujettis à la production d'une caution bancaire en début de chaque campagne.

### *1.2.2  Principes de base du système de commercialisation*

La vente à terme ou la vente par anticipation peut s'entrevoir dans un intervalle allant jusqu'à vingt-quatre (24) mois. Dans tous les cas, elle doit correspondre aux termes pratiqués sur les marchés boursiers.

L'attribution des droits d'exportation aux opérateurs s'effectue par le principe des ventes aux enchères et par les ventes à différentiel.

Les principes généraux de la vente à terme s'établissent comme suit :

- Le mécanisme proposé est basé sur le principe de la vente par anticipation d'une proportion des prévisions de récoltes de la campagne à venir;

- Le solde est vendu au cours de la campagne (ventes spots) ;

- Le Conseil du Café-Cacao concède des droits d'exportation aux opérateurs aussi bien nationaux qu'internationaux. La répartition des droits d'exportation de café et de cacao entre opérateurs internationaux et nationaux se fera dans la limite maximale de 20% pour les opérateurs internationaux ;

- Les transformateurs locaux participent aux ventes dans les mêmes conditions que les exportateurs de fèves. Cependant, afin de les aider à atteindre les capacités installées, l'Etat a autorisé la prise de dispositions particulières ;

- Les contrats de cacao sont côtés en livres sterling et ceux du café en dollars US sur la bourse de Londres ;

- Les données du taux de change sont recueillies auprès des fournisseurs d'accès d'informations boursières et financières ;

- Tous les contrats, en francs CFA, sont fermes et convertis en euros. Le montant en FCFA sera réajusté en cas de changement de parité Euro/FCFA ;

- Pour garantir la fiabilité et la solidité du système, tous les Contrats de Vente font l'objet de cautions représentant 2,5% de la valeur du contrat pour les sociétés commerciales et 1% pour les exportateurs nationaux et les COOPEX (à partir de la 2ème année d'exercice après analyse de la demande de l'opérateur). A ces cautions, sont joints des contrats de contrepartie (couverture). Ces contreparties sont exigibles sous la forme originale,. Les clients (contreparties) des opérateurs locaux sont tenus de confirmer les contrats dans le module de contrepartie dans un délai de 24 heures ouvrables après les déblocages. Des cautions complémentaires pourront être également exigées en cas de risque de défaillance d'un opérateur ;

- Chaque opérateur local dispose de six (06) jours ouvrables pour fournir la caution de vente et le(s) contrat(s) de contrepartie. Le contrat de contrepartie doit porter la mention « prix fixé ». Pour les opérateurs internationaux, une caution bancaire de vente de 2,5% de la valeur du contrat de déblocage est exigée dans un délai de six (06) jours ouvrables. Le chargeur local (exportateur) à qui le contrat de vente est attribué, est exempté de la production d'une caution additionnelle. Cependant, en cas de report, le chargeur fournira une caution à adosser au Contrat de Vente ;

  Le chargeur n'a pas à fournir de contrepartie ; le contrat signé entre l'opérateur international et le Conseil du Café-Cacao en tenant lieu ;

- Pour leurs déblocages en propre, les s exportateurs nationaux et COOPEX, fournissent une caution de bonne fin d'exécution équivalant à 1% de la valeur du contrat et un contrat de contrepartie. Le dépôt du Contrat de Vente, de la caution bancaire et de la contrepartie doit se faire dans un délai maximum de six (06) jours ouvrables ;

- Le règlement du prix prévu au contrat doit être exclusivement effectué par la contrepartie à l'opérateur ;

- Le plafond individuel de tonnage défini pour les déblocages ne doit pas excéder le volume maximum autorisé à l'achat par période pour un opérateur sur la campagne principale. Cette disposition vise à éviter une éventuelle spéculation sur le physique par des opérateurs ayant plus de physique que de contrats. Le volume maximal par opérateur est de 110 000 tonnes sur la période de vente Octobre-Décembre (OD) et de 50 000 tonnes sur la période Janvier-Mars (JM) ; ce qui correspond à un volume total de 160 000 tonnes sur la campagne principale (d'octobre à mars). Toutefois, tout opérateur n'ayant pas atteint son plafond de 110 000 tonnes sur OD est autorisé à dépasser la limite de 50 000 tonnes sur JM, dans la limite du plafond global de 160 000 tonnes ;

- Dans le cas d'entreprises détenant des structures d'exportation de fèves, de produits semi-finis et éventuellement une autre de produits finis, le volume autorisé à l'achat sera pour le groupe ;

- Les offres d'achat pour le cacao se font par multiple de 25 tonnes métriques avec une quantité minimale de 25 tonnes ;

- Les offres d'achat pour le café se font avec une quantité minimale de 5 tonnes ;

- Le prix CAF de référence (hors DRD) est déterminé avant le début de chaque campagne ;

- Le prix bord champ est calculé après validation du barème. Le DRD sera entièrement reversée au producteur selon le niveau des prix ;

- Un fonds de réserve est mis en place pour soutenir la stabilisation.

### 1.2.3   *Présentation de la vente aux enchères*

La vente aux enchères consiste à vendre aux meilleurs prix de soumission, les droits d'exportation de physique aux opérateurs agréés.

Les prix sont recueillis sur le marché à terme de Londres et ajustés du différentiel d'origine. La valeur du différentiel retenue pour le calcul du prix plancher est arrêtée par le Conseil du Café-Cacao pour chaque session, tenant compte des données du marché international. Le prix de référence (prix plancher) par période cotée est fixé par le Conseil du Café-Cacao à chaque session. Les périodes de session ne sont ouvertes que pour les contrats cotés. Toutes les soumissions doivent être au moins égales à ce prix de référence.

Afin de limiter la surenchère, le mécanisme intègre la notion de « **limite de surenchère** ».

La limite de surenchère par période est déterminée pour chacune des périodes cotées à chaque session par le Conseil du Café-Cacao après analyse du marché, du différentiel d'origine et de plusieurs autres paramètres. En tout état de cause, son niveau reste à la discrétion du Conseil du Café-Cacao et n'est pas communiqué aux opérateurs.

#### 1.2.3.1   *Mode des enchères*

Les enchères se font par le biais d'un système automatisé ayant pour interface avec les participants, une messagerie électronique.

Les enchères sont organisées en deux (02) séances quotidiennes, respectivement à 10h30 et à 14h.

Les participants disposent de 30 minutes après l'ouverture de la séance pour faire les offres. Une offre consiste à proposer pour chaque période de cotation, un prix et un tonnage. Chaque participant ne peut faire qu'une seule offre par période de cotation.

Après la période de 30 minutes réservées aux soumissions, les enchères sont bloquées automatiquement de sorte à ne recevoir aucune offre.

La règle d'adjudication est appliquée pour servir les participants ; le temps d'application de la règle de gestion est de 15 minutes.

Après l'application de la règle d'adjudication, les participants servis disposeront de 45 minutes pour confirmer ou non leurs mises à main.

La rectification des saisies de prix et de tonnage par les opérateurs reste possible au cours d'une même session de soumission. Cependant, aucune correction ne pourra être effectuée après la période (30 min) de soumission.

Les ventes se déroulent suivant les principes ci-après :

- **Détermination des quantités à mettre sur le marché** : Les quantités à mettre en vente à chaque séance sont déterminées avant l'ouverture des enchères. Elles ne sont pas communiquées aux participants aux enchères. Le tonnage à mettre en vente est déterminé par le Conseil du Café-Cacao ;

- **Annonce d'un prix (prix plancher) selon la politique commerciale** : En début de chaque séance d'enchères, les références minimales (prix plancher ) par campagne à terme, par période d'embarquement, par produit sont publiées. Ces prix plancher sont déterminés par la règle suivante pour la session du matin :

  *(Prix de clôture de la veille corrigé du différentiel d'origine + prix d'ouverture de session corrigé du différentiel d'origine) \* )\*taux de change XOF/£ / 2 + DRD\*taux de change XOF/USD*

  En ce qui concerne la session de 14h, les prix affichés à la bourse de Londres à 12h et celui affiché entre 13h30 et 14h seront utilisés respectivement comme prix de clôture et prix d'ouverture dans la formule précédente.

### 1.2.3.2 Règle d'adjudication

Les volumes sont attribués aux mieux-disants avec un plafond de tonnage par exportateur et par séance. Les opérateurs sont servis au prix offert pour le tonnage demandé tenant compte des limites définies par le système de vente.

- Pour chacune des périodes cotées d'une session, l'attribution des tonnages se fait aux prix proposés, dans la limite du plafond de surenchère, du plus offrant au moins offrant avec un plafond de tonnage par exportateur. 50% maximum du volume mis à marché sur une période est servi au premier mieux-disant ;
- 50% maximum du solde du volume mis à marché est servi au deuxième mieux-disant ;
- Le solde est équitablement réparti entre le troisième et quatrième mieux-disant.

L'ordre d'adjudication est basé sur le prix proposé. A prix identique, l'heure de réception de la soumission est utilisée comme deuxième critère d'adjudication.

Pour se conformer à la répartition des déblocages entre les opérateurs nationaux et les opérateurs internationaux, le Conseil du Café-Cacao pourrait organiser des sessions d'ajustement par type d'opérateurs (nationaux et internationaux). En outre, dans le cadre de la convention entre les broyeurs et l'Etat de Côte d'Ivoire, un marché secondaire est organisé pour les broyeurs.

Les prix de référence pour les ventes dédiées aux broyeurs sur cette récolte sont fixés dans les mêmes conditions que les ventes normales. Toutefois, afin d'éviter toute velléité d'entente, ces prix de ventes intègrent une valeur dont le mode de détermination est défini ci-après :

Dans cette option, le prix proposé par chaque broyeur sur le marché primaire est rapporté au marché secondaire. Il est défini une valeur en dessous de laquelle aucune adjudication n'est admise. Cette valeur est exprimée en pourcentage de l'amplitude entre le prix plancher et la moyenne pondérée des prix adjudicataires sur le marché primaire. Afin de maintenir l'esprit de compétition pour l'obtention des volumes, les allocations sont faites selon la règle d'allocation sur le marché primaire à savoir que seuls les quatre (04) mieux-disants sont servis.

Les volumes débloqués par les broyeurs sur ce second marché sont sujets à des limitations en fonction des capacités de broyage de chaque opérateur. La limite de déblocage sur le second marché est donc au prorata de la capacité de broyage de chaque opérateur, comparativement à la capacité nationale de broyage totale installée.

### 1.2.4   *Présentation de la vente à différentiel*

Le Conseil du Café-Cacao négociera avec des opérateurs, un volume et un différentiel sur une période cotée à la bourse de Londres pendant les heures de cotation.

A la suite d'un accord conclu entre les deux parties, le Conseil du Café-Cacao renseignera dans le système les paramètres de la vente. L'operateur devra à son tour confirmer lesdits paramètres .

Le Contrat de Vente (CV) correspondant à la vente sera généré dans le système après une dernière validation effectuée par le Conseil du Café-Cacao.

### 1.2.5   *Modalités de vente, d'allocation et d'exécution du volume réservé aux opérateurs internationaux*

La vente des volumes auprès des opérateurs internationaux se fait dans les mêmes conditions que les opérateurs locaux.

Un contrat de vente est signé entre le Conseil du Café-Cacao et l'opérateur international ayant débloqué à travers la messagerie ou par la vente à différentiel.

Pour l'exécution de ces contrats, le Conseil du Café-Cacao désigne, en accord avec l'opérateur international, un exportateur (chargeur) qui est chargé d'émettre le contrat d'exécution pour matérialiser son engagement à exporter le tonnage débloqué.

Le chargeur est dispensé de la production d'une caution bancaire additionnelle et d'un contrat de contrepartie. Le contrat de vente initial signé par l'opérateur international est considéré comme contrepartie.

Les modalités d'attribution des contrats internationaux aux opérateurs locaux tiennent compte notamment de :
   ✓ la solvabilité financière de l'opérateur national ;
   ✓ la capacité à disposer de produits physiques respectant qualitativement et quantitativement les termes contractuels.

Le volume retrocédé à un exportateur (chargeur) est pris en compte dans l'évaluation de la règle de correlation entre les achats physiques et ses contrats.

### 1.2.6  Calcul des reversements et soutiens

Le mécanisme de commercialisation prévoit la fixation d'un **prix CAF de référence** en début de campagne. Le prix CAF de référence correspond au prix moyen pondéré des ventes réalisées par anticipation (ventes à terme) et corrigé d'une estimation des ventes à réaliser en cours de campagne (vente spot) sans le DRD.

Ce prix CAF de référence est réparti entre :
- Prix au producteur ;
- Fiscalité et parafiscalité ;
- Coûts intermédiaires.

Cet ensemble de coûts est garanti par le système à hauteur du prix CAF de référence. Ainsi, lorsqu'un opérateur réalise un achat, le prix du contrat (**prix de déblocage**) sans le DRD est comparé au prix CAF de référence et trois situations peuvent se présenter :

- le prix de vente sans le DRD est égal au prix CAF de référence. Il n'y a ni reversement ni soutien ;

- le prix de vente sans le DRD est supérieur au prix CAF de référence ; l'écart entre les deux prix constitue un **reversement** et est payé par l'exportateur au Conseil du Café-Cacao ;

- le prix de vente sans le DRD est inférieur au prix CAF de référence ; l'écart entre ces prix est appelé **soutien** et est payé par le Conseil du Café-Cacao à l'exportateur.

En cas de report ou d'anticipation d'un contrat induisant un ajustement de prix, un reversements éventuels est effectué. Cet ajustement est déterminé par comparaison du prix du contrat (sans le DRD) et du prix de déblocage (sans le DRD) le plus élevé sur la période de report (si elle était ouverte) à la date de vente. Dans le cas où la période de report n'était pas ouverte, le prix reste inchangé. Cependant, pour tenir compte de la spécificité de l'activité de broyeur, le Conseil du Café-Cacao admet que tous les contrats non apurés et couverts par du physique à fin mars et fin septembre d'une campagne soient reportés sans ajustement de prix et sans pénalité. Cependant, lorsqu'un opérateur introduit une demande de changement de parité pour ce type de contrats reportés, le prix dudit contrat fera l'objet d'un ajustement selon les règles en vigueur.

### 1.2.7  Fonds de réserve

La constitution du fonds de réserve permet de sécuriser le système de commercialisation contre les risques liés au mécanisme de stabilisation sur la base de l'évaluation des risques liés aux variations de prix et ceux inhérents à la défaillance éventuelle de certains opérateurs.

Par ailleurs, les soldes positifs de stabilisation à la fin de chaque campagne contribueront à renforcer le fonds de réserve.

Ce fonds est logé dans un compte séquestre domicilié à la BCEAO et son utilisation est soumise à l'autorisation préalable des ministères de tutelle après délibération du Conseil d'Administration.

En principe, ce fonds devrait être utilisé en cas de neccessité lorsque les reversements n'ont pu couvrir en totalité les soutiens enregistrés.

### 1.2.8  Procédures d'exportation et d'exécution des contrats

Les procédures d'exportation peuvent être résumées aux points ci-dessous :

- Un contrôle qualité à l'embarquement sera effectué par des concessionnaires de contrôle qualité qui délivrent les Bulletins de Vérification (BV) ;

- L'exécution d'un contrat fait l'objet d'un Contrat d'Exécution (CE) comportant, le code de l'exportateur, le numéro de vente ainsi que toutes les informations relatives au contrat ;

- Les CE sont déposés par l'exportateur au Conseil du Café-Cacao. Une fois les vérifications de concordance et les traitements effectués, le Conseil du Café-Cacao signe le CE;

- Un CE donné peut faire l'objet de plusieurs plans d'embarquement. L'exportateur adresse au Conseil du Café-Cacao, une demande d'autorisation d'exportation appelée formule lancée (FO1) qui reprend les informations du CE. La FO1 est accompagnée des chèques de règlement des taxes et redevances attachées à l'exportation effective ;

- Des vérifications de conformité entre la FO1 et le CE sont effectuées. En cas de non concordance de ces informations, la FO1 est rejetée pour être mise en conformité ;

- Une fois la FO1 visée par le Conseil du Café-Cacao, l'exportateur prépare le produit à exporter et entreprend les démarches pour l'embarquement effectif.

Les exportations sont réalisées sur la base du poids réel des produits. Cependant, les formalités d'exportation peuvent se faire sur la base du poids réel ou théorique des produits. Pour les produits transformés, les taxations se font sur la base du poids en équivalent fèves.

## 2.  MECANISME DE COMMERCIALISATION INTERIEURE

### 2.1  Principes et mode de fonctionnement du mécanisme de commercialisation intérieure

Les principes et le mode de fonctionnement definissent le cadre général de la commercialisation intérieure.

#### 2.1.1  Acteurs de la commercialisation intérieure

Au niveau de la commercialisation intérieure du café et du cacao, les acteurs sont :
- Les Producteurs individuels ;
- Les Sociétés Coopératives ;
- Les Acheteurs ;
- Les Exportateurs agréés : Ils sont répartis en deux  (2) catégories :

    - Les COOPEX : Sociétés Coopératives exportatrices.
    - Sociétés commerciales (les négociants et les transformateurs)
- Les Banques et Etablissements financiers ;
- Les Usines de conditionnement ;
- Les Compagnies d'assurance ;
- L'Etat ;

- Les transitaires ;
- Les Transporteurs ;
- Les Concessionnaires qualité agréés ;
- Les tiers détenteurs.

Les pisteurs des acheteurs agréés et les Collecteurs/Délégués de section des sociétés coopératives sont identifiés et codifiés par le Conseil du Café-Cacao.

Pour la prise en compte et la validation des livraisons de produits dans les usines, chaque société coopérative et chaque acheteur **doit se faire identifier afin de bénéficier d'un code de livraison.**

### 2.1.2 Amélioration de la qualité des produits

La qualité du café et du cacao porte sur la determination des défauts definis par les normes. Cependant, la qualité est une notion qui peut être abordée sous plusieurs aspects autres que la qualité physique du produit notamment :

- La qualité chimique (Taux d'acide gras libres) ;
- L'aspect sanitaire relatif à la présence de contaminants chimiques dans les produits marchands ;
- L'aspect social (travail des enfants, santé et sécurité au travail, distribution équitable des ressources, etc.) ;
- L'aspect environnemental (protection de l'environnement et des ressources naturelles, introduction d'arbres dans les plantations, etc.).

En vue d'améliorer la qualité intrinsèque des produits au bord champ, le Conseil du Café-Cacao s'appui sur des agents opérationnels (du Conseil du Café-Cacao ou de structures partenaires) et sur des programmes de sensibilisation et de formation à l'endroit de l'ensemble des acteurs de terrain.

**Producteurs :** les programmes de formation des producteurs sont intensifiés autour des techniques de production, de récolte et de traitements post-récoltes (fermentation, séchage, triage, etc.).

**Acheteurs/pisteurs et sociétés coopératives :** les formations en direction de cette cible concerneront les techniques de contrôle (taux d'humidité, nombre de défauts et de matières étrangères fèves, taux de fèves moisies et ardoisées, ensachage, etc.). L'accent est mis sur les pratiques inappropriées qui favorisent la  mauvaise qualité et sur la nécessité pour eux d'effectuer leurs transactions dans le strict respect des dispositions prises sur la qualité des produits.

**Exportateurs :** les représentants des exportateurs sont également une cible des actions de formation sur les mêmes thèmes.

Ces actions de formation sont soutenues par des campagnes permanentes de sensibilisation et d'information. Dans cette perspective :

- Sur la base de contrats-plans avec l'État, les rôles de l'ANADER et du CNRA ont été recentrés et renforcés pour permettre aux acteurs de la filière de bénéficier pleinement de leurs expertises dans les domaines de la recherche-développement, de l'encadrement et du conseil agricole ;

- Les Délégations Régionales du Conseil du Café-Cacao sont dotées de moyens techniques appropriés pour participer à la sensibilisation et à l'information des acteurs de terrain et pour effectuer des contrôles inopinés de la qualité des produits collectés par les acheteurs et les sociétés coopératives.

### 2.1.3   *Fixation du prix minimum d'achat garanti*

Pour le cacao, un prix minimum garanti aux producteurs est fixé deux fois dans la campagne sur l'ensemble des zones de production. Un prix en début de la campagne principale et un autre prix pour la campagne intermédiaire.

Pour le café, le prix garanti s'applique sur toute la campagne .

Ce prix garanti sera égal au moins à 60% du prix CAF de référence, sans le DRD, quel que soit le niveau du marché international.

En cas de difficulté à servir ce niveau de prix au producteur, les différents acteurs se rapprocheront pour rechercher les solutions idoines avant l'ouverture de la campagne.

### 2.1.4   *La péréquation transport*

La péréquation transport est un mécanisme visant à assurer une répartition équitable des charges de transport. Ce mecanisme intègre les points de départ (sous-préfectures) et les points d'arrivée (usines dotées de ponts bascules).

La péréquation transport s'appuie sur un barème de coûts en tenant compte de plusieurs paramètres (prix à la pompe du carburant, état des routes, distance, disponibilités de camions, marge des acteurs concernés, etc.).
Une table de Tonnes Kilométriques (TKM) est établie par origine (sous-préfecture) et fera l'objet de révision si nécessaire.

Un forfait transport est fixé au barème afin de permettre aux exportateurs de payer au déchargement le coût du transport facturé à la tonne kilométrique (TKM) quelle que soit la zone de provenance du produit. Périodiquement, un ajustement sera effectué par rapport au **coût réel supporté par l'exportateur suivant la grille TKM** arrêtée. Le coût mensuel total du transport supporté par un exportateur selon la grille TKM en vigueur est comparé au coût théorique du transport résultant du forfait inscrit au barème :

- Lorsque le coût mensuel de transport supporté par l'exportateur est égal au coût de transport résultant du forfait du barème, **il n'y a pas d'ajustement transport ;**
- Lorsque le coût mensuel de transport supporté par l'exportateur est supérieur au coût de transport résultant du forfait du barème, **l'exportateur adresse une facture d'ajustement transport au Conseil du Café-cacao ;**
- Lorsque le coût mensuel de transport supporté par l'exportateur est inférieur au coût de transport résultant du forfait du barème, **le Conseil du Café-Cacao adresse une note de débit transport à l'exportateur ;**
- Le règlement des ajustements transport interviendra dans **un délai maximum fixé par une note de la direction générale en début de campagne.**

Les opérations prises en compte par le mécanisme de péréquation transport sont les livraisons de produit tout venant à destination des usines des **zones portuaires d'Abidjan** et de **San-Pedro ;**

Les livraisons dans les centres d'achat des exportateurs à l'intérieur du pays, dont les ponts bascules sont dotés du Système Autonome Intégré de Gestion des Informations Commerciales

(SAIGIC), d'un agent peseur et d'un dispositif de contrôle qualité du Conseil du Café-Cacao sont également prises en compte.

En effet, pour toute livraison de produit à un centre d'achat, le coût de transport sera calculé exceptionnellement sur la base du tronçon séparant le point de départ du fournisseur à l'usine de livraison. Le coût de transport ainsi déterminé sera mis à la disposition de l'exportateur pour :

- le paiement au fournisseur, du coût de transport supporté pour la livraison du produit au centre d'achat ;
- le paiement du coût de transport supporté par l'exportateur pour la livraison du produit dans ses entrepôts en zone portuaire.

Le calcul du coût de transport est évalué **par rapport au port le plus proche du point de départ avec un écart de distance maximal tolérable de 200 kilomètres.**

### 2.1.5   Détermination des barèmes de coûts garantis

Le mecanisme de stabilisation de la filière café-cacao, axée sur la transparence dans la gestion, nécessite une saine appréciation des coûts intermédiaires à chaque niveau du processus de commercialisation.

La notion de barème permet d'évaluer les coûts et rémunérations des différents services et intervenants, du bord champ au port d'embarquement, et de garantir le paiement du prix fixé aux producteurs.

Un barème unique est établi pour chaque campagne et est applicable à tous les opérateurs.

Ce barème couvre l'ensemble de la chaîne de commercialisation du café ou du cacao qui se résume en cinq (05) étapes essentielles :

1. La collecte du produit bord champ (valeur nu-centre de commercialisation) ;
2. Le transport du produit aux usines de conditionnement (valeur entrée usine) ;
3. L'usinage et le magasinage du produit (valeur loco magasin) ;
4. Les opérations de manutention et de préparation à l'exportation du produit (valeur FOB) ;
5. L'expédition du produit (valeur CAF FCFA/Kg).

Ce barème des coûts intermédiaires intègre le coût du transport qui permet d'harmoniser les prix à la livraison du produit quelque soit la distance entre le centre de collecte et le port d'embarquement à Abidjan ou à San Pedro. L'ossature des barèmes café et cacao est présentée en annexe 2.

L'élaboration du barème se fait en début de chaque campagne.

### 2.1.6   Contrôle des prix pratiqués et de la qualité bord champ

Afin de s'assurer du respect des prix garantis, des contrôles sur les prix d'achat peuvent être effectués dans les zones de production, aussi bien chez les acheteurs et les sociétés coopératives que chez les producteurs. Ces contrôles sont conduits par des équipes mobiles du Conseil du Café-Cacao.

Les représentations régionales du Conseil Café-Cacao sont chargées d'effectuer, selon un protocole technique, les contrôles réguliers portant à la fois sur le respect du prix d'achat, sur la qualité des produits collectés et les stocks des opérateurs. Ces contrôles seront étendus à la réfaction (le prix et/ou sur les quantités).
Les réfactions ne sont pas autorisées au bord champ.

Les opérateurs doivent tenir des registres d'achat et delivrer des reçus d'achat.

Des contrôles de la qualité des produits peuvent être réalisés par le Conseil du Café-Cacao dans les magasins des opérateurs sur toute l'étendue des zones de production.

Les informations pertinentes de la commercialisation seront relayées auprès des acteurs de terrain en matière de qualité.

### 2.1.7   Documents de Contrôle et de Vérification

Les supports techniques obligatoires définis pour le contrôle et la vérification du déroulement des transactions bord champ sont :

- **Le Registre d'achats brousse** : document détenu par l'opérateur (sociétés coopératives et acheteurs), il retrace toutes les opérations d'achats effectuées dans le temps.

- **Le Carnet de reçus** : il comporte une souche et est délivré par l'acheteur, à chaque opération d'achat de cacao ou de café, auprès d'un producteur individuel.

- **Le Connaissement** : ce document accompagne le produit d'un point A à un point B. Il existe deux types de connaissement : le connaissement inter-operateur (lieu de départ du magasin d'un opérateur à un autre) et le connaissement entrée usine (lieu de départ vers les usines de conditionnement ou les magasins portuaires). Il renferme des informations sur l'origine du produit livré. Il est émis et imprimé à partir de l'applicatif informatique du Conseil du Café-Cacao dénommé SYDORE.

- **Le Ticket de pesée :** il atteste du poids brut, du poids net, du nombre d'emballage ainsi que de l'identification de l'opérateur, à l'entrée des usines.

- **Le Bulletin d'analyse qualité** : il est délivré par le concessionnaire qualité après analyse du produit, il atteste de la qualité physique du produit.

- **Le bordereau de réception** : il est délivré par l'exportateur après acceptation du produit. Il récapitule toutes les informations utiles pour le dénouement de la transaction.

Les documents ci-dessus désignés sont traités selon des procédures définies.

### 2.1.8   Plafonnement des achats

Le plafonnement des achats vise à lutter contre les abus de positions dominantes et à assurer une saine et loyale concurrence entre les différents opérateurs agréés. Dans son application, il doit permettre à tous les exportateurs d'executer leurs contrats.

Ainsi, les plafonds d'achats de cacao brousse sont définis et les sanctions de dépassement renforcées. Ces plafonds sont déterminés pour les deux périodes commerciales (octobre-novembre-décembre et janvier-février-mars) couvrant la récolte principale. Ils seront déterminés en tenant compte des niveaux estimés de la récolte principale dans le cadre des activités de prévision des récoltes.

En raison de la taille des fèves issues de la récolte intermédiaire, les exportateurs sont autorisés à titre exceptionnel à s'approvisionner dans les limites du potentiel de production de ladite récolte intermédiaire. Toutefois, en cas d'abus provenant de pratiques visant à mettre à mal la saine et loyale concurrence entre opérateurs, dûment constatées par le Conseil du Café-Cacao, il ne sera pas exclu de contingenter les achats de la récolte intermédiaire.

Les limitations d'achat pour le cacao sont les suivantes :

- Octobre-Décembre :                      110 000 tonnes ;
- Janvier-Mars :                          50 000 tonnes ;
- Avril-Septembre (intermédiaire) :   Pas de limite.

La limite globale d'achat pour un opérateur sur la campagne principale étant de 160 000 tonnes, un opérateur n'ayant pas atteint le volume de 110 000 tonnes sur la période OD, peut aller au-delà de 50 000 tonnes sur la période JM tant qu'il reste dans la limite des 160 000 tonnes.

En plus de ces limites maximales, les achats de chaque opérateur doivent correspondre à ses déblocages majorés de 2%.

Les opérateurs ne disposant pas de contrat de déblocage et ceux dont les volumes débloqués sont inférieurs ou égaux à 1000 tonnes sont autorisés à acheter dans la limite maximale de 1000 tonnes sur la campagne principale et 500 tonnes sur la campagne intermédiaire.

Pour tenir compte de la spécificité de l'activité de broyage et de la capacité installée des unités locales de broyage, la limitation des achats effectués par les broyeurs se présente comme suit :

- Une limitation des achats à la capacité semestrielle moyenne de broyage majorée de l'équivalent d'un mois et demi (1,5 mois) de stock sans avoir la contrainte d'être couvert par des déblocages ;
- Une seconde limite d'achat correspondant à la capacité semestrielle moyenne de broyage majorée de l'équivalent de deux mois et demi (2,5 mois) de stock avec l'obligation de disposer de déblocage à hauteur de 90% du volume acheté.

S'agissant du café, le plafonnement correspond aux déblocages majorés de 5%. Les opérateurs ne disposant pas de déblocages ne sont pas autorisés à faire des achats de physique.

Ces plafonds seront ajustés en cas de nécessité.

### 2.1.9  *Contrôle de la qualité des produits à l'entrée des usines*

Dans la même optique d'amélioration de la qualité du café et du cacao commercialisé, un contrôle systématique de la qualité est effectué sur tous les produits livrés dans les usines de conditionnement et de transformation sur toute l'étendue du territoire.
Ces contrôles sont consignés dans le système informatique SAIGIC.

Ces contrôles ont été concédés par l'Etat de Côte d'Ivoire à des opérateurs privés appelés concessionnaires qualité sous la supervision du Service Contrôle Qualité du Conseil du Café-Cacao qui veille au respect et à la bonne application des normes et procédures en vigueur.

Les normes qualité sont définies en rapport étroit avec celles en vigueur à l'exportation. Des seuils de tolérance sont également définis en accord avec les exportateurs et les concessionnaires et diffusés largement auprès des acteurs. Au-delà de ces seuils, l'usinier ne sera pas autorisé à réceptionner les produits.

Les transformateurs sont tenus de réceptionner les produits destinés au broyage directement sur les sites dédiés à cet effet. Les produits ne seront dans aucun cas issus du tamisage (trie du cacao sur le site de réception).

Les produits refoulés pourront être reconditionnés par le fournisseur en dehors de l'usine de réception, selon les défauts révélés et présentés de nouveau au contrôle. Si le produit ne peut être reconditionné parce que réputé être de mauvaise qualité, il est alors convoyé vers une usine de transformation ( le produit ne devra pas être issu d'un processus de tamisage des fèves), dans la limite des normes d'acceptation définies à l'entrée des usines.  Sinon, le produit doit être acheminé vers les usines de traitement de résidus..

Les résultats d'analyses issus des contrôles effectués par les concessionnaires permettent de déclencher le renforcement des actions de formation, sensibilisation et information des producteurs et acheteurs responsables de la mauvaise qualité.

### 2.1.10 Gestion des produits sous-grade , hors norme, déchetset des residus

L'objectif affiché par les autorités est de parvenir à court terme à une amélioration significative de la qualité du cacao de Côte d'Ivoire. Cet objectif commande une gestion rigoureuse des produits non conformes et des résidus.
Le contrôle systématique de la qualité de ces produits à l'entrée des usines de transformation est réalisé à cet effet.

### 2.1.11 Principes et modes de fonctionnement du cadre reglementaire relatif à la mise en œuvre des projets de certification et des programmes de durabilité à prime

#### 2.1.11.1 Problématique

La certification a été présentée par l'industrie du cacao comme un outil devant transformer le secteur du cacao en une chaîne de production et de commercialisation durable. Cependant, il est ressorti des études ainsi que des nombreuses réclamations enregistrées par le Conseil du Café-Cacao, des limites structurelles et fonctionnelles liées à l'implémentation de la certification du cacao.

Il s'agit entre autres des mauvaises pratiques enregistrées sur le terrain, notamment:

- Le non-respect des clauses des contrats de certification ;
- La livraison ou l'achat de cacao certifié sans certificat en cours de validité de la coopérative, du traitant ou de l'exportateur ;
- La délivrance de certificats à des coopératives dont les plantations de certains de leurs producteurs sont dans les forêts classées ;
- Le déclassement du cacao certifié en cacao ordinaire par les exportateurs sans motif valable ;
- Le mélange du cacao certifié au cacao ordinaire par l'exportateur ;
- Le non-paiement de la prime ou des retenues arbitraires effectuées ;
- Le non-respect de la durée de la formation ou des formations de mauvaise qualité dispensées ;
- L' inefficacité du Système de Gestion Interne (SGI) ;
- Le racket des auditeurs ;
- La non fiabilité des systèmes de traçabilité élaborées par les différents acteurs.

### 2.1.11.2  Principes et fonctionnement du cadre règlementaire

L'objectif principal est d'instaurer le cadre juridique indispensable à une mise en œuvre réussie et contrôlée des projets et programmes susmentionnés, sur le terrain, à travers les textes juridiques suivants :

- Le décret  N° 2017-321 du 24 Mai 2015 relatif à la mise en oeuvre des projets de certification et des programmes de durabilité dans la filière café-cacao, signé le 24 Mai 2017. Il a pour objet de réglementer la mise en œuvre des projets de certification et des programmes de durabilité, à travers l'instauration de conditions préalables à leur mise en œuvre ainsi que l'élaboration et la mise en œuvre d'un dispositif de suivi-évaluation;

- L'Arrêté N° 444/MINADER/CAB du 25 Juillet 2018 déterminant la liste des manquements donnant lieu au retrait de l'agrément pour la mise en oeuvre des projets de certification et des programmes de durabilité dans la filière café-cacao, ainsi que pour l'achat du café ou du cacao certifié ou durable;

- L'Arrêté N° 445/MINADER/CAB du 25 Juillet 2018 déterminant les mentions devant figurer dans les contrats relatifs à la mise en oeuvre des projets de certification et des programmes de durabilité dans la filière café-cacao.

