## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ISSOUF COUBALY, *et al.*,
*Plaintiffs*,

v.                                    Civil Action No. 21-0386 (DLF)

CARGILL, INCORPORATED, *et al.*,
*Defendants*.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Terrence P. Collingsworth (D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org
*Counsel for Plaintiffs*

TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT…………………………………...1

II.     STATEMENT OF FACTS…………………………………………………………...6

III.    STANDARD OF REVIEW……………………………………………………………7

IV.     ARGUMENT……………………………………………………………………...7

  A.    Plaintiffs State a Claim for Forced Labor Under the TVPRA…………………………………7

      1.    Plaintiffs Properly Allege that Defendants Knew or Should Have Known that Forced Child Labor Was a Serious Problem in their Cocoa Supply Chains in Cote D'Ivoire…………7

      2.    Defendants Participated in a Cocoa Supply Chain Venture and their Status as Co-Venturers Makes Them Jointly and Severally Liable…………………………………………...15

          a. Defendants Are Co-Venturers in a Cocoa Supply Chain "Venture" in Cote D'Ivoire….16

          b. Defendants "Participated in" a Cocoa Supply Chain "Venture."………………………21

          c. Defendants As Co-Venturers Are Jointly and Severally Liable for Acts of the Venture...25

      3.    Defendants Are Financially Benefitting From their Cocoa Supply Chain Venture…...…27

      4.    Defendants Do Not Contest the Eight Plaintiffs Were Subjected to Forced Labor By Coercion……………………………………………………………………………………29

  B.    Plaintiffs Were Trafficked…………………………………………………………...29

  C.    Section 1596 (a) Extends the TVPRA to Plaintiffs' Claims Even if They Are Considered Extraterritorial……………………………………………………………………....30

  D.    Plaintiffs Have Properly Alleged Their Common Law Claims…………………………33

      1.    Plaintiffs have stated a claim for unjust enrichment……………………………………33

      2.    Plaintiffs have stated a claim for negligent supervision…………………………………35

      3.    Plaintiffs have stated a claim for intentional infliction of emotional distress……………36

      4.    All of Plaintiffs' claims were timely based on equitable tolling…………………………38

  E.    Plaintiffs Have Article III Standing to Seek Redress for their Injuries……………………40

i

1.    Plaintiffs have standing to obtain damages for their undisputed injuries………………..40

2.    Plaintiffs have standing to obtain injunctive relief……………………………….…...43

V.    CONCLUSION……………………………………………………………………………..45

TABLE OF AUTHORITIES

**CASES**

*Abafita v. Aldukhan,*
  No. 116CV06072RMBSDA, 2019 WL 6735148, (S.D.N.Y. 2019)………………....……31-32

*A.B. v. Hilton Worldwide Holdings, Inc.,*
  484 F. Supp. 3d 921 (D. Or. 2020)…………………………………………………………..10, 18

*A.B. v. Hilton Worldwide Holdings, Inc.,*
  2020 WL 5371459 (D. Ore. Sept. 8, 2020)…………………………………………………9, 41

*A.B. v. Marriott Int'l, Inc.,*
  455 F. Supp. 3d 171 (E.D. Pa. 2020)………………………………………………………8,11, 23

*A.C. v. Red Roof Inns, Inc.,*
  No. 2:19-CV-4965, 2020 WL 3256261 (S.D. Ohio June 16, 2020)………………..4, 8, 21-22, 28

*Adhikari v. Kellogg Brown & Root, Inc.,*
  845 F.3d 184 (5th Cir. 2017)……………………………………………………………………31

*Aguilera v. Aegis Commc'ns Grp., LLC,*
  72 F. Supp. 3d 975 (W.D. Mo. 2014)……………………………………………………………31

*Almerfedi v. Obama,*
  654 F.3d 1 (D.C. Cir., 2011)……………………………………………………………….....26-27

*Angus v. Shiley Inc.,*
  989 F.2d 142 (3d Cir. 1993)……………………………………………………………………..38

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)…………………………………………………………………………....7

*Baker* v. *Carr,*
  369 U.S. 186 (1962)……………………………………………………………………………..44

*Baloco ex rel. Tapia v. Drummond* Co.,
  640 F.3d 1338 (11th Cir. 2011)…………………………………………………………………41

*Bell Atlantic Corp.* v. *Twombly,*
  550 U.S. 544 (2007)…………………………………………………………………………...7

*Bistline v. Parker,*
  918 F.3d 849 (10th Cir. 2019)……………………………………………………………17, 22

iii

*B.M. v. Wyndham Hotels & Resorts, Inc.,*
   2020 WL 4368214, (N.D. Cal. July 30, 2020)……. …………………………………...9, 18, 23, 41

*Braxton-Secret v. A.H. Robins Co.,*
   769 F.2d 528 (9th Cir. 1985)…………………………………………………………………15

*Bregman v. Perles,*
   747 F.3d 873 (D.C. Cir. 2014)………………………………………………………………33-35

*Brown v. Corr. Corp. of Am.,*
   603 F.Supp.2d 73 (D.D.C. 2009)…………………………………………………………14, 36

*Byers v. Burleson,*
   230 U.S. App. D.C. 62 (D.C. Cir. 1983)…………………………………………………....39

*Chambliss v. Nat'l RR Passenger Corp.,*
   2007 WL 581900 (D.D.C. Feb. 20, 2007)………………………………………………….38

*Chung v. United States DOJ,*
   333 F.3d 273 (D.C. Cir. 2003)……………………………………………………………...39

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983)…………………………………………………………………………....44

*Deshawn E. by Charlotte E. v. Safir,*
   156 F.3d 340 (2d Cir. 1998)………………………………………………………………44-45

*Ditullio v. Boehm,*
   662 F.3d 1091 (9th Cir. 2011)……………………………………………………………...15

*Doe #9 v. Wyndham Hotels & Resorts, Inc.,*
   2021 WL 1186333 (S.D. Tex. Mar. 30, 2021)……………………………………………...10

*Doe S.W. v. Lorain-Elyria Motel, Inc.,*
   No. 2:19-CV-1194, 2020 WL 1244192 (S.D. OH 2020)………………………...9, 14, 18, 36, 42

*Doe v. Rickey Patel, LLC,*
   No. 0:20-60683-WPD-CIV, 2020 WL 6121939 (S.D. Fla. Sept. 30, 2020)……………....17-18

*Doe v. Twitter, Inc.,*
   2021 WL 3675207 (N.D. Cal. Aug. 19, 2021)……………………………………………....23

*Elliot v. Michael James Inc.,*
   507 F.2d 1179 (D.C. Cir., 1974)…………………………………………………………....27

*E.S. v. Best Western International, Inc.,*
   510 F. Supp. 3d 420 (N.D. Tex. 2021)……………………………………………………..10

iv

*Faison v. Nationwide Mortg. Corp.,*
    839 F.2d 680 (D.C. Cir. 1987)…………………………………………………………..26

*Fed. Deposit Ins. Corp. v. Bank of Am., N.A.,*
    308 F. Supp. 3d 197 (D.D.C. 2018)………………………………………………………33-35

*Firestone v. Firestone,*
    76 F.3d 1205 (D.C. Cir. 1996)…………………………………………………………..45

*Flores v. City of New York,*
    19-CV-5763, 2021 WL 663977 (E.D.N.Y. Feb. 9, 2021)…………………………………...45

*Franciso v. Susano,*
    525 Fed. Appx. 828 (10th Cir. 2013)……………………………………………………15

*Francisco v. Susano,*
    No. 10-CV00332-CMA-MEH, 2013 WL 4849109 (D. Colo. Sept. 10, 2013)…………………26

*Geiss v. Weinstein Co. Holdings LLC,*
    383 F. Supp. 3d 156 (S.D. NY 2019)……………………………………………………22

*Gilbert v. USA Taekwando, Inc.,*
    No. 18-CV-00981-CMA-MEH, 2020 WL 2800748 (D. Colo. May 29, 2020)………………....17

*Gilbert v. United States Olympic Comm.,*
    423 F. Supp. 3d 1112 (D. Colo. 2019)………………………………………………...17, 21, 23

*Goldman v. Bequai,*
    19 F.3d 666 (D.C. Cir. 1994)……………………………………………………………39

*Hill v. Diamond,*
    442 A.2d 133 (D.C. App. 1982)…………………………………………………………26

*H.G. v. Inter-Continental Hotels Corp.,*
    489 F. Supp. 3d 697 (E.D. Mich. 2020)…………………………………………………10

*H.H. v. G6 Hosp., LLC,*
    No. 2:19-CV-755, 2019 WL 6682152 (S.D. OH 2019)……………………………………..9, 23

*Howard University v. Best,*
    484 A.2d 958 (D.C. 1984)………………………………………………………………36

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    295 F. Supp. 2d 30 (D.D.C. 2003)…………………………………………………...34-35

*In re Managed Care Litig.,*

135 F. Supp. 2s 1253 (S.D. Fla. 2001)……………………………………………………...19

*J.C. v. Choice Hotels Int'l, Inc., et al.,*
Case No. 20-cv-0155, 2020 WL 6318707 (N.D. Cal. Oct. 28, 2020)……………………9-10, 14

*J.C. v. Choice Hotels Int'l, Inc.,*
No. 20-CV-00155-WHO, 2020 WL 3035794 (N.D. Cal. June 5, 2020)………………………17

*Jean-Charles v. Perlitz,*
937 F. Supp. 2d 276 (D. Conn. 2013)…………………………………………………..9, 17, 22

*Jensen v. United States Tennis Ass'n,*
No. 20-2422-JWL, 2020 WL 6445177 (D. Kan. Oct. 30, 2020)………………………………17

*J.L. v. Best Western Int'l, Inc.,*
No. 19-CV-03713-PAB-STV, 2021 WL 719853 (D. Colo. Feb. 24, 2021)……………………17

*Kiwanuka v. Bakilana,*
844 F. Supp. 2d 107, 117 (D.D.C. 2012)……………………………………………………33, 38

*Kramer Assocs., Inc. v. Ikam, Ltd.,*
888 A.2d 247 (D.C. 2005)……………………………………………………………....34-35

*Lagasan v. Al-Ghasel,*
92 F. Supp. 3d 445 (E.D. Va. 2015)………………………………………………………..26

*Lesnik v. Se,*
374 F. Supp. 3d 923 (N.D. CA 2019)……………………………………………………….9

*Leiva v. Clute,*
No. 4:19-CV-87-TLS-JPK, 2020 WL 8514822 (N.D. Ind. Dec. 16, 2020)……………………26

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)………………………………………………………………………..40

*M.A. v. Wyndham Hotels & Resorts, Inc.,*
425 F. Supp. 3d 959 (S.D. OH 2019)…………………………………….8-9, 14, 17-18, 22, 36, 41

*Marshall v. Honeywell Tech. Sols., Inc.,*
536 F. Supp. 2d 59 (D.D.C. 2008)………………………………………………………39

*Mazor v. Farrell,*
186 A.3d 829 (D.C. 2018)………………………………………………………………33

*Menominee Indian Tribe of Wis. v. United States,*
764 F.3d 51 (D.C. Cir. 2014)……………………………………………………………38

*Mitchell v. Riegel Textile, Inc.*,
    259 F.2d 954 (D.C. Cir. 1958)…………………………………………………………..35

*M.L. v. craigslist Inc.*,
    2020 WL 5494903 (W.D. WA 2020)………………………..……………………...9, 19

*Morrison v. Nat'l Australia Bank*,
    561 U.S. 247 (2010)……………………………………………………………………..32

*Nestle USA, Inc. v. Doe*,
    141 S.Ct. 1931 (2021)………………………………………………………..…5, 8

*News World Commc'ns, Inc. v. Thompsen*,
    878 A.2d 1218 (D.C. 2005)…………………………………………………….33, 38

*Nunag-Tanedo v. East Baton Rouge Par. Sch. Bd.*,
    2012 WL 5378742 (C.D. Cal. Aug. 27, 2012)……………………………………………32

*O'Connor v. Boeing N. Am.*,
    311 F.3d 1139 (9th Cir. 2002)……………………………………………………...…11, 15

*Oveissi v. Islamic Republic of Iran*,
    573 F.3d 835 (D.C. Cir. 2009)…………………………………………………………...33

*Owino v. CoreCivic, Inc.*,
    2020 WL 1550218 (S.D. Cal. Apr. 1, 2020)…………………………………………...43

*Pace v. DiGuglielmo*,
    544 U.S. 408, 125 S. Ct. 1807 (2005)…………………………………………………36

*Phelan v. City of Mount Rainier*,
    805 A.2d 930 (D.C. 2002)……………………………………………………………35

*Plaintiff A v. Schair*,
    No. 2:11-CV-00145-WCO, 2014 WL 12495639 (N.D. Ga. Sept. 9, 2014)……………………32

*Purcell v. Thomas*,
    928 A.2d 699 (D.C. 2007)……………………………………………………………36

*Ratha v. Phatthana Seafood Co., Ltd.*,
    No. CV 16-4271-JFW, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017)……………………..21, 23

*Ratha v. Phatthana Seafood Co., Ltd.*,
    No. 18-55041 (9th Cir.)……………………………………………………………..21

*Ricchio v. McLean*,
    853 F.3d 553 (1st Cir. 2017)…………………………………………………...9, 17-18, 22

*Riddell v. Riddell Washington Corp.,*
   866 F.2d 1480 (D.C. Cir. 1989)……………………………………………………………39

