# Key elements for an agreement between the EU and cocoa-producing countries, to ensure sustainability in the cocoa sector

A DISCUSSION PAPER



© John.U/Flickr

















**September 2020**

# Introduction

The European Commission is exploring bilateral agreements with the governments of Ghana and Côte d'Ivoire to ensure sustainability in the cocoa sector, and in particular to tackle deforestation, farmer poverty and child labour.

The aim of these agreements should be to ensure a transition towards sustainable cocoa production that provides farmers with a living income, while ensuring that EU cocoa consumption does not contribute to child labour and deforestation. As the EU imports most of the cocoa coming from Ghana and Côte d'Ivoire, and many of the cocoa companies have major operations in the EU, such an agreement could be very effective.

This agreement should complement the mandatory human rights and environment due diligence law that is currently being developed by DG Justice of the European Commission, as well as the regulatory approach considered by DG Environment towards ensuring that forest-risk commodity supply chains will be free from deforestation. These two new EU laws are likely to and should require companies buying cocoa to ensure that risks of human rights violations and deforestation are identified, addressed, and mitigated.

The purpose of this discussion paper is to provide the European Commission and the governments of Ghana and Côte d'Ivoire an insight into our thinking as to what a bilateral partnership agreement should cover, how it should be negotiated and how it could work in tandem with the expected EU laws.

This paper has been developed over a period of six months by NGOs based in the EU and in Ghana and Côte d'Ivoire. A draft was discussed at two webinars, one in Ghana and one in Côte d'Ivoire, to solicit further comments from local NGOs, farmer representatives and academics.[1] Note that this is a discussion paper, rather than a position paper, as many elements require further thinking.

This paper starts by outlining our vision of what a sustainable cocoa sector would look like, and hence what a bilateral partnership agreement should tackle. It then describes how the partnership could achieve its aims, pointing to different components, stakeholder responsibilities, and the process for negotiation. It concludes by summarising possible ways forward.



Cocoa plantaton in Ghana © jbdodane/Flickr

---

[1]   Reports of these webinars are available on request from Fern

# I. Our vision of a sustainable cocoa sector

Our vision is for cocoa production to be environmentally sustainable, providing a living income to farmer households (based on estimates from the Living Income Community of Practice[2]), free from child labour and other human rights abuses, and where gender equality is the norm.

## Environmental sustainability

To achieve an environmentally sustainable cocoa sector, the aim is to stop the deforestation of remaining forests, restore degraded forest areas and promote sustainable production. This will require investment, and it will be necessary first to improve the legal enforcement of existing forest reserves and national parks. This may mean that national forest agencies will need more resources, or the introduction of legal accountability for downstream actors which buy cocoa from illegally deforested areas. It may also be necessary to revise and strengthen the existing legal framework, e.g. to give legal protection to areas of forests outside currently protected forest reserves, or to introduce national strategies for agroforestry.

It is critical, however, that legal enforcement does not simply mean expelling local people from their farmland. Farmers should not be criminalised. It is necessary to involve farming households in the process of deciding how to protect and restore forests in their area, and ensure that they produce economic gains, and where this is not possible to help them find alternative sustainable livelihoods.

The empowerment of local people is essential for sustainable land and forest management. Cocoa farmers' organisations and other local formal and informal groups (such as Village Savings and Loan Associations (VSLA), women's groups and youth groups) should be empowered to assume more responsibility over landscapes, and to come up with (and implement, alongside other local stakeholders) management plans about which areas in their landscape should be forest, which should be for agroforestry, and so on.

To realise such plans, cocoa farming households will need initial financial support, for instance to plant non-cocoa trees and replace ageing ones, and possible compensation for keeping non-cocoa trees on their farms and/or introducing agroforestry systems. At a later stage, most of these costs need to be incorporated in the cocoa price.[3] For this to be effective, tree and land tenure rights will need to be clarified and strengthened.

The use of toxic chemicals on cocoa farms – including by children – is becoming increasingly common. Herbicides, pesticides and fungicides are being used by 51 per cent, 88 per cent and 74 per cent of households in Ghana, respectively, and 32 per cent, 75 per cent and 15 per cent respectively in Côte d'Ivoire.[4] There is a risk that pregnant and breastfeeding women use such chemicals too with negative consequences on themselves and their children. Many of the active ingredients used are classified as "highly hazardous", and farm workers – including children – generally apply them without the proper protective equipment. There is a need to promote systems such as integrated pest management, and to properly regulate the use of these pesticides to avoid damage to people and ecosystems.

The use of some of these ingredients, such as Bifenthrin, is forbidden in Europe, but they are still exported. Hence ensuring that banned substances are not exported to Ghana and Côte d'Ivoire should be part of the agreement.

## Tackling poverty

Problems in the cocoa sector (including child labour and deforestation) are underpinned by the poverty suffered by cocoa farming households. Some of the above measures (e.g. stronger tenure rights, investment in replacing ageing trees, compensation for keeping shade trees on farms) would also help address poverty. Other interventions would also be needed.