Les principes suivants régissent la mise en œuvre des projets de certification et des programmes de durabilité:

1) Les opérateurs intervenant dans les projets de  certification et les programmes de durabilité doivent obtenir un agrément de campagne  conformément au décret n° 2017-321 du 24 mai 2015.
2) Les demandes d'agrément se font en ligne à travers le  Système de Gestion de l'Information des Projets de Certification et des Programmes de Durabilité Café-Cacao (SGICD).
3) Les sept types d'opérateurs visés par les demandes d 'agrément sont les suivants :
   - Les Structures de certification ;
   - Les Exportateurs conduisant des projets et/ou des programmes de durabilité ;
   - Les Exportateurs achetant uniquement du cacao/café certifié ou durable ;
   - Les Sociétés Coopératives conduisant des projets de certification et/ou des programmes de durabilité ;
   - Les Centres d'achat conduisant des projets de certification et/ou des programmes de durabilité ;
   - Les Cabinets de formation dispensant des formations en matière de certification ;
   - Les Cabinets d'audit opérant dans la certification et les programmes de durabilité.

4) l'Organe de Régulation et de Stabilisation assure la centralisation, la coordination, le suivi et le contrôle des activités des opérateurs impliqués dans les projets de certification et des programmes de durabilité, en collaboration avec les Directions opérationnelles, depuis les opérations d'achat bord champ jusqu'à l'exportation.

   - Les opérateurs s'enregistrent dans le Système de Gestion de l'Information des Projets de Certification et des Programmes de Durabilité Café-Cacao (SGICD) pour le suivi de leurs activités de certification et de durabilité.

   - Les opérateurs  font leurs déclarations d'achat de café/cacao certifié et de cacao durable dans le SYDORE.

   - Les opérations de suivi et de contrôle des  activités menées par les opérateurs agréés se font à travers le SGICD et les missions de terrain.

- Les contrôles à l'entrée des usines portent également sur les volumes de café/cacao certifié et de cacao durable réceptionnés. En aucun cas, le cacao certifié ne peut être déclassé en cacao ordinaire.

- Le Conseil du Café-Cacao effectue un contrôle qualité systématique du café/cacao certifié et du cacao durable sur tous les lots présentés.

- Au niveau de l'exportation, les Exportateurs déclarent les volumes de cacao certifié, avec le type de certification, les CDC, les lots, les montants de prime dans le logiciel conçu à cet effet, afin de faire correspondre les données à l'export, avec les connaissements de la commercialisation intérieure.

- Le Conseil du Café-Cacao effectue la vérification du paiement des primes.

- Un lien entre le SYDORE/ SIGEC et le SGICD est disponible.

5) Un cabinet de consultance spécialisé en matière de certification et sélectionné par l'Organe de Régulation et de Stabilisation effectue, sur une base annuelle, un contrôle des activités menées par les opérateurs agrés, conformément aux dispositions du Décret N0. 2017-321 du 24 Mai 2015. En cas de non-conformités, les opérateurs agréés concernés doivent nécessairement mettre en œuvre les mesures correctives sous peine de sanction.

6) Le Conseil café-Cacao est chargé de constater les manquements, conformément à l'article 5 de l'arrêté déterminant la liste des manquements donnant lieu au retrait de l'agrément pour la mise en œuvre des projets de certification et de programmes de durabilité dans la filière Café-Cacao, ainsi que pour l'achat du café ou du cacao certifié ou durable.

7) Les sanctions sont mises en œuvre conformément aux dispositions de l'arrété susmentionné.

### 2.1.12 *Estimation des récoltes*

L'estimation des récoltes fait partie intégrante des missions du Conseil du Café-Cacao.

### 2.1.13 *Gestion de la sacherie brousse*

La sacherie brousse est indispensable au bon déroulement de la campagne et à la préservation de la qualité des produits à tous les stades de la commercialisation. Elle fait l'objet d'une taxe parafiscale. Sa gestion se fait selon les principes suivants :

- Évaluer en début de chaque campagne les besoins en sacs ;

- Mettre à la disposition des Délégations Régionales un nombre de sacs en rapport avec le potentiel de production de chaque région ;

- Les sacs brousse sont destinés aux producteurs individuels via les sociétés coopératives et acheteurs selon leur capacité de collecte et leur rythme de livraison des produits. Les stocks résiduels de sacs par magasin sont régulièrement mis à jour pour le réapprovisionnement qui tient compte de la fluidité de l'activité ;

- Au niveau des zones portuaires (Abidjan et San Pedro), veiller à ce que les exportateurs remettent un nombre équivalent de sacs vides à chaque livraison de produits. Le dispositif

institués à l'entrée des usines de conditionnement et de transformation, permettent un meilleur suivi de la gestion de la sacherie via un logiciel dénommé SICOPS;

- Les mouvements d'entrée et de sortie des sacs sont tracés par des bons signés par les différents intervenants.

Il existe des spécifications techniques relatives aux sacs. Les normes sur la sacherie brousse doivent préserver la qualité des produits et la résistance aux trois rotations prévues.

### 2.1.14 Mesures étatiques d'appui
Les mesures étatiques d'appui portent essentiellement sur les aspects suivants :

✓ Lutte contre la Contrebande du produit
Le Conseil du Café-Cacao en relation avec le Ministère en charge du Commerce, la douane et les forces de sécurité, échangent pour combattre la contrebande.

Tous les produits saisis sont vendus par le Conseil du Café-Cacao.

✓ Lutte contre le racket
Le Gouvernement prend des mesures pour combattre le racket et réduire les frais de route pour ne pas amoindrir le prix au producteur.

## 3. SECURISATION DE LA COMMERCIALISATION ET GESTION DES RISQUES

### 3.1 Dispositif lié à la commercialisation extérieure

#### 3.1.1 Identification des risques liés au système de commercialisation

Le système de vente à terme et de stabilisation des prix comporte deux principaux types de risques :

- un risque lié à la variation du prix CAF;
- un risque lié à la défaillance d'un opérateur.

Par ailleurs, les contrats étant convertis immédiatement en euro et en franc CFA, les risques de change sont quasi inexistants.

##### 3.1.1.1 Risque lié à la variation du prix CAF
Les ventes à termes consistent à vendre une proportion des prévisions de récolte ; ce qui veut dire que pour cette proportion de la récolte, le prix est connu avant le démarrage de la campagne. Une estimation de prix est faite pour le solde qui est vendu en spot.

Le prix de référence est la moyenne des prix obtenus par les ventes anticipées et de l'estimation du prix pour les ventes à réaliser en spot.

Si pendant la campagne, le prix réel de ventes est supérieur au prix estimé un solde positif est dégagé. Dans le cas contraire, on aura un solde négatif qu'il faudra financer.

##### *3.1.1.2 Risque de défaillance d'un opérateur*

Ce risque résulte de l'incapacité d'un opérateur national ou international ayant pris des engagements dans le système à honorer lesdits engagements. Cet opérateur sera alors déclaré défaillant.

Si la défaillance intervient avant la fixation des prix de la campagne, il n'y a aucun risque majeur pour le système puisque les tonnages de l'opérateur peuvent être remis en vente.

Si la défaillance intervient après la fixation des prix, trois cas peuvent se présenter :
- soit le contrat est revendu à un prix supérieur ou égal : il n'y a donc pas de perte pour le système ;
- soit le contrat est replacé à un prix inférieur : dans ce cas, la perte est supportée par le système ;
- soit le contrat ne peut être replacé : dans ce cas, la perte est supportée par le système.

### *3.1.2   Gestion des risques liés au système de commercialisation*

La gestion des risques liés au mécanisme des ventes, peut s'entrevoir par des actions d'anticipation et des garanties financières avant l'application de sanctions.

##### *3.1.2.1 Les actions d'anticipation et les garanties financières*

Pour réduire la probabilité de survenance des risques évoqués, le mécanisme de commercialisation prévoit à différentes étapes, des mesures permettant de filtrer les opérateurs ou de s'assurer de la bonne exécution de leurs engagements. Il s'agit notamment de :

#### ➢ L'agrément des opérateurs

La délivrance d'agrément selon les conditions précises permet de sélectionner les opérateurs pouvant exercer dans le système.

#### ➢ L'agrément des acheteurs internationaux

Tout acheteur international désireux d'acheter du cacao et du café de Côte d'Ivoire, a l'obligation de fournir une liasse documentaire (cf note à l'attention des contreparties des exportateurs de café-cacao CCC/125-17/YBK/DGA-FD/DV-KIEK/Kp du 14 septembre 2017 ). Cette étape a pour objectif de sélectionner les potentiels acheteurs, garantir la bonne fin d'exécution des différents contrats et réduire les risques de spéculation. Les demandes de ce type d'agrément se font tout au long d'une campagne.

#### ➢ La validation des Contrats de Ventes (CV), la délivrance de caution de ventes et la validation de contrats de contrepartie

Les ventes font obligatoirement l'objet de confirmation de la part des opérateurs avant validation par le système.

Le Contrat de Vente est soumis à la production de caution bancaire de 2,5% ou 1% du prix de vente selon la nature de l'opérateur (cf. 1.2.2.) et de la fourniture d'un contrat de contrepartie.

En principe, les transformateurs n'étant pas autorisés à exporter des fèves, ils ne devraient pas produire de contreparties en fèves.

En outre, le contrat de contrepartie étant une garantie de bonne fin d'exécution d'une vente, la contrepartie d'un transformateur devrait être sous forme de produit transformé qui confirme la vente effective des tonnages.

Toutefois, pour tenir compte des contraintes pratiques, les transformateurs peuvent produire des contreparties exprimées en équivalent fèves. Néanmoins, la contrepartie exprimée en produit transformé sera fournie au moment de l'exécution du contrat.

➢ **La fixation d'un prix plafond (ventes aux enchères)**

La fixation d'un prix plafond dans le mécanisme de commercialisation permet d'éliminer les prix irréalistes proposés par les opérateurs.

Ce prix plafond tient compte de l'évolution du marché, du différentiel d'origine et du comportement des acteurs.

➢ **L'observation de la position de chaque opérateur et le suivi des allocations**

La position de chaque opérateur est observée au jour le jour et les allocations accordées aux opérateurs sont suivies sur la base :

- de l'historique des statistiques de commercialisation ;
- des moyens logistiques et financiers.

Si le Conseil du Café-Cacao juge la position d'un opérateur fragile en cours de campagne, il demandera des garanties supplémentaires notamment un justificatif de couverture de position par la contrepartie, l'existence de lignes de financement, etc. Le Conseil du Café-Cacao peut aller jusqu'à suspendre un opérateur de son droit d'accès au système de ventes pour éviter que ce dernier mette à risque le système.

➢ **La vérification de la bonne fin d'exécution des contrats**

Le Conseil du Café-Cacao se réserve le droit de procéder à la vérification de la bonne fin d'exécution des contrats à travers les points suivants :

- la conformité de la contrepartie initialement produite et ayant confirmé le contrat dans le module à celle avec laquelle le contrat est effectivement exécuté ;
- le paiement effectif du prix prévu au contrat dans la limite autorisée et par la contrepartie produite.

### 3.1.2.2 *Sanctions*

(voir annexes)

Une série de sanctions est appliquée par le Conseil du Café-Cacao à l'ensemble des opérateurs intervenant dans la commercialisation en cas de non-respect des règles en vigueur. Ces sanctions peuvent aller jusqu'au retrait de l'agrément.

### 3.2 *Dispositif lié à la commercialisation intérieure*

La commercialisation intérieure pourra s'accompagner d'un mécanisme de suivi des transactions commerciales.

➢ **Au niveau de l'agrément des opérateurs**

Les exportateurs et les acheteurs sont agréés pour une campagne agricole.

➢ **Au niveau de l'achat bord champ par les opérateurs**

Des plafonds d'achats sont imposés aux différents exportateurs agréés pour éviter les abus de positions dominantes.

Toute réfaction au détriment du producteur pour quelques raisons que ce soit est interdite.

Des sanctions sont prises contre la contrebande et l'évasion de produits avec l'appui des administrations compétentes, ainsi que contre tout opérateur contrevenant aux procédures et règles établies.

> **Au niveau du prix d'achat bord champ aux producteurs**

Un prix minimum garanti aux producteurs de café et de cacao est fixé pour toute la campagne sur l'ensemble des zones de production. Il est au moins égal à 60% du prix CAF.

Par ailleurs, à partir de la campagne 2020/2021, une proportion du DRD fixé à USD/TM 400 selon le niveau du marché, sera éventuellement ajouté au prix minimum garanti calculé à partir du prix CAF de référence.

Afin de permettre à chaque opérateur d'appliquer le prix garanti, l'approche préconisée consiste en la définition d'un barème, qui sera garanti à tous les intervenants.

# PARTIE II :

# REGLES DE GESTION DES OPERATIONS COMMERCIALES ET TECHNIQUES

## 1.   CAMPAGNE

Les campagnes de cacao débutent le 1ᵉʳ octobre pour s'achever le 30 septembre de l'année suivante. Elle est subdivisée en deux (2) périodes : la campagne principale qui s'étend d'octobre à mars et la campagne intermédiaire, d'avril à septembre.
La campagne de café commence en décembre et prend fin en novembre de l'année suivante.

La gestion des deux produits café et cacao est séparée à tous les niveaux :

- Déclarations d'achats ;
- Obtention de droits d'exportation ;
- Emission et gestion des formules ;
- Autorisations d'empotage ;
- Déclarations douanières ;
- Embarquement ;
- Vu embarqué ;
- Etc.

## 2.   INVENTAIRE DES STOCKS, DECLARATIONS DES ACHATS ET TRANSACTIONS

Le Conseil du Café-Cacao fixe le niveau du plafonnement des achats. Les modalités pratiques de mise en œuvre sont définies et arrêtées avant le démarrage de la campagne.

Ces modalités sont intégrées dans le système afin d'alerter sur toute déclaration d'achat au-delà de la limite et d'aider ainsi les exportateurs au respect de la décision.

### 2.1.  Inventaire des stocks

Conformément au mécanisme de commercialisation du café et du cacao, le Conseil du Café-Cacao réalise un inventaire physique des stocks de café et de cacao détenus par les exportateurs et transformateurs.

Un inventaire physique est réalisé pour arreter les stocks de cacao et de café au 31 mars et au 30 septembre de chaque année. Pour le café, un arreté des stocks est effectué au 30 novembre.

De même, lorsqu'en cours de période de commercialisation, surviennent des modifications au niveau des paramètres du barème, un inventaire s'avère nécessaire afin d'éviter que les stocks antérieurs soient valorisés au même niveau que les nouveaux stocks au moment de l'exportation.

Par ailleurs, dans le cadre du suivi des flux physiques, le Conseil du Café-Cacao peut procéder à tout moment à des inventaires physiques de stocks.

Les opérations périodiques d'inventaire physique de stocks ont pour objectifs de :
- permettre un suivi et une évaluation efficace des flux physiques de café et de cacao ;
- procéder aux ajustements financiers en cas de changement de paramètres du barème ;
- fournir les indicateurs pertinents pour la régulation commerciale (notamment le suivi des ventes) ;
- permettre les prévisions et ajustements budgétaires ;

*Opérationnalité des mécanismes de commercialisation du café et du cacao  -01/10/2020-*   Page 32 sur 72

- boucler correctement la gestion comptable et financière sur la base des stocks reports qui doivent être exportés sur la base de la parité correspondant à la récolte de provenance ou la période de production.

Les opérateurs sont tenus de communiquer au Conseil du Café-Cacao, avant le démarrage de la campagne, la liste et les adresses géographiques précises des lieux d'entreposage de leurs différents produits. Chaque fois qu'ils ouvriront un nouveau site de stockage, ils devront le déclarer au Conseil du Café-Cacao dès sa mise en service.

L'inventaire de stocks se déroule sur l'ensemble des sites de stockage où sont entreposés les produits de différentes natures des exportateurs.

### 2.1.1. Détermination des stocks théoriques et rapprochement aux résultats d'inventaires physiques

Le Conseil du Café-Cacao déterminera sur la base des déclarations d'achat des opérateurs, des transactions internes entre opérateurs et des exécutions de contrat, le stock théorique de chaque opérateur. Les résultats issus de l'inventaire physique seront confrontés aux stocks théoriques déterminés.

Tout opérateur dont le niveau de la freinte, au terme de la séance de reconciliation des stocks, presente une valeur négative ou supérieure au taux de freinte admis au barème, s'expose au paiement d'une pénalité de 15 Fcfa/Kg applicable à l'écart absolu de stock.

### 2.1.2. Nature des produits concernés par les inventaires
Les natures de produits concernés par les inventaires sont :

**Pour le Café**
- le café tout venant ;
- le café usiné ;
- le café hors norme (grains noirs et brisures) ;
- les produits café transformés.

**Pour le Cacao**
- les fèves de cacao brousse ;
- le cacao usiné (conditionné) ;
- les produits cacao transformés ;
- les résidus, déchets et autres produits hors-normes du cacao.

### 2.1.3. Stock report
Tout exportateur qui disposera d'un stock de la récolte précédente inventorié au 31 mars et au 30 septembre pour le cacao, et au 30 novembre pour le café, devra les exporter dans un délai maximum de 03 et 06 mois respectivement pour le cacao et le café, à compter du 1er du mois suivant l'arrêté des stocks aux conditions du barème correspondant.

Passé ces délais respectifs, une pénalité est appliquée à tous les retardataires.

### 2.1.4. Traitement des stocks hors normes appartenant aux exportateurs de fèves « good fermented »

Lorsqu'un exportateur cacao « good fermented » dispose de stocks hors norme au terme des inventaires, il dispose de 30 jours à compter de la fin de la séance de réconciliation pour céder ce produit à un exportateur de résidus et déchets de cacao. Passé ce délai, le stock sera saisi par le Conseil du Café-Cacao et vendu aux enchères aux exportateurs de déchets et résidus de cacao.

## 2.2. Déclarations d'achats

La déclaration d'achat est une obligation faite à tout opérateur agréé ou codifié dans le cadre de la commercialisation du café et du cacao, d'enregistrer auprès du Conseil du Café-Cacao l'ensemble de ses achats réceptionnés dans les magasins ou dans les usines de conditionnement.

### 2.2.1. Déclarations d'achats bord champs

Pour tout achat de produits bord champ, les acheteurs et les sociétés coopératives agréés au titre de la campagne ont obligation de délivrer un reçu au producteur.

Chaque jour, l'acheteur/la société coopérative procède à l'enregistrement systématique des informations de chacun des reçus délivrés aux vendeurs, dans le système.

Avant toute livraison à un exportateur, à un acheteur ou à une société coopérative, chaque opérateur doit émettre un connaissement de livraison de produit tout-venant ou brousse à travers le système de gestion commerciale du Conseil du Café-Cacao.

### 2.2.2. Déclarations d'achats à l'entrée des usines

La déclaration d'achat est une obligation faite à tout exportateur d'enregistrer auprès du Conseil du Café-Cacao l'ensemble de ses achats réceptionnés dans une usine. Ces déclarations d'achats portent sur toutes les natures de produit (brousse, tout-venant, usiné, déchet).
Les déclarations d'achats à l'entrée des usines consistent en la validation, par l'exportateur, des données de réception enregistrées dans le système de gestion des opérations commerciales.

Quarante-huit heures au plus tard après l'opération d'achat, l'exportateur doit procéder à la vérification des informations d'achat dans le système de gestion des opérations commerciales du Conseil du Café-Cacao. Si les informations d'un achat sont conformes à celles inscrites dans ses livres, l'exportateur approuve l'achat sinon il conteste l'achat en précisant les motifs de la contestation (erreurs sur le fournisseur, sur la qualité, etc.). Au-delà de quarante-huit heures tous les achats et toutes les cessions réalisées en dehors du système de gestion et non déclarés sont sanctionnés sur décision du Conseil du Café-Cacao.

Toute déclaration validée ne peut faire l'objet de modification, sauf dérogation. Les autorisations d'embarquement et de cession de produit sont validées sur la base des volumes déclarés.

## 2.3. Contrôle qualité

### 2.3.1. Contrôle qualité bord champ

Un contrôle sommaire est effectué au bord champ dans les magasins des opérateurs par des agents de terrain du Conseil du café-Cacao.

Une analyse complète peut également être réalisée sur des échantillons prélevés auprès des fournisseurs.

Ces analyses complètes peuvent se faire à la demande des opérateurs ou sur initiative propre du Conseil du café-Cacao, au sein des mini-laboratoires des Délégations Régionales.

Des opérateurs sont particulièrement ciblés pour des contrôles grâce aux remontées d'information qualité obtenues à l'entrée des usines et traitées via le SYDORE.

### 2.3.2.  Contrôle qualité entrée-usine

Aux entrées des usines de conditionnement et de transformation, un contrôle systematique de la qualité de tous les chargements de cacao et de café brousse est réalisé par des concessionnaires qualités mandatés à cet effet. Les produits contrôlés non conformes aux normes qualité entrée usines sont systematiquement refoulés.
Des contrôles inopinés sont effectués par des agents du Service Contrôle qualité du Conseil du Café-Cacao qui s'assurent ainsi du respect des normes et procédures en vigueur.
Les données sont gérées via le logiciel SAIGIC.

### 2.3.3.  Contrôle qualité export

Afin de s'assurer de la conformité des produits à l'exportation, un contrôle qualité systématique du café et du cacao est effectué sur tous les lots présentés. Ce contrôle est actuellement concédé à des sociétés concessionnaires agréés à cet effet..

En outre, le Conseil du Café-Cacao effectue des controles inopinés sur les lots présentés à l'exportation afin de s'assurer de la fiabilité des resultats d'analyse émis par les concessionnaires qualité.

Toutes ces opérations sont gérées via le logiciel Ecoqual.

Tout lot qui ne répond pas aux normes définies à l'export ne peut être exporté et cela autant de fois que nécessaire.

### 2.3.4.  Gestion des produits hors norme  café

Le café hors norme est un résidu obtenu après usinage et conditionnement du café tout venant. Ce type de café n'est pas autorisé à l'exportation.

### 2.4.  *Déclaration d'usinage*

La déclaration d'usinage consiste à effectuer dans le système une ventilation du tonnage usiné en grade et sous-grade. Le poids usiné doit être équivalent au cumul des ventilations y compris les déchets.

Tous les exportateurs de fèves sont tenus de déclarer dans le système de gestion des opérations commerciales les lots de fèves fabriqués vingt-quatre heures après le processus d'usinage.

Tous les exportateurs de produits transformés sont tenus de déclarer dans le système de gestion des opérations commerciales le volume des produits dérivés fabriqués après le processus d'usinage.

Les demandes de BV et les autorisations d'exportation sont validées sur la base de produits préalablement déclarés.

L'exportateur est tenu de déclarer chaque 15 jours, le volume des déchets d'usinage relatif aux achats de produit tout venant usiné.

Tout ré-usinage doit faire l'objet d'une nouvelle déclaration précisant par grade et lot les tonnages ré-usinés. Les exportateurs doivent déclarer dans le système, les lots de produits usinés.

Un lot non déclaré ne peut faire l'objet d'autorisation d'exportation (FO1), à l'exception des produits transformés.

## 2.5.   *Déclaration des ventes locales*

Lorsqu'une partie des volumes de produits achetés est vendu localement à des opérateurs non agréés pour sa transformation et sa consommation locale, elle doit être déclarée dans le système de gestion commerciale du Conseil du Café-Cacao.

Ces déclarations de vente doivent être réalisées au plus tard le 31 mars ou le 30 septembre de chaque année.

## 2.6.   *Transactions loco-magasins*

Les transactions (achats-ventes) concernent à la fois les produits non usinés (cacao brousse ou café tout venant) et les produits usinés et allotis.

Pour le café, les transactions s'effectuent selon des dispositions particulières du Conseil du Café-Cacao en ce qui concerne les grains noirs et les brisures. Les transactions portant sur du produit usiné (gradé et alloti) permettent à un exportateur de céder des lots à un autre exportateur ; les lots ainsi transférés à l'acquéreur portent la marque et les numéros propres aux vendeurs.

La conclusion du contrat autorise l'acquéreur à exporter pour son compte une marque qui n'est pas la sienne.

Les dispositions particulières suivantes s'appliquent aux cessions de lots portant sur le stock report :

- En début de chaque campagne, le Conseil du Café-Cacao procède au report systématique des CE non apurés ;
- L'apurement de ces CE par des formules se fera dans la limite du stock réconcilié ;
- Tout CE reporté non exécuté dans les délais prescrits donnera lieu au paiement du reversement, des taxes et redevances ;
- Les lots faisant l'objet de cession devront respecter les normes export en vigueur sur la période d'acquisition.

Un exportateur ne peut nouer une transaction avec un autre que dans la limite de son stock disponible. A l'émission du contrat de transaction par le vendeur, le système contrôle le stock théorique selon la formule ci-dessous pour s'assurer que ce dernier est au moins égal au tonnage de la transaction :

*Stock théorique = Somme des achats - Somme des cessions loco-magasin + Somme des achats loco-magasin - Somme des tonnages F01 validées et exécutées.*

Dans le cas contraire, la transaction est impossible. Pour lever cette contrainte, le vendeur devra effectuer une déclaration partielle d'achat, afin d'avoir le niveau du stock théorique requis.

Pour être validée, cette transaction devra être confirmée par l'acheteur dans le système.

Toute transaction loco-magasin devra être totalement finalisée par sa validation par le Conseil du Café-Cacao avant que les exportateurs concernés ne puissent initier d'autres transactions loco-magasin.

Pour assurer la bonne fin d'exécution des contrats, le Conseil du Café-Cacao peut être amené à contraindre certains opérateurs à effectuer des transactions loco-magasins, notamment pour permettre à ceux ayant des contrats résiduels et ne disposant pas de stocks, d'acquérir du produit détenu par d'autres.

## 2.7.   *Pesage des produits*

Tous les produits qui transitent dans une usine ou un site disposant d'un pont bascule reconnu par le Conseil du Café-Cacao doivent faire l'objet de pesée à l'entrée ou à la sortie de ces unités. (Voir en annexe : Note à l'attention des exportateurs, des usiniers et des transformateurs de café et de cacao, du 19 juin 2015)

Les livraisons de produits tout-venant ou brousse doivent être pesées conformément au connaissement émis par le fournisseur (récolte, campagne, période commerciale, type de fournisseur, etc.).

Avant l'empotage, chaque lot de fèves de cacao ou de café vert doit être pesé au moins une fois individuellement et conformément au bordereau de sortie ou d'entrée dans les usines ou site de conditionnement.

Le poids des lots de produits finis est celui qui est délivré par les instruments de métrologie installés sur la chaîne de production. Il est déclaré au Conseil du Café-Cacao au moment de la sortie du produit de l'usine de transformation vers les quais d'embarquement ou vers les sites de stockage de l'usinier.

Les camions qui transportent ces produits en dehors de l'usine de transformation sont systématiquement pesés avec leurs cargaisons pour marquer la sortie effective du produit de l'usine de transformation.

## 2.8.   *Correction des achats, des déclarations d'achat et des transactions loco-magasin*

Les corrections peuvent être autorisées par le Conseil du Café-Cacao à la demande de l'exportateur lorsque les motifs évoqués sont jugés recevables.

## 3.   VENTES

### 3.1.   *Définition de la vente*

La vente est un contrat entre le Conseil du Café-Cacao et un opérateur agréé.

La vente s'effectue sur la base de cotations par le biais d'un système d'enchères ou à différentiel. Il comporte :

- La campagne ;
- La nature du produit (café ou cacao) ;
- Le grade de référence (G2 pour le café et GF pour le cacao) ;
- La quantité ;
- La récolte ;
- La période de vente (bimensuelle pour le café et trimestrielle pour le cacao) ;
- La destination de référence du produit (EUR pour EUROPE) ;
- Le prix de vente (base CAF) converti et affiché en francs CFA ;
- Le taux de change ;
- Le DRD de USD/TM 400 pour les contrats à partir de la campagne 2020/2021.

Par la vente, l'engagement d'exportation est pris par l'exportateur pour un prix CAF de vente, un DRD, une quantité, une qualité, une destination et une période future d'embarquement. Cet engagement est assujetti aux conditions fiscales et parafiscales conformes aux dispositions légales et règlementaires en vigueur.

La vente donne lieu à l'émission, par le système, d'un Contrat de Vente (CV) qui est le document contractuel de référence pour la réalisation des opérations d'exportation.

Pour les opérateurs internationaux, la vente se matérialise par un contrat signé entre ces derniers et le Conseil du Café-Cacao. Ce contrat fera ensuite l'objet d'émission d'un Contrat d'Exécution (CE) par l'opérateur local à qui il sera attribué pour exécution.

### 3.2. *Accès au système de vente*

La réalisation d'opérations dans le système de vente est strictement réservée aux exportateurs disposant d'un agrément valide pour la campagne de commercialisation en cours. L'exportateur agréé effectue librement ses transactions commerciales avec le Conseil du Café-Cacao, de manière automatique, tous les jours ouvrables à 10h30 et à 14h pour les sessions d'enchères et pendant les heures de cotation sur la bourse de Londres pour les ventes à différentiel.

### 3.3. *Prix plancher*

#### 3.3.1. *Vente par messagerie*

Le prix plancher d'une période commerciale ou d'une cotation est déterminé sur la base de la moyenne des prix du marché sur la Bourse de Londres, corrigé du différentiel d'origine, puis converti en francs CFA. Les taux de change euro/\$ et euro/£ retenus pour chaque période sont ceux en vigueur avant l'ouverture d'une session.

La formule de calcul du prix plancher est indiquée comme suit :

$$[((\text{Prix clôture}_{J-1} + \text{Différentiel}) \times \text{Taux de change}) + ((\text{Prix ouverture}_J + \text{Différentiel}) \times \text{Taux de change XOF/GBP})] / 2 + \text{DRD} \times \text{Taux de change XOF/USD}$$

Cette formule reste valable pour toutes les périodes ouvertes au cours d'une même session.

Cependant, en ce qui concerne les autres sessions de la journée, le prix de fermeture de la session précédente et le prix affiché avant l'ouverture de la nouvelle session seront utilisés respectivement comme prix de clôture et prix d'ouverture dans la formule précédente.

Les prix plancher sont exprimés en CAF Europe base Grade 2 (G II) pour le café et Good Fermented (GF) pour le cacao, corrigés du différentiel d'origine. Ces différentiels sont révisables par période et sont respectivement de ± X $/tonne métrique et ± X £/tonne métrique, X étant variable.

La valeur du différentiel d'origine à retenir pour le calcul du prix plancher est arrêtée à chaque session et par période par le Conseil du Café-Cacao, tenant compte des données du marché international.

Toutes les composantes du prix plancher (prix de clôture, prix d'ouverture, différentiel, taux de change, DRD) sont disponibles dans le système.

### 3.3.2.  *Vente à différentiel*

Le prix de vente d'une période commerciale est déterminé sur la base du prix du marché sur la Bourse de Londres, corrigé du différentiel d'origine négocié et du DRD. Les taux de change pour la conversion du prix en franc CFA, de même que le prix du marché sont ceux en vigueur au moment de la vente.

La formule de calcul du prix de vente est indiquée comme suit :
**(last traded price* + Différentiel) x Taux de change XOF/GBP + DRD*Taux de change XOF/USD**

* *c'est le prix auquel la dernière transaction a eu lieu sur la bourse*

### 3.4.  *Détermination du prix CAF café par grade*

Le prix CAF de vente du café étant assis sur le grade 2, l'exportation des autres grades se fera soit avec une prime, soit avec une décote en fonction de la qualité du produit à exporter. Ainsi, le barème de passage du café grade 2 aux autres grades se présente comme suit :
- Passage du G 2 à G 0= Prix CAF de vente + 25 FCFA (prime) ;
- Passage du G 2 à G 1 = Prix CAF de vente + 25 FCFA (prime) ;
- Prix du G 2 = Prix CAF de vente (parité) ;
- Passage du G 2 à G 3 = Prix CAF de vente – 25 FCFA (décote) ;
- Passage du G 2 à G 4 = Prix CAF de vente – 80 FCFA (décote) ;
- Passage du G 2 à Grains noirs (GN) = 1/2  x Prix CAF de vente
- Passage du G 2 à Brisures = 1/2 x Prix CAF de vente.

Ces transformations se font dans le système intégré de gestion de la chaine de commercialisation du café et du cacao (SIGEC4) par le jeu des « Annule et Remplace ».

### 3.5.  *Définition des grades de café à l'exportation*

**Grade 0**
Café retenu par le crible n°18 avec une tolérance de 6% de fèves passant au crible n°18 dont 1% au plus passant au crible n°16.

### Grade 1
Café passant au crible n°18 et retenu par le crible n°16 avec une tolérance de 20% de fèves retenues par le crible n°18 et de 6% passant au crible n°16 dont 1% au plus passant au crible n°14.

### Grade 2
Café passant au crible n°16 et retenu par le crible n°14 avec une tolérance de 20% de fèves retenues au crible n°16 et de 6% de fèves passant au crible n°14 dont 1% au plus passant au crible n°12.

### Grade 3
Café passant au crible n°14 et retenu par le crible n°12 avec une tolérance de 20% de fèves retenues par le crible n°14 et de 6% de fèves passant au crible n°12 dont 1% au plus passant au crible n°10.

### Grade 4
Café passant au crible n°12 et retenu par le crible n°10 avec une tolérance de 20% de fèves retenues par le crible n°12 et de 6% de fèves passant au crible n°10.

### 3.6.  *Quantité et qualité autorisées à la vente*
Pour le cacao, les ventes se font par multiples de 25 tonnes métriques avec une quantité minimale de 25 tonnes. Le grade de référence est le Good Fermented (GF) correspondant aux grades I et II conformément aux normes de la Côte d'Ivoire.

Pour le café, les ventes se font avec une quantité minimale de 5 tonnes. Le grade de référence est le grade II (G2).