*Ruelas v. County of Alameda,*
   No. 19-cv-07637-JST, 2021 WL 475764 (N.D. Cal. Feb. 9, 2021)……………………19

*Salazar v. Islamic Republic of Iran,*
   370 F. Supp. 2d 105 (D.D.C. 2005)………………………………………………………..37

*S.J. v. Choice Hotels Int'l, Inc.,*
   473 F. Supp. 3d 147 (E.D.N.Y. 2020)……………………………………………....9-10

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998)………………………………………………………………....41

*Stevens v. Hall,*
   391 A.2d 792 (D.C. App. 1978)………………………………………………………26

*Siegel v. U.S. Department of Treasury,*
   304 F. Supp. 3d 45 (D.D.C. 2018)……………………………………………………43

*S.Y. v. Best Western Int., Inc.,*
   No. 2:20-cv-616-JES-MRN, 2021 WL 2315073 (M.D. Fla. Jun. 7, 2021)…………………..18

*S.Y. v. Marriot Int'l, Inc.,*
   No. 2:20-cv-627-JES-MRM, 2021 WL 2003103 (M.D. Fla. May 19, 2021)………………....18

*S.Y. v. Naples Hotel Co.,*
   476 F. Supp. 3d 1251 (M.D. Fla. 2020)……………………………………………18-19

*UFCW Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.,*
   719 F.3d 849 (7th Cir. 2013)…………………………………………………………19

*United Klans of Am. v. McGovern,*
   621 F.2d 152 (5th Cir. 1980)…………………………………………………………11

*United States ex rel. Elgasim Mohamed Fadlalla v. Dyncorp Int'l LLC,*
   402 F. Supp. 3d 162 (D. Md 2019)…………………………………………………....17

*United States v. Afyare,*
   632 F. App'x 272 (6th Cir. 2016)……………………………………………………..21

*U.S. v. Philip Morris,*
   116 F. Supp. 2d 131 (D.D.C. 2000)……………………………………………....24

*United States v. Williams,*

319 F. Supp. 3d 812 (E.D. Va. 2018)…………………………………………………………26

*Vulcan Golf, LLC v. Google Inc.,*
552 F. Supp. 2d 752 (N.D. Ill. 2008)………………………………………………………19

*Young v. SEC,*
956 F.3d 650 (D.C. Cir. 2020)…………………………………………………………...38

**RULES**

Fed. R. Civ. P. 12(6)(b)…………………………………………………………………………7

Fed. R. Civ. P. 15(a)…………………………………………………………………………...45

**STATUTES**

18 U.S.C. § 1589……………………….……………………………..1, 7, 18, 23, 29-30, 32

18 U.S.C. § 1590……………………………………………………………… 1, 29-30, 32

18 U.S.C. § 1591………………………………………………………………15, 17-18, 21

18 U.S.C. § 1595………………………...…………………...1, 8-9, 15-18, 21-23, 27-28, 30-31

18 U.S.C. § 1596………………………………………………………………....29-32

28 U.S.C. § 1350…………………………………………………………………...4

D.C. Code § 12-301(8)……………………………………..……………………………38

Pub. L. No. 110-457, 122 Stat. 5044 (2008)……………………………………………………16

**OTHER AUTHORITIES**

10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2729 (4th ed.)…………...15

154 Cong. Rec. S4799-800 (daily ed. May 22, 2008)……………………….……………………...31

H.R. Rep. No. 106-939 (2000) (Conf. Rep.)………………………………………………....15

H.R. Rep. No. 110-430 (2007)……………………………………………………....32

Harkin-Engel Protocol (2001)……………………………….....……....2, 3, 7, 11-12, 20-21, 23-24, 42

ILO Convention No. 182……………………………………………………………....12

Prosser, The Law of Torts § 44, pp. 222-223 (2d ed. 1955)…………………………………….....27

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs are eight Malian nationals who allege facts undisputed by Defendants of their traumatic experiences being trafficked as children from Mali and then enslaved and forced to perform hazardous work harvesting cocoa in Cote D'Ivoire. Complaint ¶¶ 127-48. They allege that they worked on plantations that supplied to a venture between Defendants Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz, seven multinational conglomerates that dominate all aspects of the world's cocoa production and chocolate sales. *See id.* ¶¶ 24-31, 154.  Together, these Defendants control 70% of cocoa produced in Cote D'Ivoire. *Id.* ¶ 156. Plaintiffs filed their Complaint alleging forced labor and trafficking against Defendants under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 *et. seq.*, and bring common law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress.

The TVPRA authorizes civil suits against any person who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [forced labor under § 1589 or trafficking under § 1590]." 18 U.S.C. § 1595 (a). Plaintiffs' Complaint easily meets these elements, and Defendants' Motion to Dismiss ("MTD") is based almost entirely on an implausible factual argument they are improperly making to support their Motion: in challenging Plaintiffs' standing to sue and in arguing they are not in a "venture," Defendants claim they are mere purchasers of cocoa and have no more responsibility for trafficked and forced child labor in their cocoa supply chains in Cote D'Ivoire than an innocent child choosing her favorite chocolate bar at the corner store.  Defendants assert that if *they* could be liable, "any manufacturer, retailer, and even consumer—anyone who purchases cocoa or a cocoa-based product knowing of the possibility of unlawful labor conditions on foreign farms that are part of a global supply chain." MTD at 11.  This is not remotely true, but more fundamentally, in making

a factual argument on their own Motion, Defendants ignore that Plaintiffs' allegations must be taken as true and all reasonable inferences drawn in their favor.

Using Defendants' own words and actions, Plaintiffs demonstrate that Defendants tell a dramatically different tale from the "mere innocent purchasers of cocoa" story they peddle to this Court when they are dealing with regulators and consumers and have an interest in appearing to be fully engaged in working with their cocoa suppliers to end child labor. Over **20 years ago**, in 2001, following voluminous documentation of forced child labor in cocoa harvesting and faced with passage in Congress of a mandatory law that would ban the importation of cocoa produced by child labor, the major cocoa companies joined together and successfully converted the law to a voluntary initiative called the Harkin-Engel Protocol ("the Protocol," attached as Exhibit A). Complaint ¶ 52. The major chocolate companies, including Defendants,[1] signed the Protocol and admitted their cocoa supply chains used the "worst forms of child labor," specifically including forced child labor. Protocol at 11, Art. 3. They promised to develop by 2005 an industry-wide system of monitoring and certification to assure such child labor was not used in their cocoa production. *Id.* at 3. Rather than do this, the cocoa sector, led by Defendants, *id.* ¶¶ 54,55, 61,111,120,154-58, did nothing to stop their use of forced child labor and gave themselves **four** extensions of time,  claiming now that they will "reduce by 70%" their use of the "worst forms of child labor" by 2025. *Id.* ¶ 53.

Improperly disputing or ignoring Plaintiffs' factual allegations, Defendants repeatedly insist they never acted to traffic or enslave children. *See, e.g.*, MTD at 2,5,8-9, 18-19. While Defendants can be "participants" in a trafficking venture without having an active role in the enslaving process as

---

[1] Defendants Nestlé, Hershey, Mars, and Barry Callebaut signed the Protocol as originators, Protocol at 15, and the other Defendants were bound to it by their membership in the Chocolate Manufacturers Association and/or the World Cocoa Foundation, both of which approved and signed the Protocol on behalf of their members. Protocol at 2.

long as they derived a "benefit" from the venture, *see* section IV.A.2.b, *infra*, Plaintiffs' actual allegations are that in 2001, when Defendants signed the Protocol, they admitted the cocoa production system they had established, supported, and benefitted from was fundamentally dependent on child labor. *See, e.g.*, Complaint ¶¶ 49-53.  Defendants did not need to ***form*** a venture to traffic and enslave children; they already had that system in place. They instead formed a venture to protect that system and prolong their ability to profit from the worst forms of child labor. They avoided meaningful regulation by misrepresenting to the public and regulators that they would put in place new policies and end their reliance on child labor. *Id.* ¶¶ 22,45,49-55,85,96,104,112-15, 123-24,154-58. Their venture has thus far succeeded. A 2020 University of Chicago study, funded by the U.S. Department of Labor, concluded that child labor has gotten worse since 2001, and there are now ***1.56 million*** children harvesting cocoa in Cote D'Ivoire and Ghana. *Id.* ¶ 1.

Across the 20 years since they signed the 2001 Protocol, Defendants have done little to change their system of cocoa production that remains dependent on child labor. *Id.* ¶¶ 39,50,54,55, 70-71,82-84,96,111,154-58. Instead, they acted collectively to mislead consumers and regulators. *Id.* ¶¶ 47,50,52,55,59-61,67,69,82-84,89,96,99,103, 104,111-13,120,123.

Plaintiffs will discuss the many reasons Defendants have legal liability for their unique role in knowingly benefitting from forced and trafficked child labor in their cocoa supply chains, but the overarching fact for assessing the issues is Defendants are ***not*** simply like retailers or consumers of cocoa — as the major players in cocoa production in Cote D'Ivoire, Defendants formed a venture to allow them to continue benefitting from cheap cocoa harvested by forced child labor.

The question that makes this an easy case to resolve at this stage is, could Defendants, unlike mere consumers and retailers of their chocolate products, have acted in 2001 to stop forced child labor thus preventing the harms that occurred to the Plaintiffs and thousands of other children? Defendants promised in 2001 they could and would, and they have reinforced that promise

repeatedly when giving themselves extensions of time and on their websites when touting various new "programs" and policies that are designed to look good only on paper. *Id.* ¶¶ 39,53, 55,70,71,82-84,89,94,99, 101, 112,113,115,123-24.  Certainly a reasonable inference allows Plaintiffs to take Defendants at their word that they had the control, resources, influence, and relationships to end child labor, but chose not to for financial gain. *See, e.g, id.* ¶ 156. Besides Defendants, the list is short of others who control 70% of cocoa production, were caught with pervasive child labor in their supply chains, joined with each other, admitted the problem and promised to address it to avoid real regulation, but failed to take action while using a misleading public campaign claiming to be working with "their" cocoa farmers to do so, while continuing to benefit from cheap cocoa harvested by forced child labor. Defendants, seven powerful corporations with decades of experience working with cocoa plantations in Cote D'Ivoire, could not plausibly assert that, despite their asserted control and resources, after twenty years of effort, they merely failed in their mission. A jury should get to decide Defendants' culpability for allowing child slavery to continue in their supply chains.

Beyond the incredible "innocent purchaser" story, Defendants attack the TVPRA, invoking a legally-irrelevant specter of the floodgates of cases that will be coming if Plaintiffs prevail here. Facing the identical attack, one court noted that  "speculative concerns about opening the floodgates for other kinds of corporate liability"  . . . is untethered to the [TVPRA] statutory language itself." *A.C. v. Red Roof Inns, Inc.*, No. 2:19-CV-4965, 2020 WL 3256261, *4 (S.D. Ohio June 16, 2020).

Defendants may not agree with the broad scope of the TVPRA, but their dispute is with Congress, which established with bipartisan support an effective tool to combat a specific evil: stopping those who knowingly benefit from trafficked and forced labor. In a recent decision the Supreme Court ruled the Plaintiffs' child slavery claim under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, did not apply extraterritorially to reach Nestle and Cargill's offshore child slavery. Writing for the majority, Justice Thomas drew a sharp contrast with the scope of the TVPRA, of

which he stated, "***in 2008, Congress created the present private right of action, allowing plaintiffs to sue defendants who are involved indirectly with slavery***." *Nestle USA, Inc. v. Doe*, 141 S.Ct. 1931, 1939 (2021) (emphasis added). Plaintiffs here are using the TVPRA properly to sue the Defendants, which, for the past twenty years, have knowingly benefitted from child slavery.

Defendants ignore the text and intent of the TVPRA and also the great weight of authority interpreting the TVPRA in arguing for an unprecedented and restrictive construction of the statute. Numerous recent cases, ignored by Defendants, are discussed below and establish Plaintiffs' claims are squarely within the scope of the statute. The TVPRA provides for liability for "participants in a venture" that "should have known" they were benefiting from forced or trafficked labor.  This was a policy choice by Congress to ensure "beneficiaries" cannot escape the reach of the statute by ignoring red flags or turning a blind eye to forced labor. Incredibly, after promising 20 years ago to stop using the worst forms of child labor, including forced child labor, Defendants argue they lack sufficient knowledge of forced child labor being an issue in their cocoa harvesting to be liable under the TVPRA's "should have known" negligence standard. MTD at 23-25.

Plaintiffs allege that Defendants knowingly participate in and benefit from a cocoa supply chain venture that is dependent upon cheap cocoa harvested by children, including Plaintiffs and others similarly situated who were trafficked and enslaved on  plantations controlled by Defendants. Defendants ignore Plaintiffs' allegations and distort the law when they argue they are not in a venture with each other.  Defendants have been collaborating within formal structures, including the World Cocoa Foundation ("WCF"), for over twenty years to create, protect and maintain their system of cocoa production dependent upon child slavery. Complaint ¶¶ 54,55,61,111,120,154-58. Defendants argue that they can't be liable for the acts of each other in the cocoa production venture, MTD at 8-11, 15-18, but ignore the basic rule that co-venturers are jointly and severally liable.

Plaintiffs also establish that the TVPRA was expressly extended extraterritorially.  Further, they have properly alleged their timely common law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress. Finally, Plaintiffs establish they have legal standing to bring their claims. Defendants' MTD should be dismissed in its entirety.