---

[2] For Ghana Living Income calculation: https://c69aa8ac-665-942b2-abb7-0f0b86c23d2e.filesusr.com/ugd/0c5ab3_8b6a7e26d-7c04908a7738f1c97376a78.pdf. For Ivorian Living Income calculation: https://c69aa8ac-6965-42b2-abb7-0f0b86c23d2e.filesusr.com/ugd/0c5ab3_a437a776dc7747c2999d3b0c60a46a97.pdf

[3] It is anticipated that some costs, e.g. for replacing aged farms, will need additional funding that cannot be achieved just through higher cocoa prices.

[4] Cocoa production practices; KIT study chapter 8, available at: https://www.kit.nl/wp-content/uploads/2018/11/Demystifying-cocoa-sector-chapter8-cocoa-production-practices.pdf

First and foremost, cocoa farmers need a living income. This will require higher prices for cocoa in combination with a holistic approach to achieving living incomes. A living income alone will not end the problems in the cocoa sector, but if cocoa-farming households cannot earn enough to live on, a sustainable cocoa sector is impossible. A living income is a human right and a precondition for enabling access to other human rights.

Current approaches to increase farmers' incomes have been too focused on increasing productivity and diversifying income. This will not be sufficient; any poverty alleviation approach must include solutions for the fact that farm gate prices are far too low for farmers to achieve a living income.

The Living Income Differential (LID) implemented by Ghana and Côte d'Ivoire in autumn 2019 is a positive step and should be supported (and ideally joined by other cocoa-producing countries). It must be recognised, however, that the proposed new farm gate values by the governments, although a significant increase, will not lead to a living income for the average farming household.

The LID intervention is only one of many steps necessary for farmer households to achieve a living income. Since – in Ghana and Côte d'Ivoire—this LID is passed on to the government before going to farmers, there is a need for transparency and accountability about how the money is spent, to ensure that a significant amount gets to the farmers and/or is invested into cocoa growing communities. There needs to be future dialogues on how to strengthen the implementation and design of the LID.[5]

There is also a need to improve contracting and purchasing practices between farmers and buyers, to give farmers more security, to improve their negotiating power with buyers, and to give them recourse if contracts are not honoured. This should be combined with improvements of labour contracts for workers on farms, as well as better working conditions for sharecroppers and caretakers.

Male and female farmers need social security or insurance mechanisms to protect them when harvests are bad or prices are low. They need access to affordable finance, especially in the pre-season period. This will improve their negotiating position with buyers. The ability of farmers to access finance is currently limited, borrowing is expensive, and income structures are not suited to the periodic nature of farmers' incomes. They also need better support, for instance through extension services, to increase yields and to reduce costs, and in some cases to diversify into other crops or sectors.

Access to finance is especially difficult for female farmers, as they are often not formally part of a cooperative, and therefore cannot count on its services, and often don't own land. Women's lower levels of literacy, especially in older generations, is also a barrier for accessing credit. Borrowing schemes for farmers who do not have collateral or family membership to cooperatives need to be in place to bridge the gap in accessing services between female and male farmers.

## Tackling child labour

Poverty is a major cause of child labour, so some of the above measures would also contribute to resolving it. As child labour is not limited to the cocoa sector, however, interventions should be holistic, community-based, and take account of local realities. Both Ghana and Côte d'Ivoire have a strong legal framework banning child labour. They have national action plans and initiatives to tackle child labour, and various institutions are involved in enforcement. However, implementation and enforcement are lagging, and it remains a major challenge in both countries. Local actors have stated that some of these initiatives could and should benefit by being more rooted in local realities.[6]

The partnership should contribute to ensuring that every child has access to schools which are safe, well-staffed and provide a sufficient level of education. There should be child labour monitoring and remediation systems rolled out across all cocoa growing communities, as well as community-driven prevention programmes. There should be no place for child labour, especially the worst forms of it, such

---

[5] The VOICE Network has released a short position paper outlining support for and concerns around the LID. https://www.voicenetwork.eu/wp-content/uploads/2019/09/190905-VOICE-Position-on-West-African-Cocoa-Floor-Price.pdf

[6] Final report seminar Cocoa and Human Rights, Accra Ghana by EcoCare and Forest Trends 29 August 2019 and Child Labor Laws and Policy in Ghana by Taylor Crabbe, published by Forest Trends 2019, available at: https://www.forest-trends.org/publications/child-labor-laws-and-policies-in-ghana/

as heavy labour or working with toxic pesticides, as defined by the International Labour Organisation (ILO) in Conventions 138 and 182, and specified in the national Hazardous Activity Frameworks. Nor should there be any place for child trafficking.

Enforcing existing laws would partially address these problems, but it is important for local actors, including local civil society organisations (CSOs), to analyse why enforcement is weak, and to develop locally grounded solutions for improving enforcement. This should include how to improve the capacity of institutions to enforce laws, along with monitoring, inspections, and remediation, while taking care not to unduly criminalise people. The EU should support this process, but the process should be locally designed and led.