### 3.7.  *Destinations à la vente*
La vente est toujours effectuée sur la base de la destination Europe. Les coûts des autres destinations sont pris en compte au niveau du barème. Le changement de destination s'effectuera au moment de l'émission de la formule.

### 3.8.  *Fiscalité et parafiscalité*
Au titre de chaque campagne de commercialisation, les niveaux des taxes et redevances sont adossées au prix CAF de référence et fixés par arrêtés ministériels.

### 3.9.  *Contrat de Vente (CV)*
Toute vente à un opérateur agréé fait obligatoirement l'objet d'un contrat. Ce contrat se traduit par l'émission, par le système, d'un document contractuel dénommé « CV » ou Contrat de Vente.

Un Contrat d'Exécution (CE) est émis par l'opérateur local pour matérialiser son engagement à exécuter un contrat international qui lui est attribué par le Conseil du Café-Cacao.

Le poids mentionné sur le CE est exprimé en kilogramme. Pour les exportateurs de fèves de cacao et/ou de café vert, il est obtenu à partir du poids théorique de vente (en tonne) corrigé, en cas de besoin, du coefficient de sacherie correspondant à un nombre de sacs à exporter :

- 1,001 pour le cacao
- 1,008 pour le café

L'exécution d'un contrat d'exécution se fait par émission d'un document appelé « formule F01 » faisant ressortir les informations du CE ainsi que le tonnage à embarquer, le Reversement/Soutien, les taxes et redevances.

Un CE peut donner lieu à l'émission d'une ou de plusieurs « formules F01 » suivant le plan d'embarquement de l'opérateur.

Le prix de chaque contrat sera exprimé en euro et en franc CFA. La parité entre l'euro (€) et le franc CFA sera celui en vigueur.

### 3.10. *Opération d' « Annule et remplace » de contrat d'execution (CE) ou A/R de CE*

L' « **ANNULE et REMPLACE** » de CE est une procédure qui permet à l'exportateur d'annuler un CE et de le remplacer par un ou plusieurs CE dont la somme des tonnages correspond au tonnage du CE annulé.

L'exportateur ne peut effectuer une annule et remplace qu'après validation du CE d'origine par le Conseil du Café-Cacao. Les Motifs « d'Annule et Remplace » sont :

- Changement de grade ou de qualité ;
- Changement de récolte (parité) ;
- Changement de période d'embarquement ;
- Exonération.

Les « Annule et Remplace » pour « changement de récolte » doivent faire l'objet d'une autorisation du Conseil du Café-Cacao.

Les « Annule et Remplace » pour « changement de période d'embarquement » sont soumises à l'autorisation du Conseil du Café-Cacao. Elles entraînent éventuellement un ajustement du prix du contrat. Cet ajustement est déterminé par comparaison du prix du contrat et du prix de vente le plus élevé sur la période de report/anticipation (si elle était ouverte) à la date de vente. Dans le cas où la période de report/anticipation n'était pas ouverte, le prix reste inchangé.

Les « Annule et Remplace » pour « changement de parité » sont soumises à autorisation expresse du Conseil du Café-Cacao.

### 3.11. *Caution bancaire*

Le montant de la caution bancaire de vente est fixé à 2,5% de la valeur du contrat. Cette caution bancaire est libellée au profit du Conseil du Café-Cacao et déposée en même temps que le CV ou le Contrat de Vente international par l'exportateur ou par l'opérateur international. Pour les contrats internationaux, le chargeur local est dispensé de la délivrance d'une caution bancaire sauf en cas de report.

La caution à fournir par les opérateurs nationaux est fixée à 1% du contrat débloqué en propre à compter de la deuxième année d'exercice sur autorisation du Conseil du Café-Cacao.

Seules les cautions émises par les établissements financiers bancaires ayant leurs sièges en Côte d'Ivoire sont admises.

Les « **Annule et Remplace** » entraînent le cas échéant la production d'une nouvelle caution dès lors que la caution de base ne correspond plus à la valeur d'exportation du CE « Annule et Remplace » du fait d'un changement de période et/ou de prix de déblocage.

Des cautions complémentaires seront exigées des opérateurs qui présentent des risques de défaillance. L'appréciation de ces risques sera faite par le Conseil du Café-Cacao dans le cadre du suivi des positions des opérateurs.

Le niveau de la caution complémentaire sera fixé en fonction du niveau des engagements pris par l'opérateur concerné et de l'importance du risque.

La demande de contrepartie extérieure du contrat est systématique. Il est possible que le prix de la contrepartie soit différent du prix de vente. Dans un tel cas, la contrepartie sera acceptée tant que son prix est fixé et supérieur ou égal au prix de vente.
Pour les ventes aux opérateurs internationaux, la production de contrepartie n'est pas exigée pour la signature des Contrats de Vente (CV).

### 3.12. *Délais*

#### 3.12.1. *Délais de vente*

Par référence aux cotations du marché de la Bourse de Londres, les ventes se font obligatoirement auprès du Conseil du Café-Cacao, dans les délais suivants, pour chacun des contrats :

**PRODUIT : CACAO**

| Périodes de vente | Contrat de cotation | Date limite de vente* |
|---|---|---|
| Octobre/Décembre | Décembre | Date limite d'expiration du contrat |
| Janvier/Mars | Mars | Date limite d'expiration du contrat |
| Avril/Juin | Mai/Juillet | Date limite d'expiration du contrat/de la période de vente |
| Juillet/Septembre | Septembre | Date limite d'expiration du contrat |

**PRODUIT : CAFE**

| Périodes de vente | Contrat de cotation | Date limite de vente* |
|---|---|---|
| Octobre/Novembre | Novembre | Date limite d'expiration du contrat |
| Décembre/Janvier | Janvier | Date limite d'expiration du contrat |
| Février/Mars | Mars | Date limite d'expiration du contrat |
| Avril/Mai | Mai | Date limite d'expiration du contrat |
| Juin/Juillet | Juillet | Date limite d'expiration du contrat |
| Août/Septembre | Septembre | Date limite d'expiration du contrat |

*(Sous réserve de modifications éventuelles par le LIFFE)

#### 3.12.2. *Délai de dépôt et de traitement des liasses documentaires*

Le Contrat de Vente accompagné obligatoirement de la caution bancaire de vente et du contrat de contrepartie, est déposé au Conseil du Café-Cacao dans un délai de six (06) jours ouvrables à compter du jour suivant la date de vente. A défaut, le droit d'accès de l'opérateur aux différents systèmes de vente est suspendu pendant sept (07) jours ouvrables.

Passé ce délai, le contrat est liquidé et les sanctions imputées à l'opérateur (voir la table des sanctions).

La contrepartie est informée par le Conseil du Café-Cacao et le contrat est réattribué à un nouvel opérateur d'un commun accord. Celui-ci devra fournir toute la liasse documentaire dans le délai des 06 jours ouvrables exigés.

Si le contrat ne peut-être réattribué à un nouvel opérateur du fait de la contrepartie, le contrat est liquidé (cf tableau de sanction) et la contrepartie suspendue.

Il convient de noter que la suspension du droit d'accès aux ventes de l'opérateur est levée dès que celui-ci transmet sa liasse documentaire avant le terme des 07 jours ouvrables.

En cas de rejet résultant d'une erreur portant sur un ou plusieurs éléments de la liasse documentaire, l'opérateur dispose de cinq (05) jours ouvrables pour transmettre le document corrigé, à compter de la date de rejet. A défaut, son droit d'accès aux ventes est suspendu pour   sept (0 7) jours ouvrables.

En ce qui concerne les Contrats d'Exécution (CE), le Conseil du Café-Cacao dispose d'un délai maximum de 48 heures pour traiter et signer le contrat.

### 3.12.3. Délai de ventilation et de confirmation des contrats

Dès l'obtention d'un Contrat de Vente, l'opérateur est tenu de ventiler dans le module des contreparties, le volume total du contrat à une ou plusieurs contreparties dans un délai maximum de 24 heures.

La ou les contrepartie(s) doivent également traiter (confirmer ou rejeter) le(s) contrat(s) que l'opérateur leur aura ventilé dans même délai.

S'il s'avère que l'opérateur n'a pas ventilé son contrat, son droit d'accès aux systèmes de vente est suspendu. Un délai supplémentaire de 24 heures lui sera accordé pour régulariser cette situation. Passé ce délai,  le contrat est liquidé et le volume remis à marché.

Si au contraire, la contrepartie n'a pas traité (confirmé ou rejeté) le contrat, cette défaillance est assortie d'une suspension de son - droit d'accès au module des contreparties pour   cinq (05) jours ouvrables pendant lesquels elle ne pourra nouer de nouveaux contrats. L'exportateur sera alors invité à faire une nouvelle ventilation dans les 24 heures suivantes.

## 4. APUREMENT DES CE  ET OPERATIONS  D'EMBARQUEMENT

### 4.1.   Apurement des CE

L'apurement des CE donne lieu notamment :
- à l'émission dans le système de la demande d'autorisation d'exportation ou Formule F01 ;
- au dépôt pour traitement, auprès du Guichet Unique, du formulaire dénommé « Formule F01 » avec la liasse documentaire exigée ;
- au paiement par chèques du reversement, des taxes et des redevances au Guichet Unique du Conseil du Café-Cacao. Par la suite, les chèques sont transmis aux différents bénéficiaires.

Le tonnage d'une formule lancée vient en déduction du tonnage du CE de base. La somme des tonnages des formules lancées sur un CE ne peut excéder le tonnage de ce CE que dans la limite tolérée (2%).

L'émission de toute Formule lancée (F01) dans le système informatique est subordonnée à la disponibilité d'un stock au moins égal au volume concerné par la transaction (stock report plus cumul des achats, plus solde des transactions loco-magasin déclarées, moins cumul des exportations (base F01)).

Un Contrat d'Execution (CE) émis au titre d'une période de commercialisation doit être apuré à l'intérieur de la campagne concernée.

Les exportations de produits transformés se feront sur la base du poids équivalent fèves.

Les périodes pour lancer et valider les formules (période d'apurement des CE) sont celles indiquées ci-dessous :

**Cacao**
- 1er octobre au 31 décembre pour la période OD ;
- 1er janvier au 31 mars pour la période JM ;
- 1er avril au 30 juin pour la période AJ ;
- 1er juillet au 30 septembre pour la période JS.

**Café**
- 1er décembre au 31 janvier pour la période Décembre-Janvier (DJ) ;
- 1er février au 31 mars pour la période Février-Mars (FM) ;
- 1er avril au 31 mai pour la période Avril-Mai (AM) ;
- 1er juin au 31 juillet pour la période Juin-juillet (JJ) ;
- 1er août au 30 septembre pour la période Août-Septembre (AS) ;
- 1er octobre au 30 novembre pour la période Octobre-Novembre (ON).

### 4.1.1. Annule et remplace de Formule

La formule A/R portera les mentions suivantes :
- La date de la formule ;
- Le reversement, les taxes, banques, numéros et montants des chèques émis sur la formule d'origine ;
- Les taxes et redevances complémentaires éventuelles.

Lorsqu'une formule A/R portant sur un CE A/R présente une augmentation des reversements, taxes à percevoir, le complément de reversements et taxes est généré sur la nouvelle formule A/R.

### 4.1.2. Tolérance de 2% sur tonnage

L'apurement du CE est admis dans la limite de ± 2% de son tonnage. Toute formule apurant le solde du CE de base et ayant bénéficié de +2% de la tolérance ne peut faire l'objet d'Annule et Remplace.

### 4.1.3. Décote

Compte tenu de la petite taille des fèves pendant la campagne intermédiaire, une décote intervient selon la table des décotes (cf. annexes).
Les broyeurs ont obligation d'appliquer la décote sur les CE dans le système et fournir les documents ci-après :
- CE décotée ;

- Bulletin d'analyse ;
- Ticket de pesée délivré à l'entrée des usines.

Pour les exportateurs de fèves, le traitement du CE du fait du grainage intervient sur la formule. Ils fournissent dans ce cas, après validation du CE de base, les différents bulletins de vérification rattachés au CE validé.

### 4.2.   *Embarquement*

Tout Contrat d'Execution ou CE est suivi d'un embarquement. La procédure d'embarquement donne lieu notamment :

- à l'introduction, par l'exportateur, d'une demande d'autorisation d'exportation F01 ;

- aux contrôles quantitatifs et qualitatifs effectués par des sociétés privées concessionnaires agréées ou par le Conseil du Café-Cacao ; les produits issus des programmes de certification qualité sont aussi assujettis au contrôle qualité avant embarquement ;

- au contrôle phytosanitaire effectué par les services du Ministère de l'Agriculture et du Développement Rural ;

- à l'introduction, par l'exportateur, d'une demande d'embarquement ou d'empotage auprès du Guichet Unique ;

- à l'établissement par le transitaire de l'exportateur, d'une déclaration douanière D6 ;

- à l'établissement de la formule « Vu Embarqué » qui doit être systématiquement déposée au Conseil du Café-Cacao par l'exportateur dans un délai de vingt et un (21) jours à compter de l'embarquement effectif du produit.
  Le défaut de production de la vu-embarquée expose à des sanctions. La date de la « Vu Embarqué » est la preuve de l'embarquement ;

- les opérations d'empotage doivent être réalisées sur des sites homologués et en présence des agents du Conseil du Café-Cacao ;

- le café et le cacao doivent être exportés par voie maritime. L'utilisation de tout autre mode de transport devra être soumis à l'autorisation au préalable du Directeur Général du Conseil du Café-Cacao ;

- les exportations sous l'incoterm CAF donnent lieu à la production d'une attestation ou d'un certificat d'assurance maritime au moment de la signature des « Vu-Embarqué » ;

- les sacs issus des opérations d'embarquement en vrac doivent être retournés au Conseil du Café-Cacao.

Au terme de chaque période d'embarquement, les formules doivent avoir été validées par le Guichet Unique.

L'exportateur dispose d'un délai maximum de 15 jours (port Abidjan) et de 21 jours (port de San-Pedro) au-delà de la période d'apurement des CE  pour exécuter son engagement.

Passé ce délai, l'exportateur est tenu de solliciter une annulation de la Formule et une « Annule et Remplace » du CE pour report de période d'embarquement. L'exportateur est assujetti au paiement de chèques complémentaires en cas de changement de prix.

### 4.3.   Report d'embarquement

L'exportateur est libre de reporter ses embarquements **sur la même campagne.** Le report d'embarquement est autorisé dans les conditions suivantes :

- L'annulation de la ou des formule(s) lancée(s) auprès du Guichet Unique ;

- L'introduction de la demande de report du contrat auprès du Conseil du Café-Cacao. A défaut, le Conseil du Café-Cacao pourrait procéder au report des CE non apurés au terme du délai d'embarquement.

### 4.4.   Traitement des contrats de vente en cas de non agrément ou de défaillance d'un opérateur

Dans la gestion des engagements pris par les opérateurs, des difficultés peuvent entraver la bonne fin d'exécution des contrats. Ainsi :

- Lorsqu'un opérateur qui a pris des engagements sur une campagne donnée s'est vu retirer son agrément au titre de ladite campagne, le Conseil du Café-Cacao et cet opérateur se rapprocheront pour un traitement adéquat de ses engagements afin de limiter les préjudices pour les différentes parties.

- Dans le cas où un exportateur n'est pas agréé sur une campagne donnée, les contrats qu'il détient sur ladite campagne sont réattribués en accord avec sa contrepartie à un autre exportateur au prix de vente desdits contrats :

  ✓ Si les contrats sont attribués à un nouvel opérateur, ce dernier fournira de nouvelles cautions pour garantir leur exécution ;
  ✓ Si les contrats n'ont pu être attribués à un nouvel opérateur, ils seront annulés et le tonnage correspondant remis à la vente.

  Le Conseil du Café-Cacao informera les banques de la situation de cet opérateur et du traitement réservé à ses contrats et donnera, s'il y a lieu, la mainlevée sur les cautions attachées aux déblocages effectués par l'opérateur.

-
- Un acheteur, qui se voit retirer son agrément pourra recevoir livraison des contrats qu'il détient.

Cependant, s'il s'avère que celui-ci est déclaré défaillant , l<'exportateur devra quant à lui, proposer au Conseil du Café-Cacao dans un délai de quinze (15) jours, un autre acheteur agréé.

- Si un exportateur ne peut proposer une nouvelle contrepartie :

  ✓ Le contrat de vente est annulé et les volumes sont remis en vente si le prix d'équilibre n'a pas encore été fixé ;
  ✓ Le contrat de vente est annulé, une pénalité correspondante aux préjudices éventuels pour l'équilibre du système est calculée et une facture d'ajustement est imputée à l'exportateur, si le prix d'équilibre est déjà fixé.

### 4.5. *Mainlevée de caution*

#### 4.5.1. *Caution bancaire de vente*

La mainlevée de la caution bancaire de vente intervient à la fin du processus d'embarquement. Elle est assujettie à une demande écrite, adressée au Conseil du Café-Cacao par l'exportateur. A cette demande de mainlevée sont jointes notamment :

- la copie de la caution bancaire faisant l'objet de la demande ;
- la copie du CE ;
- la copie des CE scindés éventuellement ;
- l'original de chaque formule « Vu–Embarqué » ;
- la copie de chaque formule «Vu–Embarqué » pour les contrats qui font l'objet d'un soutien.

Le Conseil du Café-Cacao dispose de quatre (04) jours **ouvrables** pour délivrer le certificat de mainlevée de caution, la date de dépôt de la demande faisant foi. A l'échéance de ce délai, la mainlevée est réputée acquise par la banque.

Si l'exportateur n'a pas introduit de demande de mainlevée après exécution du contrat de vente, cette mainlevée est considérée acquise, un (01) mois après la fin de la période d'embarquement, la formule « Vu Embarqué » faisant foi.

Les cautions bancaires validées ne peuvent être annulées. La caution devient sans objet lorsque le CE est apuré par des formules « Vu Embarqué » ou lorsque le CE fait l'objet d'un report. Dans le cas d'un report de CE, une nouvelle caution est exigée.

#### 4.5.2. *Caution bancaire d'agrément*

Elle intervient en début de campagne pour tout opérateur agréé. Sa durée actuelle couvre une campagne et sa validité s'arrête au 31 octobre, soit un (01) mois après la fin de la campagne. Passé ce délai, la mainlevée de caution est réputée donnée après réception de la demande restée sans suite.

Cette caution a pour but de garantir la bonne fin d'exécution des engagements commerciaux et financiers pris par l'exportateur sur toute la durée de la campagne.

En cas de défaillance vis-à-vis du Conseil du Café-Cacao, la caution est appelée.

La mainlevée de la caution peut intervenir à tout moment de la campagne à la demande de l'opérateur, sous réserve d'avoir honoré tous ses engagements. Dans ce cas, l'opérateur est suspendu de toute opération sur le reste de la campagne et le Conseil du Café-Cacao suspend son agrément.

### 4.6. *Traitement des soutiens/reversements*

Pour chaque période de commercialisation de la campagne principale, l'on procède, à la demande de l'opérateur, à une compensation entre les contrats en reversement et ceux en soutien pour en dégager un solde net. Ce solde net permet de déterminer un taux moyen de reversement ou de soutien pour l' opérateur.

Au moment de l'embarquement de chaque contrat, l'opérateur paiera le reversement. En cas de soutien, le paiement se fera sur la base de ce taux moyen, après l'embarquement.

La facture de soutien est émise par l'exportateur. Elle est déposée par l'exportateur au Conseil du Café-Cacao accompagnées des documents suivants :

- Facture originale normalisée ;
- Feuillet original de la formule « Vu Embarqué Exportateur » de couleur verte ;
- Copie de la D6 ;
- Copie du BL ;
- Original du certificat de pesage pour les factures au poids réel.

Le Conseil du Café-Cacao dispose d'un délai maximum de dix (10) jours pour le paiement de la facture. Les dispositions nécessaires seront prises avec les banques et les exportateurs pour que ce paiement soit effectivement fait dans la banque ayant financé le produit.

### 4.7.  *Traitement des stocks report*

Les stocks de cacao inventoriés et réconciliés au 30 septembre devront être exportés en totalité sur la période octobre-décembre aux conditions du barème correspondant.

Les exportateurs disposant de plus de physique que de contrats devront céder le surplus aux opérateurs disposant de contrats non couverts par du physique au prix de ventes loco-magasin du barème. Les lots objet de cession devront respecter les normes requises à l'exportation notamment sur le grainage.

Le non apurement des stocks reports à fin décembre expose le contrevenant à la suspension de son droit d'accès aux ventes jusqu'à régularisation ainsi qu'à l'application des frais, à titre de sanction, d'un montant de trente (30) francs CFA/KG. (cf. Art 29 du décret n° 2012-1008 du 17 octobre 2012 fixant les modalités de commercialisation du café et du cacao).

Les mêmes dispositions s'applique au café provenant des récoltes antérieures.

# PARTIE III :

# PROCEDURES D'EXECUTION DES CONTRATS DE VENTES

Pour la mise en œuvre du mécanisme de commercialisation extérieure décrit ci-dessus, les dispositions opérationnelles relatives aux traitements ci-après ont été arrêtées :

- ✓ Mécanisme de détermination du reversement et du soutien ;
- ✓ Edition des Contrats d'Exécution (CE) ;
- ✓ Compensation des reversements et soutiens ;
- ✓ Apurement des contrats ;
- ✓ Traitement des factures de soutien et des ajustements.

## 1. *MECANISME DE DETERMINATION DU REVERSEMENT ET DU SOUTIEN*

Lorsqu'un opérateur réalise un achat, on compare le prix du contrat (**prix de vente sans le DRD**) au prix CAF de référence pour déterminer le soutien ou le reversement.:

- le prix de **vente** sans le DRD est égal au prix CAF de référence. Il n'y a ni reversement ni soutien ;

- le prix de **vente** sans le DRD est supérieur au prix CAF de référence ; l'écart entre les deux prix constitue un **reversement** et est payé par l'exportateur au Conseil du Café-Cacao ;

- le prix de **vente** sans le DRD est inférieur au prix CAF de référence ; l'écart entre ces prix est appelé **soutien** et est payé par le Conseil du Café-Cacao à l'exportateur.

Dans la pratique, en raison des frais variables du barème lié au prix de vente, la formule de calcul du reversement-soutien se présente comme suit :

**R/S = Prix de vente sans DRD - [(Frais de mise à FOB + Frais fixes) + (Prix de ventex Taux de frais variables)]**

## 2. *EDITION DES CONTRATS D'EXECUTION (CE)*

Le service administration des ventes procède, après la finalisation du barème et la fixation du prix au producteur, à la génération dans le SIGEC4 des Contrats d'Exécution qui sont édités par les exportateurs.

Ces CE feront apparaître le taux de reversement/soutien initial de chaque contrat et les taxes et redevances.

## 3. *COMPENSATION DES REVERSEMENTS ET SOUTIENS*

La veille du début de chaque période commerciale, les contrats d'exécution générés dans le SIGEC4 sont compensés à la demande des exportateurs. Cette compensation qui intervient uniquement sur la campagne principale vise à déterminer un solde net entre tous les contrats en reversement et ceux en soutien par produit, par opérateur et par période.

Le solde net issu de cette compensation sera rapporté à l'ensemble des tonnages issus des contrats concernés pour déterminer un taux de reversement/soutien moyen compensé.

Au niveau des ventes spots réalisées en cours de campagne, les Contrats d'Exécution porteront à leur émission, uniquement le taux de reversement/soutien spécifique à chaque vente ainsi que les taxes et redevances.

### 3.1. Compensation des CE reportés ou anticipés

Un contrat anticipé ou reporté sur une nouvelle période donnée ne peut participer à la compensation des reversements et soutiens de la nouvelle période.

Les contrats conclus en spot ne font pas l'objet de compensation.

### 3.2. Compensation des ccontrats des opérateurs internationaux

Les contrats dits internationaux imputés à un chargeur ne font pas l'objet de compensation ni entre eux, ni avec les contrats propres à ce chargeur.

## 4. APUREMENT DES CONTRATS

L'apurement des CE compensés pourra se faire individuellement ou par regroupement de plusieurs CE selon les besoins de l'exportateur. L'exportateur devra dans ce cas adresser un courrier au Conseil du Café-Cacao pour solliciter son autorisation et indiquer les CE qu'il souhaite regrouper. En cas d'avis favorable du Conseil du Café-Cacao, un autre CE « Annule et Remplace » sera généré en remplacement des premiers et mis à la disposition de l'exportateur qui pourra l'éditer et le faire signer.

- Les CE à regrouper ne peuvent comporter des contrats issus de ventes par les opérateurs internationaux ;

- Les regroupements de CE concernent les contrats compensés, les contrats en spot, anticipés ou reportés ;

- Si en fin de période ce CE n'est pas apuré en totalité, le report s'effectuera aux conditions suivantes :
    - Détermination du prix de report de chaque CE issu du regroupement ;
    - Détermination d'un nouveau prix CAF moyen pondéré ;
    - Application du nouveau prix CAF ainsi obtenu au CE report.

- Le CE non soldé ayant déjà fait l'objet de regroupement ne pourra plus être regroupé avec d'autres CE.

L'« ANNULE et REMPLACE de CE » est une procédure qui permet à l'exportateur d'annuler un CE et de le remplacer par un ou plusieurs CE dont la somme des tonnages correspond au tonnage du CE annulé.

L'exportateur ne peut effectuer une annule et remplace qu'après validation du CE de base par le Conseil du Café-Cacao. »

## 5. TRAITEMENT DES FACTURES DE SOUTIEN, D'EXONERATION ET DES AJUSTEMENTS
### 5.1. Traitement des factures de soutien

Lorsque le prix de vente sans le DRD d'un contrat est inférieur au prix CAF de référence, l'écart entre ces prix est appelé **soutien** et est payé par le Conseil du Café-Cacao à l'exportateur.

Les contrats à terme de la période à ouvrir seront compensés. Dans ce cas, le soutien est payé après embarquement de chaque contrat, sur la base du taux moyen compensé. Pour les contrats spot, le soutien est payé après embarquement de chaque contrat sur la base du taux de soutien du CE. L'exportateur établit sa facture de soutien qu'il adresse à la Direction de la Commercialisation Extérieure, accompagnée des documents suivants :

- Feuillet original de la formule « Vu Embarqué » couleur verte ;
- Copie de la D6 ;
- Copie du BL ;
- Original du certificat de pesage pour les factures établies sur la base du poids réel.

Le Conseil du Café-Cacao dispose d'un délai maximum de **dix (10) jours ouvrables,** à compter de la date de réception de la facture de soutien, pour le paiement.

### 5.2.    *Traitement des factures d'exonération*

L'exonération de la parafiscalité et/ou de la fiscalité est une mesure prise par l'Etat pour aider les -COOPEX.

L'opérateur fournit la liste des CE devant faire l'objet d'exonération dans la limite du volume accordé. Dans le cas où le CE a déjà été apuré, le Conseil du Café-Cacao procède au remboursement sur présentation des documents ci-après :

- Facture d'exonération ;
- Copie du courrier de notification du Conseil du Café-Cacao à l'opérateur le rendant éligible à l'exonération ;
- Copie du courrier réponse de l'opérateur au Conseil du Café-Cacao avec mention des CE et des volumes à exonérer ;
- Copie des formules « Vu Embarqué » ;
- Copie des chèques sur la parafiscalité.

### 5.3.    *Les ajustements de postes au barème*

Les ajustements se feront sur la base des données relatives aux embarquements effectifs. Ces ajustements donneront lieu à des notes de débits ou d'avoirs.

#### 5.3.1.  *La sacherie export*

Certains embarquements dits « Vrac Containers » ou « Vrac Cale » sont faits directement dans des containers ou dans les cales des navires sans utilisation de sacs. Les sacs ayant servi à emballer les produits avant leur mise en container ou en cale sont retournés par l'exportateur au Conseil du Café-Cacao.

Les broyeurs ne sont pas soumis à l'ajustement sur la sacherie export.

#### 5.3.2.  *Le Transit*

Le coût du transit varie selon les types de conditionnement utilisés pour l'exportation du café et du cacao. Ces coûts déterminés par campagne sont relatifs aux types d'embarquements suivants :

- o   les embarquements en conventionnel (prélingage) ;
- o   les embarquements en sacs container ;
- o   les embarquements en vrac container.

Dans le cadre du barème, le coût le plus élevé, correspondant aux embarquements en vrac container a été retenu. Toutes les fois qu'un embarquement sera fait suivant un conditionnement différent de celui retenu au barème, un ajustement de coût sera opéré.

L'opérateur choisit à l'édition de sa formule FO1, le type d'embarquement qu'il compte utiliser. Cette option permettra d'identifier les formules devant faire l'objet d'ajustement sur le transit.

Les broyeurs ne sont pas soumis à l'ajustement sur le transit.

Par ailleurs, le poste transit comprend le coût de la prestation liée à la sécurité portuaire de 1,16 FCFA/KG. Cette prestation est en vigueur au port d'Abidjan et pas encore à San-Pedro. Par conséquent, les embarquements effectués à partir du port de San-Pedro donneront lieu à un ajustement à hauteur du montant de 1,16 FCFA.

### 5.3.3.  L'Assurance maritime

La fourniture d'un certificat d'assurance maritime couvrant les risques de transport maritime est rendu obligatoire à chaque exportation.

Pour l'exécution des contrats des opérateurs internationaux exécutés par des chargeurs locaux, le Conseil du café-cacao émettra le certificat d'assurance.

L'acheteur et/ou le chargeur, est tenu de produire à cet effet, une copie des connaissements (B/L) au plus tard dans les sept (7) jours, après l'embarquement de la marchandise.
L'acheteur et ou le chargeur est tenu de respecter les procédures de prévention au départ des ports ivoiriens, prévues dans la police d'assurance du Conseil du Café-Cacao.

Le taux de reversement-soutien payé par le chargeur dans ce cas sera calculé de sorte à tenir compte du montant de l'assurance.

S'agissant des contrats débloqués par des opérateurs locaux, l'exportateur a le choix de fournir lui-même son certificat d'assurance ou de demander au Conseil du Café-Cacao de lui fournir un certificat selon le même mode que pour les contrats internationaux.

Pour les embarquements en FOB ou CAF, les contreparties devront marquer formellement et par écrit leur consentement au changement de type de contrat. Dans ces cas, le certificat d'assurance ne sera pas exigé et aucun réajustement ne sera opéré.

Les nouvelles dispositions de l'article 308 du code CIMA (Conférence Interafricaine des Marchés de l'Assurance) prévoient que le contrat d'assurance couvrant le transport maritime du cacao soit placé auprès d'assureurs locaux.

A cet effet, le Conseil du Café-Cacao exige dorénavant la présentation d'un contrat ou une attestation d'assurance pour les tous les contrats exécutés en CAF. A défaut de pouvoir justifier cette charge, un ajustement est fait à hauteur du montant inscrit au barème.

### 5.3.4. Le poids

Les perceptions sont calculées sur le poids théorique déclaré et le rapprochement avec le poids réel intervient à postériori, après l'embarquement, en vue d'ajuster les recettes.

Un ajustement financier est donc fait en cas de différence entre le poids des lots sur la formule et le poids réel relevé par la Chambre de Commerce et d'Industrie. L'ajustement portera sur la totalité de l'écart de poids sans tenir compte de la tolérance à l'export. Les données concernées par l'ajustement sont :

- Reversement ou soutien ;
- Redevances ;
- Fiscalité.

### 5.3.5. Le contrôle qualité export

Le contrôle qualité à l'export est concédé à des entreprises privées avec lesquelles l'Etat de Côte d'Ivoire à travers le Conseil du Café-Cacao a passé une convention de concession d'activité d'intérêt publique. Le coût d'intervention de ces acteurs est fixé en pourcentage du prix CAF garanti selon le principe ad valorem.

Les transformateurs de cacao n'étant pas soumis au contrôle qualité sur les produits semi finis, la rémunération offerte au barème fera l'objet d'une refacturation en faveur du Conseil du Café-Cacao.

### 5.3.6. L'usinage

Pour les produits issus du processus de certification qualité non conditionnés au bord champ, il n'y aura pas d'ajustement. Pour les autres produits certifiés ainsi que tout produit non certifié conditionné au bord champ, il sera procédé à travers un dispositif de marquage, à l'identification des sacs contenant ces produits dont le conditionnement est effectué à partir du bord champ. Les ajustements porteront sur la totalité du cout de 12 FCFA/kg. Une proportion de 8 F CFA/Kg du coût d'usinage sera reversée par le Conseil du Café-Cacao à la société coopérative.

## 6. GESTION DES TAXES ET AUTRES PRELEVEMENTS

### 6.1.   Fiscalité (Taxes d'enregistrement et DUS)

Les taxes sont calculées sur le prix CAF de référence sans le DRD et feront l'objet de règlement par chèques séparés comme dans le système libéralisé.
La taxe d'enregistrement est faite par prélèvement bancaire ou par virement bancaire sur la plateforme électronique e-impôt de la Direction Générale des Impôts, pour les contribuables soumis à la déclaration et au paiement des impôts et des taxes par voie électronique

( La déclaration du paiement des impôts et taxes par voie électronique est actée par un **arrêté N° 123/MPE/DGI du 06 mars 2017**.)

La perception du DUS se fera selon les procédures douanières en vigueur.

### 6.2.   Redevances parafiscales

Toutes les redevances sont aussi calculées sur le prix CAF de référence sans le DRD ou le prix Caf d'enregistrement et sont perçues séparément telles qu'elles figurent sur les Contrats d'Execution (CE).

### 6.3.   *Reversement*

Les chèques de reversement seront distincts des chèques de redevance et libellés au nom de : « Le Conseil du Café-Cacao-Stabilisation ».