## II.    STATEMENT OF FACTS

Plaintiffs include a detailed discussion of relevant facts within their responses to Defendants' specific legal arguments. The key background facts are the eight Plaintiffs, Issouf Coubaly, Sidiki Bamba, Tenimba Djamoutene, Oudou Ouattara, Ousmane Ouattara, Issouf Bagayoko, Arouna Ballo, and Mohamed Traore are all former enslaved children of Malian origin who were trafficked from Mali and subjected to forced labor harvesting and cultivating cocoa beans on farms in Côte d'Ivoire. Complaint ¶ 2. Defendants are the seven global cocoa giants that control the world's cocoa market: Nestlé, Cargill, Barry Callebaut, Mars, Olam, Hershey, and Mondelēz. *Id.* ¶¶ 1,156. They have knowingly profited from the forced labor of children, including the eight Plaintiffs, harvesting their cocoa. Facing legislative and consumer pressure, Defendants pledged in 2001 to end their reliance on forced child labor. *Id.* ¶¶ 52-53. Rather than make changes to the system, the prevalence of forced child labor has increased. *Id.* ¶1.

Defendants have been collaborating with each other and within formal structures of the WCF in presenting a joint response to mislead the public about the fact that the worst forms of child labor, including forced child labor, remain present, if not common, in their cocoa supply chains. *Id.* ¶¶ 54,55,61,111,120,154-58.  While pointing to their sham "policies", Defendants continue to profit from the forced labor of children harvesting cocoa for them. *Id.* ¶¶ 1,39,53, 55,70, 71,82-84,89,94,99,101,112,113,115,123-24.  Plaintiffs were trafficked from Mali and forced to work on cocoa plantations in Cote D'Ivoire that supplied to Defendants. *Id.* ¶¶ 127-48.

### III.    STANDARD OF REVIEW

The well-established legal standard for evaluating a motion to dismiss under Fed. R. Civ. P. 12 (b)(6) requires that Plaintiffs' allegations must be taken as true and all reasonable inferences must be drawn in their favor to determine whether they state a plausible claim. *See Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555-56, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing this standard, *all* of the allegations must be considered as true. *Twombly*, 550 U.S. at 555. Violating these fundamental rules, Defendants repeatedly mischaracterize the nature of Plaintiffs' claims, argue against the reasonable inferences, and argue for factual positions that conflict with Plaintiffs' allegations. Applying the proper standard, this is an easy case. Plaintiffs have stated plausible claims for liability against the Defendants, and Defendants' motion should be denied.

### IV.    ARGUMENT

**A.  <u>Plaintiffs State a Claim for Forced Labor Under the TVPRA.</u>**

Plaintiffs demonstrate that the four elements of a TVPRA forced labor claim have been plausibly alleged: (1) Defendants knew or should have known that forced child labor was used in their cocoa harvesting; (2) with this knowledge they participated in a cocoa supply chain venture that utilized forced child labor; (3) Defendants knowingly benefited from participating in the venture; and (4) Plaintiffs, all children, were subjected to forced labor. 18 U.S.C. § 1589(a).

**1.  Plaintiffs Properly Allege that Defendants Knew or Should Have Known that Forced Child Labor Was a Serious Problem in their Cocoa Supply Chains in Cote D'Ivoire.**

After signing the Protocol and admitting in 2001 their cocoa supply chains used the "worst forms of child labor," specifically including forced child labor, Protocol at 11, Art. 3., and making a commitment to stop using the worst forms of child labor, *see* Complaint ¶¶ 52-54, Defendants argue to this Court they lack sufficient knowledge of forced child labor being present in their cocoa harvesting to be liable under the TVPRA's "should have known" standard. MTD at 23-25.

7

Defendants Nestlé and Cargill claim ignorance even though they were sued in 2005 under the ATS by six former enslaved children, *see Nestlé USA, Inc.*, 141 S.Ct. 1931, a case surely watched closely by the other cocoa Defendants.[2] This incredible position merely reinforces Defendants' willingness to say virtually anything to preserve their cocoa supply system based on child slavery.

Defendants' attempted defence of insufficient knowledge largely depends upon their fundamental misstatement of the scienter requirement of the TVPRA. In conflict with the plain language of section 1595 (a) that Defendants can be liable if they "knew or should have known" of forced child labor in their supply chains, and without mentioning the great weight of authority against them on the issue, Defendants argue that they were required to have actual knowledge that each specific Plaintiff was subjected to forced labor. MTD at 24. That is not the law.

Defendants' effort to interpose a specific knowledge requirement on the TVPRA's "knew or should have known" standard would read the "should have known" language out of the statute. "Defendants need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless." *A.C. v. Red Roof Inns, Inc.*, 2020 WL 3256261, at *7. "[T]he plain text of § 1595(a) makes clear that the standard under this section is a negligence standard of constructive knowledge, not actual knowledge" *Id.* at *4; *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d at 189 ("We will not impose a "knowingly" state of mind requirement to section 1595 and ignore language Congress specifically included allowing a civil action against facilitators who should

---

[2] Defendants claim they can't be bound by factual conclusions made by the Ninth Circuit in the 2005 ATS case and sampled in Plaintiffs' Complaint (¶¶ 42-49) concerning Nestlé and Cargill's knowledge of child slavery. MTD at 25-26, n.9. Plaintiffs are merely contending that this prior child slavery case provides actual knowledge to Nestlé and Cargill that there is forced child labor in their cocoa supply chains and, at a minimum, constructive knowledge to the remaining Defendants that there are significant issues of forced child labor in their cocoa harvesting.

have known about a sex trafficking venture."); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. OH 2019) (same).

All of the following cases, constituting a near-unanimous position, agree that the "should have known" standard can be met by showing Defendants were aware of general allegations of the category of violation Plaintiffs suffered and this put Defendants on notice of the violations at issue. *See, e.g.*, *Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *3 (S.D. OH 2019); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *5 (S.D. OH 2020) ("The plain text of § 1595(a) makes clear that the standard under this section is a negligence standard of constructive knowledge."); *J.C. v. Choice Hotels Int'l, Inc., et al.*, Case No. 20-cv-0155, 2020 WL 6318707, at *6 (N.D. Cal. Oct. 28, 2020).

Applying the constructive knowledge standard, courts have uniformly held that liability under section 1595 (a) can be imputed based on knowledge or acts of others in the venture with Defendants. *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017); *A.B. v. Hilton Worldwide Holdings, Inc.*, 2020 WL 5371459, at *6 (D. Ore. Sept. 8, 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020); *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288 (D. Conn. 2013). *See also*, *Lesnik v. Se*, 374 F. Supp. 3d 923, 952-953 (N.D. CA 2019).

Summing up the state of the law, after reviewing most of the cases cited above, the Court in *M.L. v. craigslist Inc.*,  2020 WL 5494903, *5-6 (W.D. WA 2020), noted that "Craigslist argues that to state a claim under § 1595, Plaintiff must allege that craigslist possessed knowledge or constructive knowledge about Plaintiff's *specific* trafficking . . . These cases make clear that this Court should apply a negligence, constructive knowledge standard," not a specific knowledge requirement.

Defendants neglect this vast body of TVPRA case law and cite inapposite cases in which the plaintiff alleged merely a generally-known issue of sex trafficking without reference to any sex trafficking venture of which defendant was a participant. *See* MTD at 23-25. For example,

Defendants rely heavily upon *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020), but in that case the plaintiff did not identify a sex trafficking venture that could be tied to the defendant hotel chains. Rather, she cited a few prior examples of sex trafficking that occurred on the hotel properties and argued that this general awareness was sufficient. The court there, accepting that a negligence standard applied, stated "simply because [the defendant hotel chains] were generally aware that sex trafficking sometimes occurred on their franchisees' properties unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess.'" *Id.* at 154. Likewise, in *H.G. v. Inter-Continental Hotels Corp.*, 489 F. Supp. 3d 697, 704-06 (E.D. Mich. 2020), the court rejected a claim that defendants merely "were generally aware of" sex trafficking. These courts certainly did not require that plaintiff allege that defendants had specific knowledge of plaintiff's own specific victimization by a sex trafficking venture, as Defendants falsely claim. *See* MTD 23-25.[3]

---

[3] Defendants' other cases are also inaccurately portrayed. In *E.S. v. Best Western International, Inc.*, 510 F. Supp. 3d 420 (N.D. Tex. 2021), the Court did not endorse a narrow, specific knowledge requirement for TVPRA claims. Indeed, the Court in *E.S.* explicitly held that the existence of monitoring programs and human trafficking policies is a key factor in determining whether a defendant had constructive knowledge of a plaintiff's injuries: "uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at [their] properties" support the inference that the defendant should have known about the victim's trafficking. *Id.* at 428 (citation omitted). As is the case here, Defendants claim to have implemented monitoring programs and human rights standards to prevent forced child labor in Cote D'Ivoire. These policies, which are widely cited by the Defendants, support the inference that they should have known about the victims' forced labor. Further, Defendants misconstrue the holding in *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921 (D. Or. 2020). There, the Court relied on *J.C. v. Choice Hotels Int'l, Inc., et al.,* 2020 WL 6318707, at *6, which did not require defendants to have specific knowledge of plaintiff being trafficked. Rather, the Court required at least constructive knowledge of the sex trafficking venture that injured plaintiff. Finally, Defendants overstate the holding in *Doe #9 v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1186333, at *1 (S.D. Tex. Mar. 30, 2021). That case merely required that Plaintiff had allegations that would have allowed the inference the parent company of a hotel chain knew or should have known of a sex trafficking venture. *Id.* at *1-2.  The Court set a low bar that the "Plaintiff has not demonstrated 'more than a sheer possibility' that Defendants knew or should have known of Plaintiff's sex trafficking." *Id.* at *2. That is not remotely comparable to the specific notice Defendants have had of the thousands of children like the Plaintiffs who have been trafficked and forced to work across the twenty-year period that Defendants were promising to reform their cocoa production system but failed to do so.

Here, the question that Defendants knew or should have known of forced child labor in their cocoa supply chains in Cote D'Ivoire is not even close. The baseline for Defendants' knowledge is that in 2001 they ***admitted*** that the "worst forms of child labor," including forced child labor, existed in their specific supply chains, Protocol at 11, Art. 3, and they pledged to work to end it. Complaint ¶¶ 52-54. This should end the inquiry. Defendants' admitted knowledge of forced child labor ***in their own supply chains*** is on the other end of the spectrum from the mere general awareness alleged by the plaintiffs in the cases Defendants rely on, all of which, contrary to Defendants' argument, applied a constructive knowledge/negligence standard.

While they should not need them, Plaintiffs have abundant other allegations establishing Defendants knew or should have known of forced child labor in their cocoa supply chains. After their initial promise to end their use of "the worst forms of child labor," Defendants gave themselves ***four*** extensions of time to do so, and now claim that they will "reduce by 70%" their use of the "worst forms of child labor" by 2025. *Id.* ¶ 53. Thus, Defendants repeatedly admitted they have the worst forms of child labor in their own supply chains, and they also admit they will continue to benefit from this illegal child labor and will merely reduce it by 70% by 2025.

Defendants were also on notice of forced child labor in their cocoa supply chains from independent reports from highly credible agencies. Courts have uniformly held that reports of widespread human trafficking can support the inference that Defendants had constructive knowledge of forced labor. *See, e.g., A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 193 (E.D. Pa. 2020) (on motion to dismiss a TVPRA claim, numerous news articles, government investigations, and independent reports of a human trafficking can provide support for the reasonable inference that defendant should have known about the problem). *See also, O'Connor v. Boeing N. Am.,* 311 F.3d 1139, 1152 (9th Cir. 2002); *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980).

11

As discussed in the Complaint, forced child labor and other types of the worst forms of child labor have been well-documented by journalists, NGOs, and government agencies. *See, e.g.*, Complaint ¶¶ 36-44. For instance, the U.S. State Department, the U.S. Department of Labor, the International Labor Organization (ILO), and UNICEF, among others, have recognized since the late 1990s the existence of child slavery in the cocoa sector in Côte d'Ivoire with documented reports and statistics. *Id.* ¶ 36. These agencies also documented trafficking and other illegal acts against children within the cocoa supply chain. *Id.* at ¶ 37. In a 2014 report, the U.S. Department of Labor described in chilling detail the horrors facing children, like the Plaintiffs herein, who were trafficked and forced to work on cocoa plantations in Cote D'Ivoire. *Id.* at ¶ 40.

Defendants attempt to play a semantic game by arguing that mere reports of "child labor" do not put them on notice of "forced" child labor. MTD at 27. First of all, many of the reports referenced specifically discuss forced and trafficked child labor. Complaint at ¶ 44. More fundamentally, Defendants' disingenuous argument ignores that in 2001, within the Protocol they signed and accepted, the cocoa industry identified as its goal eliminating the "worst forms of child labor" as defined by ILO Convention No. 182, and the companies specifically noted that this definition includes forced or compulsory labor and trafficking. Protocol at 11, Art. 3. With that inclusive definition, **any** credible report referencing child labor provided notice to Defendants that it could include forced child labor and should have provoked an investigation by the companies.

Further, Defendants have all acknowledged ongoing use of the worst forms of child labor in their own supply chains, which could include forced child labor. Nestlé flatly acknowledges because of third party investigations, "there are children working on farms in Côte d'Ivoire in areas where we source cocoa," "there are situations of children carrying out unsafe tasks, using dangerous tools, carrying loads that are too heavy, suffering injuries and missing out on schooling," and "[s]ome producers are also known to seek cheap labour by illegally using forced child or adult labour."