## Ensuring gender equality

In Ghana and Côte d'Ivoire many women participate in cocoa production. Research shows that they carry out all types of tasks in cocoa farming, with the exception of cocoa spraying (although women usually are the ones who fetch the water to mix the chemicals), thinning and pruning, and selling to local buyers (with the exception of women who own their farms).

The Fair Labour Association estimates that women comprise 58 per cent of the workforce in the Côte d'Ivoire cocoa farming industry but are reported to earn only 21 per cent of the generated income and very often do not have access to producer organisations and cooperatives. This is because membership requirements often include proof of land ownership, and only 25 per cent of cocoa farmland is owned by women in Côte d'Ivoire and 20 per cent in Ghana.[7]

Recognised land ownership not only provides rights to farmland and the profits from the harvest but also visibility, access to cooperative membership, agricultural extension, inputs, training, premium payments and credit. Those women not able to hold land titles, tend to remain outside cooperatives or producers' organisations and therefore miss out on extension services and other programmes targeting organised farmers. Even where women own land, they are likely to face greater constraints than their male



Productrice de cacao - Côte d'Ivoire © SOCODEVI/Flickr

counterparts, as their farms tend to be smaller, less fertile and more remote.

Hence, despite their active participation in cocoa farming, women are often not recognised as farmers by policy makers, service providers, or sometimes their own communities. This limits their chances to participate in decision-making in the cocoa sector at every level: from the household, to the cooperative or producer organisation level, to national and international settings. It also limits their access to training, support and financial services. A fairer representation of female farmers in decision-making bodies, and an equal share of service provision among male and female farmers would be the first step to tackle gender inequalities. This would first require recognition of the role they play today so strongly in the sector.

---

[7] This section – including the data - is based on a report by the Fair Trade Foundation: https://www.researchgate.net/publication/339483623_Women_and_Cocoa_Fairtrade_Foundation_research_paper_into_the_links_between_female_participation_in_cocoa_production_and_women's_economic_empowerment

# II. Principles for a good process

The following three principles should be pursued when designing a process to negotiate this partnership agreement between the EU and cocoa-producing countries.

## Strengthening cocoa farmers' organisations

Central to our vision is the role of cocoa farmers' cooperatives or organisations.[8] We do not believe that a sustainable cocoa sector is possible unless they play a much stronger part. The role, functioning, quality, and structure of cooperatives need to be clarified and strengthened. There are a plethora of different cooperatives, from large to small, and from cooperatives created by the government to ones that have developed organically; this can lead to confusion, unhelpful power dynamics and conflicts.[9] Some suggest that the creation of a common governance structure would be helpful, though others disagree.

For many cooperatives, internal governance is weak; many are not able to act as advocates for their members in policy-making processes. In some cases, cooperative structures may be mis-used as fronts by local traders – or, in Côte d'Ivoire, by big landowners – to gain access to money or training. International traders have also had an influence on the running of cooperatives, sometimes for the good, but sometimes less so. Cooperatives must be farmer-led, professionally run, and accountable to their members.

Cooperatives also rarely properly represent women farmers, as their members are usually predominantly male, while we know that a large part of the work is done by women. The low level of female members in turn allows the cooperatives to gear their actions (representation, service provision, advocacy) more to male farmers' needs. Barriers that prevent female farmers from becoming members include high membership fees and strict requirements of land or tree ownership.

A sustainable cocoa sector therefore requires cooperatives: (1) to improve their internal governance, to ensure that they become democratic bodies which genuinely represent their male and female farmer members, and (2) to be supported in such a way that they can participate effectively in multi-stakeholder policy processes. This is a process that will take time, resources, and potentially a review of the laws governing cooperatives.

There are examples of well-run cooperatives, however, and much work has been conducted with these cooperatives on the development of their organisations, and how their decisions are based on needs assessments of their members, along with the inclusion of participatory decision-making, including the participation of women.[10]

The EU should support processes that enable cooperatives to strengthen their internal governance procedures, improve their communication with and representation of their members, maximise their political advocacy capacity and improve their ability to make and implement collective plans about how to manage landscapes.

## A deliberative process for decision-making

Cocoa farmers and CSOs need to be able to participate in decision-making processes around cocoa. There needs to be an information flow from male and female farmers and local CSOs to the government, and vice versa. We believe that there is a real need for the creation of national multi-stakeholder forums in producer countries, where stakeholders can sit together to discuss and resolve issues that will come up as part of this bilateral partnership agreement.[11]

There should be a parallel arrangement in the EU, where EU stakeholders, male and female, including private sector actors, CSOs, and government representatives can discuss areas where EU policy

---

[8] In line with the UN Declaration on the Rights of Peasants and Other People Working in Rural Areas, adopted by the UN General Assembly on 17 December 2018 and signed by the governments of both Ghana and Côte d'Ivoire.
[9] In Côte d'Ivoire, since the adoption of the OHADA Uniform Act relating to Cooperative Societies, the creation of these is not subject to a control of their viability before the issuance of the approval.
[10] https://www.fairtrade.net/library/fairtrade-west-africa-cocoa-programme-monitoring-report-first-edition
[11] Note that this is not a forum for voluntary action, but a forum to develop and implement a legally binding agreement. For a critical analysis of **voluntary** Multi-Stakeholder Initiatives (MSI) see http://www.msi-integrity.org/not-fit-for-purpose/..