# ANNEXES

*Annexe I : Schéma simplifié du circuit de commercialisation intérieure*
*Annexe II : Barème de coûts cacao campagne principale*
*Annexe III : Tables des sanctions de commercialisation*
*Annexe IV : Conditions d'agrément des acheteurs internationaux*
*Annexe V : Normes de qualité du cacao brousse*
*Annexe VI : Table de décote pour petit grainage*
*Annexe VII : Contrat de vente aux opérateurs internationaux*
*Annexe VIII : Contrat d'Exécution (CE)*
*Annexe IX : Formule (FO1)*
*Annexe X : Note à l'attention des exportateurs, des usiniers et des transformateurs de café et de cacao*
*Annexe XI : Schéma de distribution de la sacherie brousse*

# ANNEXE I

## SCHEMA SIMPLIFIE DU CIRCUIT DE COMMERCIALISATION INTERIEURE

**Activités :**
- Achats par les traitants et exportateurs et coopératives

## ZONES DE PRODUCTION

**Activités :**
- Contrôle systématique de la qualité et du poids par les

## USINES DE CONDITIONNEMENT

**Activités :**
- Contrôle systématique de la qualité et poids

## PORTS D'EMBARQUEMENT

**ANNEXE II : BAREME DE COUTS CACAO CAMPAGNE PRINCIPALE**



LE DIRECTEUR GENERAL

Abidjan, le **2 OCT. 2015**

DOCUMENT OFFICIEL

### DIFFERENTIEL CACAO
### CAMPAGNE PRINCIPALE 2015-2016
A COMPTER DU 01 OCTOBRE 2015 AU 31 MARS 2016

| | |
|---|---|
| VALEUR CAF GARANTI EUROPE/USA/ASIE (FCFA/T) | 1.651.008 |
| VALEUR FOB GARANTI EUROPE/USA/ASIE (FCFA/T) | 1.588.065 |
| VALEUR LOCO-MAGASIN DE STOCKAGE (FCFA/T) | 1.173.906 |
| VALEUR ENTREE USINE CONDITIONNEMENT (FCFA/T) | 1.088.000 |
| TRANSPORT DU CENTRE DE COLLECTE A L'USINE DE CONDITIONNEMENT (FCFA/T) | 20.000 |
| VALEUR DIFFERENTIEL RAMASSAGE (FCFA/T) | 68.000 |
| PRIX MINIMUM GARANTI NU-BASCULE PRODUCTEUR BORD-CHAMP (FCFA/T) | 1.000.000 |

LE DIRECTEUR GENERAL

Massandjé TOURE-LITSE

Organisme crée par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage Tel : 20 25 60 69 / 20 25 60 70
17 BP 797 ABIDJAN 17

<u>ANNEXE III</u> : TABLE DES SANCTIONS DE COMMERCIALISATION EXTERIEURE

| Infractions à la règlementation | Sanctions encourues |
|---|---|
| Non confirmation du bidding à trois reprises (Article 26 du décret N° 2012-1008 du 17 octobre 2012) | Suspension automatique de la messagerie pour dix (10) sessions de cotation. |
| Absence de dépôt des documents issus de déblocage dans le délai de 6 jours ouvrables (Article 27 du décret N° 2012-1008 du 17 octobre 2012 | Suspension du droit d'accès au système de vente jusqu'à régularisation dans un délai maximum de 7 jours de vente. |
| Non-régularisation du dépôt des documents issus du déblocage à la fin du délai de 7 jours de suspension | Contrat de déblocage issu de la campagne en cours : <br><br> - Si l'annulation (à date) entraine un préjudice financier en défaveur du système de stabilisation, le volume du contrat sera remis à marché et l'opérateur devra s'acquitter du paiement des frais de sanctions issus de la différence entre le prix du marché du jour et le prix de déblocage appliqué sur le tonnage débloqué (en kg). La suspension de l'accès au système des ventes sera levée après régularisation des frais de sanctions ; <br><br> - Si l'annulation (à date) n'entraîne aucun impact financier en défaveur du système de stabilisation, les volumes sont remis à marché. La suspension du droit d'accès au système de vente de l'opérateur sera levée après un (01) mois. <br><br> Annulation d'un Contrat de Vente issu de la campagne suivante: <br><br> - Si l'annulation (à date) entraine un préjudice financier en défaveur du système de stabilisation, le volume est remis à marché et l'opérateur devra s'acquitter du paiement des frais de sanction de 15 FCFA/Kg sur le tonnage débloqué au profit du Conseil du Café-Cacao. La suspension de l'accès au système des ventes de l'opérateur sera levée après régularisation des frais de sanctions. <br><br> - Si l'annulation (à date) n'entraîne aucun impact financier en défaveur du système de stabilisation, les volumes sont remis à marché et la suspension du droit d'accès aux ventes de l'opérateur sera levée après un (01) mois. |
| Non-dépôt des contrats rejetés pour des erreurs portant sur un ou plusieurs constituant(s) de la liasse documentaire, dans un délai de cinq (05) jours ouvrables | Suspension du droit d'accès au système de vente jusqu'à régularisation dans un délai maximum de 7 jours de vente. |
| Non-ventilation d'un contrat par l'opérateur dans le délai de 24 heures (à la date de déblocage) | Suspension du droit d'accès au système de vente. <br> Délai maximum de 24 heures supplémentaires pour régulariser. Passé ce délai, annulation et remise en vente des volumes concernés. |
| Non-traitement (rejet ou confirmation) des contrats par la contrepartie dans le COCOEX dans le délai de 24 H | Suspension pour 05 jours de ventes |
| Contrat non exécuté suite à un second report cacao et un troisième report café (Article 31 du décret N° 2012-1008 du 17 octobre 2012) | Paiement des reversements, des taxes et redevances dues à l'application des frais de sanction (sanction pécuniaire) à hauteur de 30 FCFA/Kg au profit du Conseil du Café-Cacao |
| Chèque impayé (Article 34 du décret N° 2012-1008 du 17 octobre 2012) | 1. Suspension du droit d'accès aux ventes et au système de commercialisation (SIGEC 4) jusqu'à régularisation. |

| | |
|---|---|
| | Paiement d'une pénalité de 10% de la valeur du chèque revenu impayé ;<br>2. En cas de récidive sur trois différents embarquements, paiement systématique du reversement, des taxes et redevances par des chèques certifiés de banques durant toute la campagne. |
| Non exécution totale ou partielle des contrats à la fin de la campagne (Article 35 du décret N° 2012- 1008 du 17 octobre 2012) | Appel de la caution d'agrément à hauteur du reversement, des taxes ,redevances et DUS dues. |
| Dépassement du délai de cinq jours ouvrables de dépôt des formules « Vu Embarqué » et de la copie du connaissement (Article 33 du décret N° 2012- 1008 du 17 octobre 2012) | Suspension des droits d'accès aux systèmes de commercialisation jusqu'à régularisation. |
| Déclaration d'achats non effectuée | Suspension du droit d'accès aux ventes jusqu'à régularisation |
| Non apurement des stocks report de la campagne précédente à fin décembre (Article 29 du décret N° 2012- 1008 du 17 octobre 2012) | Suspension du droit d'accès aux ventes jusqu'à régularisation. Application des frais à titre de sanctions. |
| Non respect du niveau du niveau de plafonnement des achats  (Article 36 du décret N° 2012- 1008 du 17 octobre 2012) | Interdiction des achats jusqu'à l'ouverture de la seconde période des achats.<br>Sanctions pécuniaires à raison de 100 000 F CFA par tonne de dépassement. |
| Présentation au Conseil du Café-Cacao de fausse contrepartie ( 37 du décret N° 2012- 1008 du 17 octobre 2012) | Retrait d'agrément et poursuite judiciaire.<br>Interdiction d'obtenir l'agrément en Côte d'Ivoire pendant une période de 5 ans.<br>En outre, les dirigeants seront interdits d'exercer dans la filière sur la même période. |
| Refus de collaboration et de non  mise à disposition du Conseil du Café-Cacao des documents de transactions commerciales (tickets de pesée, connaissement, reçus de paiement...) et l'opposition à l'accès des locaux (Article 24 du décret N° 2012- 1008 du 17 octobre 2012) | Suspension du droit d'accès aux ventes.<br>Retrait d'agrément en cas de récidive. |
| Non respect des dispostions pour le contrôle de la qualité des produits à l'entrée usine et à l'embarquement | Pénalité de 5% de la quantité du produit litigieux.<br>Suspension du droit d'accès aux ventes en cas de récidive.<br>Retrait d'agrément. |
| Empotage irrégulier (Article 22 du décret N° 2012- 1008 du 17 octobre 2012) | Saisie des tonnages au profit du Conseil du Café-Cacao.<br>Suspension du droit d'accès aux ventes.<br>Retrait d'agrément. |

## TABLE DES SANCTIONS DE COMMERCIALISATION INTERIEURE

| Infractions à la règlementation | Sanctions encourues |
|---|---|
| Non respect du prix garanti (Article 17 du décret N° 2012- 1008 du 17 octobre 2012) | Saisie des tonnages se trouvant en entrepôt au profit du Conseil du Café-Cacao, paiement du complément de prix, Retrait d'agrément<br><br>Poursuite pénales |
| Non respect et refus de contrôle des reçus et des registres d'achat (Article 20 du décret N° 2012- 1008 du 17 octobre 2012)<br><br>Refus de contrôle inopiné de qualité | Retrait d'agrément sur rapport du Délégué Régional |
| Non paiement des frais de ramassage inscrits au différentiel sauf accord commercial entre les parties | Pénalité de 10% du chargement<br><br>Obligation de régularisation<br><br>Retrait d'agrément |
| Non paiement des autres frais inscrits au différentiel sauf accord commercial entre les parties | Avertissement<br><br>Pénalités de 10% de la valeur du chargement<br><br>Obligation de régularisation<br><br>Retrait d'agrément en cas de récidive |
| Réfaction non autorisée sur le prix (Article 19 du décret N° 2012- 1008 du 17 octobre 2012) | Pénalité de 10 pour cent de la valeur du chargement<br><br>Obligation de régularisation<br><br>Retrait d'agrément |
| Non respect par l'opérateur de la zone d'achat. (Article 21 du décret N° 2012- 1008 du 17 octobre 2012) | Avertissement ;<br>Pénalité de 10% du volume de la valeur du produit acheté en dehors de sa zone.<br><br>Retrait d'agrément en cas de récidive |
| ~~Organisation de la fuite~~ exportation ou tentative d'exportation illicite des produits agricoles soumis à agrément ~~vers les pays frontaliers~~ ( ordonnance n°2018-437 du 3 mai 2018) | **Acheteurs/Coopératives :** Retrait de l'agrément<br>Poursuites judiciaires<br><br>**Exportateurs :** Retrait de l'agrément<br>Poursuites judiciaires<br><br>**Transporteurs :** Interdiction de transporter du cacao ou du café sur toute la campagne/confiscation des moyens de transport<br>Poursuites judiciaires<br><br>**Produits** confisqués au profit du Conseil du Café-   Cacao |

**ANNEXE  IV : CONDITIONS D'AGREMENT DES ACHETEURS INTERNATIONAUX**

Le dossier d'agrément des  acheteurs internationaux devra comprendre :

1. Une caution de garantie de deux cent millions (200 000 000) FCFA émise par une banque réprésentée en Côte d'Ivoire,
2. Les états financiers certifiés sur les trois derniers exercices ;
3. La preuve que l'entreprise existe depuis au moins trois ans ;
4. La présentation des dirigeants et des actionnaires de l'entreprise (Nom ou dénomination et nationalité) ;
5. La présentation de l'organisation, des politiques et stratégies mises en œuvre sur le marché du cacao ;
6. Une déclaration sur l'honneur que l'entreprise n'a pas fait l'objet de sanctions internationales ;
7. ;
8. La preuve d'une organisation efficace et de clients fiables dans le secteur du cacao ;
9. La preuve de la capacité d'achat ;(délivré par une banque , signé et cacheté) ,
10. La preuve s'il y a lieu, de toute affiliation à une fédération de commerce du cacao,
11. La lettre d'engagement,
12. L'affiliation à la FCC (Fédération du Commerce des Cacaos)
13. ou à la FEC,
14. La liste  de potentiels nouveaux founisseurs et les prévisions d'achat de cacao / café.
15.

(Comme pour l'agrément des exportateurs, la phase d'instruction des dossiers pourrait impliquer des visites sur sites).

## <u>ANNEXE V</u> : NORMES DE QUALITÉ SUR LE CACAO BROUSSE

Selon les dispositions en vigueur, pour être commercialisable, le cacao brousse doit :

- Être obligatoirement bien fermenté ;
- Être sec ;
- Être propre et exempt de matières étrangères libres ou adhérentes ;
- Ne pas présenter d'odeurs étrangères (moisi, fumé, insecticides, etc.).
- et répondre aux normes de qualités ci-dessous :

| Critères | Normes |
|---|---|
| Taux de fèves moisies | 4% |
| Taux de fèves ardoisées | 8% |
| Taux de fèves défectueuses (mitées, germées, plates) | 6% |
| Matières étrangères | 0% |
| Humidité | ≤ 8% |
| Grainage[1] | 105 fèves /100g |

[1] Pour la récolte intermédiaire, la norme est aménagée.

### Critère Qualité Entrée Usine

Pour le taux d'humidité, la réfaction sera appliquée entre 8% et 9%. Au-delà de 9%, le produit doit être refoulé.

S'agissant des matières étrangères, la décote sera autorisée entre 1,5% et 3%. Au-delà de 3%, le produit doit être refoulé.

# ANNEXE VI : TABLE DE DECOTE PETIT GRAINAGE

## TABLE DE DECOTE POUR GRAINAGE
### CAMPAGNE 2013-2014

| Grainage (Nb de fèves/100) | Nombre de fèves | Decote Nvelle |
|---|---|---|
| 100 | 0 | 0,00 |
| 105 | 0 | 0,00 |
| 106 | 1 | 4,00 |
| 107 | 2 | 8,00 |
| 108 | 3 | 12,00 |
| 109 | 4 | 16,00 |
| 110 | 5 | 20,00 |
| 111 | 6 | 24,00 |
| 112 | 7 | 28,00 |
| 113 | 8 | 32,00 |
| 114 | 9 | 36,00 |
| 115 | 10 | 40,00 |
| 116 | 11 | 44,00 |
| 117 | 12 | 48,00 |
| 118 | 13 | 52,00 |
| 119 | 14 | 56,00 |
| 120 | 15 | 60,00 |
| 121 | 16 | 61,00 |
| 122 | 17 | 62,00 |
| 123 | 18 | 63,00 |
| 124 | 19 | 64,00 |
| 125 | 20 | 65,00 |
| 126 | 21 | 66,00 |
| 127 | 22 | 67,00 |
| 128 | 23 | 68,00 |
| 129 | 24 | 69,00 |
| 130 | 25 | 70,00 |
| 131 | 26 | 71,00 |
| 132 | 27 | 72,00 |
| 133 | 28 | 73,00 |
| 134 | 29 | 74,00 |
| 135 | 30 | 75,00 |
| 136 | 31 | 76,00 |
| 137 | 32 | 77,00 |
| 138 | 33 | 78,00 |
| 139 | 34 | 79,00 |
| 140 | 35 | 80,00 |
| 141 | 36 | 80,25 |
| 142 | 37 | 80,50 |
| 143 | 38 | 80,75 |
| 144 | 39 | 81,00 |
| 145 | 40 | 81,25 |
| 146 | 41 | 81,50 |
| 147 | 42 | 81,75 |
| 148 | 43 | 82,00 |
| 149 | 44 | 82,25 |

| 150 | 45 | 82,50 |
|-----|-----|-------|
| 151 | 46 | 82,75 |
| 152 | 47 | 83,00 |
| 153 | 48 | 83,25 |
| 154 | 49 | 83,50 |
| 155 | 50 | 83,75 |
| 156 | 51 | 84,00 |
| 157 | 52 | 84,25 |
| 158 | 53 | 84,50 |
| 159 | 54 | 84,75 |
| 160 | 55 | 85,00 |

**ANNEXE VII :**

# CONTRAT DE VENTE AUX OPERATEURS INTERNATIONAUX
# N°xxx-xxxx DU XX/XX/XXXX

Le présent contrat constitue la confirmation de la vente électronique intervenue ce jour entre le Conseil du Café-Cacao et la société ……………………………………… selon les règles du marché de la Fédération du Commerce des Cacaos (FCC) et aux conditions générales du contrat FCC que les parties déclarent connaître et accepter sans préjudice de la réglementation relative au conditionnement du cacao à l'export en République de Côte d'Ivoire.

| | |
|---|---|
| **Quantité contractuelle :** | ………………………………… (Tonnes de 1.000 kg). La quantité contractuelle est nette de toute tare sous réserve d'une tolérance de plus ou moins 1,50% à l'embarquement. Cette tolérance ne sera pas applicable en cas de résiliation du contrat avec paiement de la différence entre prix d'achat et prix de vente. |
| **Produit :** | **Cacao en fèves de Côte d'Ivoire** |
| **Qualité [(1)]:** | **Good Fermented** |
| **Récolte :** | **2012-2013** |
| **Prix [(2)] :** | Le prix est fixé à………………FCFA, soit ……….. Euro, exprimé pour une livraison CAF (Coût, Assurance, Fret). |
| **Conditionnement :** | Le conditionnement des fèves de cacao doit respecter les caractéristiques appropriées au transport de ce type de marchandise (en vrac ou en sac). L'acheteur a l'option du choix du type de conditionnement et doit l'indiquer avant le premier jour de la période d'embarquement. Faute de quoi, ce choix est laissé au vendeur. |
| **Destination :** | ………………………………………………………… Le(s) port(s) de destination est (sont) au choix de l'acheteur (à moins qu'un seul port ne soit mentionné au contrat) et doit (doivent) être désigné(s) avant le premier jour de la période d'embarquement. Faute de quoi, le vendeur sera autorisé à choisir le port de destination. |
| **Embarquement :** | **JAN-FEV-MARS 2013**…………………………………………….. Durant cette période, le vendeur a l'option de la date du chargement de la marchandise. L'embarquement sera effectué par port au poids réel par quantité minimale de 25 tonnes ou d'un multiple de 25 tonnes par port. |
| **Paiement[(3)] :** | Net comptant des 99% du montant de la facture provisoire établie à partir du poids net connaissementé, à première présentation. Le solde sur la base du poids net livré à destination. |
| **Conditions spéciales :** | Les expéditions du café et du cacao venant à exécution du présent contrat sont assurées sous la police d'assurance maritime, souscrite par le Conseil du Café-Cacao |

Cachet et signature du Conseil du Café-Cacao                    Cachet et signature de l'acheteur

(1) *La qualité G1 et G2 selon les normes ivoiriennes, au départ de Côte d'Ivoire pour les ventes FOB et à l'arrivée pour les ventes CAF*
(2) *Le montant en franc CFA sera réajusté en cas de changement de parité avec l'Euro (€).*
   *En cas de livraison CF (Coût et Fret) ou FOB (Free on Board), le prix sera ajusté selon le barème du Conseil du Café-Cacao.*
(3) *Le paiement en cas de livraison FOB se fera comptant des 100% du poids net embarqué et connaissementé.*

# ANNEXE VIII : CONTRAT D'EXECUTION (CE)

Conseil du Café-Cacao - Côte d'Ivoire

## INFORMATION DE VENTE CACAO

### 221-20009

Les Etablissements **COEX CI** représentés par **Mr UZAN PAUL** déclarent avoir conclu, avec **Le Conseil du Café-Cacao** représenté par **Mme MASSANDJE TOURE-LITSE** la vente ferme au prix CAF de **1 208** Frs CFA/kg, soit **1,84158 €** aux conditions ci-dessous:

| Campagne | Prix CAF de référence | N° Contrat de base | |
|---|---|---|---|
| 2012 - 2013 | 1 200 F CFA/kg | 221-2018 | |

| Récolte | Quantité(kg) | Grade - Qualité | Destination | Période |
|---|---|---|---|---|
| 2012 - 2013 / 1 | 250 250 | CACAO GF | EUROPE | OCT - NOV - DEC |

#### REVERSEMENT/SOUTIEN (F CFA)

| QUANTITE(kg) | TAUX(FCFA/KG) | | REVERSEMENT | SOUTIEN |
|---|---|---|---|---|
| 250 250 | BASE | 7,85 | 1 964 462 | |
| 250 250 | COMPENSE | -8,95 | | 2 239 737 |

✗ Ventes opérateurs locaux

#### REDEVANCES

| Fiscalités/Para-Fiscalités | Taux(%) | Montant |
|---|---|---|
| Redevance du Conseil du Café-Cacao | 0,93 | 2 792 790 |
| Fonds d'Investissement Agricole | 0,47 | 1 411 410 |
| Fonds d'Investissement en Milieu Rural | 0,54 | 1 621 620 |
| Sacherie Brousse | 0,21 | 630 630 |
| Taxe d'Enregistrement | 0,5 | 1 501 500 |
| | Montant Total à Payer : 7 957 950 | |
| Dus* (Théorique Base Fève) | 14,6 | 43 843 800 |

Le Conseil du Café-Cacao
**LE DIRECTEUR GENERAL**

L'Exportateur
**COEX CI**

Imprimer

(1) *Le montant en franc CFA sera réajusté en cas de changement de parité avec l'Euro (€).*
*En cas de livraison CF (Coût et Fret) ou FOB (Free on Board), le prix sera ajusté selon le barème du Conseil du Café-Cacao.*

Contrat du Café-Cacao - Loi Française

## CONFIRMATION DE VENTE CACAO

## 221-20009

Les Etablissements **COEX CI** représentés par Mr **UZAN PAUL** déclarent avoir conclu, avec **Le Conseil du Café-Cacao** représenté par **Mme MASSANDJE TOURE-LITSE** la vente ferme au prix CAF de **1 208** Frs CFA/Kg, soit **1,84158 €** aux conditions ci-dessous:

| Campagne | Prix CAF de référence | N° Contrat de base |
|----------|----------------------|--------------------|
| 2012 - 2013 | 1 200 F CFA/kg | 221-2018 |

| Récolte | Quantité(kg) | Grade - Qualité | Destination | Période |
|---------|-------------|-----------------|-------------|---------|
| 2012 - 2013 / 1 | 250 250 | CACAO GF | EUROPE | OCT - NOV - DEC |

### REVERSEMENT/SOUTIEN (F CFA)

| QUANTITE(kg) | TAUX(FCFA/KG) | | REVERSEMENT | SOUTIEN |
|--------------|---------------|------|-------------|---------|
| 250 250 | BASE | 7,85 | 1 964 462 | |
| 250 250 | COMPENSE | -8,95 | | 2 239 737 |

✕ Ventes opérateurs locaux

### REDEVANCES

| Fiscalités/Para-Fiscalités | Taux(%) | Montant |
|----------------------------|---------|---------|
| Redevance du Conseil du Café-Cacao | 0,93 | 2 792 790 |
| Fonds d'Investissement Agricole | 0,47 | 1 411 410 |
| Fonds d'Investissement en Milieu Rural | 0,54 | 1 621 620 |
| Sacherie Brousse | 0,21 | 630 630 |
| Taxe d'Enregistrement | 0,5 | 1 501 500 |
| | Montant Total à Payer : 7 957 950 | |
| Dus* (Théorique Base Fève) | 14,6 | 43 843 800 |

Le Conseil du Café-Cacao
**LE DIRECTEUR GENERAL**

L'Exportateur
**COEX CI**

Légender

(6) *Le montant en franc CFA sera réajusté en cas de changement de parité avec l'Euro (€).*
(7) *En cas de livraison CF (Coût et Fret) ou FOB (Free on Board), le prix sera ajusté selon le barème du Conseil du Café-Cacao.*

## ANNEXE IX : FORMULE FO1

1/09/12      Le Conseil du Café-Cacao - Formule Provisoire

| REPUBLIQUE DE COTE D'IVOIRE<br>MINISTERE DE L'ECONOMIE<br>ET DES FINANCES | **DIRECTION DU COMMERCE EXTERIEUR**<br>**DEMANDE D'AUTORISATION D'EXPORTATION** | | **CAFE VERT**<br>**CACAO FEVES** |
|---|---|---|---|

Le Conseil du Café-Cacao
Autorisation accordée le

Exportateur :    COEX CI
Transitaire :    BALANCE TRANSIT
N° d'Autorisation :
N° Contrat    : CONTRAT COEX
Produit    : CACAO
Campagne    : 2012 - 2013
Récolte    : 2012 - 2013 / KKO-1
Grade    : GF  G2
Qualité    : FEVES

( Cachet et Visa )

Destination
EUR

Pays   : AFRIQUE DU SUD AF1
Port   : AUTRES
Visa   :

**Contrat**
N°    : 221-2018
Date    : 22/02/2012
Prix Prix    : 1 208 Frs CFA
Période    : OCT - NOV - DEC

**Confirmation de vente**
N°    : 221-20009
Date    : 10/09/2012
Prix    : 1 208 Frs CFA
Prix Ref    : 1 200 Frs CFA
Période    : OCT - NOV - DEC

Direction Générale
des Impôts

Origine
Port d'Embarq : ABIDJAN
Période d'Embarq : OCT - NOV - DEC

Date FO1 : **12/09/2012**

Tonnage
Net : 25 025 Kg
Brut : 25 295 Kg

N° FO1

Emballage :   BIG - BAG      Nombre :   385
Transit :    Vrac cale/sac conventionnel
Destinataire : DERTRE
Nomenclature Douanière : 180 1001 200 Z

Date, Signature et Cachet du
Demandeur

Le Receveur de
l'Enregistrement

Navire : GGG
Valeur FOB réelle en Douane : 1 520 000 Frs

Déclaration en Douane

.............. N° ...................

Abidjan, le

.......................................

L'Inspecteur

**REVERSEMENT/SOUTIEN(F CFA)**

| | TONNAGE | TAUX(FCFA/KG) | | REVERSEMENT | SOUTIEN |
|---|---|---|---|---|---|
| | 25 025 | **BASE** | 7,85 | 196 446 | 0 |
| | 25 025 | **COMPENSE** | -8,95 | 0 | 223 974 |

Vu Embarquer - Navire
parti le

**REDEVANCES**

| | | | | |
|---|---|---|---|---|
| Conseil –<br>Redevance | Taux : 0,93<br>Date : 12/09/2012 | Montant : 279 279 Frs<br>Banque : BICICI | Chèque : | 3258003 |
| Fonds Inv.<br>Agricole | Taux : 0,47<br>Date : 12/09/2012 | Montant : 141 141 Frs<br>Banque : BICICI | Chèque : | 3258004 |
| Fimr | Taux : 0,54<br>Date : 12/09/2012 | Montant : 162 162 Frs<br>Banque : BICICI | Chèque : | 3258002 |
| Sacherie | Taux : 0,21<br>Date : 12/09/2012 | Montant : 63 063 Frs<br>Banque : BICICI | Chèque : | 3258000 |

(Cachet et Visa de
la Douane)

REF Fo1:
F012/221/0009/0001/0001

**TAXES**

| | | | | |
|---|---|---|---|---|
| Taxe d'Enr. | Taux : 0,5<br>Date : 12/09/2012 | Montant : 150 150 Frs<br>Banque : BICICI | Chèque : | 3258001 |
| Dus | Taux : 14,6<br>Date : | Montant : 4 413 609,2 Frs<br>Banque : | Chèque : | |

**CAMPAGNE**
**2012 - 2013**

**ANNEXE X :** NOTE A L'ATTENTION DES EXPORTATEURS, DES USINIERS ET DES TRANSFORMATEURS DE CAFE ET DE CACAO



LE DIRECTEUR GENERAL ADJOINT

Abidjan, le 1 9 JUIN 2015

## NOTE A L'ATTENTION DES EXPORTATEURS, DES USINIERS ET DES TRANSFORMATEURS DE CAFE ET DE CACAO

### ABIDJAN – SAN PEDRO

N/Ref. :  **ccc/..2.6.1.....2.0.1.5........./EKN/DOT-IB/Kmk/tl/lc**

Objet :  **Validation des pesées de réception de lots et de sortie de produits à l'embarquement au niveau des usines**.

**Mesdames, Messieurs,**

Depuis le démarrage de la campagne 2012-2013, Le Conseil du Café-Cacao améliore ses outils de gestion, en vue de suivre efficacement l'évolution des stocks de café et de cacao, au cours des campagnes.

Ainsi, après la mise en œuvre de la procédure de réception et de déclaration automatisée des achats brousse, Le Conseil du Café-Cacao a mis en place, à partir de la campagne 2013-2014, une nouvelle procédure de traçabilité des lots de fèves et de produits dérivés, fabriqués par les négociants et transformateurs de cacao et de café qui permet d'établir de manière dynamique et en temps réel, un stock théorique très proche du stock physique.

Dans la perspective d'une amélioration constante de son système de traçabilité et de gestion de la production, Le Conseil du Café-Cacao met en place à compter de ce jour, un nouveau module de validation des embarquements de lots de fèves et de produits dérivés, ainsi que de réception de lots de fèves et de stocks brousse acquis par cession.

Ce nouveau module permettra non seulement de faciliter les rapprochements des données sur les stocks en fin de période de commercialisation à l'occasion des inventaires de stock, ainsi que la détermination des taux de rendement des usines de broyage, mais aussi et surtout, permettra aux exportateurs d'éditer leurs états de gestion de stocks à partir du SAIGIC WEB.

La procédure de validation des embarquements et des réceptions de lots de fèves et de stocks brousse acquis par cession est la suivante :

.../.

1- **Pour les réceptions de lots et de stocks brousse acquis par cession**

Accéder au module d'approbation des pesées par le menu :

❖ **ACHATS >> Validation des pesés**
  - Choisir « **TRANSFERT** » à la place de « ACHAT TOUT-VENANT » dans le menu « **MOUVEMENT** » et afficher les pesées
  - Valider les pesées selon le même principe de validation des achats tout-venant.

2- **Pour les sorties de lots de fèves et produits dérivés à l'embarquement**

Accéder au module de validation des pesées exports par le menu :

*a- Pour Exportateur de lots de Fèves*

❖ **EXPORTS>>Validation des exports (Fèves)**
  - Afficher les pesées et les valider selon le même principe de validation des achats tout-venant.

❖ **EXPORTS>>Liste des exports validés (Fèves)**
  - Permet de consulter les pesées déjà validées.

*b- Pour Exportateurs de produits dérivés (Broyeurs)*

❖ **EXPORTS>>Liste des exports (Broyeurs)**
  - Afficher les pesées et les valider selon le même principe de validation des achats tout-venant.

❖ **EXPORTS>>Liste des exports validés (Broyeurs)**
  - Permet de consulter les pesées déjà validées.

Le Conseil du Café-Cacao accorde une importance particulière à cette nouvelle disposition et invite l'ensemble des opérateurs à prendre toutes les dispositions utiles pour sa mise en application diligente.

Les pesées à valider sont celles effectuées depuis le 1er avril 2015 pour les broyeurs, et depuis le 1er octobre 2014 pour les exportateurs de fèves.

La Cellule Suivi des Usines et SAIGIC se tient à votre disposition pour toute information complémentaire (contacts : 20-20-29-25 / 20-25-69-86).

Dans l'attente, veuillez agréer, **Mesdames**, **Messieurs**, l'expression de nos salutations distinguées.

**Edouard Kouassi N'GUESSAN**

Organisme créé par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage Tél : 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

## ANNEXE XI : SCHEMA DE DISTRIBUTION DE LA SACHERIE BROUSSE



**LE DIRECTEUR DES OPERATIONS TECHNIQUES**

SERVICE APPUI AUX PRODUCTEURS

## SCHEMA DE DISTRIBUTION DE LA SACHERIE BROUSSE

## (Résumé)

A partir de la campagne 2013/2014, un logiciel de gestion de la sacherie brousse a été élaboré. Ce logiciel (SICOPS) est utilisé par les exportateurs et les Délégations Régionales du Conseil du Café-Cacao, sous la supervision du Service Appui aux Producteurs.