12

Complaint ¶ 62. Similarly, Defendant Cargill announced its "Cargill Cocoa Promise program," *id.* ¶ 85, and described a key feature of identifying "lead farmers" from members of "farmers' cooperatives working with the company to serve as child labor agents and **lead interventions that help children escape child labor**." *Id.* ¶ 87 (emphasis added).

Defendant Barry Callebaut reiterates the industry claim that it will "eradicate child labor" by 2025, which is, of course, an admission that the company's supply chain continues to benefit from child labor. *Id.* ¶ 94. The company also claims it has found 4,230 cases of child labor in its supply chain during 2017-18. *Id.* ¶ 97.

Specifically mentioning its "farmers in Cote D'Ivoire," Defendant Mars claims to have "identified forced labor and child labor as the human rights issues that may pose the most severe risk to people in our extended supply chains." *Id.* ¶ 100. Mars adds that "[w]e are seeking to advance respect for human rights **in our extended agricultural supply chains**, **which reach past our first-tier suppliers all the way to the farm** or fishery level." *Id.* ¶ 102 (emphasis added).

Defendant Hershey claims to be against child slavery and boasts of a vast monitoring and certification system of its suppliers (presumably including its all-important cocoa suppliers) to prohibit "the use of forced and illegal child labor." *Id.* ¶ 105. Hershey expressly states that its code of conduct requires its suppliers to work to eliminate the "worst forms of child labor." *Id.* ¶ 107.

Defendant Mondelēz acknowledges on its website there is ongoing "child labor across the West African cocoa sector." The company cites to studies it has commissioned that confirm "a high risk of child labor in the cocoa sectors of Côte d'Ivoire" *Id.* ¶ 115. It targets child and forced labor with its code of conduct, *id.* ¶ 118, and claims to consumers and regulators that it prohibits its cocoa suppliers from utilizing forced or child labor. *Id.* ¶ 119.

Defendant Olam claims to be against all forms of "child exploitation" in its cocoa supply chain. *Id.* ¶ 121. Olam acknowledges the existence of child labor on smallholder farms in West

13

Africa, but points to its own "stringent requirements within its cocoa supply chain" and "adherence to all applicable national and international labour laws." *Id.* ¶ 122. Olam also claims to be "making progress on the issue of child labor" and that it is providing direct financial assistance to 85,000 of its farmers as part of this effort. *Id.* ¶ 124. Olam also says it created the "Olam Farmer Information System" to keep track of the well-being of 100,000 of its farmers." *Id.*

These admissions of knowledge of the worst forms of child labor in their supply chains at a minimum provide constructive knowledge Defendants "knew or should have known" of forced child labor. Further, Defendants' assertions on their websites of their close relationships with "their farmers" proves the lie of their claim to this Court that they are mere "downstream purchasers" of cocoa. They are not mere purchasers if cocoa, and they have chosen to do nothing despite having knowledge of "their farmers" using the worst forms of child labor. *Id.* ¶ 156

In addition, Defendants have all promoted their various codes of conduct, policies, and programs they claim will eliminate child labor from their supply chains to mislead consumers and regulators into believing they are solving the problem. While the reality is that these programs and policies are shams designed to look good on paper, *id.* ¶¶ 39,53, 55,70,71,82-84,89,94, 99,101,112, 113,115,123-24, the promotion of their anti-child labor policies certainly allows an inference that Defendants know it remains a problem in their supply chains. *See, e.g.*, *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 6318707, at *7 (N.D. Cal. Oct. 28, 2020). Further, courts have held that "failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence." *Wyndham*, 425 F. Supp. 3d at 968; *see also Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. 2009) (failure to remedy a known problem constitutes wilful blindness and negligence); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, at *5 (Defendants "failed to take adequate steps to train staff in order to prevent" sex trafficking).

Plaintiffs' allegations on the intent issue are more than sufficient to withstand a motion to dismiss. However, they note that questions of whether a party knew or should have known something are generally inappropriate for summary judgment, let alone resolution on a motion to dismiss. *See O'Connor*, 311 F.3d at 1152; *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2729 (4th ed.). A jury should get to decide whether, twenty years after Defendants admitted there was forced child labor in their cocoa supply chains and failed to keep their promise to regulators and consumers they would address the problem, their claim is credible that they don't have sufficient knowledge under a knew or should have known standard.  Plaintiffs intend to make Defendants' breathtaking denial of knowledge about and responsibility for forced child labor in their supply chains they've claimed to be addressing for over 20 years the cornerstone of their claim for punitive damages.[4]

## 2. Defendants Participated in a Cocoa Supply Chain Venture and their Status as Co-Venturers Makes Them Jointly and Severally Liable.

Defendants complain about the TVPRA's potential reach, but this was an intentional choice by Congress. Indeed, the "benefit from participation in a venture" language of section 1595 (a) was originally enacted only in the criminal provision of section 1591 of the TVPRA. Congress omitted it from the other TVPRA sections out of concern that the provision was too broad; the conferees "agreed not to extend it to persons who benefit financially or otherwise from trafficking out of a concern that such a provision might include within its scope persons, such as stockholders in large

---

[4] Courts have consistently held "'permitting punitive damages is consistent with Congress' purposes in enacting the TVPA [and later including a civil remedy in the TVPRA], which include increased protection for victims of trafficking and punishment of traffickers.'" *Franciso v. Susano*, 525 Fed. Appx. 828, 834–835 (10th Cir. 2013) (quoting *Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011)).

companies who have an attenuated financial interest in a legitimate business where a few employees might act in violation of the new statute." H.R. Rep. No. 106-939, at 101-02 (2000) (Conf. Rep.).

Notwithstanding those initial concerns about the breadth of liability, **_clearly knowing its broad reach_**, Congress added the language to the other TVPRA sections in 2008, including the provision at issue here, section 1595 (a) Pub. L. No. 110-457, 122 Stat. 5044 (2008). Defendants rely on dictionaries and non-TVPRA cases rather than the text of the statute, the clear legislative history, and the growing body of TVPRA jurisprudence. Plaintiffs establish that Defendants formed a venture with their suppliers to protect their system of cocoa production that depends upon cheap cocoa harvested by children. Each Defendant participated in the venture by direct or tacit agreement to promote sham child labor programs while doing little or nothing to alter their existing system. Defendants' status as co-venturers makes them jointly and severally liable for acts of the venture.

a.  Defendants Are Co-Venturers in a Cocoa Supply Chain "Venture" in Cote D'Ivoire.

As an initial matter, Defendants' "venture" argument is premised upon a mischaracterization of Plaintiffs' allegations: "Plaintiffs try to sweep every entity involved in the supply or purchase of cocoa—including multiple _direct_ competitors—into a single, massive "supply chain" venture." MTD at 15.  Plaintiffs actually allege that the seven Defendants, while they indeed may be competitors in selling chocolate to consumers, collude to lead the cocoa sector's intentionally ineffective response to endemic child labor to ensure they can all continue to profit from cheap cocoa harvested by children for as long as they can get away with deceiving consumers and regulators. _See, e.g.,_ Complaint ¶¶ 54,55,60,61,69,92, 98,103,111,120,126,154-58. They acted collectively to avoid meaningful regulation, and they jointly orchestrated a public relations response to mislead consumers and regulators. _Id._ ¶¶ 47,50,52,55,59-61,67,69,82-84,89,96,99,103,104,111-13,120,123. Plaintiffs have properly alleged facts that expose a relatively narrow "venture" of the seven Defendants as the ringleaders within the WCF of joint action to continue profiting from a cocoa

supply chain that depends upon child slavery, along with their specific cocoa suppliers that include those who use enslaved children to harvest cocoa. *Id.* ¶¶ 54,55,61,111,120,154-58. Defendants claim to the Court that they are mere purchasers of cocoa, but Plaintiffs are entitled to hold Defendants to their own claims to consumers and regulators that they are enforcing codes of conduct prohibiting "their farmers" from using child labor, and are implementing programs directly with these farmers. *Id.* ¶¶ 39,53, 55,70,71,82-84,89,94, 99,101,112,113,115,123-24,154-56. Other than before this Court, Defendants claim to have direct relationships with and control over "their" farmers. *Id.*

As to the legal issues, Defendants begin by arguing there is not a clear definition of "venture" in the civil TVPRA, so the ordinary, dictionary definition should be applied. MTD at 15-16. While it is true that section 1595 does not define "venture" with respect to civil liability, the identical statutory language in the parallel criminal provision of 1591 defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6). Defendants consign this issue to a footnote and cite a non-TVPRA case to argue that the criminal venture definition cannot be applied. MTD at 15, n. 3. In doing so, Defendants fail to address the ***many*** TVPRA cases that disagree with their position. These cases, while acknowledging that within the TVPRA the criminal definition of venture does not apply directly to the section on civil liability, consider the definition a useful indication of the scope of "venture" within the civil context. *See, e.g., Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019); *Ricchio v. McLean*, 853 F.3d at 556; *United States ex rel. Elgasim Mohamed Fadlalla v. Dyncorp Int'l LLC*, 402 F. Supp. 3d 162, 196 (D. Md 2019)*; Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1137-38 (D. Colo. 2019); *Jean-Charles*, 937 F. Supp.2d at 288 n. 11 (D. Conn. 2013); *Gilbert v. USA Taekwando, Inc.*, No. 18-CV-00981-CMA-MEH, 2020 WL 2800748, at *9-10 (D. Colo. May 29, 2020); *Jensen v. United States Tennis Ass'n*, No. 20-2422-JWL, 2020 WL 6445177, at *5 (D. Kan. Oct. 30, 2020).

Other courts rejected this approach, finding the criminal provision **narrower** than the provision establishing civil liability and requiring only a tacit agreement to accept benefits from the venture. *See, e.g., J.L. v. Best Western Int'l, Inc.*, No. 19-CV-03713-PAB-STV, 2021 WL 719853, at *6-7 (D. Colo. Feb. 24, 2021); *Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 3035794, at *1 n. 1 (N.D. Cal. June 5, 2020); *Doe v. Rickey Patel, LLC*, No. 0:20-60683-WPD-CIV, 2020 WL 6121939, at *5 (S.D. Fla. Sept. 30, 2020); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020); *S.Y. v. Best Western Int., Inc.*, No. 2:20-cv-616-JES-MRN, 2021 WL 2315073, at *4 (M.D. Fla. Jun. 7, 2021); *S.Y. v. Marriot Int'l, Inc.*, No. 2:20-cv-627-JES-MRM, 2021 WL 2003103, at *4 (M.D. Fla. May 19, 2021).

Even if the narrower definition of "venture" from the criminal statute is applied, Plaintiffs' allegations easily establish Defendants were "associated in fact" in their cocoa supply chain "venture." *See, e.g.,* Complaint ¶¶ 154-58. Previous cases assessing the scope of "venture" using the "associated in fact" language of section 1591(e)(6) have found a "venture" existed based on an informal, tacit understanding. The hotel sex trafficking cases in particular have not required any formal agreement or creation of a business relationship. Instead, a tacit understanding that specific hotels within a major chain rented rooms to sex traffickers, and the corporate chains' failure to take reasonable steps to prevent the unlawful conduct they should have known was occurring, has been sufficient to place them in the venture. In none of these cases was there any explicit agreement forming the venture, which was based solely on a mutually-beneficial relationship. *See, e.g., A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F.Supp.3d at 936; *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4; *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *see also Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, *6-7.

In one case, the First Circuit held that allegations the motel owner defendants rented out a room were sufficient to constitute "participation in a venture" under both § 1591 and § 1589(b),

because it could be inferred that the hotel owners "understood that in receiving money as rent for the quarters where [the trafficker] was mistreating [the victim], they were associating with him." *Ricchio*, 853 F.3d at 555 (Souter, J. by designation). In another hotel sex trafficking case, the court also held that '[i]n the absence of any controlling authority…actual "participation in the sex trafficking act itself" is not required to state a claim under section 1595.'" *Naples Hotel Co.*, 476 F. Supp. 3d at 1256 (citation omitted). In *M. L.*, a venture was found based only on the fact that Craigslist allowed ads that it should have known were placed by sex traffickers to run on its list service in exchange for payment. *M. L. v. Craigslist Inc.*, 2020 WL 5494903, at *5-6. There was apparently no agreement at all, and the association was based on a mutually beneficial relationship. *See id. See also*, *Ruelas v. County of Alameda*, No. 19-cv-07637-JST, 2021 WL 475764, at *7 (N.D. Cal. Feb. 9, 2021)(the court held that defendant Aramark was a "venture offender" under the criminal section use of "venture" because they knowingly received a financial benefit from the use of uncompensated prison labor and participated despite their knowledge of the labor scheme).[5]

---

[5] Implicitly acknowledging that the TVPRA "venture" cases Plaintiffs' rely upon are insurmountable for them, Defendants ignore them and instead cite RICO cases in which alleged "enterprises," not "ventures," were held to be too broad. *See In re Managed Care Litig.*, 135 F. Supp. 2s 1253, 1262 (S.D. Fla. 2001); *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 785 (N.D. Ill. 2008); *UFCW Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). Defendants use *Vulcan Golf* and *UFCW Unions* to argue Plaintiffs' proposed venture is overly broad, stating '[i]f plaintiffs' "nebulous, open-ended description" of the venture were sufficient to state a plausible TVPRA claim, it could potentially subject "millions of entities and individuals" to civil and criminal liability.' MTD at 16-17 (citations omitted). Aside from being easily distinguishable as non-TVPRA cases, Defendants' RICO cases are far afield from the allegations of this case. In *Vulcan Golf*, the enterprise became overly broad when Plaintiffs alleged that advertisers, publishers, and other participants in Google's networks were part of the enterprise. 552 F. Supp. 2d at 785. The complaint in *UFCW Unions* failed to allege "that officials from either company involved themselves in the affairs of the other." *UFCW Unions*, 719 F.3d at 854. As noted in the first paragraph of this section, the "venture" Plaintiffs' allege is narrow – the seven Defendants are the ringleaders of joint action to continue profiting from their respective cocoa supply chains that depend upon child slavery.