Laying cocoa beans to dry in the sun, Homaho village, Assin district, Ghana
© Ecosystem Services for Poverty Alleviation (ESPA) programme/Flickr

should be revised to ensure it supports sustainable cocoa production. Good communication and/or participation in or between the producer country and EU forums is critical.[12]

These forums should take a deliberative approach, meaning that decision-making is not only inclusive but builds on partnership methodologies to enable participants to decide jointly on priorities and policy actions, after having considered topics from the other participants' points of view.[13] The forums would give local CSOs, companies and farmers' representatives a real seat at the table. This needs to go beyond mere "consultation", so that it is a genuinely deliberative discussion where stakeholders can respect, argue, build trust, decide, and collaborate.

The approach we propose draws on lessons learned from the Forest Law Enforcement Governance and Trade (FLEGT) Voluntary Partnership Agreement (VPA) process[14] in both countries and the "Collaborative Development Governance" model[15] – both multi-stakeholder deliberative processes, bringing all actors round the table to address and resolve governance challenges.

Disenfranchisement of local farmers and local CSOs, and a lack of accountability – of EU and producer country governments, and of companies – is a key problem in the cocoa sector. The partnership agreement process should therefore be able to address this disenfranchisement and the lack of accountability and transparency that allows politicians, companies, and others to act with impunity. Addressing such deep structural issues takes time, and the process should proceed with a long-term view in mind. Speed should not be pursued at the expense of getting things right.

---

[12] The European Commission is in the process of setting up a European multi-stakeholder platform to discuss the EU's regulatory and partnership approach for the cocoa sector. Several relevant CSOs and farmer-based organisations from Côte d'Ivoire and Ghana declined to be nominated to this platform, as they believe their role should be at the national level in producing countries.

[13] Deliberation is an approach to decision-making that allows participants to consider relevant information from multiple points of view. Deliberation enables participants to discuss the issues and doptions and to develop their thinking together before coming to a view, taking into account the values that inform people's opinions. **Deliberative dialogue** builds on dialogue and consensus-building techniques, enabling participants to work together (often with expert input) to develop an agreed view or set of recommendations. **Deliberative decision-making** builds on partnership methodologies to enable participants and decision-makers to decide jointly on priorities and programmes. Examples include partnership bodies and participatory budgeting exercises where power is genuinely devolved to participants. See: https://www.involve.org.uk/resources/knowledge-base/what/deliberative-public-engagement

[14] For a detailed analysis, see EcoCare, Fern and TBI, Transferring lessons from FLEGT-VPA to promote governance reform in Ghana's cocoa sector, available at: https://www.tropenbos.org/resources/publications/transferring+lessons+from+flegt-vpa+to+promote+governance+reform+in+ghana%E2%80%99s+cocoa+sector

[15] Florini and Pauli; Collaborative Governance for the Sustainable Development Goals (SDGs); May 2018.



Cocoa © Veronesi/Flickr

It would be useful if these forums are overseen by independent facilitators. This has been helpful in the FLEGT-VPA process in both Ghana and Côte d'Ivoire, and it is a key feature of national United Nations Development Programme (UNDP) Green Commodities Programme (GCP) processes. In these processes, facilitators have been instrumental in ensuring that where there is deadlock, there are channels for communication to address controversial issues.

For truly deliberative policymaking, it is essential that all parties – including CSOs and cocoa farmers' organisations – have sufficient capacity to advocate for themselves. It is also crucial that there is enough time built into the process to allow them to participate effectively. If the EU and its Member States wish to have a successful partnership agreement, they should provide financial and operational support to contribute to this local capacity-building.

Finally, for any of the above to work, it is essential that there is a genuine commitment and interest from the governments (including the European Commission, the Cocobod and Le Conseil du Café Cacao (CCC)) to increase transparency and public participation in policymaking. It is equally important to ensure that outcomes of deliberative processes are implemented effectively by all parties.

## Building on what is there

This initiative is potentially ground-breaking in that it uses the EU's demand for cocoa to leverage change in Ghana and Côte d'Ivoire, through a legally binding and enforceable bilateral partnership agreement. This agreement must be inclusive, and there should be clear incentives for actors to change, as well as mechanisms to hold them to account. This combination should make it more impactful than previous voluntary initiatives, where there was less accountability. However, this initiative should build on the many existing initiatives towards sustainable cocoa production.

It is therefore important to know what existing initiatives there are, to assess and learn from them, and possibly merge with them – e.g. by adding objectives and stakeholders or partners – or to ensure that information is being shared between them.