Le schéma de distribution est décrit comme suit :

* En début de campagne, le nombre de sacs brousse nécessaire à la commercialisation intérieure du café et du cacao est calculé et commandé chez FILTISAC.
* Au prorata de leurs volumes de produits commercialisés, la quantité de sacs disponibles (Sacs commandés – stock initial) est attribuée aux exportateurs, d'une part, et aux coopératives et acheteurs de l'autre.
* Les bénéficiaires des sacs sont les fournisseurs (coopératives, acheteurs) codifiés ;
* Via le SICOPS, les exportateurs agréés déclenchent la procédure en émettant une autorisation d'enlèvement de sacs (AE) au bénéfice d'un fournisseur ;
* Le fournisseur se rend en délégation avec l'autorisation d'enlèvement pour se faire servir ;
* En délégation, la cellule logistique réceptionne l'AE, vérifie son authenticité à travers le SICOPS et génère le Bon de Sortie (BS) pour le compte du fournisseur et lui remet les sacs.
* Périodiquement, les sacs usagés sont retirés des magasins des fournisseurs (et éventuellement de ceux des exportateurs) en vue d'être incinérés)

**B**

Coffee-Cocoa Council

Council for the regulation, stabilization, and development of the coffee and cocoa industry

[stamp: Arrival
Oct. 27 2020
Gepex]
[Handwritten:] 22431

# DOCUMENT
# FOR THE IMPLEMENTATION OF
# INTERNAL AND EXTERNAL
# MARKETING MECHANISMS

Table of Contents

FOREWORD.................................................................................................................. 7
INTRODUCTION............................................................................................................ 8
PART 1........................................................................................................................ 11
IMPLEMENTATION OF INTERNAL AND EXTERNAL MARKETING MECHANISMS FOR COFFEE AND
COCOA ....................................................................................................................... 11
1. EXTERNAL MARKETING IMPLEMENTATION................................................................ 12
    1.1 Challenges ....................................................................................................... 12
    1.2 Principles and operation of the external marketing implementation ................... 12
        1.2.1 Implementation players ............................................................................. 12
        1.2.2 Basic principles of the marketing system................................................... 13
        1.2.3 Auction sales............................................................................................. 14
        1.2.4 Differential selling ..................................................................................... 16
        1.2.5 Terms of sale, allocation and execution of volumes reserved for international
operators ................................................................................................................. 16
        1.2.6 Calculation of repayments and support ...................................................... 17
        1.2.7 Reserve funds ........................................................................................... 17
        1.2.8 Export and contract enforcement procedures ............................................ 18
2. INTERNAL MARKETING IMPLEMENTATION................................................................ 18
    2.1 Principles and operations of internal marketing implementation ...................... 18
    2.1.1 Internal marketing actors ............................................................................. 18
    2.1.2 Increasing product quality ............................................................................ 19
    2.1.3 Setting the minimum guaranteed purchase price .......................................... 20
    2.1.4 Transport equation ....................................................................................... 20
    2.1.5 Determination of guaranteed cost schedules ............................................... 21
    2.1.6 Farm-gate price control and quality control .................................................. 21
    2.1.7 Inspection and verification documents.......................................................... 22
    2.1.8 Purchase limits............................................................................................ 22
    2.1.9 Quality control of the products upon entrance to the factories ..................... 23
    2.1.10 Managing sub-grade and off-grade products, waste and residues ............... 24
    2.1.11 Principles and operating procedures of the regulatory framework for the
implementation of certification projects and premium sustainability programs............ 24
    2.1.12 Harvest estimates ...................................................................................... 26
    2.1.13 Managing bush bag production.................................................................... 26
    2.1.14 State support measures.............................................................................. 27
3. MARKETING SECURITY AND RISK MANAGEMENT ..................................................... 27
    3.1 Mechanism related to external marketing ......................................................... 27
    3.1.1 Identifying risks related to the marketing system .......................................... 27
    3.1.2 Risk management related to the marketing system........................................ 28
    3.2 Device related to domestic marketing .............................................................. 29
PART 2........................................................................................................................ 31
MANAGEMENT GUIDELINES FOR COMMERCIAL AND TECHNICAL OPERATIONS ......... 31
1. SEASON ................................................................................................................. 32
2. SUPPLY INVENTORY, STATEMENTS OF PURCHASES AND TRANSACTIONS................ 32
    2.1 Supply inventory.............................................................................................. 32
        2.1.1 Determining theoretical supplies and physical inventory reconciliation
results...................................................................................................................... 33
        2.1.2 Types of products related to inventories...................................................... 33
        2.1.3 Postponed supply ...................................................................................... 33
        2.1.4 Treatment of non-standard supplies belonging to exporters of "good
fermented" beans ..................................................................................................... 33
    2.2 Statements of purchase .................................................................................. 34
        2.2.1 Farm-gate statements of purchase ............................................................ 34
        2.2.2 Types of products covered by the inventory ............................................... 34
    2.3 Quality control ................................................................................................ 34
        2.3.1 Farm-gate quality control .......................................................................... 34
        2.3.3 In-factory quality control ........................................................................... 35
        2.3.3 Export quality control ................................................................................ 35
        2.3.4 Management of non-standard coffee products ............................................ 35
    2.4 Machining statements ..................................................................................... 35

2.5 Local sales statements ................................................................................. 36
2.6 Warehouse transactions ............................................................................. 36
2.7 Product weighing .......................................................................................... 37
2.8 Correcting purchases, purchase statements and warehouse transactions ............... 37
3. SALES .................................................................................................................... 37
3.1 Defining sales ............................................................................................... 37
3.2 Access to the sales system ......................................................................... 38
3.3 Minimum price ............................................................................................... 38
      3.3.1 Sales by courier .................................................................................. 38
      3.3.1 Differential sales ................................................................................ 39
3.4 Determining CIF coffee pricing by grade .................................................... 39
3.5 Definitions for export coffee grading ......................................................... 40
3.6 Quantity and quality authorized for sale ................................................... 40
3.7 Destinations for the sale ............................................................................. 40
3.8 Taxation and parafiscal charges ................................................................ 40
3.9 Sales contract (attached) ............................................................................ 40
3.10 Cancellation and replacements of performance contracts ..................... 41
3.11 Bank guarantee ........................................................................................... 41
3.12 Periods ......................................................................................................... 42
      3.12.1 Sales periods .................................................................................... 42
      3.12.2 Period for submitting and processing documentation packets ............... 42
      3.12.3 Period of contract breakdown and confirmation .............................. 43
4. PE CLEARING AND BOARDING PROCEDURES ............................................. 43
4.1 PC Clearing ................................................................................................... 43
      4.1.1 Cancelling and replacing the form ................................................... 44
      4.1.2 2% Allowance on tonnage ................................................................. 44
      4.1.3 Discount ............................................................................................. 44
4.2 Shipment ........................................................................................................ 45
4.3 Shipment Deferred ........................................................................................ 46
4.4 Processing sales contracts in the event of non-approval or failure of an operator ..... 46
4.5 Release of deposit ........................................................................................ 47
      4.5.1 Bank guarantee of sale ..................................................................... 47
      4.5.2 Bank guarantee approval .................................................................. 47
4.6 Processing support and repayment ............................................................ 47
4.7 Processing postponed supplies ................................................................. 48
PART 3 ....................................................................................................................... 49
PERFORMANCE PROCEDURES FOR SALES CONTRACTS .................................. 49
   1.   DETERMINING MECHANISM IN SUPPORT AND REPAYMENT .............. 50
   2.   DRAFTING PERFORMANCE CONTRACTS ............................................... 50
   3.   SETTLING REPAYMENTS AND SUPPORT ............................................... 50
3.1 Settling performance contracts ................................................................... 51
3.2 Settling contracts with international operators .......................................... 51
   4. CLEARING CONTRACTS ................................................................................ 51
   5. PROCESSING SUPPORT, EXEMPTION, AND ADJUSTMENT DOCUMENTS ........... 51
5.1 Processing support invoices ....................................................................... 51
5.2 Processing exemption documents .............................................................. 51
5.3 Adjusting scaled positions .......................................................................... 52
      5.3.1 Exporting baggage ............................................................................. 52
      5.3.2 Transit ................................................................................................ 52
      5.3.3 Maritime insurance ............................................................................ 53
      5.3.4 Weight ................................................................................................ 54
      5.3.5 Quality Export Inspections ................................................................ 54
      5.3.6 Machining ........................................................................................... 54
6. MANAGING TAXES AND OTHER PAYMENTS DUE ........................................ 54
6.1 Taxation (Registration taxes and DUS) ...................................................... 54
6.2 Quasi-fiscal charges .................................................................................... 54
6.3 Repayment ..................................................................................................... 55
ANNEXES .................................................................................................................. 55

**FOREWORD**

This document presents the implementation of the marketing mechanisms applicable as of October 1, 2020. They consist of three parts, which are:

Part I: Implementation of the external and internal coffee and cocoa marketing mechanism

Part II: Management policies for commercial and technical operations

Part III: Execution procedures for sales contracts

This document deals mainly with the following:

1. External marketing mechanisms;
2. Internal marketing mechanisms;
3. Marketing security and risk management
4. Management policies for commercial and technical operations;
5. Practical regulations for the execution of contracts and the operation monitoring

## INTRODUCTION

Cote d'Ivoire has implemented a mechanism to stabilize the purchase price for coffee and cocoa producers, starting in the 2012/2013 season.

*This governmental initiative aims to guarantee producers a fixed income per season equal to at least 60% of the CIF (cost, insurance, and freight) price. Starting with the sales of the 2020/2021 season, a Living Income Differential (DRD) set at USD/TM 400 will be included in the prices. A proportion of the DRD will be added to the farm gate price, which will be derived from the reference CIF price depending on the market level.*

To reach this goal, the mechanism implemented aims to optimize marketing through differential sales, or an auction operated through an electronic messaging system. They also implemented risk control, security management and quid pro quo contracts.

In this context, the operational mechanisms of the external and internal marketing are proposed below.

**External Marketing**

The external marketing mechanism is defined by the State, which assures final operators that the proper execution of the sale contracts will be carried out by the final operators.

External marketing is performed through a computerized auction sales system and/or by differential sales.

The link between external and internal marketing is made through **the reference CIF price and the "Scale of Costs,"** which allows for the stabilization of the price that is guaranteed to the producer by the repayment and support system.

For each season, a guaranteed average reference CIF price is determined based on every sale made (excluding DRD INCOME) to operators. Any implementation above this price creates a repayment. Conversely, any implementation below it creates a support.

**Internal Marketing**

Purchasing operations are performed by authorized operators.

The Coffee-Cocoa Council performs the following operations:

- Quality control of the material in stores and at the operators' factories;
- Ensuring the price guarantee is observed for the producers, based on receipts and purchase records presented by the associated companies and buyers; who collected the material
- Monitoring the material supplies of the associated companies and buyers.

Having a monitoring system for the flow of material would allow the exchange of pertinent information upon entering the factories, such as the weight and the quality of the products.

Before discussing the operational topics, it makes sense to briefly recall the major ideas of the proposals in the strategy document adopted by the government. These proposals can be summarized as follows:

**1- Production:**
- Improving productivity and quality of products on the market;
- Training producers to adopt intensification techniques and proper agricultural practices, with an emphasis on preserving the environment;
- Land tenure security;
- Support on research and development (varietal research, disease and pest control, etc.);
- Coffee revival.

**2- For a sustainable cocoa and coffee economy:**
- Developing a Public-Private Partnership (PPP) platform to create a framework for dialogue with the private sector on issues related to the sustainability of the industry;
- Establishing a regulatory framework dedicated to monitoring and inspecting certification projects and sustainability programs;
- Developing and implementing the African Standard for Cocoa Sustainability;
- The search for additional sources of financing (profits from the sale of assets, State budget, support from development partners, public-private partnership) to guarantee the sustainability of the sector;
- Reinforcing and improving the activities planned within the framework of the Rural Investment Fund (Fonds d'Investissements en Milieu Rural, FIMR), in particular the restoration and opening of agricultural feeder roads in connection with the other agricultural sectors (rubber trees, oil palm-trees) to facilitate domestic marketing activities and to ensure compliance with the minimum guaranteed price.

**3- Product transformation, valorization, and consumption:**
- Establishing a convention with the processors for the local transformation of the ungraded products;
- Implementing communication campaigns and promotional actions to encourage local and regional consumption of coffee and cocoa.

**4- Taxing, quasi-fiscal charges and financing:**
- Maintaining a maximum level of taxation and quasi-fiscal levies at 22% of the CIF price, in accordance with the commitments undertaken by the Government before its development partners;
- After study and analysis of the impacts on activity, revising the single export tax (droit unique de sortie, DUS) advantages granted to the processors by the State;
- Starting the search for additional sources of financing (support from development partners, public-private partnership) in order to guarantee sustainability of the sector.

**5- Representation and professionalization of producers and their organizations**

- Designating representatives to the Board of Directors of the Council for the Regulation, Stabilization and Development of the Coffee-Cocoa Sector;
- Reorganizing cooperative movement in the sector, through the identification and evaluation of cooperatives;
- Reinforcing the capacities of producers and their organizations through training, mentoring and evaluating their management;
- Popularizing the Organization for the Harmonization of Corporate Law in Africa (OHADA) Uniform Act on Cooperative companies.

**6- Under the institutional framework and governance**:
- Establishing a single management structure for the sector which will be controlled by the State and the joint-trade organization;
- Implementing the reform through consultation between all actors;
- Establishing a reserve fund to secure the stabilization system, managed by the Coffee-Cocoa Council under the control of the supervisory ministries and intended to pay for any support in the event of insufficient stabilization funds;
- Establishing a framework for the reconciliation of marketing data between the Coffee-Cocoa Council, the organization in charge of weighing statistics, customs, and taxes;
- Evaluation by the Coffee-Cocoa Council's information system to verify the credibility of the information provided;
- Approval by the Board of Directors, at the beginning of each season, of the action program and the operating and investment budget, which will be approved by the relevant ministries;
- Implementation of external inspections through the statutory auditors and independent audits that could be ordered by the Board of Directors of the Cocoa-Coffee Council or the Government in order to give credibility to the system put in place.

The Operational Document sets the general framework for the management of technical and commercial operations.
The procedures and operations described therein are subject to changes related to the environment and/or any market developments. Decisions and Notes will specify the content if necessary.

# PART I

# IMPLEMENTATION OF
# INTERNAL AND EXTERNAL
# MARKETING MECHANISM FOR COFFEE AND
# COCOA

## *1. EXTERNAL MARKETING MECHANISM*

### *1.1 Challenges*

The liberalized marketing system was subject to price fluctuations on the world market. Because of the volatility of these prices on the producer's price, the producer was not guaranteed a minimum income. Furthermore, fixed index prices were not always respected by the buyers.

Producers lost the residual price as the weakest link in the marketing chain. The latest system is designed to ensure and guarantee the producer's income, against international price fluctuations, and to shield them from other operators.

### *1.2 Principles and operation of the external marketing implementation*

It is a system of sales anticipated at the average, which offers an advantage on the market. The forward sales predicted within the framework of the reform are based on a certain number of players and operate in compliance with major principles.

### *1.2.1 Implementation players*

The implementation players are as follows:
1.      Coffee-Cocoa Council;
2.      International buyers;
3.      Local operators.

The operators authorized to use the mechanism described are subject to prior approval.

### *1.2.1.1 The Coffee-Cocoa Council*

(See missions in decree)

### *1.2.1.2 International Buyers*

These are operators not established on Ivorian territory. These companies are not under Ivorian law and are not registered in the Ivorian Trade and Personal Property Credit Register (RCCM).

International buyers admitted to the mechanism are world processors of coffee and cocoa, traders and other operators of speculative markets.

All international buyers who wish to participate in the sales mechanism are approved according to well-defined criteria. The elements of the approval file are listed in annex 4.

### *1.2.1.3 Local Operators*

These are made up of operators located on the Ivorian territory, registered in the Ivorian Trade and Personal Property Credit Register (RCCM). It is essentially composed of:
- Exporters (subsidiaries of large groups and national operators);
- Cooperative exporting companies or COOPEX;
- Local processors.

Local operators are subject to approval and are required to provide a bank guarantee at the start of each season.

### 1.2.2 Basic Principles of the Marketing System

The forward sale or advance sale can be expected within a period of up to twenty-four (24) months. In any case, it must correspond to the practical terms on the supply markets.

Granting of export rights to operators is carried out by the principle of auction and differential sales.

General principles of forward sales are as follows:
- The proposed mechanism is based on the principle of advance sales of a proportion of the predicted harvest of the coming season;
- The balance is sold during the season (spot sales);
- The Coffee-Cocoa Council grants export rights to both national and international operators. The distribution of coffee and cocoa export rights between international and national operators will have a maximum of 20% for international operators;
- Local processors will participate in sales under the same conditions as bean exporters. However, in order to help them reach the arranged capacity, the State has authorized special provisions;
- Cocoa contracts are quoted in British pounds and coffee contracts in U.S. dollars on the London supply Exchange;
- Exchange rate data is collected from supply market and financial information sources;
- All contracts, in XAF (Central African francs), are firm and converted into Euros. The amount in XAF will be readjusted in case of change of the Euro/XAF exchange;
- To guarantee the reliability and solidity of the system, all sales contracts are subject to bonds representing 2.5% of the value of the contract for commercial companies and 1% for national exporters and COOPEX (from the second year of operation after analysis of the operator's request). Quid pro quo contracts (coverage) are attached to these guarantees. These counterparties are payable in original form. The clients (counterparties) of the local operators are required to confirm the contracts in the quid pro quo module within 24 business hours after the releases. Additional bonds may also be required in case of risk of failure by an operator;
- Each local operator has six (06) business days to pay the sales bond and contract(s). The quid pro quo contract must be marked "fixed price". For international operators, a bank sales bond of 2.5% of the value of the release contract is required within six (06) business days. The local shipper (exporter) to whom the sales contract is assigned, is exempted from producing an additional bond. However, in case of postponement, the shipper shall provide a bond to be attached to the Sales Contract. The shipper does not have to provide a counterparty; the contract signed between the international operator and the Coffee-Cocoa Council serves that purpose;
- For their own releases, national exporters and COOPEX provide a performance bond equivalent to 1% of the contract value and a quid pro quo contract. The deposit of the Sales Contract, the bank guarantee and the consideration must be paid within a maximum period of six (06) business days;

- Payment of the contract price must be made exclusively by the counterparty to the operator;
- The individual tonnage limit defined for releases must not exceed the maximum volume authorized for purchase per period for an operator in the main season. This provision aims to avoid possible speculation on the physical products by operators with more physical products than contracts. The maximum volume per operator is 110,000 tons for the October-December (OD) sales period and 50,000 tons for the January-March (JM) period, which corresponds to a total volume of 160,000 tons for the main season (October to March). However, any operator who has not reached their 110,000 ton limit on OD is allowed to exceed the 50,000 ton limit on JM, within the overall limit of 160,000 tons;
- In the case of companies with export structures for beans, semi-finished products and possibly another for finished products, the volume authorized for purchase will be for the group;
- The purchase offers for cocoa are made by multiple of 25 metric tons with a minimum quantity of 25 tons;
- The purchase offers for coffee are made with a minimum quantity of 5 tons;
- The reference CIF price (excluding the living differential revenue of DRD) is determined before the beginning of each season;
- The farm-gate is calculated after validation of the scale. The DRD will be entirely paid back to the producer according to the price level;
- A reserve fund is set up to support stabilization.

### 1.2.3 *Auction Sales*

The auction consists in selling the physical export rights to the agreed operators at the best bidding prices.

Prices are collected on the London futures market and adjusted by the origin differential. The value of the differential used to calculate the floor price is decided by the Coffee-Cocoa Council for each session, taking into account the international market data. The reference price (floor price) per quoted period shall be fixed by the Coffee-Cocoa Council at each session. The session periods are open only for quoted contracts. All bids must be at least equal to the reference price. In order to limit overbidding, the mechanism incorporates the notion of **"overbidding limit."**

The overbid limit per period is determined for each of the periods quoted at each session by the Coffee-Cocoa Council after analyzing the market, the original differential, and several other parameters. In any case, its level shall remain at the discretion of the Coffee-Cocoa Council and shall not communicated to operators.

### 1.2.3.1 *Auction Method*

Auctions are made through an automated program, interfacing with the participants through an electronic messaging system.

Auctions are organized into two (2) daily sessions, at 10:30 AM and at 2 PM.

Participants have 30 minutes before the session begins to make bids. A bid consists of submitting a quotation, price and tonnage for each period. Each participant can make no more than one bid for each quotation period.

After the 30-minute bidding period, the auction is automatically blocked so that no more bids can be made.

The bidding rule is implemented on behalf of the participants; application time for management provisions is 15 minutes.

After the bidding rule is applied, participants will have 45 minutes to confirm their bids or lose them.

Price and tonnage corrections of entries by operators remain possible during the same bidding period. However, no corrections can be made after the 30-minute bidding period.

Sales are carried out according to these principles:

- **Determination of the quantities to be put on the market:** The quantities to be put on sale at each auction are determined before the opening of the auction. They are not communicated to the participants of the auction. The tonnage to be sold is determined by the Coffee-Cocoa Council;
- **Announcement of a price (floor price) according to the commercial policy:** At the beginning of each auction session, the minimum references (floor price) per season, per shipping period, and per product are published. These floor prices are determined by the following rule for the session of the month:

*(Previous day's closing price corrected for the original differential + session opening price corrected for the original differential) *)* XAF/GBP/2 exchange rate + DRD* XAF/USD exchange rate.*

For the 2:00 PM session, the prices posted on the London supply exchange at 12:00 PM and the one posted between 1:30 PM and 2:00 PM will be used respectively as the closing and opening prices in the above formula.

### 1.2.3.2 *Auction Rules*

Volumes are awarded to the highest bidders with a tonnage limit per exporter and session. Operators are served at the price offered for the tonnage requested, within the limits defined by the auction system.

- For each of the quoted periods of a session, the allocation of tonnages is made at the prices offered, within the limit of the overbidding limit, from the highest bidder to the lowest bidder with a tonnage limit per exporter. A maximum of 50% of the volume tendered in a period is served to the first highest bidder;
- No more than 50% of the balance of the auctioned volume is awarded to the second highest bidder;
- The balance is equally divided between the third and fourth highest bidders.

The award order is based on the bid price. For the same price, the time of receipt of the bid is used as the second award criterion.

To comply with the distribution of releases between national and international operators, the Coffee-Cocoa Council could organize adjustment sessions by operator type (national and international). Also, within the framework of the agreement between the grinders and Cote d'Ivoire, a secondary market is organized for the grinders.

The reference prices for the sales dedicated to the mills on this harvest are fixed under the same conditions as the nominal sales. However, in order to avoid any attempt at collusion, these sales prices include a value whose method of determination is defined below:

In this option, the price offered by each mill on the primary market is related to the secondary market. It is defined as a value below which no tender is allowed. This value is expressed as a percentage of the range between the floor price and the weighted average of the auction prices in the primary market. In order to maintain the spirit of competition for volumes, the allocations are made according to the allocation rule on the primary market, i.e. only the four (04) highest bidders are served.

The volumes released by the grinders on this second market are subject to limitations depending on the crushing capacity of each operator. The release limit on the second market is prorated based on the grinding capacity of each operator, compared to the total national grinding capacity installed.

### 1.2.4 Differential Selling
The Coffee-Cocoa Council will negotiate with operators, a volume and a differential on a period quoted on the London supply exchange during the quotation hours.

Following agreement between the two parties, the Coffee-Cocoa Council will enter the parameters of the sale in the system. The operator will have to confirm these parameters.

The Sales Contract (SC) corresponding to the sale will be issued in the system after final approval by the Coffee-Cocoa Council.

### <u>1.2.5 Terms of sale, allocation, and execution of volumes reserved for international operators</u>
Volume selling to international operators is conducted under the same conditions as selling to local operators.
A sales contract is signed between the Coffee-Cocoa Council and the international operator, who has released the volumes through the courier service or through the differential sale.
For the execution of these contracts, the Coffee-Cocoa Council designates, in agreement with the international operator, an exporter (shipper) who is in charge of delivering the performance contract to ensure their commitment to exporting the released tonnage.
The shipper is exempted from having to present an additional bank guarantee and a quid pro quo contract. The initial sales contract signed by the international operator is considered as the quid pro quo.
Procedures for granting international contracts to local operators are based on review of the following:
√ The National operator's level of financial solvency;

√ The ability to have physical products that qualitatively and quantitatively meet the contractual terms.

The volume restored to an exporter (shipper) is taken into consideration in assessment of the correlation rule between physical purchases and their contracts.

### 1.2.6 *Calculation of repayments and support*

The marketing mechanism provides for the setting of a reference CIF price at the beginning of the season. The reference CIF price corresponds to the weighted average price of sales made in advance (forward sales) and adjusted for an estimate of sales to be made during the season (spot sales) without the DRD.

This reference CIF price is divided between
- Producer price;
- Taxation and quasi-fiscal charges;
- Intermediate costs.

This set of costs is guaranteed by the system at the reference CIF price. This means when an operator makes a purchase, the contract price (**release price**), without the DRD, is compared to the reference CIF price and three situations may occur:
- the selling price without the DRD is equal to the reference CIF price. There is no repayment or support;
- the selling price without the DRD is higher than the reference CIF price; the difference between the two prices constitutes a **repayment** and is paid by the exporter (shipper) to the Coffee-Cocoa Council;
- the selling price without the DRD is lower than the reference CIF price; the difference between these prices is called "**support**" and is paid by the Coffee-Cocoa Council to the exporter (shipper).

In the event of deferral or acceleration of a contract that results in a price adjustment, an eventual repayment would be made. This adjustment is determined by comparing the contract price (without the DRD) and the highest release price (without the DRD) over the deferral period (if it was open) on the sale date. In the event that the deferral period was not open, the price is not changed. However, in order to take into account the particular elements of the grinding process, The Coffee-Cocoa Council allows all contracts that are not cleared and covered by physical products, in a season, at the end of March and the end of September shall be postponed without price adjustment or penalty. However, when an operator submits a request for a change of shares for this type of deferred contract, the price of the contract will be adjusted according to the applicable rules.

### 1.2.7 *Reserve Funds*

Creating the reserve fund will facilitate the protection of the marketing system against the risks associated with the stabilization mechanism. This will be based on an evaluation of the risks associated with price variations, and those involved in the possibility of failure of certain operators. Additionally, the positive stabilization balances at the end of each marketing year will help to strengthen the reserve fund.

This fund is held in an escrow account at BCEAO and its use is subject to prior authorization from the supervisory ministries before the Board of Directors' decision.

In principle, this fund should be used in case of necessity when the repayments could not cover the totality of the registered supports.

### 1.2.8 *Export and Contract Enforcement Procedures*

Export procedures can be summarized in the following points:

- Quality control at shipment will be carried out by quality control providers who issue Verification Bulletins (VB);
- The execution of a contract is subject to a performance contract (PC) including the exporter's code, the sales number and all information related to the contract;
- The exporter submits the PC to the Coffee-Cocoa Council. Once the consistency and processing verifications have been carried out, the Coffee-Cocoa Council signs the PC;
- A given PC may be the subject-matter of several shipping plans. The exporter sends to the Coffee-Cocoa Council an application for export authorization, called the FO1, which includes the information of the PC. The FO1 is accompanied by cheques for the payment of taxes and fees related to the actual export;
- Conformity checks between the FO1 and the PC are carried out. In case of discrepancies, the FO1 is rejected and brought into conformity;
- Once the FO1 has been approved by the Coffee-Cocoa Council, the exporter prepares the product for export and takes the necessary steps for actual shipment.

Exports are carried out on the basis of the actual weight of the products. However, the export formalities can be done on the basis of the actual or theoretical weight of the products. For processed products, taxations are made on the basis of the weight in equivalent beans.

## 2. *INTERNAL MARKETING MECHANISM*

### 2.1 *Principles and operation of the internal marketing mechanism*

The principles and operations defining the general framework of internal marketing.

#### 2.1.1 *Internal marketing actors*

At the internal marketing level of coffee and cocoa, the actors are:

- Individual producers;
- Cooperative Companies;
- Buyers;
- Approved exporters: They are divided into two (2) categories:

- COOPEX: Cooperative exporting companies.
- Commercial companies (traders and processors)

- Banks and financial institutions;
- Packaging factories;
- Insurance companies;
- The State;
-

- Freight forwarders;
- Carriers;
- Approved quality dealers;
- Third-party holders.

Trackers of approved buyers and collectors/sectional delegates of the cooperative companies are identified and classified by the Coffee-Cocoa Council.

In order to take into account and validate product deliveries to factories, each cooperative company and each buyer **must be identified in order to use their delivery code**.

### 2.1.2 *Increasing product quality*

Coffee and cocoa quality is based on identifying defects, as defined by the standards.

However, quality is a concept that can be approached from multiple points of view, and not solely the physical quality of the product:

- Chemical quality (free fatty acid content);
- Health concerns related to chemical contaminants in the marketed products;
- Social concerns (child labor, occupational health and safety, equal distribution of resources, etc.);
- Environmental concerns (protecting the environment and natural resources, replacing trees at the plantations, etc.).

In order to improve the quality of products at the field stage, the Coffee-Cocoa Council relies on operational agents (from the Coffee-Cocoa Council or from partner organizations) and on awareness and training programs for all field actors.

**Producers**: training programs for producers are increased as related to production, harvesting and post-harvest processing techniques (fermentation, drying, sorting, etc.).

**Buyers/trackers and cooperatives**: training for this target group will focus on control techniques (humidity rate, number of defects and foreign matter in beans, rate of moldy and slatey beans, bagging, etc.). Emphasis is placed on inappropriate practices that lead to poor quality and the need for them to conduct their transactions in strict compliance with the provisions on product quality.

**Exporters:** Exporters' representatives are also a target of training activities on the same themes. These training activities are supported by permanent awareness and information seasons. In this perspective:

- On the basis of contract plans with the State, the roles of ANADER and CNRA have been refocused and strengthened to enable the actors in the sector to fully benefit from their expertise in research and development, supervision and agricultural advising;

- The Regional Delegations of the Coffee-Cocoa Council are equipped with technical means sufficient for educating and training field actors and performing unannounced quality inspections on products collected by the buyers and the cooperative companies.

### *2.1.3 Setting the minimum guaranteed purchase price*

For cocoa, a minimum price guaranteed to producers is set twice during the season for all production areas: a price at the beginning of the main season and an additional price for the intermediate season.

For coffee, the guaranteed price applies to the entire season.

This guaranteed price will be equal to at least 60% of the reference CIF price, without the DRD, regardless of the international market level.

If there is difficulty in setting this price level to the producer, the different actors will get together to find an appropriate solution before the season starts.

### *2.1.4 Transport Equation*

The transport equation is a mechanism to ensure an equitable distribution of transport loads. This mechanism integrates the points of departure (sub-prefectures) and the points of arrival (factories equipped with weighbridges).

The transport equation is based on a cost scale, taking into account several parameters (fuel pump prices, road conditions, distance, availability of trucks, margins of the actors involved, etc.). A ton-kilometer table (TKM) is set by origin (sub-prefecture) and will be revised if necessary.

A fixed price for transport is fixed at the scale in order to allow exporters to pay at unloading the cost of transport invoiced at the ton-kilometer (TKM) whatever the zone of origin of the product. Periodically, an adjustment will be made to the **actual cost incurred by the exporter according to the agreed TKM scale**. The total monthly cost of transport incurred by an exporter according to the current TKM scale is compared to the theoretical cost of transport, determined by the flat rate listed in the schedule:

- When the monthly cost of transport incurred by the exporter is equal to the cost of transport resulting from the flat rate, **there is no transport adjustment**;
- When the monthly transport cost borne by the exporter is higher than the transport cost resulting from the flat rate, **the exporter sends a transport adjustment invoice to the Coffee-Cocoa Council**;
- When the monthly transport cost borne by the exporter is lower than the transport cost decided by the flat rate, **the Coffee-Cocoa Council shall send a transport debit note to the exporter**;
- The payment of the transport adjustments shall be made **within a maximum period fixed by a notice issued by General Management at the start of the season**.

The operations taken into account by the transport equation mechanism are the deliveries of all products to the factories of the port areas of Abidjan and San Pedro;

Deliveries from exporters' buying centers in the interior of the country, whose weighing stations are equipped with the Integrated Autonomous System of Commercial Information Management (SAIGIC),

a weighing agent and a quality control system of the Coffee-Cocoa Council are also taken into account.

In fact, for any delivery of product to a purchasing center, the transport cost will be calculated exceptionally on the basis of the distance between the supplier's point of departure and the delivery factory. The transport cost thus determined will be made available to the exporter for:

- payment to the supplier of the transport cost incurred for the delivery of the product to the purchasing center;
- the payment of the transport cost incurred by the exporter for the delivery of the product to their warehouses in the port area.

The calculation of the transport cost **is based on the nearest port to the point of departure with a maximum distance of 200 km possible**.

### 2.1.5 _Determination of Guaranteed Cost Schedules_

The stabilization mechanism of the coffee-cocoa industry, based on transparency in management, requires a sound appreciation of intermediary costs at each level of the marketing process.

The concept of a scale makes it possible to evaluate the costs and fees of the various services and stakeholders, from the field to the port of shipment, and to guarantee the payment of the fixed price to producers.

A single scale is established for each season and is applicable to all operators.

This scale covers the entire marketing chain of the bean or cocoa which is summarized in five (05) essential steps

1. The collection of the product at the edge of the field (bare value - marketing center);
2. The transport of the product to the packaging factories (factory entry value);
3. Processing and storage of the product (warehouse value);
4. Handling and preparation for export of the product (FOB value);
5. The expedition of the product (value CIF CFA FR/Kg).

This schedule of intermediate costs incorporates the cost of transport, which makes it possible to align prices at the time of product delivery, regardless of the distance between the collection center and the port of shipment in Abidjan or San Pedro. The framework of the coffee and cocoa price lists is presented in Annex 2.

The scale is designated at the beginning of each season.

### 2.1.6 _Farm-gate price control and quality control_

In order to ensure that the guaranteed prices are respected, inspections on purchase prices can be carried out in the production areas, both at the buyers' and cooperative companies' premises, as well as those of the producers. These inspections are carried out by mobile teams of the Coffee-Cocoa Council.

The regional representations of the Coffee-Cocoa Council are responsible for carrying out, according to a technical protocol, regular inspections to ensure the purchase price, the quality of the collected products and the operators' supplies are respected. These inspections will be extended to the discounting (the price and/or on the quantities).

Discounted pricing is not allowed at the farm-gate stage.

Operators must keep purchase records and issue purchase receipts.

Product quality inspections may be performed by the Coffee-Cocoa Council in the operators' stores throughout the production areas.

Relevant marketing information will be relayed to the field actors pertaining to quality issues.

### 2.1.7 *Inspection and Verification Documents*

Mandatory technical supports defined for the inspection and verification of the processing of farm-gate transactions are:

- **Raw purchase log**: a document held by the operator (cooperative companies and buyers), it follows all the purchase operations carried out over time.
- **Receipt book**: it has a counterfoil and is issued by the buyer, at each cocoa or coffee purchase operation, from an individual producer.
- **Bill of lading**: this document accompanies the product from point A to point B. There are two types of bills of lading: the inter-operator bill of lading (place of departure from one operator's warehouse to another) and the factory bill of lading (place of departure to packing factories or port warehouses). It contains information on the origin of the delivered product. It is issued and printed from the computer application of the Coffee-Cocoa Council called SYDORE.
- **Weighing ticket:** it attests the gross weight, the net weight, the number of packages and the identification of the operator, at the entrance of the factories.
- **Quality analysis bulletin:** it is delivered by the quality dealer after analysis of the product, it attests the physical quality of the product.
- **Receipt slip:** it is issued by the exporter after accepting the product. It summarizes all pertinent information for completing the transaction.

The above mentioned documents are processed according to defined guidelines.

### 2.1.8 *Purchase limits*

Purchase limits are intended to counteract abuse by those in dominant positions, and to ensure healthy and fair competition between all the approved operators. Its application must, however, still allow all exporters to carry out their contracts.

This is why **purchase limits** on raw cocoa have been set and the penalties for exceeding them have been reinforced. These limits are determined for both trading periods (October-November-December and January-February-March) of the main harvest. They are determined by taking into account the estimated levels of the main crop as part of crop prediction activities.

Because of bean size during intermediate harvest, exporters are exceptionally permitted to supply within the production potential limit during the above-mentioned intermediate harvest. However, in the event of abuse resulting from practices aimed at undermining fair and honest competition between operators, duly noted by the Coffee-Cocoa Council, the intermediate harvest purchases may be restricted.

Purchase limits for cocoa goes as follows:
- October-December:                       110,000
- January-March:                          50,000
- April-September (intermediate harvest):  No limit

Since the overall purchase limit for an operator in the main season is 160,000 tons, an operator that has not reached the 110,000 ton volume in the OD period may purchase more than 50,000 tons in the JM period as long as it remains within the 160,000 ton limit.

In addition to these maximum limits, each operator's purchases must correspond to its releases plus 2%.

Operators who do not have a release contract and those whose releases are less than or equal to 1,000 tons are allowed to buy up to a maximum of 1,000 tons in the main season and 500 tons in the intermediate season.