Here, Plaintiffs allege much more than Defendants' mere tacit agreement with cocoa suppliers using forced child labor. Within their own supply chains, each Defendant has "exclusive supplier/buyer relationships with local farms and/or farmer cooperatives," and Defendants have the authority to dictate terms and conditions on the plantations. Complaint ¶ 50. Despite being "competitors" as they claim, the Defendant companies united in mutual interest to protect their cocoa supply chains that provide them with the benefit of cheap cocoa harvested by forced and/or trafficked child labor. *See id.* ¶¶ 154-58. The 2001 Harkin-Engel Protocol represents the latest likely start of the "venture" among Defendants to jointly present the cocoa industry's response to its serious child slavery problem. *See id.* ¶¶ 52, 155. Defendants are not merely purchasers of cocoa from Côte D'Ivoire; they are the architects and defenders of the cocoa production system of Côte D'Ivoire. The seven Defendants were the leaders of the WCF, a formal association beyond the necessary "association in fact" that, through the Defendants' own actions, works collectively on behalf of the cocoa sector to create the false impression that the companies are taking effective action to stop using child labor. *Id.* ¶¶ 22,45,47,50,52,55,59-61,67,69,82-85, 89,96, 99,103, 104,111-15,120,123, 154-59.[6] In addition to leading the WCF, Defendants created the ICI, a fundraising "NGO" poised to receive funds to implement the Harkin-Engel Protocol, and they jointly developed the sham Child Labor Monitoring and Remediation System (CLMRS). *Id.* ¶ 155. Further, they associated with Fair Trade and Rainforest Alliance to mislead consumers to believe these

---

[6] Defendants argue that their participation in the WCF is not evidence of a venture because it is a policy organization rather than one that "coordinate[s] the growing, purchase, and sale of cocoa." MTD at 17. They are concerned that "treating the members of an industry group as an unlawful trafficking venture…would discourage companies from participating in global efforts to combat human rights violations." *Id.* at n. 4. Defendants are merely disputing Plaintiffs' factual allegations in attempting to reframe what the WCF actually does, which is not permissible on a motion to dismiss. Plaintiffs have made specific allegations WCF is acting as a vehicle to support the false impression that Defendants are making progress ending their use of child labor. *See, e.g.*, Complaint ¶¶ 155-56.

entities were certifying the companies' cocoa supply chains as child labor free, a claim the *Washington Post* investigated and found not to be credible. *Id.* ¶ 59. Despite Defendants' attempt to frame these efforts as seeking to end forced child labor, the number of children working on cocoa farms has increased since their establishment. *Id.* ¶¶ 1,155.

Through these formal associations and systems, Defendants protect a cocoa supply chain that allows them to continue to profit from cheap cocoa harvested by children. *Id.* ¶¶ 52, 55, 154-58. Unfortunately, Defendants, after committing with the Harkin-Engel Protocol to end child labor in the cocoa sector, *see id.* ¶¶ 52-53, decided to continue their child slavery-based system for as long as they possibly could. *See id.* ¶¶ 45-47, 54, 157. Their venture is a "success" because child labor has dramatically increased since Defendants united in 2001 to protect their cocoa existing supply system. *Id.* ¶¶ 1,155. The alternative, that after twenty years of effort, Defendants, among the largest, wealthiest, and most powerful corporations in the world, lacked the resources and capacity to end child labor in their supply chains, is not plausible. This will be a key question for the jury.

b. Defendants "Participated in" a Cocoa Supply Chain "Venture."

Section 1595 (a) of the TVPRA requires Plaintiffs to allege Defendants' "**participation** in the venture" established in the preceding section. Defendants turn again to a dictionary and cite non-TVPRA cases to define "participate," *see* MTD at 19, again ignoring the bedrock tools of statutory construction, TVPRA's express statutory language and its legislative history, as well as the vast majority of TVPRA cases, to argue that they can only be liable if they directly participated in acts of enslaving children. MTD at 18-20. Defendants' position is ***not*** the law, and they fail to disclose to the Court that every court but one[7] interpreting the "participation in a venture" language

---

[7] The single outlier decision that required direct participation in the forced labor or trafficking activity, *Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017), is pending on appeal. *Ratha v. Phatthana Seafood Co., Ltd.*, No. 18-55041 (9th Cir.).

agrees that a defendant need not actively participate in the underlying forced labor or trafficking

with an overt act as long as they knew or should have known they are benefitting from a venture

that is responsible for the unlawful activity.[8]  As was previously established in discussing the intent

requirement, *see* section IV.A.1, *supra*, Defendants need not have actual knowledge "in order to have

participated in a forced labor or trafficking venture for civil liability under the TVPRA, otherwise the

'should have known' language in § 1595(a) would be meaningless." *Red Roof Inns, Inc.*, 2020 WL

3256261, at *7.[9] The Court found that a hotel that was doing business with a sex trafficker by

renting rooms and selling amenities to the trafficker established a pattern of a business relationship

founded on a tacit agreement to allow the trafficking that provided a financial benefit to the hotel,

even though the hotel was never engaged in or assisted the sex trafficking. *Id. *6. See also*, *Wyndham

Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 971 (same).

      In *Jean-Charles,* 937 F. Supp. 2d at 279-80, plaintiffs alleged that the venture was Project

Pierre Toussaint, a school for poor Haitian children run by the Haiti Fund in conjunction with

Fairfield University and Father Paul E. Carrier.  There was no allegation that the school was

organized for the purpose of sex trafficking.  But because Perlitz, a venture participant, engaged in

---

Defendants of course rely on this case, but fail to note its current status. *See* MTD at 20. The other
case Defendants rely heavily upon, *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016), *see* MTD
at 20, was interpreting a separate criminal provision of the TVPRA, section 1591(a)(2). Courts have
rejected applying *Afyare* to the civil provision at issue here, section 1595 (a).  Courts have rejected
applying *Afyare* to the civil provision at issue here, section 1595 (a). *See, e.g.*, *Red Roof Inns, Inc.*, 2020
WL 3256261, * 6; *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d at 1138.
[8] Defendants cite *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D. NY 2019) for
the proposition that the "participation" in that case had to be in a sex trafficking venture, MTD at
20. While a narrower take on section 1595 (a), *Geiss* is of no help to them as Plaintiffs have alleged
Defendants' venture's purpose was to perpetuate their ability to profit from cheap cocoa harvested
by enslaved children.  *See, e.g.*, Complaint ¶¶ 54,55,60,61,69,92, 98,103,111, 120,126, 154-58.
[9] As noted in the introductory paragraph of this section at pgs. 15-16, Congress extended the
"should have known" language to section 1595 (a) knowing that it would establish civil liability for
mere venture participants who should have known they were benefitting from the venture.

sex trafficking, Carrier and Fairfield could be liable for benefitting from their participation in the

school, even if the common purpose was education not sex trafficking. *Id.  See also, Ricchio,* 853 F.3d

at 556 (motel owners who rented a room to a sex trafficker and benefitted financially participated in

the venture); *Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019)("In this case, plaintiffs allege facts

supporting their claims that defendants were well aware of the crimes being committed against

plaintiffs, did nothing to expose these atrocities, tacitly approved of the conduct by constructing a

scheme for the purpose of enabling it, and benefited for years from [it].").[10]

Defendants attempt to dismiss this near-unanimous line of cases, arguing that "the

complaint does not plausibly allege that Defendants engaged in any tacit agreement condoning

forced labor with any trafficker or farmer." MTD at 21. Defendants' mischaracterize Plaintiffs'

allegations. As noted, the baseline for assessing the underlying agreements, tacit or otherwise, that

---

[10] ***Every*** case to have considered the issue except the *Ratha* decision Defendants rely on, see note 7, *supra*, agrees that "should have known" is the standard and Defendants need not have committed an overt illegal act. *See, e.g., Wyndham Hotels & Resorts, Inc.*,  2020 WL 4368214, *4 ("'participation in venture' under section 1595 of the TVPRA does not require an 'overt act' of participation in the sex trafficking itself . . . [T]he Court finds that Plaintiff has alleged sufficient facts to support a plausible claim that Wyndham and Choice received financial benefits from a venture they vicariously participate in (through their franchisees) that the franchisees should have known was engaged in sex trafficking of B.M. in violation of section 1595."); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d at 174 ("A.B. sufficiently pleads specific facts from which we can reasonably infer Marriott . . . knowingly benefitted from participating in a venture which it should have known engaged in her trafficking. This is all Congress requires a victim to plead."); *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d at 1138 ("Although Section 1589(b) certainly requires the defendant to participate in a venture with another member who violated Section 1589(a), nothing in it requires that the defendant's participation be an overt act in furtherance of the other member's TVPA violation."); *G6 Hosp., LLC*, 2019 WL 6682152, *3 ("Defendants need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture . . . under the TVPRA, otherwise the "should have known" language in § 1595(a) would be meaningless . . . Plaintiff has alleged sufficient facts to show Defendants "participated in a venture" under § 1595 by alleging that Defendants rented rooms to people it knew or should have known were engaged in sex trafficking. These acts and omissions by Defendants, H.H. alleges, facilitated the sex trafficking venture."); *Doe v. Twitter, Inc.*, 2021 WL 3675207, *25 (N.D. Cal. Aug. 19, 2021) (the "should have known" standard means Defendants do not need actual knowledge nor must they commit an overt act).

confirm Defendants' participation in the venture is that in 2001, when they signed or joined the Protocol, the companies expressly admitted that there **was** forced child labor in their supply chains. Protocol at 11, Art. 3. They did not need further agreement with their cocoa suppliers to enslave children; this was already a well-established (and highly-profitable) practice.

Plaintiffs' complaint easily meets the "participation in a venture" element because it alleges that the venture came into being in 2001 at the latest when the seven largest cocoa producers, the Defendants herein, joined together and directly or tacitly agreed that they would **continue** their existing system of inexpensive cocoa production based on enslaved child labor and protect it from meaningful regulation. The seven Defendant companies banded together to block meaningful legislation in Congress and instead adopt the voluntary Protocol. Complaint ¶ 52. Within the WCF, Defendants developed a joint strategy to mislead consumers and regulators into believing that they were taking effective action to end forced child labor and provide education and rehabilitation programs for the former child laborers. Complaint ¶¶ 22,45,47,50,52,55,59-61,67,69,82-84,89,96,99, 103,104,111-15,120,123-24, 154-58.  As per their strategy, the major cocoa companies, led by Defendants, *id.* ¶¶ 54,55,61,111,120,154-58, did little or nothing to stop their use of forced child labor and gave themselves **four** extensions of time,  at last claiming they will "reduce by 70%" their use of the "worst forms of child labor" by 2025. *Id.* ¶ 53.  In fact, again based on direct or tacit agreement, Defendants did little to change their system of cocoa production that is dependent on child labor. *Id.* ¶¶ 39,50,54,55,70-71,82-84,96,111,154-58.  This strategy has allowed them to continue benefitting from cheap cocoa harvested by forced child labor.

Defendants will likely reply that it's not plausible for Plaintiffs to allege the companies would deliberately prolong forced child labor (that was already integral to their system of cocoa

production),[11] but there is no question that after **20 years** of Defendants' policies, programs, and promises, the incidence of child labor and the worst forms of child labor in cocoa production has gotten worse, and there are now **1.56 million** children harvesting cocoa in Cote D'Ivoire and Ghana. *Id.* ¶ 1. Plaintiffs **are entitled to take Defendants at their word when they** promised in 2001 they could and would end child labor, and they have reinforced that promise repeatedly when giving themselves extensions of time and on their websites when touting various new "programs" and policies that are designed to look good only on paper. *Id.* ¶¶ 39,53, 55,70,71,82-84,89,94,99, 101,112,113,115,123-24.  Certainly a reasonable inference is Defendants, as they claimed, had the control, resources, influence, and relationships to end child labor, but chose instead to continue and protect their profitable system based on forced child labor. *See, e.g. id.* ¶¶ 45-47, 54, 156-57.

The companies' factual argument that their programs and policies were aimed at "reducing and eliminating problematic labor practices from the cocoa supply chain" is legally irrelevant in the context of their Motion to Dismiss. *See* MTD at 21. The ultimate factual question for the jury in this case is whether Defendants knew or should have known they were participating in a venture designed to mislead the public and regulators and protect and prolong their ability to profit from cheap cocoa harvested by children, or, as Defendants posit, they were innocent purchasers of cocoa gratuitously making a good faith but failed effort to reduce the incidence of child labor in the cocoa supply chain. Which side is ultimately correct will be resolved at trial by a jury.

---

[11] This would not be the first time a major industry colluded to deceive regulators and consumers. For example, the United States brought "a massive civil [RICO] action against the tobacco industry, seeking billions of dollars in damages for what it alleges to be a lengthy unlawful conspiracy to deceive the American public about the health effects of smoking and the addictiveness of nicotine . . . ." *See U.S. v. Philip Morris* 116 F. Supp. 2d 131, 134–35 (D.D.C. 2000).

c. Defendants As Co-Venturers Are Jointly and Severally Liable for Acts of the Venture.