Initiatives include the various existing local-level partnerships working towards landscape management, the Cocoa and Forest Initiative, the Accra Agenda, Cocoa Action, the International Cocoa Initiative, initiatives that strengthen cooperatives, for example Fairtrade's work through the West Africa Cocoa Program,[16] Rainforest Alliance's Sector Partnership Programmes, and existing voluntary initiatives such as standard setting systems and company based sustainability programmes.

---

[16] https://www.rainforest-alliance.org/articles/harnessing-digital-technology-for-better-farming Fairtrade Africa have been engaged in a long-running programme of organisational strengthening of cooperatives https://www.fairtrade.net/library/fairtrade-west-africa-cocoa-programme-monitoring-report-first-edition

# III. Components of a bilateral partnership agreement

The following six components should be pillars of a new bilateral partnership agreement between the EU and cocoa-producing countries.

The process would lead to a common understanding of the required reforms and an enabling environment for sustainable production in Ghana and Cote d'Ivoire.



## Component I
### Putting in place a multi-stakeholder dialogue in Ghana and in Côte d'Ivoire

The national government in producer countries should set up a national dialogue with representatives of all stakeholder groups, including government, farmers, private sector and CSOs. The stakeholders would identify, discuss, and find ways to resolve, using a deliberative process, issues related to national policy and law enforcement that are driving unsustainable production in the cocoa sector.

Dialogue representatives should be elected or selected by their own representative bodies, using their own selection processes, ensuring a gender balance and ensuring that both female and male farmers' needs and interests are represented. Equally all participating groups should develop transparent mechanisms that ensure they are accountable to their respective constituencies. Representatives should not be hand-picked by the government.

Stakeholders should prioritise what they consider to be the most important measures. These discussions could include recognition of living income as a precondition to sustainability, tree and land tenure reform, price floors, rules on the use of agrochemicals, strengthening the capacity of local child labour law enforcement structures, requirements for government transparency and access to information. They could also include issues such as creating new obligations of contracts between cocoa farmers and buyers; creating a national eco-payment scheme for farmers to encourage forest restoration and developing a national traceability system. These priorities cannot be determined at the outset but must be developed via the national multi-stakeholder deliberative process.

The group should then set a roadmap, with clear timelines, for implementing the list of priorities. It should be possible to update the roadmap with new issues as they come up. The multi-stakeholder group should meet regularly to check on and discuss progress.



## Component II
### Putting in place a multi-stakeholder dialogue in the EU

The national producer-country dialogues should be mirrored by an EU-wide platform bringing together EU decision-makers with European NGO and private sector stakeholders. Again, these stakeholders should not be hand-picked but selected or elected by their representative bodies. These stakeholders would identify, discuss, and find ways to resolve, according to a deliberative process, issues related to EU policy and law enforcement that are driving the unsustainable consumption of cocoa.

Priority issues that EU stakeholders may want to discuss include: changes in EU competition law (which currently makes it difficult to justify improving human rights or environmental outcomes, if they lead to higher prices which are seen as anti-competitive); development and implementation of the EU human rights and environmental due diligence regulation and forest risk commodity regulation (including how these laws can strengthen the partnership and vice versa); transparency requirements for the financial sector, notably in pre-financing cocoa loans; implications of the EU Unfair Trading Practices Directive for cocoa producers; and other ways to increase transparency and accountability in the sector.

This process would create an enabling policy and regulatory environment at the EU for sustainable cocoa production in Ghana and Côte d'Ivoire. As in Component I, the EU group should then set a roadmap, with clear timelines, for implementing a list of actions in the EU. It should be possible to update the roadmap with new issues as they come up. The multi-stakeholder group should meet regularly to check on and discuss progress.

The EU multi-stakeholder group should also meet regularly with representatives of the multi-stakeholder groups in Ghana and Côte d'Ivoire, so that all sides can hold each other accountable.



Farmer Afia Timothy at cocoa harvest time, Assin district, Ghana
© Ecosystem Services for Poverty Alleviation (ESPA) programme/Flickr



## Component III
### Collectively developed, locally managed, sustainable landscape management plans

The global data is clear: the best way to ensure forest protection and forest restoration is to empower local people to manage (their) forest lands.[17] This component of the process would be based around local governments working with a group of local stakeholders to agree on and implement landscape management plans in which cocoa farmers' organisations should play an important role.

This management plan would be developed – and its implementation overseen – by a local multi-stakeholder group, including local government officers and local cocoa-growers' organisations and local CSOs selected or elected by their representative bodies through a transparent process. It is important to actively involve all parts of the population living in a landscape and specifically to ensure women's participation.

In the management plan, the local stakeholders would identify which areas in their landscape should be protected as forest (even if they are not

---

[17] Seymour F, LaVina T, Hite K (2014) Evidence linking community level tenure and forest condition; an annotated bibliography. Available at: http://www.climateandlandusealliance.org/wp-content/uploads/2015/08/Community_level_tenure_and_forest_condition_bibliography.pdf. World Resources Institute (no date) Land matters: How securing community land rights can slow climate change and accelerate the sustainable development goals. Available at: https://www.wri.org/news/land-matters-how-securing-community-land-rights-can-slow-climate-change-and-accelerate

currently legally protected), which areas should be restored, which should be agroforestry and what that agroforestry should look like, as well as the replacement of ageing trees.