In order to take into account the specificity of the grinding activity and the installed capacity of the local grinding units, purchase limits made by the grinders is as follows

- A purchase limit on the average half-yearly grinding capacity plus the equivalent of one and a half (1.5) months of supply without mandatory covering by releases;
- A second purchase limit corresponding to the average half-yearly grinding capacity plus the equivalent of two and a half (2.5) months of supply, with the obligation that 90% of the purchased volume be covered by releases.

For coffee, the limit is the amount of the release plus 5%. Operators with no releases are not allowed to make physical purchases.

These limits will be adjusted as needed.

### 2.1.9 *Quality control of the products upon entrance to the factories*

With the same hope of improving the quality of the coffee and cocoa available on the market, a systematic quality control inspection is performed on all products delivered to the packaging and processing factories throughout the country.

These inspections are recorded in the computer system SAIGIC.

These inspections have been granted by Cote d'Ivoire to private operators called quality control providers under the supervision of the Quality Control Department of the Coffee-Cocoa Council which ensures the respect and the good application of the standards and protocols in force.

The quality standards are defined in close relation with those in effect for exportation. Tolerance thresholds are also defined in agreement with exporters and dealers, and then widely disseminated among the actors. If anything falls outside of these thresholds, the factory owners will not be allowed to receive the products.

Processors are required to accept delivery of products for grinding directly at the grinding sites. The products are not to be coming, in any way, from the sieving process (sorting of cocoa on the site of reception).

Rejected products may be repackaged by the supplier outside the receiving plant, depending on the defects revealed and presented again at the inspection. If the product cannot be repackaged because it is deemed to be of poor quality, it is to be conveyed to a processing factory (the product is not to be the result of the bean sifting process), within the limits of the acceptance standards defined at the entrance of the factories. Otherwise, the product must be sent to a waste treatment factory.

The results of the analysis of the inspections performed by the QC providers allow the reinforcement of the training, education and information outreach towards the producers and buyers who were responsible for the bad quality.

### 2.1.10 _Managing sub-grade and off-grade products, waste and residues_

The objective of the authorities is to achieve a significant improvement in the quality of cocoa in Côte d'Ivoire in the short term. This objective requires a rigorous management of non-conforming products and residues.
This is why systematic quality inspections of these products at processing factories are carried out.

### 2.1.11 _Principles and operating procedures of the regulatory framework for the implementation of certification projects and premium sustainability programs_

#### 2.1.11.1 Challenges

Certification has been touted by the cocoa industry as a tool to transform the cocoa sector into a sustainable production and marketing chain. However, studies as well as numerous reports registered by the Coffee-Cocoa Council have revealed structural and functional constraints to the implementation of cocoa certification.
These include improper practices in the field, such as:

- Failure to comply with the terms of the certification contracts;
- Delivery or purchase of cocoa without a valid certificate from the cooperative company, processor or exporter;
- Issuing certificates to cooperative companies whose producers' plantations are in protected forests;
- Declassification of certified cocoa into non-certified cocoa by exporters without a legitimate reason;
- Mixing of certified cocoa with non-certified cocoa by the exporter;
- Non-payment of premium or arbitrary deductions made;
- Non-compliance with the training periods specified, or poor quality training provided;
- Inefficiency of the Internet Management System (IMS);
- Racketeering of auditors;
- Unreliable tracking systems developed by different actors.

**2.1.11.2 Principles and operation of the regulatory framework**

The main objective is to establish the legal framework necessary for the successful and controlled implementation of the above-mentioned projects and programs in the field, through the following legal texts:

- Decree No. 2017-321 of May 24, 2015 on the implementation of certification projects and sustainability programs in the coffee and cocoa sector, signed on May 24, 2017. The purpose of the decree is to regulate the implementation of certification projects and sustainability programs, through the establishment of preconditions for their implementation as well as the development and implementation of a system for monitoring and evaluation;
- Order # 444/MINADER/CAB of July 25, 2018 determining the list of failures leading to the withdrawal of approval for the implementation of certification projects and sustainability programs in the coffee and cocoa sector, as well as for the purchase of certified or sustainable coffee or cocoa;
- Order # 445/MINADER/CAB of July 25, 2018 determining the information to be included in contracts relating to the implementation of certification projects and sustainability programs in the coffee and cocoa sector.

The following principles govern the implementation of certification projects and sustainability programs:

1) Operators involved in certification projects and sustainability programs must obtain a season license in accordance with Decree No. 2017-321 of 24 May 2015.

2) Applications for approval are made online through the Information Management System for Coffee-Cocoa Certification Projects and Sustainability Programs (IMSCP).

3) The seven types of operators targeted by the applications are the following:

- Certification organizations;
- Exporters conducting sustainability projects and/or programs;
- Exporters purchasing only certified or sustainable cocoa/CIF;
- Cooperative companies conducting certification projects and/or sustainability programs;
- Purchasing centers conducting certification projects and/or sustainability programs;
- Training firms providing certification training;
- Audit firms operating certification and sustainability programs.

4) The Regulation and Stabilization Body ensures the centralization, coordination, monitoring and control of the activities of the operators involved in the certification projects and sustainability programs, in collaboration with the operational departments, from the field purchase operations up until exportation.

- Operators register in the Cocoa Certification and Sustainability Project Information Management System (CCPIS/SGICD) to track their certification and sustainability activities.
- Operators declare their purchases of certified coffee/cocoa and sustainable cocoa in SYDORE.
- The monitoring and control operations of the activities carried out by the approved operators are done through the SGICD and field missions.

- The inspections at the entrance of the factories also concern the volumes of certified coffee/cocoa and sustainable cocoa received. In no case, certified cocoa can be declared as ordinary cocoa.
- The Coffee-Cocoa Council carries out a systematic quality control of certified and sustainable cocoa on all the lots present.
- At the export level, exporters declare the volumes of certified cocoa, with the type of certification, the CDC, the lots, the premium amounts in the software designed for this purpose, in order to match the export data with the bills of lading of the domestic marketing.
- The Coffee-Cocoa Council verifies the payment of premiums.
- Links to SYDORE/SIGEC and SGICD are available.

5) A consultancy firm specialized in certification and selected by the Regulation and Stabilization Body shall carry out, on an annual basis, an audit of the activities conducted by approved operators, in accordance with the provisions of Decree No. 2017-321 of May 24, 2015. In case of non-conformity, the authorized operators concerned must necessarily implement corrective measures under penalty of sanction.

6) The Coffee-Cocoa Council is in charge of noting any failures, in accordance with Article 5 of the Decree determining the list of failures leading to the withdrawal of approval for implementation of certification projects and sustainability programs in the coffee-cocoa sector, as well as for the purchase of certified or sustainable coffee or cocoa.

7) The sanctions will be implemented in accordance with the provisions of the above-mentioned decree.

### 2.1.12 *Harvest Estimates*
Harvest estimations are a central part of the mission of the Coffee-Cocoa Council.

### 2.1.13 *Managing bush bag production*
The bush bag is essential for the smooth running of the season and the preservation of product quality at all stages of marketing. It is subject to a quasi-fiscal tax. Its management is based on the following principles:
- To evaluate at the beginning of each season the needs in bags;
- To provide the Regional Delegations with a number of bags in relation to the production potential of each region;
- Bush bags are destined for individual producers via cooperatives and buyers according to their collection capacity and their rate of delivery of products. Residual supplies of bags per store are regularly updated for replenishment, taking into account the fluidity of the activity;
- In the port areas (Abidjan and San Pedro), ensure that exporters hand over an equivalent number of empty bags for each product delivery. The system set up in the packaging and processing factories allows for better monitoring of bag management via a software called SICOPS;

- The movements of entry and exit of the bags are traced by vouchers that are signed by the various actors.

There are technical specifications for the bags. The bush bag standards are made to preserve the quality of the products and durability for the three rotations planned.

### 2.1.14 State Support Measures

State support measures are centered on the following areas:

✓ Measures against product smuggling

The Coffee-Cocoa Council in collaboration with the Ministry of Commerce, the customs and the security forces, are working together to combat smuggling.

All seized products are sold by the Coffee-Cocoa Council.

✓ Measures against racketeering

The government is taking steps to combat racketeering and reduce travel fees in an effort to avoid undermining the producer price.

## 3. MARKETING SECURITY AND RISK MANAGEMENT

### 3.1 Mechanism related to external marketing.

#### 3.1.1 Identifying risks related to the marketing system

There are two main types of risk in the futures and price stabilization system:
- a risk related to the variation of the CIF price;
- a risk related to operator failure.

In addition, since contracts are immediately converted into EUR and XAF, exchange rate risks are almost non-existent.

#### 3.1.1.1 Risks related to CIF price variations

Term sales consist of selling a proportion of the forecasted harvest, which means that for this proportion of the harvest, the price is known before the start of the season. A price estimate is made for the balance that is sold on the spot.

The reference price is the average of the prices obtained from anticipated sales and the estimated price for spot sales.

If during the season, the actual sales price is higher than the estimated price, a positive balance is generated. Otherwise, there will be a negative balance that must be financed.

### 3.1.1.2 *Risks related to operator failure*

This risk arises from the inability of a national or international operator who has undertaken commitments in the system to honor those commitments. This operator will then be declared as defaulting.

If the failure occurs before the prices for the season are fixed, there is no major risk to the system since the operator's tonnages can be put back on sale.

If the failure occurs after the fixing of the prices, three cases can occur:

- either the contract is resold at a higher or equal price: which means there is then no loss for the system; or
- the contract is replaced at a lower price: in this case, the loss is incurred by the system; or
- the contract cannot be replaced: in this case the loss is also incurred by the system.

### 3.1.2 <u>*Risk management related to the marketing system*</u>

Risk management related to the sales mechanism is achieved through anticipatory measures and financial guarantees, before resorting to sanctions.

### 3.1.2.1 *Anticipatory actions and financial guarantees*

In order to reduce the likelihood of these risks, the marketing mechanism foresees, at different stages, measures allowing to filter the operators or to ensure the good execution of their commitments, with special focus on:

> **Approval by operators**

The issuance of approval according to the conditions specified allows the selection of operators who can work in the system.

> **Approval by international buyers**

Any international buyer wishing to purchase cocoa and coffee from Cote d'Ivoire is required to provide a documentary packet (Please see note on counterparties of coffee and cocoa exporters CCC/125-17/YBK/DGA-FD/DV-KIEK/Kp of September 14, 2017). This step aims to select potential buyers, guarantee proper contract execution, and reduce speculation risks. Requests for this type of approval are made throughout the season.

> **Validation of Sales Contracts (SC), delivery of sales guarantees and validation of counterparty contracts**

Sales are subject to confirmation by the operators before validation by the system.

The Sales Contract is subject to the production of a bank guarantee of 2.5% or 1% of the sales price, depending on the kind of the operator (see 1.2.2.) and the provision of a counterparty contract.

In principle, since processors are not allowed to export beans, they should not produce the consideration in beans.

Additionally, since the quid pro quo contract is a guarantee of the finalization of a sale, a processor's consideration should be in the form of the processed product, one that confirms the actual sale of the tonnages.

However, in order to take into account practical constraints, processors may provide the consideration expressed in bean equivalents. Nevertheless, the consideration expressed in processed product will be provided at the time of contract execution.

✓ **The setting of a price limit (auctions)**

The setting of a price limit in the marketing mechanism makes it possible to eliminate unrealistic pricing proposed by operators.

This price limit takes into account the evolution of the market, the origin differential and the behavior of the actors.

✓ **Observation of the position of each operator and monitoring of allocations**

The position of each operator is observed on a daily basis and the allocations granted to operators are monitored on the basis of:
- historical marketing statistics;
- logistical and financial resources.

If the Coffee-Cocoa Council considers the position of an operator to be vulnerable during the season, it will request additional guarantees, such as proof of position coverage by the counterparty, the existence of financing lines, etc. The Coffee-Cocoa Council can go as far as suspending an operator's right of access to the sales system in order to prevent it from putting the system at risk.

✓ **Verification of the proper execution of the contracts**

The Coffee-Cocoa Council reserves the right to verify the proper execution of the contracts through the following points:
- conformity of the consideration initially produced and having checked the contract in the module against the one with which the contract is effectively executed;
- effective payment of the price provided for in the contract within the authorized limit and by the counterpart produced.

### 3.1.2.2 Sanctions

(See Annex)

A series of sanctions is applied by the Coffee-Cocoa Council to all operators involved in marketing in case of non-compliance with the rules in force. These sanctions can go as far as withdrawal of approval.

### 3.2 Device related to internal marketing

The internal marketing could be accompanied by a monitoring system of commercial transactions.

➤ **At the operators approval level**

Exporters and buyers are agreed for a crop year.

➤ **At the farm-gate level of purchase by operators**

Purchasing limits are imposed on the various approved exporters to avoid dominant positions.

Any reaction to the detriment of the producer for any reason whatsoever is prohibited.

Sanctions are taken against smuggling and evasion of products with the support of the competent administrations, as well as against any operator violating the procedures and rules established.

> ➤ **At the level of the purchase price at the field to the producers**

A minimum price guaranteed to coffee and cocoa producers is fixed for the entire season in all production areas. It is at least equal to 60% of the CIF price.

In addition, from the 2020/2021 season onwards, a proportion of the DRD fixed at USD/TM 400 depending on the market level, will eventually be added to the minimum guaranteed price calculated from the reference CIF price.

In order to allow each operator to apply the guaranteed price, the recommended approach is to define a scale that will be guaranteed to all stakeholders.

# PART 2:
# MANAGEMENT GUIDELINES
# FOR COMMERCIAL AND TECHNICAL OPERATIONS

## 1. *SEASON*

The cocoa season begins on October 1 and ends on September 30 of the following year. It is subdivided into two (2) periods: the main season which lasts from October to March and the intermediate season, from April to September.
The coffee season starts in December and ends in November of the following year.

The management of the two products, coffee and cocoa, is separated at all levels:
- Purchase declarations;
- Obtaining export rights;
- Issuance and management of forms;
- Stuffing authorizations;
- Customs declarations;
- Shipping;
- Logged as Shipped;
- Etc.

## 2. *SUPPLY INVENTORY, STATEMENTS OF PURCHASES AND TRANSACTIONS*

The Coffee-Cocoa Council sets the level of the purchase limit. The practical modalities of implementation are defined and agreed upon before the start of the season.
These modalities are integrated in the system in order to alert on any declaration of purchase beyond the limit and to help the exporters to respect the decision.

### 2.1 Supply Inventory
In accordance with the coffee and cocoa marketing mechanism, the Coffee and Cocoa Board conducts a physical inventory of coffee and cocoa supplies held by exporters and processors.

A physical inventory is carried out to determine the supplies of cocoa and coffee as of March 31 and September 30 of each year. In the case of coffee, an inventory check is performed on November 30.

Similarly, when changes occur in the parameters of the scale during the marketing period, an inventory is necessary to avoid the previous supplies being valued at the same level as the new supplies at the time of export.

In addition, as part of the monitoring of physical flows, the Coffee-Cocoa Council may carry out physical inventories of supplies at any time.
The objectives of periodic physical inventory operations are to:
- allow for efficient monitoring and evaluation of physical flows of coffee and cocoa;
- make financial adjustments in case of changes in the scale parameters;
- provide relevant indicators for trade regulation (including sales monitoring);
- enable budget forecasting and adjustments;
-

- correctly close the accounting and financial management on the basis of the supplies carried forward, which should be exported on the basis of the exchange corresponding to the crop of origin or the period of production.

Operators are obliged to submit to the Coffee-Cocoa Council, before the beginning of the season, the list and the precise geographical addresses of the storage facilities of their different products. Each time they open a new storage site, they shall declare it to the Coffee-Cocoa Council as soon as it is put into operation.

The inventory of supplies shall be carried out on all the storage sites where the products of different nature of the exporters are stored.

### *2.1.1 Determining theoretical supplies and physical inventory reconciliation results*

The Coffee-Cocoa Council will determine the theoretical supply of each operator on the basis of the operators' purchase declarations, inter-operator transactions and contract executions. The results of the physical inventory will be compared with the determined theoretical supplies.

Any operator whose level of shrinkage, at the end of the supply reconciliation session, presents a negative value or a value higher than the rate of shrinkage allowed in the schedule, is liable to the payment of a penalty of 15 XAF per kg applicable to the absolute difference in supply.

### *2.1.2 Types of products related to inventories*
The types of products related to inventories are:

For coffee
- all-purpose coffee;
- factory coffee;
- non-standard coffee (black and broken beans);
- processed coffee products.

For cocoa
- raw cocoa beans;
- cocoa factory (packaged);
- processed cocoa products;
- residues, waste, and other non-standard cocoa products.

### *2.1.3 Postponed supply*
Any exporter who has a supply of the previous harvest inventoried on March 31 and September 30 for cocoa, and on November 30 for coffee, must export them within a maximum period of 03 and 06 months respectively for cocoa and coffee, starting from the first of the month following the closing of the supplies under the conditions of the corresponding scale.

After these respective deadlines, a penalty will be applied.

### *2.1.4. Treatment of non-standard supplies belonging to exporters of "good fermented" beans*

When a "good fermented" cocoa exporter has non-standard supplies at the end of the inventories, he has 30 days from the end of the reconciliation session to sell this product to an exporter of cocoa residues and waste. After this period, the supply will be seized by the Coffee-Cocoa Council and sold at auction to exporters of cocoa waste and residues.

### 2.2 Statements of Purchase

The declaration of purchase is an obligation made to any agreed or codified operator within the framework of the marketing of coffee and cocoa, to register with the Coffee-Cocoa Council all its purchases received in the stores or in the packaging factories.

### 2.2.1 Farm-Gate Statements of Purchase

Buyers and cooperative companies approved for the season are obliged to issue a receipt to the producer for every purchase of produce in the field.

Each day, the buyer/co-operative company systematically registers the entries of each receipt issued to the sellers in the system.

Before any delivery to an exporter, a buyer or a cooperative, each operator must issue a bill of lading for the delivery of unprocessed or raw products through the commercial management system of the Coffee-Cocoa Council.

### 2.2.2 Types of Products covered by the Inventory

The purchase declaration is mandatory for any exporter to register with the Coffee-Cocoa Council on all their purchases received in a factory. These purchase declarations cover all types of products (bush, all-round, factory, waste).

The declarations of purchases at the entrance of the factories consist of the validation, by the exporter, of the reception documents recorded in the management system of commercial operations.

No more than 48 hours after the purchase operation, the exporter must verify the purchase information in the Coffee-Cocoa Council's trade management system. If the purchase information is consistent with the information in the exporter's books, the exporter approves the purchase, otherwise he/she contests the purchase, specifying the reasons for the contestation (errors on the supplier, on the quality, etc.). After forty-eight hours, all purchases and transfers made outside the management system and not declared are sanctioned by decision of the Coffee-Cocoa Council.

Any valid declaration cannot be modified, except by derogation. Authorizations for shipment and transfer of products are validated on the basis of declared volumes.

### 2.3 Quality Control

### 2.3.1 Farm-Gate Quality Control

A summary inspection is carried out in the field in the operators' stores by field agents of The Coffee-Cocoa Council.

A complete analysis may also be carried out on samples taken from suppliers.

These complete analyses can be carried out at the request of the operators or on the initiative of the Coffee-Cocoa Council, in the mini-laboratories of the Regional Delegations.

Operators are particularly targeted for inspections thanks to the quality information feedback obtained from the factories and processed through the SYDORE.

### 2.3.2 In-factory Quality Control

At the entrance of the packaging and processing factories, a systematic quality control of all raw cocoa and coffee shipments is carried out by quality agents appointed for this purpose. Products that do not comply with quality standards at the factory are systematically rejected.

Unannounced inspections are carried out by agents of the Control Department of the Coffee-Cocoa Council, who ensure that the standards and procedures in force are respected.

The data is managed through the SAIGIC software.

### 2.3.3 Export Quality Control

In order to ensure the conformity of the products for export, a systematic quality control of coffee and cocoa is carried out on all the lots presented. This control is currently granted to concessionary companies agreed for this purpose.

In addition, the Coffee-Cocoa Council carries out unannounced checks on export lots to ensure the reliability of the analytical results obtained by the quality dealers.

All these operations are done through the Ecoqual software.

Any batch that does not meet the standards defined for export cannot be exported and this as many times as necessary.

### 2.3.4 Management of non-standard coffee products

The non-standard coffee is a residue obtained after processing and conditioning of the coffee. This type of coffee is not authorized for export.

### 2.4 *Machining Statements*

The declaration of machining consists in carrying out in the system a breakdown of the factory tonnage in grade and subgrade. The factory weight must be equivalent to the total of the breakdowns including waste.

All bean exporters are required to declare in the trade management system the batches of beans manufactured twenty-four hours after the machining process.

All exporters of processed products are required to declare in the trade management system the volume of derived products manufactured after the machining process.

VB applications and export authorizations are validated on the basis of previously declared products.

The exporter is obliged to declare every 15 days, the volume of machining by-products related to the purchase of the product from the factory.

Any re-machining is subject to a new declaration specifying by grade and lot the re-machined tonnages. Exporters must declare in the system, the batches of factory products.

An undeclared batch cannot be the subject of an export authorization (F01), except for processed products.

### 2.5 _Local Sales Statements_

When part of the volume of products purchased is sold locally to non-approved operators for processing and local consumption, it must be declared in the commercial management system of the Coffee-Cocoa Council.

These sales declarations must be made by March 31 or September 30 of each year.

### 2.6 _Warehouse transactions_

Transactions (purchase-sales) involve both non-factory products (raw cocoa or raw coffee) and factory and allotment products.

For coffee, transactions are carried out according to special provisions of the Coffee-Cocoa Council for black beans and broken beans. Transactions involving factory product (grade and allotment) allow one exporter to transfer lots to another exporter; the lots thus transferred to the purchaser bear the sellers' own mark and numbers.

The conclusion of the contract authorizes purchasers to export a mark that is not theirs, on their behalf.

The following special provisions shall apply to the transfer of lots from the carry-over supply:

- At the beginning of each season, The Coffee-Cocoa Council shall systematically carry forward undischarged ECs;
- The discharge of these PC by forms will be done within the limit of the reconciled supply;
- Any carry over of PC not executed within the prescribed time limit shall give rise to the payment of taxes and royalties;
- The batches subject to transfer will have to respect the export standards in force during the period of acquisition.

An exporter can only enter into a transaction with another exporter within the limits of their available supply. When the transaction contract is issued by the seller, the system checks the theoretical supply according to the following form to ensure that it is at least equal to the tonnage of the transaction:

*Theoretical supply = Sum of purchases - Sum of warehouse transfers + Sum of warehouse purchases - Sum of tonnages validated and executed F01.*

Otherwise, the transaction is impossible. To lift this constraint, the seller will have to make a partial purchase declaration, in order to have the required level of theoretical supply.

To be valid, this transaction must be confirmed by the buyer in the system. All warehouse transactions must be fully finalized by the Coffee-Cocoa Council before the exporters concerned can initiate other warehouse transactions.

In order to ensure the proper execution of contracts, the Coffee-Cocoa Council may force certain operators to carry out warehouse transactions, in particular to enable those with residual contracts and no supplies to acquire products held by others.

## 2.7 *Product Weighing*

All products transiting through a factory or site with a weighbridge recognized by the Coffee-Cocoa Council must be weighed upon entry or exit of these units. (See Annex: Note to exporters, millers, and processors of coffee and cocoa, dated June 19, 2015)

Deliveries of all-crop or raw products must be weighed according to the bill of lading issued by the supplier (crop, season, trade period, type of wholesaler, etc.).

Prior to stuffing, each lot of cocoa or green coffee beans must be weighed at least once individually and in accordance with the exit or entry slip to the factories or packaging site.

The weight of the batches of finished products is the one delivered by the meteorological instruments installed on the production line. It is declared to the Coffee-Cocoa Council when the product leaves the processing factory to the loading docks or to the storage sites of the miller.

The trucks transporting these products out of the processing factory are systematically weighed along with their cargoes to mark the actual exit of the product from the processing plant.

## 2.8 *Correcting purchases, purchase statements and warehouse transactions*

Corrections may be authorized by the Coffee-Cocoa Council at the last request of the exporter when the reasons given are deemed acceptable.

## 3. *SALES*

### 3.1 *Defining Sales*

The sale is a contract between The Coffee-Cocoa Council and an authorized operator.

- •

- Season;
- Product type (coffee or cocoa);
- Reference grade (G2 for coffee and GF for cocoa);
- Quantity;
- Harvest;
- Sales period (bi-monthly for coffee and quarterly for cocoa);
- Product reference destination (EUR for EUROPE);
- Sales price (CIF basis) converted and displayed in CFA francs;
- Exchange rate;
- DRD of USO/TM 400 for contracts starting in the 2020/2021 season.

By the sale, the commitment of export is taken by the exporter for a price CIF of sale, an DRD, a quantity, a quality, a destination and a future period of loading. This commitment is subject to fiscal and quasi-fiscal conditions in accordance with the legal and regulatory provisions in force.

The sale gives rise to the issuance of a Sales Contract (SC) by the system, which is the contractual document of reference for the realization of export operations.

For international operators, the sale is materialized by a contract signed between them and the Coffee-Cocoa Council. This contract will then be the subject of a performance contract (PC) issued by the local operator to whom it will be assigned for execution.

### 3.2 *Access to the Sales System*
Transactions in the sales system are strictly reserved to exporters with a valid approval for the current marketing year. Approved exporters freely carry out commercial transactions with The Coffee-Cocoa Council, automatically, every working day at 10:30 AM and at 2:00 PM for the auction sessions and during the quotation hours on the London supply Exchange for the differential sales.

### 3.3 *Minimum Price*

#### 3.3.1 *Sales by Courier*
The floor price for a trading period or quotation is determined on the basis of the average market price on the London supply Exchange, adjusted for the original differential, and then converted into CFA francs. The euro/$ and euro/£ exchange rates used for each period are those in effect before the opening of a session.
The form for calculating the floor price is as follows:

**[((Closing Price 1 .1 + Differential) x Exchange Rate) + ((Opening Price D + Differential) x Exchange Rate XAF/GBP)] / 2 + DRD*Exchange Rate XAF/USD**

This form remains valid for all open periods during the same session.

However, for the other sessions of the day, the closing price of the previous session and the price posted before the opening of the new session will be used as the closing and opening price respectively in the previous formula.

The floor prices are expressed in CIF Europe base Grade 2 (G II) for coffee and Good Fermented (GF) for cocoa, corrected for the origin differential. These differentials are revisable per period and are respectively ± X $/metric ton and ± X £/metric ton, X being variable.

The value of the origin differential to be used for the calculation of the floor price is decided at each session and per period by The Coffee-Cocoa Council, taking into account the international market data.

All the components of the floor price (closing price, opening price, differential, exchange rate, DRD) are available in the system.

### 3.3.2   Differential Sales

The selling price for a trading period is determined on the basis of the market price on the London supply Exchange, adjusted for the traded origin differential and the DRD. The exchange rates for converting the price into CFA francs, as well as the market price, are those in effect at the time of sale.
The form for calculating the selling price is as follows:
**(last traded price*+ Differential) x XAF/GBP exchange rate + DRD* XAF/USD exchange rate**
*this is the price at which the last transaction took place on the exchange*

### 3.4 Determining CIF coffee pricing by grade
As the CIF price of coffee is based on grade 2, the export of other grades will be done either with a premium or with a discount depending on the quality of the product to be exported. Thus, the scale of passage from grade 2 coffee to the other grades is as follows:
- Change from G 2 to GO = CIF sales price + 25 CFA FR (premium);
- Change from G 2 to G 1 = CIF price of sale + 25 CFA FR (premium);
- Price of G 2 = CIF sales price (exchange);
- Change from G 2 to G 3 = CIF selling price - 25 CFA FR (discount);
- Change from G 2 to G 4 = CIF selling price - 80 CFA FR (discount);
- Change from G 2 to Black beans (GN) = 1/2 x CIF selling price
- Change from G 2 to Broken beans = 1/2 x CIF selling price.

These transformations are made in the integrated management system of the coffee and cocoa marketing chain (S1GEC4) by the use of "Cancellation and Replacement."

### 3.5 Definitions for export coffee grading
Grade 0
Coffee retained by the filter #18 with a tolerance of 6% of beans passing the filter #18 of which 1 % at most passing the filter #16.

Grade 1

Coffee passing through filter #18 and retained by filter #16 with a tolerance of 20% of beans retained by filter #18 and 6% passing through filter #16 of which no more than 1% pass through the filter #14.

Grade 2

Coffee passing through filter #16 and retained by filter #14 with a tolerance of 20% of beans retained by filter #16 and 6% of beans passing through filter #14 of which 1% at most passing through filter #12.

Grade 3

Coffee passing through filter #14 and retained by filter #12 with a tolerance of 20% of beans retained by filter #14 and 6% of beans passing through filter #12 of which 1% at most passing through filter #10.

Grade 4

Coffee passing through filter #12 and retained by filter #10 with a tolerance of 20% of beans retained by filter #12 and 6% of beans passing through filter #12 of which 6% at most passing through filter #10.

### *3.6 Quantity and quality authorized for sale*

For cocoa, sales are made in multiples of 25 metric tons with a minimum quantity of 25 tons. The reference grade is Good Fermented (GF) corresponding to grades I and II according to the standards of Cote d'Ivoire.

For coffee, sales are made with a minimum quantity of 5 tons. The reference grade is grade II (G2).

### *3.7 Destinations for the sale*

The sale is always made based on the destination being Europe. The costs of other destinations are taken into account in the price list. The change of destination will be done at the moment of the issue of the formula.

### *3.8 Taxation and quasi-fiscal charges*

For each marketing year, the levels of fees and charges are based on the CIF reference price and fixed by ministerial decrees.

### *3.9 Sales Contract (attached)*

Any sale to an approved operator is necessarily subject to a contract. This contract is expressed by the system issuing a contractual document called "SC" or "Sales Contract".

A performance contract (PC) is issued by local operators to materialize their commitment to execute an international contract assigned to them by the Coffee-Cocoa Council.

The weight mentioned on the PC is expressed in kilograms. For exporters of cocoa beans and/or green coffee, it is obtained from the theoretical sales weight (in tons) corrected, if necessary, by the bagging coefficient corresponding to a number of bags to be exported:

- 1.001 for cocoa
- 1.008 for coffee

The implementation of a contract of execution is done by issuing a document called "F01 form" showing the information of the PC as well as the tonnage to be shipped, the repayment/support, taxes and fees.

A PC can generate one or more "F01 forms" according to the operator's boarding plan.

The price of each contract will be expressed in Euro and in CFA Franc. The exchange between the euro (€) and the CFA franc will be the one in effect.

### 3.10 *Cancellation and Replacements of Performance Contracts*

The **"CANCELLATION AND REPLACEMENT"** of a PC is a procedure that allows the exporter to cancel a PC and replace it by one or more PCs whose tonnage adds up to the tonnage of the cancelled PC.

The exporter can only cancel and replace a PC after the validation of the original PC by the Coffee-Cocoa Council. The "Reasons for Cancellation and Replacement" are:
- Change of grade or quality;
- Change of harvest (exchange);
- Change of embarkation period;
- Waiver.

Cancellation and replacement" for "change of harvest" shall be subject to the authorization of The Coffee-Cocoa Council.

Cancellation and replacement" for "change of landing period" are subject to the authorization of the Coffee-Cocoa Council. They may result in an adjustment of the contract price. This adjustment is determined by comparing the contract price with the highest selling price of the carry-over/anticipation period (if it was open) at the date of sale. In the event that the deferral/forward period was not open, the price remains unchanged.

Cancellation and replacement" for "change of share" are subject to the express authorization of The Coffee-Cocoa Council.

### 3.11 *Bank Guarantee*

The amount of the bank guarantee for sale is fixed at 2.5% of the value of the contract. This bank guarantee is made out in favor of the Coffee-Cocoa Council and deposited together with the SC or the International Sales Contract by the exporter or the international operator. For international contracts, the local shipper is exempted from issuing a bank guarantee except in case of postponement.

The bond to be provided by national operators is set at 1% of the contract itself, starting from the second year of operation, with the authorization of The Coffee-Cocoa Council.

Only guarantees issued by financial institutions with their headquarters in Cote d'Ivoire are accepted.

"**Cancellation and Replacement"** bonds may require a new bond if the basic bond is no longer corresponding to the export value of the "Cancelled and Replaced" PC due to a change in the release period and/or price.

Additional bonds will be required from operators who present risks of failure. These risks will be assessed by the Coffee-Cocoa Council as part of the monitoring of operators' positions.

The level of the additional guarantee will be set according to the level of commitments made by the operator concerned and the importance of the risk.

The request of external counterparty of the contract is systematic. It is possible that the price of the counterparty is different from the selling price. In such a case, the counterparty will be accepted as long as its price is fixed and greater than or equal to the selling price. For sales to international operators, producing a counterpart is not required for the signing of the Sales Contract (SC).

### *3.12 Periods*
### *3.12.1 Sales Periods*

With reference to the market quotations of the London supply Exchange, sales shall be made to The Coffee-Cocoa Council within the following time limits for each contract:

**PRODUCT: COCOA**

| Sales Periods | Quotation Contract | Sales Deadline Date* |
|---|---|---|
| October/December | December | Contract expiration date |
| January/March | March | Contract expiration date |
| April/June | May/July | Contract expiration date/Sales deadline date |
| July/September | September | Contract expiration date |

**PRODUCT: COFFEE**

| Sales Periods | Quotation Contract | Sales Deadline Date* |
|---|---|---|
| October/November | November | Contract expiration date |
| December/January | January | Contract expiration date |
| February/March | March | Contract expiration date |
| April/May | May | Contract expiration date |
| June/July | July | Contract expiration date |
| August/September | September | Contract expiration date |

*(Subject to possible modifications by the UFFE)

3.12.2  Deadline for submitting and processing documentation packets

The Sales Contract, together with the bank guarantee for sale and the counterparty contract, are to be submitted at The Coffee-Cocoa Council within six (06) working days from the day following the date of sale. Failing this, the operator's right of access to the various sales systems will be suspended for seven (07) working days. After this period, the contract is liquidated and the sanctions are imputed to the operator (see the table of sanctions).

The counterparty is informed by the Coffee-Cocoa Council and the contract is reallocated to a new operator by mutual agreement. The new operator shall provide all the documents within the required 6 working days.