Defendants' argument that Plaintiffs have impermissibly engaged in "group pleading" in alleging the companies' participation in the venture, *see* MTD at 22-23, ignores the fundamental legal consequence of being participants in a venture. Each Defendant as a co-venturer with the others is jointly and severally liable for any acts in furtherance of the venture. While there are only a few TVPRA cases directly addressing this very basic question of general joint venture liability, courts have uniformly held that co-venturers facing TVPRA liability are jointly and severally liable. *See, e.g.*, *United States v. Williams*, 319 F. Supp. 3d 812, 817-18 (E.D. Va. 2018), *aff'd*, 783 F. App'x 269 (4th Cir. 2019) (all defendants convicted of sex trafficking or aiding and abetting the sex-trafficking of plaintiffs, and trial evidence showed that all defendants "contributed to the victims losses by enticing the victims into prostitution and then exploiting the victims"); *Leiva v. Clute*, No. 4:19-CV-87-TLS-JPK, 2020 WL 8514822, at *12-19, 21, 23 (N.D. Ind. Dec. 16, 2020) (Kolar, Mag. J.) (adopted by *Leiva v. Clute*, No. 4:19-CV-87 RLM-JPK, 2021 WL 307302 (N.D. Ind. Jan. 29, 2021) (all defendants were jointly and severally liable for "compensatory damages in restitution under the TVPA for economic harms and emotional distress, and additional punitive damages"); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 449 (E.D. Va. 2015) (defendants were jointly and severally liable for compensatory and punitive damages under the TVPRA); *Francisco v. Susano*, No. 10-CV00332-CMA-MEH, 2013 WL 4849109, at *3-4 (D. Colo. Sept. 10, 2013) (Defendants were jointly and severally liable for punitive damages under the TVPRA). These cases are applying hornbook joint venture law that co-venturers are jointly and severally liable for the acts of each other. *See, e.g.*, *Faison v. Nationwide Mortg. Corp.*, 839 F.2d 680, 686 (D.C. Cir. 1987) (citing and quoting *Hill v. Diamond*, 442 A.2d 133, 137 (D.C. App. 1982) and *Stevens v. Hall*, 391 A.2d 792, 794 (D.C. App. 1978)).

Accordingly, for purposes of liability, Plaintiffs can attribute legal responsibility for their injuries to each of the Defendants as co-venturers and to other employees or agents acting on behalf

of the venture. Plaintiffs were all trafficked and enslaved as children because Defendants, acting

within their venture and in furtherance of its purpose to protect and prolong the cocoa supply chain

system they created that is dependent upon forced child labor, failed to act beginning in 2001 to

prevent children, including Plaintiffs, from being exploited by this system. *See, e.g.*, ¶¶ 1, 54-55, 154-

56, 162-64. Collectively, Defendants' venture controlled 70% of the cocoa supply chain in Cote

D'Ivoire, *id.* at ¶ 156, making it more likely than not that the venture was legally responsible for

trafficking and enslaving each of the Plaintiffs. *See, e.g.*, *Almerfedi v. Obama*, 654 F.3d 1, 5 (D.C. Cir.,

2011)(The civil preponderance of the evidence standard merely requires the plaintiff "support its

position [only] with the greater weight of the evidence."); *Elliot v. Michael James Inc.*, 507 F.2d 1179,

1184 (D.C. Cir., 1974)("'it is enough that [plaintiff] introduces evidence from which reasonable men

may conclude that it is more probable that the event was caused by the defendant than that it was

not'")(*quoting* Prosser, The Law of Torts § 44, pp. 222-223 (2d ed. 1955)).

### 3.  Defendants Are Financially Benefitting From their Cocoa Supply Chain Venture.

Section 1595 (a) requires that Defendants knowingly benefit financially from participation in

the venture. As with the other TVPRA elements, Defendants grossly mischaracterize Plaintiffs'

allegations as to how Defendants benefit from their venture. *See* MTD at 28-30.  They argue

Plaintiffs' allegation of a benefit from forced labor is not possible because farmers using it are not

permitted to charge lower cocoa prices because of a price floor set by Cote D'Ivoire. *Id.* at 29-30.

Plaintiffs instead allege Defendants' venture was established to preserve, protect, and prolong a

cocoa production system that ***already provides*** the companies cheap cocoa because much of it is

harvested by child labor, including forced child labor. Complaint ¶¶ 39,50,54,55, 70-71, 82-84, 96,

111,154-58. In other words, the venture's goal is to *prevent* ***higher*** *cocoa prices* that would result if

Defendants took the steps they promised to solve their child labor problem but didn't to avoid the

costs of compliance and to preserve their access to cheap cocoa harvested by child slaves.

27

For example, there is little doubt that if Defendants paid a higher, fair price for cocoa that allowed their farmers a livable wage, something that is ***not*** prohibited by Cote D'Ivoire's price ***floor***, those farmers would not need to resort to using forced child labor. *See, e.g.*, *id.* ¶ 159,160. Confirming this obvious fact, the European Union, joined by the governments of Cote D'Ivoire and Ghana, just released a 2020 report, *EU and Cocoa Producing Countries Agreement for Sustainable Cocoa Sector* (attached as Exhibit B), that, among other things, advocates for a large ***increase*** in the price of cocoa paid to farmers as a key step for farmers to earn a living wage to eliminate poverty and reduce child labor. *Id.* at 4, 11. Acting in concert, perhaps in violation of antitrust law, Defendants all pay farmers the minimum price because their goal is higher profits, not ending child labor.[12]

Other steps that would eradicate child labor Defendants chose not to take in order to preserve their access to cheap cocoa include regularizing the cocoa suppliers, stopping procurement from illegal farming sites, and establishing a fully transparent supply chain. *See id.* ¶ 159. Instead, because this would be costly, Defendants have regularized only a small portion of their supply chains, but mislead consumers into believing that their monitoring and certification "programs" extend to their entire supply chains. *Id.* ¶¶ 56-57, 67-68, 89, 96,103,113, 126.[13]

Defendants did not take these or other steps that would have solved the child labor problem to avoid increasing their costs and to preserve their system of cheap cocoa harvested by children. Defendants created a scheme to keep the price of cocoa artificially low, which certainly qualifies as a "benefit" under section 1595 (a).  For example, in *Red Roof Inns, Inc.*, 2020 WL 3256261, * 4, the Court held standard "merely requires that Defendant knowingly receive a financial benefit . . . As

---

[12] Some of the Defendants may pay a small but inadequate premium if they participate in the sham programs run by Rainforest Alliance and Fair Trade. *See* Complaint ¶ 59.

[13] Defendants claim they can't be responsible for unregulated plantations in the "free zones," MTD at 9, but these plantations, which ***are*** in Defendants' supply chains, are not regularized so they can avoid the cost of monitoring them while continuing to obtain cheap cocoa. Complaint ¶ 159.

this Court found . . . 'the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard.'" (citations omitted).

Defendants obtain the specific financial benefit of cheaper cocoa because they have refused to spend the funds to change their cocoa supply system as they promised or pay farmers the funds necessary to allow them to have a livable wage and avoid reliance on cheap child labor.

### 4. Defendants Do Not Contest the Eight Plaintiffs Were Subjected to Forced Labor By Coercion.

Defendants do not contest in any way that the Plaintiffs were forced to work on cocoa plantations, nor could they. Each Plaintiff alleges in detail his harrowing experience of being trafficked from Mali, his home country, and then transported to Cote D'Ivoire, where he was given to a cocoa plantation owner who enslaved him and forced him to work performing hazardous tasks under grueling conditions. Complaint ¶¶ 127-148. These uncontested allegations satisfy the forced labor provision of section 1589 (a)(2) and (4) of the TVPRA because the plantation owners, working within and on behalf of Defendants' venture, coerced Plaintiffs by means of (2) "***threats of serious harm"*** [or] (4) "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person ***would suffer serious harm or physical restraint***." 18 U.S.C. § 1589 (a)(emphasis added).

### B. <u>Plaintiffs Were Trafficked.</u>

Defendants essentially ignore this claim, but Plaintiffs also allege that they were trafficked by the cocoa venture, taken from their homes in Mali, and then delivered to cocoa plantations in Cote D'Ivoire, where they were forced to perform hazardous work to harvest cocoa. Complaint ¶¶ 127-148, 166-74. Section 1590 (a) of the TVPRA prohibits "knowingly recruit[ing]" any person for "forced labor." Based on the proceeding section, Plaintiffs were subject to "forced labor" by farmers within the cocoa venture within the scope of section 1589. Based on Plaintiffs' specific allegations,

which Defendants do not discuss or dispute, Defendants' venture recruited Plaintiffs by deception, and they have accordingly stated a claim for trafficking.

C. **Section 1596 (a) Extends the TVPRA to Plaintiffs' Claims Even if They Are Considered Extraterritorial.**

Section 1596(a) expressly extends extraterritorial jurisdiction to any "offense" under sections 1589 (forced labor) and 1590 (trafficking), among others, if, as here, members of the venture are (1) U.S. nationals or (2) "present" in the U.S. 18 U.S.C.A. § 1596(a). There is no dispute that the seven Defendants are U.S. nationals and "present" in the U.S. Complaint ¶¶ 24-31.

Without citing any TVPRA case supporting their section 1596(a) argument, and burying in footnote 14 some of the cases unanimously holding that the provision **_does_** apply to civil cases (MTD at 33), Defendants argue that section 1596(a) extends the TVPRA extraterritorially only in criminal cases. MTD 31-36. Defendants invite this Court to be the first to rule that the specific extraterritorial application in section 1596 (a) to claims based on sections 1589 (forced labor) and 1590 (trafficking) excludes civil cases based on the identical substantive provisions as the criminal cases that Defendants admit do extend extraterritorially. The Court should decline the invitation.

There is absolutely no indication in the TVPRA that the term "offense" was intended to apply only to criminal actions, as Defendants contend. The term "offense" in section 1596 (a) refers to the substantive prohibitions that were extended extraterritorially, and it makes no distinction whether the case is civil or criminal. Any claim, whether civil or criminal, based on "forced labor" must satisfy the substantive elements of the "offense" detailed in section 1589. Likewise, any claim, whether civil or criminal, based on "trafficking" must satisfy the substantive elements of the "offense" detailed in section 1590. The elements of these substantive violations do not change if the case is civil vs. criminal, and the nature of the "offense" is identical. The sole distinction the statutory scheme makes between civil and criminal cases is "[a]ny **_civil action_** filed under this

30

section shall be stayed during the pendency of any ***criminal action*** arising out of the same

occurrence in which the claimant is the victim." 18 U.S.C. § 1595 (b)(1) (emphasis added). Thus

Congress recognized that the criminal and civil offenses are identical and are based on the identical

substantive provision, distinguished the two types of cases with specific descriptors, and gave

priority to criminal cases. If Congress was able to make this distinction, it surely would have made

the same distinction if it intended only "criminal actions" extended extraterritorially.[14]

Defendants' position requires the interpretive leap that Congress gave access to the same

substantive "offenses" for both criminal and civil actions, prioritized "criminal actions," but then,

without saying so and having previously demonstrated the ability to distinguish between a "civil

action" and a "criminal action," silently did not intend civil actions to be brought for the substantive

"offenses" most likely to be brought, those occurring extraterritorially.

Defendants do not cite a single case to support their textually implausible position because

there are none. **Every** case, post-2008 amendments extending sections 1595 and 1596 to civil

actions, has held that civil claims for forced labor or trafficking extend extraterritorially under

section 1596 (a). For example, in *Adhikari v. Kellogg Brown & Root, Inc.,* the Court found that "§

1596… explicitly rebuts the presumption against extraterritoriality" and that "Congress amended the

TVPRA to provide a civil remedy for extraterritorial violations because it had concluded none

previously existed." 845 F.3d 184, 200-01 (5th Cir. 2017). The Court ultimately ruled in that case that

the provision was not retroactive. *Id.* [15] *See, also., Aguilera v. Aegis Commc'ns Grp., LLC,* 72 F. Supp. 3d

---

[14] Indeed, speaking of the 2008 amendments, Senators Biden and Brownback stated that "we establish some powerful new legal tools, including increasing the jurisdiction of the courts" to include "**_any_** trafficking case . . . even if the conduct occurred in a different country"). 154 Cong. Rec. S4799-800 (daily ed. May 22, 2008) (emphasis added).

[15] There is no issue of retroactivity in this case, as there is no dispute that all of Plaintiffs' injuries occurred well after the 2008 enactment of the enactment of section 1596(a).

975, 978-79 (W.D. Mo. 2014) (rejecting "offense" limits to criminal cases and rejecting the argument

that the TVPRA covers only victims trafficked "into" the United States); *Abafita v. Aldukhan*, No.

116CV06072RMBSDA, 2019 U.S. Dist. LEXIS 59316, at *12, 2019 WL 6735148, at *5 (S.D.N.Y.

2019) (following *Adhikari* and finding that section 1596(a) extends extraterritorial jurisdiction to civil

violations of TVPRA), *report and recommendation adopted*, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019);

*Plaintiff A v. Schair*, No. 2:11-CV-00145-WCO, 2014 WL 12495639, at *6-7 (N.D. Ga. Sept. 9,

2014)(concluding that section 1596(a) provides prospective extraterritorial application for civil

claims but does not apply retroactively). None of these civil actions expressed doubt that, from 2008

forward, the TVPRA applies extraterritorially to civil claims.

 The text of section 1596(a) clearly indicates that the TVPRA extends extraterritorially to civil

claims after the 2008 amendments, and the cases assessing the Act's extraterritorial application are in

accord. Unlike the unrelated statutes Defendants cite, the TVPRA is not silent on extraterritoriality.