Note that the cocoa sector is presently engaging in landscape-level development planning in both Ghana and Côte d'Ivoire, so this should be built upon. However, so far companies have been hesitant to put any money on the table to realise those plans. This partnership agreement process should encourage companies (via Component V below) to provide financial support.

Clarity of land and tree rights is a pre-condition for local-level landscape planning. A process of clarification, demarcation and gazettement may be part of this, including identifying and implementing best practices that ensure women have access to land. Some think it would be worth considering looking at supporting cooperatives to conduct grouped land titling within specific landscapes. One strategy for land reform could be to couple it with pension schemes.[18]

This component would establish landscape-level decision-making and investment planning around reforestation, agroforestry etc., and bring farmers together with local governments to make these plans. Companies contributing to this would be more efficient and effective than each company trying to carry out its own reforestation programme. It would also be much more empowering to farmers.



## Component IV
### Ensuring companies pay Living Income Differential

This component should increase farmer incomes as part of a time-bound process to create a living income and adopt better purchasing practices. This builds on the agreement reached in autumn 2019 between the governments of Ghana and Côte d'Ivoire and cocoa companies to put in place a Living Income Differential. Under this initiative, companies buying cocoa from Ghana and Côte d'Ivoire pay a differential over the market price, with the idea that this additional money goes towards public finance and livelihoods for farmers.

After the two governments announced this initiative, companies did agree to pay the higher price for 2020. As part of this bilateral partnership agreement, the private sector should agree to pay a higher price for cocoa every year going forward, with governments then responsible for ensuring a significant portion goes towards farmers.

However, it should be recognised and acted on that the current Living Income Differential of US$400 per tonne (and the farm gate price committed to by the Ivorian and Ghanaian governments if the world market price was between US$2,200 and US$2,600 per tonne of US$1,820 at farm gate)[19] will not enable cocoa farming households to reach a living income. The LID should, therefore, be based on calculations of what is needed to achieve a living income. The private sector should commit to further increases in the price paid for cocoa until farm gate prices reach a level that will enable a living income. The European Commission should recognise the right to a living income as a human right.

Alongside this commitment to pay a higher price, the private sector should commit to adopting purchasing and contracting practices that in the long term will contribute to a living income, such as long-term contracts, direct contracts with farmers, and potentially some form of security in case of a bad growing season. Lessons can be learned from the EU Unfair Trading Practices Directive which highlights black and grey areas to protect small suppliers against stronger buyers. These are desires that have been raised by farmers we have spoken to, but the full set of interventions should be developed together with farmers' representatives in the national multi-stakeholder group described in Component I above.

---

[18] 2018 Cocoa Barometer: "Many cocoa farmers are ageing, but old age does not exempt farmers from having to do the backbreaking labour. A possible solution could be to introduce national pension schemes in West Africa, much like what was done in land-redistribution policies in Western Europe in the 1960's and 1970's. Elderly farmers would be able to receive a lifetime pension, in return for giving up their farming land to the government. The government could then use this land to instil tenure reforms, making new – and larger – farms available to a younger generation, many of whom could be offered these farms in lieu of their vacating the cocoa farms in currently classified forests. An extra requirement could be that the new farmer commits to an agroforestry approach for at least the first years of the newly established farm. This could also be combined with a set of technological improvements and extension services to make the new farm more professional. Such a solution could be a win-win situation for all parties involved; elderly farmers can have an opportunity to stop labouring, younger farmers can become modern and professional cocoa farms, protected forests are made available for reforestation, yields can go up, and governments have a means to enable national agricultural policies to reduce overproduction."

[19] Both Ghana and Cote d'Ivoire have announced the new farm gate price for 2020/2021; Ghana $1,726, Cote d'Ivoire: $1,840



## Component V
### Financing a sustainable transition

This fifth component of the bilateral partnership agreement is a financing mechanism. The EU and chocolate companies should contribute to a finance mechanism to invest in the sustainable transition of the cocoa sector and in local sustainable development. Specific attention should be given to gender, social inclusion, and the role of youth.

Programme design needs to be conducted in a participatory manner, with the national multi-stakeholder process (Component I) playing a key role. It is especially important that women are not (inadvertently) blocked from taking part in programmes – barriers to participation need to be accounted for. For example, land ownership or entitlement should not be a requirement for women to participate. Other factors such as literacy, education levels and gender-based violence should be identified and accounted for.

A full and inclusive process, including women involved in cocoa production, will ensure that programmes are better aligned with their needs, account for female-specific barriers, and enhance women's ownership and empowerment over the programme.

Funds could go towards national projects or local and regional projects. Care should be taken that a significant part of this spending will take place in cocoa-producing areas, as some argue that currently this is often not the case.