If the contract cannot be reallocated to a new operator because of the counterparty, the contract is liquidated (see sanction table) and the counterparty suspended.

It should be noted that the suspension of the operator's right of access to sales is lifted as soon as the operator sends the documentary packet before the end of the seven working days.

In case of rejection resulting from an error concerning one or more elements of the documentary package, the operator has five (5) working days to send the corrected document, starting from the date of rejection. If it fails to do so, its right of access to sales shall be suspended for seven (7) working days.

Regarding the Performance Contracts (PC), the Coffee-Cocoa Council has a maximum of 48 hours to process and sign the contract.

### 3.12.3  Period of contract breakdown and confirmation

As soon as a Sales Contract is obtained, the operator is obliged to allocate the total volume of the contract to one or more counterparties in the counterparties' module within a maximum period of 24 hours.

The counterparty(ies) must also process (approve or reject) the contract(s) that the operator has allocated to them within the same timeframe.

If it is found that operators have not cleared their contracts, their right of access to the sales systems will be suspended. The operator will be given an additional 24hours to regularize the situation. After this period, the contract is liquidated and the volume is reactivated.
If, on the other hand, the counterparty has not processed (confirmed or rejected) the contract, this failure is accompanied by a suspension of its right of access to the counterparty module for five (5) working days during which it will not be able to make new contracts. The exporter will then be invited to make a new breakdown within the next 24 hours.


## 4. PC CLEARING AND BOARDING PROCEDURES

### 4.1 PC Clearing

With PC clearing, the following will take place:
- the issuance in the system of the application for export authorization or Form F01;
- the deposit of the form called "Form F01" with the required documentary package for processing at the single window;
- Payment by check, taxes and fees to the single window of the Coffee-Cocoa Council. Thereafter, the checks are transmitted to the different beneficiaries.

The tonnage of a form launched is added to the tonnage of the base PC. The sum of the tonnages of the forms launched on a PC can only exceed the tonnage of this PC within the tolerated limit (2%).

The issuing of any form launched (F01) in the computer system is subject to the availability of a supply at least equal to the volume concerned by the transaction (supply carried forward plus accumulated purchases, plus balance of declared warehouse transactions, minus accumulated exports (base F01)).

A Performance Contract (PC) issued for a marketing period must be discharged within the marketing year in question.

Exports of processed products shall be on a bean equivalent weight basis.

The periods for launching and validating the forms (period of clearance of the PC) are those indicated below:

**Cocoa**
- October 1 to December 31 for the OD period;
- January 1 to March 31 for the JM period;
- April 1 to June 30 for the AJ period;
- July 1 to September 30 for the JS period.

**Coffee**
- December 1 to January 31 for the December-January period (DJ);
- February 1 to March 31 for the February-March (FM) period;
- April 1 to May 31 for the April-May period (AM);
- June 1 to July 31 for the June-July period (JJ);
- August 1 to September 30 for the August-September (AS) period;
- October 1 to November 30 for the October-November (ON) period.

### 4.1.1 *Cancelling and Replacing the Form*

The C/R form will be marked as follows:
- The date of the form;
- Repayment, taxes, banks, numbers and check amounts issued from the original form;
- Any additional taxes and fees.

If a C/R form for a performance contract C/R has an increase in repayments and taxes to be collected, the additional repayments and taxes are generated on the new C/R form

### 4.1.2 *2% Allowance on Tonnage*

PC clearance is allowed within the limit of ± 2% of its tonnage. Any forms clearing the balance of the basic PC that has benefited from a tolerance of +2% cannot be cancelled and replaced.

### 4.1.3 *Discount*

Due to the small size of the bean during the intermediary season, a discount is applied according to the discount table (see appendices).

The grinders are obliged to apply the discount on the PC in the system and provide the following documents:

- Discounted PC;

- Analysis Bulletin;
- Weighing Ticket issued upon entrance to the factory.

For the exporters of beans, the processing of the PC because of the graining affects the form. In this case, after validation of the basic PC, the different verification bulletins are attached to the validated PC.

### 4.2 *Shipment*

Every Performance Contract or PC is followed by a shipment. The shipment procedure gives rise to the following:
- the submission by the exporter of an application for an F01 export authorization;
- the quantitative and qualitative inspections carried out by private concessionary companies or by the Coffee-Cocoa Council; products from quality certification programs are also subject to quality control before shipment;
- a phytosanitary control carried out by the Ministry of Agriculture and Rural Development;
- the introduction, by the exporter, of a request for shipment or packing to the single window;
- the establishment by the exporter's forwarding agent of a D6 customs declaration;
- the drawing up of the "free-on-board" form which must be systematically submitted to the Coffee-Cocoa Council by the exporter within twenty-one (21) days from the date of the actual loading of the product;
- Failure to produce the "free-on-board" shall expose the exporter to sanctions. The date of the "free-on-board" is the proof of shipment;
- the packing operations must be carried out on homologous sites and in the presence of the agents of the Coffee-Cocoa Council;
- coffee and cocoa must be exported by sea. The use of any other means of transport shall be subject to the prior authorization of the Director General of the Coffee-Cocoa Council;
- exports under the CIF incoterm shall be subject to the production of an attestation or certificate of marine insurance at the time of signing the "free-on-board";
- bags used in loading operations must be returned to the Coffee-Cocoa Council.

At the end of each shipment period, the forms must be validated by the single window.

The exporter has a maximum of 15 days (Abidjan port) and 21 days (San-Pedro port) after the clearance period of the PC to execute their commitments.

After this period, the exporter is obliged to request a cancellation of the Form and a "Cancelation and Replacement" of the PC to postpone the shipment period. The exporter is subject to the payment of additional checks in case of price changes.

### 4.3 *Shipment deferred*

Exporters are free to defer their shipments within the same season. Deferral of shipment is authorized under the following conditions:
- Cancellation of the form(s) submitted to the Single Window;
- The submission of the request for deferral of the contract to the Coffee-Cocoa Council. If this is not done, the Coffee-Cocoa Council may proceed with the postponement of the PC that has not been completed by the end of the shipping period.

### 4.4 *Processing of sales contracts in the event of non-approval or failure of an operator*

In the management of the commitments made by the operators, difficulties can impede the proper execution of the contracts. This means:

- When an operator who has made commitments for a given season has had its approval withdrawn for that season, the Coffee-Cocoa Council and that operator shall work together to ensure that its commitments are adequately addressed in order to limit the prejudice to the various parties.
- In the event that an exporter is not approved for a given season, the contracts it holds for that season shall be reallocated in agreement with the exporter's counterparty to another exporter at the selling price of said contracts:
     ✓ If the contracts are awarded to a new operator, the latter shall provide new bonds to guarantee their execution;
     ✓ If the contracts could not be awarded to a new operator, they will be cancelled and the corresponding tonnage released for sale.
     the Coffee-Cocoa Council will inform the banks of the situation of this operator and the processing applied to its contracts and will, if necessary, release the securities attached to the releases made by the operator.

- A buyer, who has an approval withdrawn, will be able to receive delivery of the contracts that it holds.
However, if the latter is found to be in failure, the exporter shall propose to the Coffee-Cocoa Council, within fifteen (15) days, another agreed buyer.
- If an exporter cannot offer a new counterparty:
     ✓ The sales contract is cancelled and the volumes are put back on sale if the equilibrium price has not yet been fixed;
     ✓ The sales contract is cancelled, a penalty corresponding to the possible prejudice to the balance of the system is calculated, and a true-up invoice is charged to the exporter, if the equilibrium price is already fixed.

### 4.5 _Release of deposit_

#### 4.5.1 _Bank guarantee of sale_

The release of the bank guarantee for sales occurs at the end of the shipment process. It is subject to a written request, addressed to the Coffee-Cocoa Council by the exporter. This request for release requires the following attachments:

- a copy of the bank guarantee in question;
- a copy of the PE;
- a copy of the split PE, if any;
- an original of each shipping document;
- a copy of each "free-on-board" form for the contracts supported.

the Coffee-Cocoa Council has four (4) working days to issue the certificate of release of the guarantee, the date of deposit of the request being taken as proof. At the end of this period, the customs clearance is deemed to have been acquired by the bank.

If the exporter has not applied for release after execution of the sales contract, the clearance shall be deemed to have been acquired one (1) month after the end of the shipment period, the "free-on-board" form being taken as proof.

Valid bank guarantees cannot be cancelled. The bond becomes void when the PC is cleared by the "free-on-board" forms or when the PC is postponed. In the case of a deferred PE, a new deposit is required.

#### 4.5.2 _Bank guarantee approval_

It is issued at the beginning of the season for all approved operators. Its current duration covers one season and its validity ends on October 31, i.e. one (1) month after the end of the season. After this period, the release of the bond shall be deemed to have been given upon receipt of the application which has not been processed.

The purpose of this bond is to guarantee the proper execution of the commercial and financial commitments made by the exporter for the entire duration of the season.

In the event of failure to the Coffee-Cocoa Council, the bond shall be called for.

The release of the guarantee may take place at any time during the season at the request of the operator, provided that the operator has honored all their commitments. In this case, the operator is suspended from all operations for the rest of the season and the Coffee-Cocoa Council suspends its approval.

### 4.6 _Processing Support and Repayment_

For each marketing period of the main season, the operator is asked to offset the contracts in repayment and those in support to obtain a net balance. This net balance makes it possible to determine an average rate of repayment or support for the operator.

At the time of shipment for each contract, the operator effects the repayment. If there is support, the payment will be made on the basis of this average rate, after shipment.

The support invoice is issued by the exporter. It is submitted by the exporter at the Coffee-Cocoa Council together with the following documents
- Original standardized invoice;
- Original form exporter's free-on-board" in green color;
- Copy of the D6;
- Copy of the BL;
- Original weighing certificate for invoices by real weight.

The Coffee-Cocoa Council has a maximum of ten (10) days to pay the invoice. The necessary arrangements will be made with the banks and the exporters so that this payment is effectively made in the bank that financed the product.

### 4.7 *Processing Postponed supply*

Cocoa supplies inventoried and reconciled as of September 30 should be exported in full during the October-December period under the terms of the corresponding scale.

Exporters with more physical supplies than contracts should sell the surplus to operators with contracts not covered by physical supplies at the warehouse sales price of the scale. The lots subject to transfer will have to respect the standards required for export, especially on the graining.

If the supplies carried over at the end of December are not cleared, the offender will be subject to suspension of its right to access to their sales until the situation is regularized. There will also be a penalty of thirty (30) XFA/Kg (cf. Art 29, Decree No. 2012-1008 of October 17, 2012 establishing the marketing of coffee and cocoa).

The same provisions apply to coffee from previous harvests.

# PART 3:
# PERFORMANCE PROCEDURES FOR SALES CONTRACTS

For the implementation of the external marketing mechanism described above, the operational provisions for the following treatments have been established:

✓ Mechanism for determining reversion and support;

✓ Edition of the performance contracts (PC);

✓ Clearing of repayments and support;

✓ Clearance of contracts;

✓ Processing of support invoices and adjustments.

### 1. *DETERMINING MECHANISM IN SUPPORT AND REPAYMENT*

When an operator makes a purchase, the contract price (**selling price without the DRD**) is compared to the reference CIF price to determine the support or repayment:

- the **selling** price without the DRD is equal to the reference CIF price. There is no reversion or support;
- the **selling** price without the DRD is higher than the reference CIF price; the difference between the two prices constitutes a **repayment** and is paid by the exporter to the Coffee-Cocoa Council;
- the **selling** price without the DRD is lower than the reference CIF price; the difference between these prices is called **support** and is paid by the Coffee-Cocoa Council to the exporter.

In practice, due to the variable costs of the sales price scale, the formula for calculating the support payment is as follows.

**R/S = Selling price without DRD - [(FOB fee+ Fixed fee) + (Selling price Variable fee rate)]**

### 2. *DRAFTING PERFORMANCE CONTRACTS*

Once the price schedule has been finalized and the producer price has been set, the sales administration department will generate in SIGEC4 the Performance Contracts (PC) that are issued by the exporters.

These ECs will show the initial repayment/support rate for each contract and the taxes and fees.

### 3. *SETTLING REPAYMENTS AND SUPPORT*

The day before the start of each marketing period, the performance contracts generated in SIGEC4 are offset at the request of the exporters. This compensation, which takes place only in the main marketing year, is designed to determine a net balance between all the contracts in repayment and those in support by product, by operator and by period.

The net balance resulting from this compensation will be related to all the tonnages from the contracts concerned in order to determine the average repayment/support rate compensated.

For spot sales made during the season, the Performance Contracts will include, at the time of issue, only the specific payout/support rate for each sale as well as the taxes and fees.

### 3.1    *Settling Performance Contracts*

A contract that is brought forward or carried over to a new period cannot participate in the offset of rebates and support for the new period.
Spot contracts are not subject to compensation.

### 3.2    *Settling Contracts with International Operators*

International contracts charged to a shipper are not offset against each other or against the shipper's own contracts.

## 4. *CLEARING CONTRACTS*

The discharge of compensated PCs may be done individually or by grouping several PCs according to the exporter's needs. In this case, the exporter should send a letter to the Coffee-Cocoa Council requesting its authorization and indicating the PCs that it wishes to group them together. In case of a favorable opinion from the Coffee-Cocoa Council, another "Cancellation and Replacement" PC will be generated to replace the first ones and made available to the exporter who will be able to edit it and have it signed.

- The PCs to be grouped may not include contracts resulting from sales by international operators;

- The regrouping of PCs concerns compensated contracts, spot contracts, anticipated contracts or deferred contracts;

- If at the end of the period this PC is not fully cleared, the carry-over will be carried out under the following conditions:
    - Determination of the carry-over price of each PC resulting from the consolidation;
    - Determination of a new weighted average CIF price;
    - Application of the new CIF price thus obtained to the carry-over PC.

- The unpaid PC that has already been grouped cannot be grouped with other PCs.

The "CANCELLATION AND REPLACEMENT of a PE" is a procedure that allows the exporter to cancel a PE and replace it with one or more PEs whose tonnage adds up to the tonnage of the cancelled PE.

The exporter can only carry out a cancellation and replacement after validation of the basic PE by the Coffee-Cocoa Council."

## 5. *PROCESSING SUPPORT, EXEMPTION AND ADJUSTMENT DOCUMENT*

### 5.1 *Processing support invoices*

When the selling price without the DRD of a contract is lower than the reference CIF price, the difference between these prices is called "support" and is paid by the Coffee-Cocoa Council to the exporter.

Futures contracts for the period to be opened will be compensated. In this case, the support is paid after the shipment of each contract, based on the average compensated rate. For spot contracts, the support is paid after the shipment of each contract on the basis of the PC support rate. The exporter shall prepare an invoice for support and send it to the External Marketing Department, together with the following documents:

- Original sheet of the "free-on-board" form in green;
- Copy of D6;
- Copy of BL;
- Original weighing certificate for invoices issued on the basis of actual weight.

The Coffee-Cocoa Council has a maximum of ten (10) working days from the date of receipt of the support invoice to pay.

### 5.2 *Processing exemption documents*

The exemption from quasi-fiscal and/or tax is a measure taken by the State to help the COOPEX.
The operator provides the list of the PC to be exempted within the limit of the volume granted. In the case where the PC has already been cleared, the Coffee-Cocoa Council proceeds to the reimbursement upon presentation of the following documents:
- Exemption invoice;
- Copy of the notification letter from the Coffee-Cocoa Council to the operator making it eligible for the exemption;
- Copy of the reply letter from the operator to the Coffee-Cocoa Council mentioning the PC and the volumes to be exempted;
- Copy of the "free-on-board" forms;
- Copy of the cheques on the quasi-fiscal levy.

### 5.3 *Adjusting Scaled Positions*

Adjustments will be made on the basis of actual boarding data. These adjustments will result in debit or credit notes.

#### 5.3.1 *Exporting Baggage*

Some shipments called "Bulk Containers" or "Bulk Hold" are made directly into containers or into the holds of ships without using bags. The bags used to pack the products before they are put in containers or in the hold are returned by the exporter to the Coffee-Cocoa Council. The grinders are not subject to the adjustment on the export bag.

#### 5.3.2 *Transit*

Transit costs vary according to the type of packaging used for exporting coffee and cocoa. These costs are determined by season and are related to the following types of shipments:

- conventional shipments (preling);
- shipments in container bags;
- bulk container shipments.

For the purposes of the schedule, the highest cost, corresponding to bulk container shipments, has been used. Whenever a shipment is made in a different type of packaging from the one used in the schedule, a cost adjustment will be made.

Operators choose the type of shipment intended for use, from the versions available of their F01 form. This option will allow identification of the forms to be adjusted on the transit.

Shredders are not subject to the transit adjustment.

In addition, the transit fee includes the cost of the port security service of 1.16 XFA/Kg. This service is in force at the port of Abidjan and not yet at San Pedro. Therefore, shipments from the port of San Pedro will be adjusted by the amount of XFA1.16.

### 5.3.3   *Maritime Insurance*

The provision of a maritime insurance certificate covering the risks of maritime transport is compulsory for each export.

For the execution of contracts of international operators executed by local shippers, the Coffee-Cocoa Council will issue the insurance certificate.

The buyer and/or shipper is required to produce a copy of the bills of lading (B/L) within seven (7) days of the shipment of the goods. The buyer and/or the shipper is required to respect the prevention procedures at the departure of the Ivorian ports, as described in the insurance policy of the Coffee-Cocoa Council.

The rate of reimbursement-support paid by the shipper in this case will be calculated to take into account the amount of the insurance.

In the case of contracts released by local operators, exporters have the choice of providing their own insurance certificate or asking the Coffee-Cocoa Council to provide a certificate in the same way as for international contracts.

For FOB or CIF shipments, the counterparties will have to formally indicate their consent in writing to the change of contract type. In these cases, the insurance certificate will not be required and no readjustment will be open.

The new provisions of Article 308 of the CIMA Code (Inter-African Conference on Insurance Markets) stipulate that the insurance contract covering the maritime transport of cocoa must be placed with local insurers.

To this effect, the Coffee-Cocoa Council requires the presentation of an insurance contract or certificate for all contracts executed in CIF. In the absence of such proof, an adjustment will be made to the amount indicated in the schedule.

### 5.3.4   *Weight*

The collected amounts are calculated on the declared theoretical weight and the reconciliation with the actual weight is done afterwards, after the shipment, in order to adjust the receipts.

A financial adjustment is made in case of difference between the weight of the lots on the form and the actual weight collected by the Chamber of Commerce and Industry. The adjustment will be made for the total weight difference without taking into account the export tolerance. The data affected by the adjustment are:
- repayment or support;
- fees;
- taxation.

### 5.3.5   *Quality Export Inspections*

The quality control at export is granted to private companies with which the State of Cote d'Ivoire through the Coffee-Cocoa Council has signed a concession agreement for a public interest activity. The cost of intervention of these actors is fixed as a percentage of the guaranteed CIF price according to the *ad valorem* principle.
As cocoa processors are not subject to quality control on semi-finished products, the remuneration offered at the scale will be re-invoiced to the Coffee-Cocoa Council.

### 5.3.6 *Machining*
For the products resulting from the process of quality certification not conditioned at the edge field, there will be no adjustment. For other certified products as well as any non-certified products packaged at the field edge, a marking device will be used to identify the bags containing these products that are packaged at the field edge. Adjustments will be made to the total cost of 12 XFA/Kg A proportion of 8 XFA//Kg of the processing cost will be paid back by the Coffee-Cocoa Council to the cooperative company.

## 6. *MANAGING TAXES AND OTHER PAYMENTS DUE*

### 6.1 *Taxation (Registration taxes and DUS)*

The taxes are calculated on the reference CIF price without the DRD and will be settled by separate checks as in the liberalized system.
The registration fee is paid by bank transfer on the e-tax electronic platform of the General Directorate of Taxes, for taxpayers subject to the declaration and payment of taxes by electronic means.
(The declaration of the payment of taxes by electronic means is made by **decree N 123/MPE/DGI of March 06, 201**7).

The collection of the DUS will be done according to the customs procedures in force.

### 6.2 *Quasi-fiscal charges*

All royalties are also calculated on the reference CIF price without the DRD or the registration CIF price and are collected separately as shown on the performance contracts (PC).

### 6.3 *Repayment*

The remittance cheques will be separate from the royalty cheques and made out to: "Le Conseil du Cafe-Cacao-Stabilisation".

# ANNEXES

*Annex I: Simplified diagram of the internal marketing cycle.*
*Annex II: Main season cocoa cost scale*
*Annex III: Marketing sanctions tables*
*Annex IV: Conditions for the approval of international buyers*
*Annex V: Quality standards for raw cocoa*
*Annex VI: Discount table for small grain*
*Annex VII: Sales contract to international operators*
*Annex VIII: Performance Contracts (PE)*
*Annex IX: Form (F01)*
*Annex X: Note to exporters, millers and processors of coffee and cocoa*
*Annex XI: Bush bagging distribution diagram*

# ANNEX I:

SIMPLIFIED DIAGRAM OF THE INTERNAL MARKETING CYCLE.

Activities:
- Purchases by the
processors and exporters
and cooperative companies

## Production Zones

Activities:
- Systematic inspection of
quality and weight by the

## PACKAGING FACTORIES

## BOARDING PORTS

Activities:
- Systematic inspection of
quality and weight

## ANNEX II: MAIN SEASON COCOA COST SCALE

The Coffee-Cocoa Council

THE DIRECTOR GENERAL

Abidjan, Oct. 2, 2015

OFFICIAL DOCUMENT

COCOA DIFFERENTIAL
MAIN SEASON 2015-2016
FROM OCTOBER 1, 2015 TO MARCH 31, 2016

| | |
|---|---|
| CIF VALUE GUARANTEED EUROPE/USA/ASIA (XFA/T) | 1,651,008 |
| FOB VALUE GUARANTEED EUROPE/USA/ASIA (XFA/T) | 1,588,065 |
| VALUE OF THE STORAGE FACILITY (XFA/T) | 1,173,906 |
| PACKAGING FACTORY ENTRANCE VALUE (XFA/T) | 1,088,000 |
| TRANSPORT OR COLLECTION CENTRE TO PACKAGING FACTORY (XFA/T) | 20,000 |
| RAMPING DIFFERENTIAL VALUE (XFA/T) | 68,000 |
| FARM/GATE PRODUCER MINIMUM PRICE GUARANTEE TOGGLE VALUE (XFA/T) | 1,000,000 |

[Illegible signatures]

[Director General
Signature
Massandje Toure-Litse]
[Stamp: Director General]

[illegible]

## ANNEX III: MARKETING SANCTIONS TABLES

| Violations of the regulations | Penalties incurred |
|---|---|
| Failure to confirm the bidding on three occasions (Article 26 of Decree N° 2012-1008 of October 17, 2012) | Automatic suspension of the messaging system for ten (10) sessions of quotation. |
| Failure to deposit the documents resulting from the release of the bid within the 6 working days deadline (Article 27 of Decree N° 2012- 1008 of October 17, 2012) | Suspension of the right of access to the sales system until regularization within a maximum period of 7 days of sale. |
| Non-regularization of the deposit of the documents resulting from the release at the end of the 7-day suspension period | Unlocking contract from the current season:<br>- If the cancellation (on the date) causes a financial loss to the stabilization system, the contract volume will be reactivated and the operator will have to pay the sanction fees resulting from the difference between the market price of the day and the unblocking price applied on the unblocked tonnage (in kg). The suspension of access to the sales system will be lifted upon payment of the sanction fee;<br>- If the cancellation (on date) does not cause any financial impact against the stabilization system, the volumes are released. The suspension of the operator's right of access to the sales system will be lifted after one (01) month.<br>Cancellation of a Sales Contract from the following season:<br>- If the cancellation (on date) causes a financial loss to the stabilization system, the volume shall be reactivated and the operator shall pay a sanction fee of 15 CFA FR/Kg on the tonnage released, to the benefit of the Coffee Council. Suspension from the sales system will be lifted after payment of the sanctions;<br>- If Cancellation (to date) has no financial loss on the stabilization system, the volumes will be reactivated and suspension from the sales system will be lifted after one (01) month. |
| Non-posting of contracts rejected for errors in one or more components of the document package, within five (5) working days | Suspension of the right of access to the sales system until regularization within a maximum period of seven days of sale. |
| Non-disclosure of a contract by the operator within 24 hours (on the release date) | Suspension of the right of access to the sales system.<br>Maximum time limit of 24 hours to regularize. After this period, the volumes concerned will be cancelled and put back on sale. |
| Non-processing (rejection or confirmation) of contracts by the counterparty in the COCOEX within 24 hours | Five (5) day suspension |
| Contract not executed following a second cocoa deferral and a third coffee deferral (Article 31 of Decree N° 2012-1008 of October 17, 2012) | Repayments, taxes and fees due to the application of penalty fees (monetary penalty) up to 30 XFA/Kg for the benefit of the Coffee-Cocoa Council |

| | |
|---|---|
| Unpaid check (Article 34 of the decree N° 2012-1008 of October 17, 2012) | 1. Suspension of sales access rights and access to the marketing system (SIGEC 4) until regularization. Payment of a penalty equal to 10% of the unpaid checks;<br>2. In case of recurrence on three different shipments, systematic payment of the remittance, taxes and fees by certified bank checks during the whole season. |
| Total or partial non-fulfilment of contracts at the end of the season (Article 35 of Decree No. 2012-1008 of October 17, 2012) | Call of the deposit of approval to the level of the repayment of the taxes, royalties and DUS due. |
| Exceeding the deadline of five working days for filing the "free-on-board" forms and the copy of the bill of lading (Article 33 of Decree N° 2012-1008 of October 17, 2012) | Suspension of access rights to marketing systems until regularization. |
| Declaration of purchases not made | Suspension of the right of access to sales until regularization |
| Failure to clear supplies carried over from the previous season to the end of December (Article 29 of Decree N° 2012-1008 of October 17, 2012) | Suspension of the right of access to sales until regularization. Application of fees as sanctions. |
| Non-compliance with the purchase cap level (Article 36 of Decree No. 2012-1008 of October 17, 2012) | Ban on purchases until the opening of the second purchasing period.<br>Financial penalties of 100,000 XFA per ton of excess. |
| Presentation to the Coffee-Cocoa Council of false counterparty (37 of decree N° 2012-1008 of October 17, 2012) | Withdrawal of approval and legal proceedings. Prohibition to obtain approval in Cote d'Ivoire for a period of 5 years.<br>In addition, the leaders will be banned from practicing in the industry for the same period. |
| Refusal to collaborate and not making available to the Coffee-Cocoa Council documents of commercial transactions (weighing tickets, bills of lading, payment receipts, etc.) and opposition to access to the premises (Article 24 of Decree No. 2012-1008 of 17 October 2012) | Suspension of the right of access to sales. Withdrawal of approval in case of recurrence. |
| Non-compliance with the provisions for the control of the quality of the products at the factory and at the shipment | Penalty of 5% of the quantity of the litigious product. Suspension of the right of access to sales in case of recurrence. Withdrawal of approval. |
| Irregular packing (Article 22 of decree N° 2012-1008 of October 17, 2012) | Seizure of tonnages for the benefit of the Coffee-Cocoa Council. Suspension of the right of access to sales.<br>Withdrawal of approval. |

## TABLE OF INTERIOR MARKETING SANCTIONS

| Violations of the regulations | Penalties incurred |
|---|---|
| Non-compliance with the guaranteed price (Article 17 of the decree N° 2012-1008 of October 17, 2012) | Seizure of the tonnages in the warehouse for the benefit of the Coffee-Cocoa Council, payment of the price supplement, withdrawal of approval Penal proceedings |
| Non-compliance and refusal to check receipts and purchase records (Article 20 of Decree No. 2012-1008 of October 17, 2012)<br><br>Refusal of unannounced quality inspection | Withdrawal of approval upon report of the Regional Delegate |
| Non-payment of the pick-up costs included in the differential unless there is a commercial agreement between the parties | Penalty of 10% of the load Obligation of regularization Withdrawal of approval |
| Non-payment of the other costs included in the differential, except by commercial agreement between the parties | Warning Penalties of 10% of the value of the load Obligation of regularization Withdrawal of approval in case of recurrence |
| Unauthorized price adjustment (Article 19 of Decree N° 2012-1008 of October 17, 2012) | Penalty of 10 percent of the value of the load Obligation of regularization Withdrawal of approval |
| Non-compliance by the operator with the purchase area. (Article 21 of Decree N° 2012- 1008 of October 17, 2012) | Warning; Penalty of 10% of the volume of the value of the product purchased outside its area. Withdrawal of approval in case of recurrence |
| Organization of the illegal export or attempted export of agricultural products subject to approval to border countries (Order 11°2018-437 of May 3, 2018) | **Buyers/Cooperatives:** Withdrawal of approval<br><br>Legal proceedings<br><br>**Exporters:** Withdrawal of approval Legal proceedings<br><br>**Transporters:** Prohibition to transport cocoa or coffee during the whole season/ confiscation of means of transport<br><br>Legal proceedings<br><br>**Products** confiscated for the benefit of the Coffee-Cocoa Council |

## ANNEX IV: CONDITIONS FOR THE APPROVAL OF INTERNATIONAL BUYERS

The file of approval of the international buyers will have to include:

1. A guarantee bond of two hundred million (200,000,000) XFA issued by a bank represented in Cote d'Ivoire,

2. Certified financial statements for the last three years;

3. The file of approval of the international buyers will have to include proof that the company has existed for at least three years;

4. The presentation of the managers and shareholders of the company (Norn or denomination and nationality);

5. Presentation of the organization, policies and strategies implemented in the cocoa market;

6. A declaration on honor that the company has not been subject to any international sanctions;

7.

8. Proof of an efficient organization and reliable customers in the cocoa sector;

9. Proof of purchasing power; (issued by a bank, signed and sealed),

10. Proof of membership in a cocoa trade federation, if applicable,

11. Letter of commitment,

12. Membership in the FCC (Cocoa Trade Federation)

13. Or the FEC,

14. List of potential new suppliers and cocoa/coffee purchasing plans

15.

   (As for the approval of exporters, the examination phase of the files could involve site visits).

## ANNEX V: QUALITY STANDARDS FOR RAW COCOA

According to the provisions in force, to be marketable, raw cocoa must:

- be well fermented;
- be dry;
- be clean and free of loose or adhering foreign matter; it must not have foreign odors (moldy, smoky, insecticides, etc.);
- and it must meet the following quality standards:

| Criteria | Standards |
|---|---|
| Rate of moldy beans | 4% |
| Rate of slated beans | 8% |
| Rate of defective beans (mitted, sprouted, flat) | 6% |
| Foreign matter | 0% |
| Humidity | ≤8% |
| Graininess [1] | 105 beans/100g |

[1] For the intermediate harvest, the standard is adjusted.

**Quality Criteria at Factory Entrance**

For moisture content, the reaction will be applied between 8% and 9%. Above 9%, the product must be repressed.

For foreign materials, the discount will be allowed between 1.5% and 3%. Above 3%, the product must be recycled.

# ANNEX VI: DISCOUNT TABLE FOR SMALL GRAIN

**DISCOUNT TABLE FOR GRAINING**
**SEASON 2013-2014**

| Grainage (# of beans/100) | Number of Beans | New Discount |
|:---:|:---:|:---:|
| 100 | 0 | 0.00 |
| 105 | 0 | 0.00 |
| 106 | 1 | 4.00 |
| 107 | 2 | 8.00 |
| 108 | 3 | 12.00 |
| 109 | 4 | 16.00 |
| 110 | 5 | 20.00 |
| 111 | 6 | 24.00 |
| 112 | 7 | 28.00 |
| 113 | 8 | 32.00 |
| 114 | 9 | 36.00 |
| 115 | 10 | 40.00 |
| 116 | 11 | 44.00 |
| 117 | 12 | 48.00 |
| 118 | 13 | 52.00 |
| 119 | 14 | 56.00 |
| 120 | 15 | 60.00 |
| 121 | 16 | 61.00 |
| 122 | 17 | 62.00 |
| 123 | 18 | 63.00 |
| 124 | 19 | 64.00 |
| 125 | 20 | 65.00 |
| 126 | 21 | 66.00 |
| 127 | 22 | 67.00 |
| 128 | 23 | 68.00 |
| 129 | 24 | 69.00 |
| 130 | 25 | 70.00 |
| 131 | 26 | 71.00 |
| 132 | 27 | 72.00 |
| 133 | 28 | 73.00 |

| 134 | 29 | 74.00 |
|---|---|---|
| 135 | 30 | 75.00 |
| 136 | 31 | 76.00 |
| 137 | 32 | 77.00 |
| 138 | 33 | 78.00 |
| 139 | 34 | 79.00 |
| 140 | 35 | 80.00 |
| 141 | 36 | 80.25 |
| 142 | 37 | 80.50 |
| 143 | 38 | 80.75 |
| 144 | 39 | 81.00 |
| 145 | 40 | 81.25 |
| 146 | 41 | 81.50 |
| 147 | 42 | 81.75 |
| 148 | 43 | 82.00 |
| 149 | 44 | 82.25 |
| 150 | 45 | 82.50 |
| 151 | 46 | 82.75 |
| 152 | 47 | 83.00 |
| 153 | 48 | 83.25 |
| 154 | 49 | 83.50 |
| 155 | 50 | 83.75 |
| 156 | 51 | 84.00 |
| 157 | 52 | 84.25 |
| 158 | 53 | 84.50 |
| 159 | 54 | 84.75 |
| 160 | 55 | 85.00 |

[Illegible signatures]

ANNEX VII:

# SALES CONTRACT TO INTERNATIONAL OPERATORS
# # xxx-xxxx FROM XX/XX/XXXX

This contract is the confirmation of the electronic sale concluded today between the Coffee-Cocoa Council and the company…………………………………………………………………… according to the market rules of the Federation of Cocoa Trade (FCC) and to the general conditions of the FCC contract that the parties declare to know and accept without prejudice to the regulations relating to the packaging of cocoa for export in the Republic of Cote d'Ivoire.

Contractual quantity: ............................................ (Tons of 1,000 kg). Contractual quantity is net of all tare subject to a tolerance of plus or minus 1.50% at shipment. This tolerance will not be applicable in case of cancellation of the contract with payment of the difference between purchase price and selling price.

Product:            Republic of Cote d'Ivoire cocoa beans

Quality [1]:         Good Fermented

Harvest:            2012-2013

Price [2]:           The price is set at XFA……….., or Euro…….., expressed for a CIF delivery (cost, insurance, Freight).