In each reauthorization of the TVPRA, Congress has expressly expanded the Act's extraterritorial

reach in order to combat the transnational crimes of forced labor and human trafficking, conduct

Congress has described as the "dark side of globalization." H.R. Rep. No. 110-430 at 33 (2007).

 Even if Defendants steer the Court away from the text, legislative history, and unanimous

case law of the TVPRA to examine the "focus" of the statute based on cases unrelated to the

TVPRA, *see* MTD at 36-37, the TVPRA authorizes suits against persons who benefit in the United

States from human trafficking and forced labor, regardless of the location of the forced labor. The

focus of the prohibition on "benefitting, financially or by receiving anything of value" is on the

benefitting, not on the other conduct. *E.g., Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 266 (2010)

(stating the focus of §10(b) "is not upon the place where the deception originated, but upon

purchases and sales of securities" in the U.S.). Plaintiffs do not seek to apply 18 U.S.C. §§ 1589 and

1590 "extraterritorially" when those provisions are applied to a benefit in the United States.

Defendants cite *Nunag-Tanedo v. East Baton Rouge Par. Sch. Bd.*, 2012 WL 5378742, *6 (C.D. Cal. Aug. 27, 2012), MTD at 37, but that case concerned a different provision of the TVPRA with a "focus" distinguishable from the benefit prong.

### D. **Plaintiffs Have Properly Alleged Their Common Law Claims.**

Plaintiffs have stated claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress. Complaint ¶¶ 175-91.[16] These claims were timely filed with the statute of limitations because equitable tolling applies to Plaintiffs' common law claims.

#### 1. **Plaintiffs have stated a claim for unjust enrichment.**

Unjust enrichment occurs when (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005); *Mazor v. Farrell*, 186 A.3d 829, 833 (D.C. 2018). These elements are easily met in this case involving seven major chocolate companies benefiting from the forced labor of Plaintiffs, who have demonstrated in the preceding sections they have a viable TVPRA claim. *See, e.g.*, *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 117 (D.D.C. 2012) (after finding TVPRA claim properly alleged, allowed unjust enrichment claim because defendants "accepted [plaintiff's] services but failed to compensate her adequately.").

---

[16] Plaintiffs agree with Defendants that District of Columbia choice of law rules apply to the state law claims. MTD at 37-38. *See, e.g., Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842, 387 U.S. App. D.C. 366 (D.C. Cir. 2009). Defendants properly identify the possible options as the forum, District of Columbia, or the home states of the Defendants, Pennsylvania, Virginia, Delaware, New Jersey, Minnesota, and Illinois. MTD at 38. The reference to California as a possible forum in ¶ 20 (b) of the Complaint was an error. Plaintiffs agree with Defendants that the substantive law for their common law claims is equivalent in these jurisdictions and the choice of law issue need not be resolved at this time. *See* MTD at 38. As Defendants did, Plaintiffs will reference the law of the District of Columbia in demonstrating that they have stated viable common law claims.

Laboring on behalf of another constitutes a benefit. In *Bregman v. Perles*, 747 F.3d 873 (D.C. Cir. 2014), an investigator who provided services to lawyers conferred a benefit, with the Court noting "benefit" denotes any form of benefit. *Id.* at 878; *Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 308 F. Supp. 3d 197, 203 (D.D.C. 2018)(quoting *Bregman*). Defendants, again mischaracterizing Plaintiffs' complaint, argue that the benefit is speculative, *see* MTD at 39, but as Plaintiffs already established in discussing the express requirement of the TVPRA that Defendants, as members of the cocoa venture, "knowingly benefited" from Plaintiffs' forced labor, *see* section IV (A)(3), *supra*, there is no question Plaintiffs have also alleged they conferred as a benefit to Defendants a steady supply of cheap cocoa due to the forced labor system protected and prolonged by the venture. Defendants argue that there is no connection between them and Plaintiffs' forced labor, but, again, this is possible only if Plaintiffs' actual allegations are ignored and Defendants' constricted and inaccurate description of their venture is accepted. Plaintiffs have properly alleged that the venture at issue includes the seven Defendants as co-venturers and their combined supply chains, which constitutes 70% of all cocoa plantations in Cote D'Ivoire. *See* section IV.A.2, *supra*. At this stage, Plaintiffs have sufficiently alleged their claim and are entitled to prove to the jury that it is more likely than not that Defendants are jointly and severally liable because they received the benefit of each Plaintiffs' forced labor. *See* section IV.A.2.c, *supra*.

As to the second element, Defendants retained the benefits conferred upon them by Plaintiffs because Defendants profited from the cheap, forced labor of Plaintiffs, and certainly did not return to them the value of their labor or provide restitution. *See Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 254 (D.C. 2005); *Bregman*, 747 F.3d at 878; *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50-51 (D.D.C. 2003).

Defendants ignore the third element, that Defendants' retention of the benefit is unjust. Plaintiffs have unquestionably alleged the unjustness of Defendants' conduct. Plaintiffs described in

detail the unlawful and horrific conditions they endured, from being trafficked to a different country where they were isolated and left without any options but to work or starve, and then were forced to work performing extremely hazardous tasks. Complaint ¶¶ 127-148.  In *Kramer*, the court held defendant's retention of a benefit was unjust because defendants had not performed any work in exchange for the $75,000 advanced by plaintiff and then refused to return the money. *Kramer*, 888 A.2d at 254. In *Bregman*, defendant's retention of the benefit of Bregman's labor became unjust when Bregman was refused payment for his services by his employers. *Bregman,* 747 F.3d at 878. In *In re Lorazepam & Clorazepate Antitrust Litig.,* 295 F. Supp. 2d 30, 50-51 (D.D.C. 2003), defendant's enrichment by economic windfall on the backs of plaintiff's payments of rebates to drug subscribers was "unjust or inequitable." Unjust enrichment can also be supported where, as here, defendant paid too little. *Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 308 F. Supp. 3d 197, 204 (D.D.C. 2018) (citing *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 956 (D.C. Cir. 1958).

In sum, Defendants took advantage of and were enriched by a known population of victims, including Plaintiffs, who were unlawfully forced to harvest cocoa without being paid and conferred additional profit on the seven largest and most powerful chocolate companies in the world.

### 2.  Plaintiffs have stated a claim for negligent supervision.

Plaintiffs properly allege the three elements of negligent supervision: (1) Defendants knew or should have known that their co-venturers, their collective cocoa farmers, had used or were using the forced labor of children to harvest cocoa; (2) Defendants failed to adequately supervise the cocoa venture; (3) resulting in harm to Plaintiffs. *See Phelan v. City of Mount Rainier,* 805 A.2d 930, 937–38 (D.C. 2002). As Plaintiffs have established, Defendants knew or should have known their co-venturers, their cocoa farmers, were using forced child labor to harvest cocoa. *See* section IV.A.1, *supra*, satisfying the first element. Defendants base their defense entirely on whether their co-venturers, the cocoa farmers, were also Defendants' agents. MTD at 40-41. While Defendants' co-

35

venturers, their cocoa suppliers, likely were their agents because Defendants claimed to have direct relationships with them and/or the right of control over their cocoa suppliers, Complaint ¶¶ 50, 62-126, the fact that Defendants are co-venturers with their cocoa suppliers, *see* section IV.A.2, *supra,* is sufficient to allow the inference that Defendants had the ability to prevent them from using forced child labor that Defendants knew or should have known was happening on their plantations. Defendants have been claiming for over 20 years that they were using their control and influence over their cocoa farmers to end child labor with their policies and codes of conduct, Complaint ¶¶ 39,53, 55,70,71,82-84,89,94,99,101,112,113,115, 123-24, 154-56, so it is reasonable to infer that they breached their duty to Plaintiffs by failing to use their right of control to prevent the forced labor they knew or should have known was occurring on their co-venturers' plantations.

As to the second element, Plaintiffs have also established that Defendants failed to properly supervise the venture and did nothing to prevent the use of forced child labor. Again, Defendants had policies and programs that they claimed to consumers and regulators would end their reliance on the worst forms of child labor, including forced child labor, but failed to implement them to actually end this abhorrent practice. *See id.* ¶¶ 39,53, 55,70,71,82-84,89,94,99,101,112, 113, 115, 123-24, 154-56. As noted in establishing Defendants knew or should have known there was forced child labor in their cocoa supply chain, *see* section IV.A.1, *supra*, courts have uniformly held that "failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence." *Wyndham*, 425 F. Supp. 3d at 968; *see also Brown,* 603 F.Supp.2d at 81; *S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, *5.

There is no question that the third element is satisfied here – Plaintiffs' allegations as to the serious harm they suffered are undisputed. *See* Complaint ¶¶ 127-148.

**3.  Plaintiffs have stated a claim for intentional infliction of emotional distress.**

There are three prongs to a claim for intentional infliction of emotional distress: "(1)

extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Purcell v. Thomas,* 928 A.2d 699, 711 (D.C. 2007) (quoting *Howard University v. Best,* 484 A.2d 958, 985 (D.C. 1984)). Plaintiffs allege these three elements: Defendants' venture engaged in extreme and outrageous conduct by forcing children to perform extremely dangerous work (Complaint ¶¶ 187-88), Defendants knew or recklessly disregarded the horrible conditions faced by the children forced to work (*see* section IV.A.1, *supra*) and Plaintiffs suffered physical injury and severe emotional distress (Complaint ¶¶189-90).

Defendants argue that Plaintiffs have not shown Defendants participated in any venture that engaged in outrageous conduct, MTD at 43, but Plaintiffs have alleged in detail that Defendants were the leaders of their cocoa supply chain venture. *See* section IV.A.2, *supra*. Then, ignoring the bulk of Plaintiffs' allegations, and revealing a shocking lack concern for the Plaintiffs' ordeal, Defendants claim they were merely engaged in "ordinary business conduct." MTD at 43. Defendants' venture to profit from child slavery cannot be an ordinary business activity, and Plaintiffs have established that Defendants knew or should have known of forced child labor in their venture, *see* section IV.A.1, *supra.*, precisely of the sort endured by Plaintiffs. Complaint ¶¶ 127-148.

Finally, Defendants blatantly misrepresent the law in arguing that a claim for intentional infliction of emotional distress requires a showing that a defendant "targeted the plaintiff." MTD at 43-44. Defendants cite as their lead case *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005).  Defendants quote the first portion of the first sentence of footnote 12 attempting to create the false impression that Plaintiffs here could not bring a claim because they are in a "broad and amorphous category of people to which the plaintiff belongs." MTD at 43. However, looking at the ***remainder*** of that same footnote 12, exactly the opposite of Defendants' representation to this Court, the *Salazar* Court ***allowed*** the emotional distress claim to proceed for a family member of the actual target of the bombing, and held the entire group of "loved ones and

others" could bring a claim as well. 370 F. Supp. 2d at 115 n.12. Here, Plaintiffs were within the specific group that Defendants' venture did target, children forced to work on cocoa plantations.[17]

Stolen from their families, Plaintiffs endured every day the trauma of being forced to work performing hazardous tasks under horrific conditions. A jury should get to decide whether what Plaintiffs experienced from the conduct of the members of the cocoa venture was outrageous enough for liability. *See, e.g., Kiwanuka*, 844 F. Supp. 2d at 119-120 (daily verbal abuse from employer was sufficient to state an emotional distress claim).

### 4. All of Plaintiffs' claims were timely based on equitable tolling.

Plaintiffs agree with Defendants that the applicable statute of limitations is three years for their unjust enrichment, negligent supervision, and intentional infliction of emotional distress claims. MTD at 44 (citing *News World Comm'ns, Inc.*, 878 A.2d at 1222 and D.C. Code § 12-301(8)). However, in their rush to dismiss Plaintiffs' common law claims as untimely, Defendants fail to consider the application of equitable tolling, which is recognized by the District of Columbia.  As the Court of Appeals for the District of Columbia explained:

> "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citations omitted). "[T]o support equitable tolling, the circumstances that caused a litigant's delay must have been beyond its control." *Menominee Indian Tribe of Wis. v. United States*, 764 F.3d 51, 58 (D.C. Cir. 2014), *aff'd*, 136 S. Ct. 750 (2016). . . "The circumstance that stood in a litigant's way cannot be a product of that litigant's own misunderstanding of the law or tactical mistakes in litigation."

*Young v. SEC*, 956 F.3d 650, 655, 446 U.S. App. D.C. 339, 344, (D.C. Cir. 2020).

---

[17] Defendants other cases also do not support their assertion that only a person specifically targeted can bring a claim. In *Angus v. Shiley Inc.*, 989 F.2d 142, 147 (3d Cir. 1993), the Court added a crucial distinction, omitted by Defendants, that a plaintiff must show he was targeted if he "has not suffered a direct physical injury." In *Chambliss v. Nat'l RR Passenger Corp.*, 2007 WL 581900, at *30 (D.D.C. Feb. 20, 2007), the emotional distress claim was dismissed because plaintiff could not show defendant's conduct toward him was sufficiently outrageous. The Court merely held that plaintiff could not rely on similar but more outrageous conduct that defendant had directed at others. *Id.*

Courts uniformly agree that equitable tolling is warranted when extraordinary circumstances that were beyond the plaintiff's control caused a delay in the ability to file a claim. *See, e.g.*, *Marshall v. Honeywell Tech. Sols., Inc.*, 536 F. Supp. 2d 59, 68 (D.D.C. 2008).  For example, the D.C. Circuit has stated that equitable tolling may apply "when a plaintiff knows he has been injured, but is unaware that his injury may be the result of possible misconduct by the defendant." *Chung v. United States DOJ*, 333 F.3d 273, 279 (D.C. Cir. 2003).