The funds should be administered by landscape-level multi-stakeholder groups and be used to implement their local landscape management plan. For example, funds might go towards funding reforestation or agroforestry in the agreed-upon areas or replacing ageing cocoa trees, as decided by the local landscape management plan. They might also go towards local development: e.g. schools, health centres, and the promotion of alternative economic activities to cocoa production especially where there is a decision to remove cocoa farmers illegally occupying forest reserves. Decision-making and investment planning around restoration and agroforestry etc. would thus take place at the landscape level, via a multi-stakeholder process.

Potentially, financial institutions could also be sought out to participate and co-fund this process. They could also help create lending options that are accessible to smallholder farmers, including those who do not have land titles or tree ownership, are illiterate, or based in remote areas, to allow them to invest in farm improvement.

The exact financing mechanism need to be explored further as there is some hesitation about the creation of a fund. There is little experience with well-managed funds and a lot of experience with badly managed funds that have not been beneficial to local farmers. In past decades, several attempts to initiate cocoa sustainability funds through the International Cocoa Organisation have been unsuccessful. Hence the financing mechanism and specifically the governance and management of it should be transparent and carefully thought through.

The difference between this financial mechanism and previous funds is that here the money would be managed collectively by the government and local stakeholders, not by individual companies, governments, or development agencies. If executed well, this model could leave behind the disjointed, individual actions that have failed in generating sector-wide change and move towards collaborative action to maximise impact. It is relevant to consider successes and failures of existing initiatives, such as the Cocoa and Forests Initiative and certification programmes' facilitation of sustainability investments.[20]

There is also hesitation about creating a fund that focuses on too many things at the same time, which is why some people suggest starting by supporting actions for farmers to access a living income and/or maintaining existing forest areas before moving to other issues.

A fund, and any contribution to a fund, does not replace the need for farmers to be paid a higher price for a cocoa, to allow them to reach a living income.

---

[20] https://www.rainforest-alliance.org/business/wp-content/uploads/2020/06/2020-program-shared-responsibility.pdf





## Component VI
**Monitoring and enforcement mechanism**

Robust joint monitoring and enforcement mechanisms are crucial for effective implementation of any agreement. Fortunately there are good models for such mechanisms concerning deforestation, such as the Grupo de Trabalho de Soja in Brazil, which has worked for over a decade and brought deforestation for soy in the Amazon from around 30 per cent to around 1 per cent.

Monitoring for the cocoa sector should include progress on addressing deforestation, achieving living incomes and tackling child labour. It is encouraging that the Cocoa and Forest Initiative signatories agreed in November 2017 to put in place robust joint monitoring mechanisms, and that official or semi-official mapping of land use and deforestation has proceeded in both Ghana and Côte d'Ivoire. Furthermore, most cocoa traders and chocolate manufacturers have begun to disclose their direct cocoa supply chains, making monitoring more feasible, even if their indirect chains remain opaque, and probably conceal both legal and illegal deforestation as well as child labour and other human rights abuses. Lastly, the EU aims to set up 'an observatory', for which the terms of reference are yet to be developed, that could play a role in monitoring and enforcement of the agreement.[21]

To be effective, it is essential for both producer countries and the EU to establish a system that monitors and enforces implementation of the roadmaps developed as part of the bilateral agreement, with free, public, and usable platforms that include not only supply-chain information but also data about land-use, deforestation, farmers' incomes and child labour. It is equally important to ensure that companies adhere to their responsibilities in the agreement.

Finally, it is important to monitor the wider impacts of the partnership agreement, so if any unforeseen consequences arise from the implementation process - such as leakage to other markets - this can be flagged and properly addressed.

---

[21] COMMUNICATION FROM THE COMMISSION TO THE EUROPEAN PARLIAMENT, THE COUNCIL, THE EUROPEAN ECONOMIC AND SOCIAL COMMITTEE AND THE COMMITTEE OF THE REGIONS Stepping up EU Action to Protect and Restore the World's Forests; COM/2019/352 final; page 16.

# IV. Conclusion and immediate next steps

The six components or pillars listed above are essential, in our view, for a sustainable transition of the cocoa sector. However, many of the activities described already exist – at least on paper – in various initiatives. We hope that this bilateral partnership agreement with the EU can make things happen that have so far proved intractable, by developing a legally binding enforceable agreement. This agreement could introduce levers that provide a "game changing" effect, specifically if developed in tandem with the new EU due diligence laws being developed.

## Next step: creation of enforceable roadmaps for producer countries and the EU

As described in Components I and II, the most important next step is to create a national multi-stakeholder deliberative dialogue within both producer countries and the EU, to come up with a timebound roadmap for what needs to happen both in producer countries and in the EU, for cocoa to be produced sustainably.

The roadmaps should identify steps that the governments, including the EU, and other stakeholders must take to address deforestation, poverty and human rights issues in the cocoa sector, with topics to be decided by the stakeholders themselves while adhering to international human rights conventions.[22]

Once the roadmaps have been developed and are being implemented, the implementation must be regularly reviewed in a plan-do-check-act cycle. Lack of progress should have consequences; implementation of the roadmap should be jointly enforced by the EU and the country governments.