Packaging:          The packaging of cocoa beans must respect the characteristics appropriate to the transport of this type of goods (in bulk or in bags). The buyer has the option of choosing the type of packaging and must indicate it before the first day of the shipment period. Otherwise, this choice is left to the seller.

Destination:        ……………………………………………………………… The buyer chooses the destination ports (unless only one port is mentioned in the contract) and must be designated before the first day of the embarkation period. Otherwise, the seller shall be entitled to choose the destination port.

Shipping:           **JAN-FEB-MAR 2013……………………………………………………….**
                    During this period, the seller has the option of the date of loading of the goods. The shipment will be made by port at actual weight by minimum quantity of 25 tons or a multiple of 25 tons per port.

Payment [3]:        Net cash of 99% of the amount of the provisional invoice established on the basis of the known net weight, on first presentation. The balance on the basis of the net weight delivered at destination.

Special Circumstances:     Coffee and cocoa shipments under this contract are insured under the maritime insurance policy subscribed by the Coffee-Cocoa Council.

Seal and signature of the Coffee-Cocoa Council          Seal and signature of the Buyer

*(1) G1 and G2 quality according to Ivorian standards, on departure from Cote d'Ivoire for FOB sales and on arrival for XFA sales*
*(2) The amount in XFA will be readjusted in case of change of exchange with the Euro.*
*In case of delivery in CF (Cost and Freight) or FOB (Free on Board), the price will be adjusted according to the schedule of the Coffee-Cocoa Council.*
*(3) Payment in case of FOB delivery shall be made in cash of 100% of the net weight shipped and bills of lading.*

## ANNEX VIII: PERFORMANCE CONTRACTS (PE)

**221-20009**

The establishments **COEX CI** represented by **MR. PAUL UZAN** declared to have concluded, with the **Coffee-Cocoa Council** represented by **MS. MASSANDJE TOURE-LITSE** the sale set at CIF price of **1,208** XFA/kg, and **Euro 1,84158** according to the conditions below:

| Season | CIF Reference Price | Basic Contract Number |
|---|---|---|
| 2012-2013 | 1,200 XFA/kg | 221-2018 |

| Harvest | Quantity | Grade- Quality | Destination | Period |
|---|---|---|---|---|
| 2012-2013/1 | 250,250 | Cocoa GF | Europe | Oct - Nov - Dec |

| Repayment/Support | | | | |
|---|---|---|---|---|
| Quantity | Rate (XFA/KG) | | Repayment | Support |
| 250,250 | **Base** | 7.85 | 1,954,462 | |
| 250,250 | **Spend** | -8.95 | | 2,239,737 |

| X | | Local Operator Sale | |
|---|---|---|---|

| FEES | | |
|---|---|---|
| Taxation/Quasi-fiscal Taxes | Rate (%) | Amount |
| Coffee-Cocoa Council Fees | 0.93 | 2,792,790 |
| Agricultural investment Fund | 0.47 | 1,411,410 |
| Rural area investment funds | 0.54 | 1,621,620 |
| Bush bagging | 0.21 | 630 630 |
| Registration Taxes | 0.5 | 1,501,500 |
| | | **Total Amount to Pay: 7,957,950** |
| DUS* (Theoretical Bean Base) | 14.6 | 43,843,800 |

The Coffee-Cocoa Council
**DIRECTOR GENERAL**

Exporter
**COEX CI**

[illegible]

*(1) The amount in XFA will be readjusted in case of exchange change with the Euro (€). In case of delivery CF (Cost and Expenses) 011 FOB (Free on Board). The price will be adjusted according to the scale of the Coffee-Cocoa Council.*

**221-20009**

The establishments **COEX CI** represented by **MR. PAUL UZAN** declared to have concluded, with the **Coffee-Cocoa Council** represented by **MS. MASSANDJE TOURE-LITSE** the sale set at CIF price of **1,208** XFA/kg, and **Euro** 1,84158 according to the conditions below:

| Season | CIF Reference Price | Basic Contract Number |
|---|---|---|
| 2012-2013 | 1,200 CFA/kg | 221-2018 |

| Harvest | Quantity | Grade- Quality | Destination | Period |
|---|---|---|---|---|
| 2012-2013/1 | 250,250 | Cocoa GF | Europe | Oct Nov Dec |

| Repayment/Support | | | | |
|---|---|---|---|---|
| Quantity | Rate (XFA/KG) | | Repayment | Support |
| 250,250 | Base | 7.85 | 1,954,462 | |
| 250,250 | Spend | -8.95 | | 2,239,737 |

| X | Local Operator Sale | |
|---|---|---|

**FEES**

| Taxation/Quasi-fiscality | Rate (%) | Amount |
|---|---|---|
| Coffee-Cocoa Council Fees | 0.93 | 2,792,790 |
| Agricultural investment Fund | 0.47 | 1,411,410 |
| Rural area investment funds | 0.54 | 1,621,620 |
| Bush bagging | 0.21 | 630 630 |
| Registration Taxes | 0.5 | 1,501,500 |
| | | Total Amount to Pay: 7,957,950 |
| DUS* (Theoretical Bean Base) | 14.6 | 43,843,800 |

The Coffee-Cocoa Council                                          Exporter
**DIRECTOR GENERAL**                                               COEX CI

[illegible]

(6) *The amount in XFA will be readjusted in the event of a change of exchange rate with the euro.*
(7) *In the event of CF delivery (Cost and Freight) or FOB (Free on Board), the price will be adjusted based on the Coffee-Cocoa Council Scale.*

# ANNEX IX: FORM (F01)

| 1/09/12 | the Coffee-Cocoa Council | |
|---|---|---|
| REPUBLIC OF CÔTE D'IVOIRE MINISTRY OF ECONOMY AND FINANCES | **EXTERNAL MARKETING DIRECTION EXPORT AUTHORIZATION REQUEST** | Green Coffee Cocoa Beans |

| The Coffee-Cocoa Council grants authorization on<br><br>(Seal and Visa)<br><br><br><br><br>Director General of Taxations<br><br>Receiver of Registration<br><br>Custom's Declaration<br><br>#<br><br>Abidjan on<br><br>Inspector<br><br>Bill of Lading- Ship left on<br><br>(Seal and Visa of Customs) | Exporter: COEX CI<br>Freight Forwarder: BALANCE TRANSIT<br>Auth. #:<br>Contract #: COEX Contract<br>Product: Cocoa<br>Season: 2012-2013<br>Harvest: 2012-2013/KKO-I<br>Grade: GF G2<br>Quality: Beans<br>Destination<br>Country: SOUTH AFRICA<br>Port: Other<br>Via:<br>Origin<br>Boarding Port: ABIDJAN<br>Boarding Period: OCT - NOV - DEC<br>Tonnage<br>Net: 25.025 kg<br>Raw: 25.295 kg<br>Packaging: BIG BAG<br>Number: 385<br>Destination: DERTRE<br>Customs Classification: 180 1001 200 Z<br>Ship: GGG<br>FOB Actual Value: 1,520,000 Frs | Contract<br>#: 221-2018<br>Date: 02/22/2012<br>Price: 1208 XFA<br>Period: OCT NOV DEC |

Repayment/Support (CFA F)

| Tonnage | Rate (CFAF/KG | Repayment | Support |
|---|---|---|---|
| Base | 7.85 | 196,446 | 0 |
| Offset | -8.95 | 0 | 223,974 |

| REF<br>F01:F012/221/0009/0001/0001 | | Confirmation of Sale<br>#: 221-20009<br>Date: 10/09/2012<br>Price: 1,208 XFA<br>Ref. price: 1,200 XFA<br><br>Period: OCT NOV DEC |
|---|---|---|

**FEES**

| Council Fees | Rate: 0.93 Date: 09/12/2012 | Amount: 279,279 fr Bank: BICICI | Check: 3258003 |
|---|---|---|---|
| Agriculture Investment fund | Rate: 0.47 Date: 09/12/2012 | Amount: 141,141 fr Bank: BICICI | Check: 3258004 |
| [Illegible] | Rate: 0.54 Date: 09/12/2012 | Amount: 162,162 fr Bank: BICICI | Check: 3258002 |
| Bagging | Rate: 0.21 Date: 09/12/2012 | Amount: 63,063 fr Bank: BICICI | Check: 3258000 |

**RATES**

| Entry Rate | Rate: 0.5 Date: 09/12/2012 | Amount: 150,150 fr Bank: BICICI | Check: 3258001 |
|---|---|---|---|
| DUS | Rate: 14.6 | Amount: | Check: |

| | | Date: | 4,413,609,2 fr Bank: | | | |
|---|---|---|---|---|---|---|
| | | | | | | FOI date: 09/12/2012 |
| | | | | | | #FOI |
| | | | | | | Date, Signature and Seal of Applicant |
| | | | | | | SEASON 2012-2013 |
| | | | | | | |

## ANNEX X: NOTICE TO EXPORTERS, MILLERS AND PROCESSORS OF COFFEE AND COCOA

## The Coffee-Cocoa Council

THE DIRECTOR GENERAL

Abidjan, June 19, 2015

## NOTICE TO EXPORTERS, MILLERS AND PROCESSORS OF COFFEE AND COCOA

ABIDJAN -SAN PEDRO

#/Ref: ccc/2B1 2015/EKN/DOT-IB/Kmk/tl/le
Objective: **Approval of batch reception and outgoing weighing at the factory level**

**To whom it may Concern,**

Since the start of the 2012-2013 season, the Coffee-Cocoa Council has improved its management, in order to follow the evolution of coffee and cocoa supplies, throughout the season.

Thus, after the implementation of the receiving process and the automatic declaration of raw purchases, the Coffee-Cocoa Council has put in place, starting in the 2013-2014 season, a new traceability procedure of beam lots or products derived, created, by negotiators and processors of cocoa and coffee which allows creation of, in dynamic real time, of a theoretical supply which is very close to the actual physical supply.

In light of improving constantly its traceability system, and production management, The Coffee-cocoa Council has implemented, starting today, a new method of approving shipping of bean lots and derived products, as well as receiving bean lots and raw supplies acquired through transfer.

This new method will allow facilitation of data on supply at the end of the marketing period, when there are supply inventories, as well as determining the rate of repayment of factories, but also will allow exporters to modify their supply management using SAGIC WEB.

The procedure for approval for shipments and receiving bean lots and raw supplies acquired by transfer is the following:

[illegible]

**1. To receive lots and raw supply by transfer [3:43 p. m.] Paula Steiner**
Access the weighing approval module through the menu.

PURCHASES >> Weighing Approval
- Select "**transfer**" for "bulk purchase" on the "**movement**" menu and enter the weight
- Validate weighing as per the same validation principle used for bulk purchases.

**2. For exiting bean lots and derived products for shipping**
Access the authorization model for exporting weights on the menu.

*a. For Bean Lot Exporters*

EXPORTS >>Export Approval (Beans)
- Enter the weight and approve it according to the same method as for bulk purchase.

EXPORTS >> List of approved exports (Beans)
- Allows viewing of the already approved weights

*b. For Derived Product Exporters (grinders)*

EXPORTS >>List exports (grinders)
- Enter the weight and approve it according to the same method as for bulk purchase.

EXPORTS >> List of approved exports (grinders)
- Allows viewing of the already approved weights

The Coffee-Cocoa council finds this new method to be very important and encourages all operators to apply this method vigilantly.

The weights to be approved are those taken since April 1, 2015 for grinders and since October 1, 2014 for bean exporters.

For any additional information, don't hesitate to contact the factory Monitors and the SAIGIC are: 20-20-29-25/20-25-69-86

Best regards and our deepest wishes for success,

[stamp]
[signature]
**Edouard Kouassi N'GUESSAN**

[illegible]

# ANNEX XI: BUSH BAGGING DISTRIBUTION SCHEMATIC

The Coffee-Cocoa Council
DIRECTOR OF TECHNICAL OPERATIONS
Support Team for Producers

**BUSH BAGGING DISTRIBUTION SCHEMATIC**
**(Summary)**

Beginning with the 2013/2014 season, a management software for bush bagging has been in use. This software (SICOPS) is used by exporters and regional delegates of the Coffee-Cocoa council, under the supervision of the Support Team for Producers.

The schematic goes as follows:

- At the start of the season, the number of bush bags necessary for internal marketing of coffee and cocoa is calculated and ordered through FILTISAC.
- On a pro rata basis of the volumes of marketed products, the quantity of bags available (bags ordered-initial supply) is attributed to the exporters on one side and the cooperative companies and buyers on the other.
- The beneficiaries of the bags are the suppliers (coded cooperative companies, buyers).
- Through SICOPS, approved exporters set off the process by sending out an authorization of removing bags (AE) for the benefit of a supplier.
- The supplier goes to the delegation with the pick-up authorization to be served.
- In delegation the logistic cell receives the AE, verifies its authenticity through the SICOPS and generates the exit voucher for the suppliers and gives them the bags.
- Periodically, used bags are removed from stores and suppliers (and possibly from exporters) in order to be incinerated.



EMBRACE THE FUTURE

625 Whitetail Blvd. River Falls, WI  54022 | Phone: 877.426.9505 | Fax: 715.426.0105 | www.Amplexor.com

## Certification of Translation Accuracy

I do hereby verify and confirm that AMPLEXOR has delivered a true and accurate translation of the following item(s):

- ENG_ARR 2020-22431 - Projet document d'opérationnalité du 22 octobre 2020 (sans lettre de transmission).docx; and
- ENG_Note Info Exportateurs - Dispositions commercialisation cacao campagne intermédiaire 2020-2021.docx

These translations were completed by technically trained native speaking linguists.

**Project No.:** Rikai project # 24037
**Date:** July 29th, 2021
**Client:** Cargill
**Client Contact:** Susan Whitman
 **Product Description:** Cocao Pricing Translation
**Source Language:** French-France
**Target Language(s):** English (US)

AMPLEXOR

By: *Chris Wells*

Chris Wells
Service Unit Manager

AMPLEXOR International, S.A. | 55, rue de Luxembourg | L-8077 Bertrange, Luxembourg | Tel.: +352 31 44 11 1 | Fax: +352 31 44 11 209 | www.amplexor.com

R.C. Lux.: Section B 122347 | Autorisation d'établissement: 115562 | Tribunal de Commerce: Luxembourg | Capital social: 470.588 € Management board: Mark Evenepoel, Michael Such | ID TVA LU 214 986 51 IBAN: LU20-0030-3561-9545-0000 / BIC (SWIFT): BGLLLULLXXX  | BGL BNP Paribas S.A.

C

**Le Conseil du Café-Cacao**

Le Conseil de Régulation, de Stabilisation et de Développement de la Filière Café-Cacao

**LE DIRECTEUR GENERAL**
----------------

Abidjan, le **2 9 MAR. 2021**

N/Réf. : **CCC/**....................... **0014-21** **DG-KBY/DGA-NK/DCE-BK/SAV-KP**

## NOTE A L'ATTENTION DES EXPORTATEURS, TRANSFORMATEURS, SOCIETES COOPERATIVES ET ACHETEURS DE CACAO

**Objet :** **Dispositions relatives à la commercialisation du cacao au titre de la campagne intermédiaire 2020-2021.**

**Mesdames, Messieurs,**

Nous avons l'honneur de porter à votre connaissance les dispositions ci-après arrêtées dans le cadre de la commercialisation intérieure et extérieure du cacao au titre de la campagne intermédiaire 2020-2021. Ce sont :

### 1. Le prix d'achat bord champ garanti du cacao

Le prix minimum garanti bord champ est fixé pour la campagne intermédiaire 2020-2021 à **750 FCFA/KG** sur l'ensemble du territoire pour le cacao bien fermenté, bien séché et bien trié. Il ne peut être négocié en dessous de ce seuil. Aucune réfaction sur ce prix n'est admise.

Conformément à l'article 17 du décret n°2012-1008 du 17 octobre 2012 fixant les modalités de commercialisation du café et du cacao, tout contrevenant s'expose *« au paiement du prix complémentaire, à la saisie des tonnages se trouvant en entrepôt au profit du Conseil du Café-Cacao et au retrait de son agrément pour une période de trois ans, sans préjudice des poursuites pénales ».*

### 2. Le prix d'achat du cacao à l'entrée des usines

Le prix d'achat entrée-usine hors transport est de **830 FCFA/Kg** sur l'ensemble du territoire national. Ce prix est fixe, il ne devra pas faire l'objet de surenchère.

Organisme créé par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage-Tél : 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

1

Conformément à l'article 18 du décret n°2012-1008 du 17 octobre 2012 fixant les modalités de commercialisation du café et du cacao, tout contrevenant à cette disposition s'expose au paiement d'une pénalité de 10% de la valeur du produit concerné au profit du Conseil du Café-Cacao et au retrait de son agrément en cas de récidive.

### 3. Le coût du transport des zones de production aux usines des exportateurs

Le coût du transport des zones de production aux usines des exportateurs est déterminé par le mécanisme de péréquation transport en vigueur. La grille des Tonnes-Kilométriques (TKM) arrêtée par le Conseil du Café-Cacao, constitue le référentiel pour le paiement du transport.

Cependant, un forfait transport de **15 FCFA/Kg** est fixé au barème afin de permettre aux exportateurs de payer aux fournisseurs à la réception du produit, le coût du transport facturé à la tonne kilométrique (TKM) quelle que soit la zone de provenance du produit. Un ajustement est effectué mensuellement ou par période commerciale par rapport au coût réel supporté par l'exportateur suivant la grille des TKM.

### 4. La rémunération dite « Super commission »

La rémunération des fournisseurs (sociétés coopératives et acheteurs) par les exportateurs et transformateurs, appelée « super commission » n'est pas prise en compte au barème de commercialisation du cacao. Par conséquent, le paiement de la super commission aux fournisseurs au cours de la campagne de commercialisation qui peut s'apparenter à une opération de dumping est interdit.
Tout contrevenant à cette disposition s'expose à une sanction de **50 FCFA/Kg** et son agrément lui sera retiré. Le Conseil du Café-Cacao se réserve le droit d'effectuer des contrôles inopinés chez les opérateurs.

### 5. Commercialisation de cacao certifié

Le Conseil du Café-Cacao a élaboré des dispositions pratiques de vérification de la sincérité des certificats en cours de validité détenus par les exportateurs et les sociétés coopératives. Ces dispositions ont pour but ultime d'améliorer la traçabilité du cacao depuis les plantations certifiées jusqu'à l'exportation.
Tout produit non certifié, déclaré par les opérateurs comme produit certifié sera saisi et vendu aux enchères comme du cacao ordinaire. Les contrevenants (exportateurs et fournisseurs) à cette disposition s'exposent chacun à une pénalité de **50 FCFA/Kg** et au retrait de leur agrément.

### 6. La durée de portage du stock

Le Conseil du Café-Cacao admet une durée de portage de stock par les acheteurs et les sociétés coopératives de 21 jours maximum.

Organisme créé par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage-Tél : 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

2

L'opérateur qui aurait des difficultés à écouler son stock dans ce délai devra saisir expressément le Conseil du Café-Cacao pour trouver une solution.

## 7. La limitation des achats de physique

- Les achats des exportateurs agréés sont limités aux volumes débloqués et/ou des volumes des contrats internationaux, le tout majoré de **3%**. Toutefois, le Conseil du Café-Cacao se réserve le droit de réviser le taux de limitation des achats en fonction du rythme d'évolution des opérations commerciales ;

- Tout opérateur ne disposant pas de contrats est interdit aux achats.

### *Pour les broyeurs* :
- Le niveau des achats de physique sur la campagne intermédiaire est équivalent à la capacité semestrielle moyenne de broyage (capacité annuelle/2) majorée de l'équivalent d'un mois et demi (1,5 mois) de stock tampon. **Cela suppose que le broyeur devra détenir un portefeuille de contrat équivalent à sa capacité semestrielle de broyage faute de quoi le volume des achats sera plafonné à son volume débloqué, majoré de l'équivalent d'un mois et demi (1,5 mois) de stock tampon.**

- <u>Les broyeurs doivent réaliser les achats de fèves brousse en propre auprès des acheteurs et des sociétés coopératives.</u>

- Tous les contrats reportés d'une campagne à une autre et couverts par du physique, seront reportés sans ajustement de prix et sans pénalité. **<u>Les contrats reportés sur la période avril-mai-juin 2021 devront être exécutés au plus tard le 30 juin 2021</u>**.

## 8. Les cessions loco-magasin

Les cessions loco-magasin sont dorénavant des opérations qui interviendront en cas d'ajustement en fin de période ou en cours de campagne sur autorisation exceptionnelle du Conseil du Café-Cacao. Elles se feront uniquement entre exportateurs agréés au prix barème, dans les conditions suivantes :

- Les exportateurs disposant de plus de physique que de contrats devront céder le surplus aux opérateurs disposant de contrats non couverts par du physique ;

- Un exportateur pourra céder du physique que s'il est couvert sur le volume total de ses contrats ;

Organisme créé par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage-Tél : 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

3

- La validation de toute cession par le Conseil du Café-Cacao se fera sur présentation d'un contrat de cession entre les deux exportateurs. Ledit contrat daté et signé des deux parties doit mentionner le prix auquel la cession se fait.

Les lots objet de cession devront respecter les normes requises à l'exportation notamment sur le grainage.

## 9. Différentiel applicable aux stocks reports de la campagne principale 2020-2021

Le différentiel applicable aux stocks reports de la campagne principale 2020-2021, non couverts par des CV de ladite campagne et validés par le Conseil du Café-Cacao, prend en compte la valeur loco-magasin du produit au moment de l'achat et les coûts exports en vigueur au moment de l'exécution des CV.

En l'occurrence, les coûts au barème n'ayant pas subi de changements, les valeurs de calcul du soutien/reversement pour ce différentiel sont identiques à ceux de la campagne principale 2020-2021, soit :

Valeur CAF de référence : **1 239 999 FCFA/Tonne**

Valeur Loco-Magasin : **905 766 FCFA/Tonne**

## 10. Suivi des stocks des exportateurs

- Tous les achats de produits (réception tout-venant) et les pesées de lots à l'embarquement, captés dans le SAIGIC au niveau des ponts bascules pour le compte d'un exportateur doivent être approuvés ou contestés par celui-ci dans les 48 heures ;

- Tous les lots de fèves de cacao fabriqués par les usines doivent être déclarés par les exportateurs de fèves 24h après leur fabrication à leurs poids réels de fabrication ;

- Les volumes de produits dérivés produits par les transformateurs de fèves doivent être déclarés ;

- Toutes les cessions ou les ventes de cacao entre les exportateurs doivent être déclarées en temps réel. Les poids déclarés dans le système engagent les deux parties. Les lots sont cédés avec leurs poids réels de fabrication déclarés ;

- Les résidus et déchets de cacao issus de l'usinage ou de la transformation des fèves de cacao doivent être pesés et déclarés périodiquement et, ces déclarations doivent être exhaustives au plus tard le dernier jour de la clôture de chaque campagne ;

Organisme créé par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage-Tél : 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

4

- Les résidus et déchets de cacao issus de l'usinage des fèves de cacao réceptionnées sont destinés aux sociétés de transformation desdits produits dûment agréées par le Conseil du Café-Cacao.

## 11. Suivi des stocks des sociétés coopératives et des acheteurs

### a. Déclarations des achats dans le SYDORE

Les sociétés coopératives et les acheteurs sont tenus de déclarer régulièrement leurs achats cumulés sur la plateforme SYDORE du Conseil du Café-Cacao. Le détail des déclarations cumulées devra être apuré par la saisie des reçus d'achat dans un délai de 15 jours.

### b. Edition des connaissements

Les sociétés coopératives et les acheteurs doivent éditer dans le SYDORE, leurs connaissements au point de départ des chargements vers les usines des exportateurs. L'édition du connaissement nécessite l'acceptation électronique du chargement par l'exportateur destinataire.

### c. Inventaire périodique des stocks en région

Un inventaire périodique des stocks de cacao est réalisé chaque quinzaine, par les agents du Conseil du Café-Cacao, dans les magasins des sociétés coopératives et des acheteurs en vue de vérifier la conformité entre les stocks déclarés dans le SYDORE et le niveau des stocks physiques détenus.

Tout contrevenant aux dispositions de suivi des stocks en région s'expose à une sanction de **15 FCFA/Kg** et son agrément pourrait faire l'objet de suspension en cas de récidive.

Nous vous prions d'agréer, **Mesdames, Messieurs**, l'expression de nos salutations distinguées.



KONE Brahima Yves

Organisme créé par Ordonnance N°2011-481 du 28 décembre 2011
Immeuble Caistab 23ème étage-Tél : 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

D

The Coffee-Cocoa Council
Council for the regulation, stabilization and development of the coffee and cocoa industry

Director General

Abidjan, March 29, 2021

#/REF.: CCC/---0014-21 DG-KBY/DGA-NK/DCE-BK/SAV-KP

NOTE TO EXPORTERS, PROCESSORS, COOPERATIVE COMPANIES AND COCOA BUYERS

**Subject:** **Provisions relating to the marketing of cocoa for the intermediary season 2020-2021.**

**To whom it may concern,**

We would like to bring to your attention the following provisions adopted within the framework of the internal and external marketing of cocoa for the intermediary season 2020-2021. These are:

**1. Guaranteed field purchase price of cocoa**

The minimum guaranteed field price is fixed for the intermediate season 2020-2021 at **750 XAF/KG** on the whole territory for well fermented, well dried and well sorted cocoa. It cannot be negotiated below this threshold. No rebate on this price is allowed.

In accordance with article 17 of decree no. 2012-1008 of October 17, 2012 about fixing the modalities of marketing of coffee and cocoa, any offender is exposed to ***"the payment of the additional price, the seizure of the tonnages in the warehouse in favor of the Coffee-Cocoa Council and the withdrawal of its approval for a period of three years, without prejudice to criminal proceedings."***

**2. Purchase price of cocoa upon entrance to factories**

The purchase price upon entrance to factories, excluding transport, is **830 XAF/Kg** throughout the national territory. This price is fixed and is not subject to overbidding.

In accordance with Article 18 of Decree no. 2012-1008 of October 17, 2012, which establishes the terms and conditions for the marketing of coffee and cocoa, any violator of this provision shall be liable to pay a penalty of 10% of the value of the product conceived for the benefit of The Coffee-Cocoa Council and to the withdrawal of his or her license in the event of a repeated offence.

## 3. The cost of transport from production areas to exporters' factories

The cost of transport from the production areas to the exporters' factories is determined by the transport equation mechanism in force. The Tonne-Kilometre scale (TKM) adopted by the Coffee-Cocoa Council is the reference for the payment of transport.

However, a fixed price of **15 XAF/Kg** is fixed in the scale in order to allow the exporters to pay to the suppliers at the reception of the product, the cost of the transport invoiced at the ton-kilometer (TKM) whatever the zone of origin of the product. An adjustment is made monthly or by commercial period in relation to the real cost borne by the exporter according to the TKM grid.

## 4. Compensation known as "Super commission"

Compensation of suppliers (cooperative companies and buyers) by exporters and processors, called "super commission" is not taken into account in the cocoa marketing scale. Therefore, the payment of the "super commission" to suppliers during the marketing year, which can be considered as a dumping operation, is prohibited. Any contravener to this provision will be sanctioned with **50 XAF/Kg** and his approval will be withdrawn. The Coffee-Cocoa Council reserves the right to carry out unannounced inspections of operators.

## 5. Marketing of certified cocoa

The Coffee-Cocoa Council has developed practical provisions for verifying the authenticity of valid certificates held by exporters and cooperative societies. The ultimate goal of these provisions is to improve the traceability of cocoa from certified plantations to export.

Any uncertified product that is declared by operators to be "certified product" will be seized and auctioned as regular cocoa. Violators (exporters and suppliers) of this provision will be subject to a penalty of **50 XAF/Kg** and the withdrawal of their approval.

## 6. Carrying period for supply

The Coffee-Cocoa Council allows a maximum carry-over period of 21 days for buyers and cooperatives.

Organism created by Order no. 2011-481 of December 28, 2011
Caistab Building 23rd floor – Tel.: 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

2

Any operator having difficulties selling his supply within this period should expressly confer with the Coffee-Cocoa Council to find a solution.

**7. Limitation of physical purchases**
- Purchases by approved exporters are limited to the released volumes and/or the volumes of international contracts, plus **3%**. However, The Coffee-Cocoa Council reserves the right to revise the rate of limitation of purchases according to the pace of development of commercial operations;

- Any operator who does not have contracts is prohibited from purchasing.

*For Grinders:*

- The level of physical purchases in the intermediate season is equivalent to the average half-yearly grinding capacity (annual capacity/2) plus the equivalent of one and a half months (1.5 months) of buffer stock. **This implies that the grinder will have to hold a contract portfolio that is equal to its half-yearly grinding capacity, otherwise the purchase volume will be capped at its released volume, plus the equivalent of one and a half months (1.5 months) of buffer stock.**

- Grinders must make their own purchases of raw products from buyers and cooperatives.

- All contracts carried over from one season to another and covered by physical products will be carried over without price adjustment and without penalty. **Contracts carried over to the April-May-June 2021 period must be executed by June 30, 2021.**

**8. Warehouse transfers**

Warehouse transfers are now operations that will take place in case of adjustment at the end of the period or during the season, after special authorization of the Coffee-Cocoa Council. They will be carried out only between approved exporters at a fixed price, under the following conditions:

- Exporters with more physical product than contracts will have to sell the surplus to operators with contracts that are not covered by physical products;

- An exporter will be able to sell physical products only if he is covered on the total volume of his contracts;

Organism created by Order no. 2011-481 of December 28, 2011
Caistab Building 23rd floor – Tel.: 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

3

- Approval of any transfer by the Coffee-Cocoa Council shall be done upon presentation of a transfer contract between both exporters. Said contract must be dated and signed by both parties and must mention the price at which the transfer is made.

The batches being transferred must comply with the standards required for export, especially in regard to graining.

## 9. Differential applicable to carryover stocks for the 2020-2021 main season

The differential applicable to stocks carried over from the 2020-2021 main season, not covered by sales contracts for that season and approved by the Coffee-Cocoa Council, takes into account the warehouse value of the product at the time of purchase and the export costs in force at the time the sales contracts were executed.
In this case, since the costs at the scale have not changed, the values for calculating the support/repayment for this differential are the same as those of the main 2020-2021 season, namely:

Reference CIF value: **1,239,999 XAF/Ton**
Loco-Warehouse value: **905,766 XAF/Ton**

## 10. Monitoring exporters' inventories

- All product purchases (receipt of all commodities) and weighing of batches on shipment, captured in SAIGIC at the level of weighing pants on behalf of an exporter must be approved or contested by the exporter within 48 hours;

- All lots of cocoa beans manufactured by factories must be declared by the bean exporters, 24 hours after their manufacture, at their actual manufacturing weight;

- The volumes of by-products produced by bean processors must be declared;

- All transfers or sales of cocoa between exporters should be reported in real time. The weights declared in the system are binding on both parties. Lots are transferred with their actual declared manufacturing weights;

- Cocoa residues and waste from the processing of cocoa beans shall be weighed and declared periodically and these declarations shall be completed by the last day of the closing of each season;

Organism created by Order no. 2011-481 of December 28, 2011
Caistab Building 23rd floor – Tel.: 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17

4

- Cocoa residues and waste resulting from the processing of the cocoa beans received are destined for the processing companies of the said products duly approved by the Coffee-Cocoa Council.

## 11. Monitoring stocks of cooperative companies and buyers

### a.  Declarations of purchases in SYDORE

Cooperative companies and buyers are required to declare their cumulative purchases on the SYDORE platform of the Coffee-Cocoa Council on a regular basis. The details of the accumulated declarations must be cleared by entering the purchase receipts within 15 days.

### b.  Issuing bills of lading

Cooperatives and buyers must issue their bills of lading in SYDORE at the point of departure of shipments and at the exporters' factories. Issuing the bill of lading requires the electronic acceptance of the shipment by the receiving exporter.

### c.  Periodic inventory check of regional supplies

A periodic inventory of cocoa stocks is carried out every two weeks by agents of the Coffee-Cocoa Council in the supplies of cooperatives and buyers in order to verify the conformity between the supplies declared in SYDORE and the level of physical supply that is held.

Any violator of the provisions for monitoring supplies in the region will be subject to a penalty of **15 XAF/Kg** and their license may be suspended in the case of a repeated offence**.**

Please accept our best regards,
[Illegible signature]

[Seal: The Coffee-Cocoa Council BP797 ABJ. 17 / Tel.: 27 20 25 69 69 / 70, Director General]
[Illegible signature]
**KONE Brahima Yves**

Organism created by Order no. 2011-481 of December 28, 2011
Caistab Building 23rd floor – Tel.: 20 25 69 69 / 20 25 69 70
17 BP 797 ABIDJAN 17





**EMBRACE THE FUTURE**

625 Whitetail Blvd. River Falls, WI  54022 | Phone: 877.426.9505 | Fax: 715.426.0105 | www.Amplexor.com

## Certification of Translation Accuracy

I do hereby verify and confirm that AMPLEXOR has delivered a true and accurate translation of the following item(s):

- ENG_ARR 2020-22431 - Projet document d'opérationnalité du 22 octobre 2020 (sans lettre de transmission).docx; and
- ENG_Note Info Exportateurs - Dispositions commercialisation cacao campagne intermédiaire 2020-2021.docx

These translations were completed by technically trained native speaking linguists.

**Project No.:** Rikai project # 24037
**Date:** July 29th, 2021
**Client:** Cargill
**Client Contact:** Susan Whitman
 **Product Description:** Cocao Pricing Translation
**Source Language:** French-France
**Target Language(s):** English (US)

AMPLEXOR

By: *Chris Wells*

Chris Wells
Service Unit Manager

AMPLEXOR International, S.A. | 55, rue de Luxembourg | L-8077 Bertrange, Luxembourg | Tel.: +352 31 44 11 1 | Fax: +352 31 44 11 209 |
www.amplexor.com

R.C. Lux.: Section B 122347 | Autorisation d'établissement: 115562 | Tribunal de Commerce: Luxembourg | Capital social: 470.588 € Management board: Mark Evenepoel,
Michael Such | ID TVA LU 214 986 51 IBAN: LU20-0030-3561-9545-0000 / BIC (SWIFT): BGLLLULLXXX  | BGL BNP Paribas S.A.