Here, all the Plaintiffs allege that they were trafficked from their home country, Mali, then forced to perform hazardous work in Cote D'Ivoire harvesting cocoa on remote plantations. Complaint ¶¶ 127-148. After varying periods of years, each Plaintiff escaped their enslavement and, after harrowing travel with no resources and no papers, eventually returned to Mali. *Id.* Most of them are illiterate, and they returned to their lives of rural poverty in Mali after they escaped. There are many critical facts that would need to be determined before an accrual date for bringing their claims could be identified. Chief among those is when was it reasonable for them to know that it was the seven leading multinational chocolate companies, Defendants herein, that were ultimately responsible for their enslavement. *See Chung,* 333 F.3d at 279.  Additional questions of fact include, but are not limited to, when Plaintiffs had access to lawyers, what kind of factual investigation was required to verify their claims, and when they could be viewed as having the capacity to sue.

The law is clear that any factual questions regarding equitable tolling are for a jury to decide, and certainly cannot be resolved in the context of a motion to dismiss:

> As a general matter, "what a plaintiff knew and when [she] knew it, in the context of a statute of limitations defense, are questions of fact for the jury." *Riddell v. Riddell Washington Corp.,* 275 U.S. App. D.C. 362, 866 F.2d 1480, 1484 (D.C. Cir. 1989). This court held in *Byers v. Burleson,* 230 U.S. App. D.C. 62, 713 F.2d 856, 861 (D.C. Cir. 1983), that, under District of Columbia law, "summary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury."

*Goldman v. Bequai*, 19 F.3d 666, 672 (D.C. Cir. 1994).

Accordingly, assessment of the statute of limitations with respect to Plaintiffs' common law claims must be deferred until the finder of fact weighs the underlying facts and determines whether Plaintiffs exercised due diligence before they were able to file their complaint on February 12, 2021.

### E. **Plaintiffs Have Article III Standing to Seek Redress for their Injuries.**

Defendants argue that Plaintiffs lack Article III standing to sue. MTD at 7-13. This "Hail Mary" argument is frivolous. Defendants are not challenging the constitutionality of the TVPRA itself and do not dispute that a person victimized by trafficking or forced labor could properly sue the responsible venture participants who benefited from the wrongful acts under the TVPRA. Rather, under the guise of a standing issue, Defendants merely rehash their meritless position that Plaintiffs have failed to state a claim and re-argue fact-based issues.

Defendants' "standing" argument necessarily assumes Plaintiffs have no viable legal claims under the TVPRA or under the common law, and begs one of the ultimate factual questions in the case—whether Defendants are in a "venture." If, as Plaintiffs have established in section IV.A.2, *supra*, Defendants **are** participants with each other and their cocoa suppliers in a venture, their claim of being too far removed from what they tell consumers and regulators are "their" cocoa farmers to be responsible for Plaintiffs' injuries fails, and Plaintiffs have standing to sue.

### 1. **Plaintiffs have standing to obtain damages for their undisputed injuries.**

Constitutional standing requires only that (1) the plaintiff have suffered an injury in fact, (2) which is fairly traceable to the challenged action of the defendant, and (3) which may be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs easily satisfy the first and third requirements. Defendants do not dispute that Plaintiffs have suffered horrible concrete injuries by being trafficked and then enslaved on cocoa plantations in Cote D'Ivoire. Complaint ¶¶ 127-148. Further, Plaintiffs' injuries are redressable because when "one private party is injured by another, the injury can be redressed in at least two ways: by awarding

40

compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 127 (1998). Plaintiffs here seek these entirely traditional remedies.

Plaintiffs also satisfy the second element, the traceability requirement, the sole element Defendants dispute. In doing so, Defendants ignore the fundamental premise of this case— Plaintiffs allege Defendants are in a "venture" with each other and the cocoa plantations in their supply chains, a venture that makes Defendants and their co-venturers jointly and severally liable for the injuries suffered by Plaintiffs. *See* section IV.A.2.c, *supra*. This indisputable focus of Plaintiffs' allegations and the very theory of their case eviscerates Defendants' argument that their cocoa suppliers, not the Defendants, injured the Plaintiffs. MTD at 9-11. Defendants' effort to blame their cocoa farmers and other "third parties," all of whom are within the venture, is in fact an admission they *did* injure the Plaintiffs, and this extends to the entire venture.[18] The very nature of venture liability under the TVPRA is that all members of the venture are liable for acts committed to benefit the venture. For example, in the hotel/sex trafficking cases, there was no allegation needed that the hotel chains were directly involved in sex trafficking; they were liable because they were in a venture with and profited from the actual traffickers and merely turned a blind to the unlawful conduct. *See, e.g.*, *Hilton Worldwide Holdings, Inc.*, 2020 WL 5371459, at *6; *Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4; *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *Lorain-Elyria Motel, Inc.*,  2020 WL 1244192, *5-6. The sex traffickers in these cases were converted from distant third

---

[18] Even if Defendants' cocoa farmers could somehow be characterized as "third parties," the law is clear that the traceability requirement can be satisfied even if the harm is directly caused by a third-party. In *Baloco ex rel. Tapia v. Drummond* Co., 640 F.3d 1338 (11th Cir. 2011), children whose fathers were murdered by a paramilitary group in Colombia had Art. III standing to sue Drummond, a mining company that was alleged to have hired the paramilitaries to provide "security." *Id.* at 1343-45. Defendants are solely responsible for providing the support to their cocoa farmers they need to continue operating within a system that relies on child labor. *See, e.g.*, Complaint ¶¶ 49-51.

parties harming the victims to being co-venturers with the hotel chains. The only distinction with this case is that Plaintiffs were able to document and allege that, unlike the sex trafficking the hotel chains turned a blind eye towards, Defendants in fact claimed to have close relationships with their cocoa farmers. Across the 20 years since they signed the Protocol,  Defendants have repeatedly represented to the public and regulators that they were working with "their" farmers to end their reliance on child labor, and that they had the necessary control, policies and programs in place designed to do so. *See, e.g.*, Complaint ¶¶ 22,39,45,47,50,52-55,59-61,67,69,70, 71,82-84,89,96,99,101,103,104,111-15,120,123-24, 154-58. Defendants told the world, we don't need to be regulated; we will *voluntarily* devote our resources, relationships, and power to require our farmers to stop using child labor. In sharp contrast, they argue to this Court they are just like cocoa retailers and consumers, and cannot be expected to do anything about child labor on distant cocoa plantations. MTD at 11. A reasonable inference is Defendants could have acted to end the child labor practices that injured Plaintiffs, as they claimed they would, but chose instead to protect their system dependent on forced child labor while creating the appearance that they were addressing the issue. *See, e.g, id.* ¶¶ 45-47, 54, 156-57.

Defendants' effort before this Court to disown their cocoa farmers as distant strangers is at best improperly raising a factual dispute in the context of a motion to dismiss and at worst a blatant misrepresentation.  Defendants ignore that if they are in a venture with their collective cocoa farmers, they are jointly and severally liable for any wrongful acts on those cocoa farms. *See* section IV.A.2.c, *supra.* This fundamental legal consequence of being co-venturers with and jointly and severally liable for wrongful acts of their cocoa suppliers also dispenses with Defendants' various assertions that Plaintiffs fail to link them to their far-flung and unnamed cocoa farmers, and renders inapplicable Defendants' cases where there was no relationship between third parties and the

defendant. *See* MTD at 9-11.[19] In short, since Plaintiffs have sufficiently alleged Defendants participated in a "venture" with their cocoa suppliers, they certainly have standing to sue under the TVPRA because they suffered serious injuries while benefiting the venture with their forced labor. The close relationship between Defendants and their cocoa suppliers is also the foundation for Plaintiffs' common law claims. *See* section IV.E, *supra*.

### 2. Plaintiffs have standing to obtain injunctive relief.

Defendants separately argue that Plaintiffs lack standing to seek injunctive relief. MTD at 11-13. As an initial matter, Plaintiffs were unable to identify any case supporting Defendants' argument that injunctive relief is not authorized by the TVPRA. MTD at 11-12. Presumably Defendants have no support either or they would have cited it. There certainly are cases denying injunctive relief under the TVPRA for substantive reasons. For example, Defendants cite *Owino v. CoreCivic, Inc.*, 2020 WL 1550218 * 7-8 (S.D. Cal. Apr. 1, 2020) for the proposition that injunctive relief is not available unless plaintiffs can show they have Article III standing. *See* MTD at 12-13. Presumably if injunctive relief were simply not available under the TVPRA, the *Owino* Court would have said so.

The *Owino* Court's approach is sensible, and the sole question should be whether Plaintiffs have Article III standing to seek injunctive relief under the TVPRA, and they do. Defendants are generally correct that Plaintiffs must show there is a likelihood of future injury that needs to be enjoined. Plaintiffs submit that their case is unique and injunctive relief is essential for them to obtain complete relief. The fundamental root of the standing doctrine is courts will not adjudicate

---

[19] Defendants rely on *Siegel v. U.S. Department of Treasury*, 304 F. Supp. 3d 45, 53 (D.D.C. 2018), where the court held that traceability could not be determined because plaintiff's assertion would require "the court [to] speculate about the actual path of the funds, the various intermediate steps, the ultimate recipients, and their relationship to the control of [p]laintiff's property." MTD at 10. No such speculation is remotely required here as Plaintiffs have established Defendants were working directly with their cocoa suppliers within the "venture." *See* section IV.A.2, *supra*.

abstract disputes. The indispensable requirement is the party seeking relief allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions . . . ." *Baker* v. *Carr*, 369 U.S. 186, 204 (1962). Here, Plaintiffs have established that they have standing to sue for damages, and they will pursue all issues in this case with the vigor demanded of our adversarial process. In addition, however, a major objective of their case is to obtain injunctive relief to prevent future injury to thousands of similarly-situated children, including members of the putative class, *see* Complaint ¶¶ 18-23, some of whom are **today** being forced to work harvesting cocoa within the Defendants' venture. As noted, the 2020 U.S. Department of Labor-funded study found 1.56 million children currently harvesting cocoa, and at least 70% of these are working on cocoa plantations within Defendants' venture. *Id.* ¶¶ 1, 156.

Plaintiffs acknowledge there is no case law in this Circuit that would explicitly allow them, having suffered an injury that entitles them to damages, and since they have escaped their enslavement and are not in danger of future injury, to seek injunctive relief for the class they seek to represent that absolutely will suffer similar injuries if Defendants are not enjoined.  There is language in cases distinguishing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 105-06 (1983), and allowing injunctive relief when a completed injury to a plaintiff would, without question, occur again. For example, the Second Circuit in *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998), held that plaintiff class representatives could pursue injunctive relief on behalf of class members because "unlike *Lyons*, the plaintiffs in this case allege that they, as a certified class, are likely to suffer future interrogations by the [police detective] Squad." The case differed from *Lyons* because "challenged interrogation methods in this case are officially endorsed policies; there is a likelihood of recurring injury because the Squad's activities are authorized by a written memorandum of understanding between the Corporation Counsel and the Police Commissioner." *Id.* at 344–345. *See*

44

*also Flores v. City of New York*, 19-CV-5763, 2021 WL 663977 at *4 (E.D.N.Y. Feb. 9, 2021) (finding that a potential class action should be assumed to have standing at the motion to dismiss stage because if the class were to be certified, it would be likely that one member of the class is "currently detained" and therefore would give standing to seek an injunction).

Here, there is no dispute that forced child labor is continuing and injuries identical to those suffered by Plaintiffs are occurring and will continue to occur absent injunctive relief. Indeed, Defendants' current promise to the public is merely that they will "reduce by 70%" their reliance on the worst forms of child labor by 2025, Complaint ¶ 53, leaving thousands of children enslaved beyond that date even if Defendants for the first time meet a deadline they've set for themselves. Further, this ongoing use of child labor by Defendants' venture is based on their deliberate policy to continue to use child labor, protect the current system, and profit from it for as long as possible. *Id.* ¶¶ 39,50,54,55,70-71,82-84,96,111,154-58. Injunctive relief ordering Defendants to do what they promised to do over 20 years ago, change their current practices, and implement effective mechanisms to end child labor in their supply chains, is the only way to finally prevent Defendants from profiting from the worst forms of child labor, including forced child labor, and save countless children from the cruel enslavement that Plaintiffs endured.

## V.      CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss should be denied in its entirety and the parties should be permitted to begin the discovery process. Should the Court identify issues that require further factual pleadings, Plaintiffs seek leave to amend their complaint to address any rulings by the Court. Fed. R. Civ. P. 15 (a) requires leave to amend "'shall be freely given when justice so requires.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (citations omitted).

Respectfully submitted this 28th day of September 2021

s/ Terrence P. Collingsworth
Terrence P. Collingsworth (D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2021 I electronically filed the foregoing with the

United States District Court for the District of Columbia by using the CM/ECF system, which will

send a notice of filing to all registered users.


Date: September 28, 2021            /s/ Terrence P. Collingsworth
                                   Terrence P. Collingsworth (D.C. Bar No. 471830)
                                   INTERNATIONAL RIGHTS ADVOCATES
                                   621 Maryland Avenue, NE
                                   Washington, D.C. 20002
                                   Telephone: (202) 543-5811
                                   tc@iradvocates.org

                                   *Counsel for Plaintiffs*