## Enforcing implementation of the roadmap

Implementation of the roadmaps could be supported by linking progress on the milestones in the roadmap with several different levers, including modified due diligence requirements, financial incentives and/or market access. If one or more milestones in the roadmap are missed, the country or the EU could be given a risk alert and a timeline to improve. Consequences of a risk alert being placed on the EU would require further discussion and agreement among all stakeholders; consequences of a risk alert being placed on a producer country would also have to be discussed and agreed among all stakeholders, but could include the following (non-mutually exclusive) options:

First, progress on the roadmap could be coupled with the due diligence requirements for companies under

---

[22] Including but not limited to the International Bill of Human Rights (consisting of the International Declaration of Human Rights; the International Covenant on Economic, Social and Cultural Rights and the International Covenant on Civil and Political Rights), the UN Declaration on the Rights of Peasants and Other People Working in Rural Areas, adopted by the UN General Assembly on 17 December 2018; The relevant ILO Conventions; the UN Guiding Principles on Business and Human Rights and the OECD Guidance for Responsible Agriculture Supply Chains.



the upcoming EU laws – depending on the content of these laws. If progress is being made, due diligence requirements for companies could be lower, and if progress on the roadmap is stalled and a risk alert has been issued, the due diligence requirements could be higher.

Second, progress on the roadmap could be linked with financing mechanisms: price rewards, increased investments, tariff adjustments, or pre-season finance interest adjustments or conditionalities. Progress could be rewarded with an additional cocoa price premium, or increased investment by cocoa companies participating in the agreement. If European banks are part of the agreement, progress could also be rewarded with special financial products by European lending institutions – perhaps with lower interest rates.

If a country has been given a risk alert and progress is not being made to address it, this could lead to the EU imposing extra tariffs, and/or suspending its financial support under the agreement. Lack of progress on the roadmap could also mean that the companies which are part of the agreement withhold financial support, or that sustainability differentials are temporarily reduced. Lack of progress might mean that producer countries temporarily pay higher interest rates for pre-season finance from EU private banks. Alternatively, the pre-season loans to governments could have conditionalities attached to them, requiring the governance milestones/timelines in the roadmap to be respected.

A final approach could be to link progress on the roadmap with better EU market access, with failure being linked to limited or no market access.

One way of making this tangible would be to use a "carding" system like the one used by the EU to tackle illegal fishing through the EU Regulation on Illegal Unreported and Unregulated (IUU) fishing. Under this option, the EU could undertake an assessment of cocoa-producing countries or jurisdictions to see whether they have an agreed national multi-stakeholder platform that has developed and has started to implement a roadmap, as above. If they do, the country or jurisdiction would be issued a green card. If there are concerns about the process, the EU would issue a yellow card. The EU would then work with the multi-stakeholder platform (including financial/technical support) to try to resolve the issues. Once resolved, the country/jurisdiction would get a green card. If reasonable progress is not made, the EU would issue a red card. This would block all cocoa from that country or jurisdiction from entering the EU until the issues are resolved.

Another, less-favoured, option could entail stakeholders reaching consensus on a farm-level standard for acceptable cocoa, and the EU then requiring all cocoa entering the EU to meet that standard. Most NGOs do not favour this option, as what is necessary from a bilateral partnership agreement is not a focus on farmer compliance, but on the creation of an enabling environment, which requires government action.[23]

---

[23] In this context it should be noted that the governments of Ghana and Côte d'Ivoire are developing an African Regional Standard for Sustainable Cocoa (ARS 1000 1-3). Besides the mentioned concerns around farm standards, this standard is also not strong enough on either deforestation or human rights violations. It should also be noted that the African Organisation for Standardisation (ARSO) standard development process itself is not deliberative and is in strong contrast to the process that led to the development of the FLEGT-VPA legality standard for timber in both Ghana and Côte d'Ivoire, which includes a roadmap for reform and was developed in a more deliberative process, with strong support from local NGOs, companies and the Forestry Commission.



Cocoa production © CIFOR/Flickr

<mark>

## List of signatories:

- EcoCare Ghana
- Fair Trade Advocacy Office
- Fern
- INADES-Formation Côte d'Ivoire
- Inkota
- Mighty Earth
- Rikolto
- Social Enterprise Development Foundation (SEND) Ghana
- Solidaridad
- Tropenbos Ghana
- Tropenbos International
- VOICE Network
- World Cocoa Farmers Organisation



Ripe Cocoa pods in a Ghana farm
© U.S. Department of Agriculture/Flickr

*We would like to thank all of the individuals and organisations who have helped draft this discussion paper, including Rainforest Alliance and Fairtrade International who contributed to various sections.*

*This publication has been produced with assistance from the Arcus Foundation; the European Union Life Programme; the Ford Foundation; the UK Foreign, Commonwealth & Development Office; and the Dutch Ministry of Foreign Affairs. The contents of this publication are the sole responsibility of the authors and can in no way be taken to reflect the views of the donors.*



