UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISSOUF COUBALY *et al.*,

    *Plaintiffs*,

v.

CARGILL, INC. *et al.*,

    *Defendants*.

No. 21-cv-386 (DLF)

## MEMORANDUM OPINION

Issouf Coubaly and seven other citizens of Mali bring this suit under the Trafficking Victims Protections Reauthorization Act (TVPRA), 18 U.S.C. § 1595 *et seq.*, for claims of human trafficking and forced labor. *See generally* Compl., Dkt. 1. Before the Court is the defendants' motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Defs.' Joint Mot. to Dismiss at 1, Dkt. 27. For the reasons that follow, the Court will grant the motion under Rule 12(b)(1).

**I.   BACKGROUND**[1]

    **A.   Factual Background**

        *1.   The cocoa industry in Côte d'Ivoire*

Côte d'Ivoire is the world's largest exporter of cocoa and provides seventy percent of the world's supply. Compl. ¶ 41. Since the late 1990s, governmental and nongovernmental

---

[1] On a Rule 12(b)(1) motion in which the "defendant mounts a 'facial' challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (citing *I.T. Consultants v. Pakistan,* 351 F.3d 1184, 1188 (D.C. Cir. 2003)).

organizations have recognized the existence of child slavery in the Ivorian cocoa industry. *Id.* ¶ 36. These child slaves have frequently been trafficked into Côte d'Ivoire from the neighboring countries of Mali and Burkina Faso. *Id.* ¶ 37. On the cocoa plantations, the child slaves "burn[] and clear[] fields, cut[] down trees to expand [the] plantations, spray[] pesticides, us[e] sharp tools to break [cocoa] pods, and transport[] heavy loads of cocoa pods and water." *Id.* ¶ 39. The plantation owners frequently purchase the children from traffickers, hold them against their will, force them to work without payment, physically abuse them, and deny them sufficient food. *Id.* ¶ 40.

The defendants in this case are all American corporations that import, process, or sell cocoa or chocolate. They all have managers in Côte d'Ivoire, and they "send buyers and others to interact with the farmers, including to provide support and training." *Id.* ¶ 45. These corporations do not own the cocoa farms, but they nonetheless "maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms." *Id.* ¶ 46 (quoting *Doe I v. Nestlé USA, Inc.*, 766 F.3d 1013, 1017 (9th Cir. 2014)). They provide both "financial assistance and technical farming assistance." *Id.* (quoting *Doe I*, 766 F.3d at 1017). The former "includes advanced payment for cocoa and spending money for the farmers' personal use." *Id.* (quoting *Doe I*, 766 F.3d at 1017); *see also id.* ¶ 51. The latter "includes equipment and training in growing techniques, fermentation techniques, farm maintenance, and appropriate labor practices." *Id.* ¶ 46 (quoting *Doe I*, 766 F.3d at 1017); *see also id.* ¶ 51. This technical support both "expand[s] the farms' capacity and act[s] as a quality control mechanism." *Id.* ¶ 46 (quoting *Doe I*, 766 F.3d at 1017); *see also id.* ¶ 51. As part of this, "defendants or their agents visit farms several times per year." *Id.* ¶ 46 (quoting *Doe I*, 766 F.3d at 1017); *see also id.* ¶ 51.

These "exclusive buyer/seller relationships" between defendants and "local farms and/or farmer cooperatives in Côte d'Ivoire" allow the defendants "to obtain an ongoing, cheap supply of cocoa." *Id.* ¶ 50.  Through "memorand[a] of understanding, agreements, and/or contracts, both written and oral, [d]efendants are able to dictate the terms by which" Ivorian cocoa "farms produce and supply cocoa to them, including specifically the labor conditions under which the beans are produced." *Id.*  When the defendants or their agents visit the farms, they "witness illegal child labor." *Id.* ¶ 51.

> 2. *The plaintiffs*

The eight plaintiffs in this case, Coubaly, Sidiki Bamba, Tenimba Djamoutene, Oudou Ouattara, Ousmane Ouattara, Issouf Bagayoko, Arouna Ballo, and Mohamed Traore, are Malian citizens who were trafficked as children to farms in Côte d'Ivoire to harvest cocoa beans. Compl. ¶¶ 2, 150.  Although their respective stories differ, they all were children in Mali who were approached by unfamiliar men who offered to transport them to Côte d'Ivoire for paying jobs. *Id.* ¶¶ 127, 130, 133, 136, 139, 143, 146.  The plaintiffs accepted these offers and wound up at cocoa plantations in Côte d'Ivoire: Coubaly at the Guezouba plantation managed or owned by Lassina Coubaly, *id.* ¶ 127; Bamba at the Karou plantation managed or owned by Madou Kone, *id.* ¶ 130; Djamoutene at the Yofla plantation managed or owned by Madou Kone's brother, *id.* ¶ 133; Oudou Ouattara at a plantation in Divo owned by Madou Kone, *id.* ¶ 136; Ousmane Ouattara and Bagayoko at a plantation near Souroudouga owned by Salif Djamoutene, *id.* ¶ 140; Ballo at a planatation near Grabo owned by Sidibe, *id.* ¶ 143; and Mohamed Traore at a plantation near Niama owned by Sekou Traore, *id.* ¶ 146.  Over several years, the plaintiffs performed various plantation tasks—clearing brush with machetes, tending cocoa plants, harvesting the plants, opening the cocoa pods and removing the beans, and applying pesticides

and herbicides—with the expectation that they would be paid for their labor at the end of each harvesting season. *Id.* ¶¶ 128, 131, 134, 137, 140–41, 143–44, 146–47, 150. But the cocoa farmers never paid the plaintiffs as promised, and they treated the children inhumanely. *See id.* ¶¶ 128, 131, 134, 137, 140–41, 143–44, 146–47, 150, 151. The farmers kept them isolated in squalid conditions and threatened them with no food if they did not work. *Id.* ¶ 151. Although they gave the children small deliveries of food, they never paid them for their labor. *See id.* ¶¶ 128, 131, 134, 137, 140–41, 143–44, 146–47, 150. Eventually, all of the children escaped and returned to Mali. *See id.* ¶¶ 128, 131, 134, 137, 141, 144, 147.

        3.      *The defendants*

Nestlé USA, Inc., is the American subsidiary of Nestlé, S.A., and is headquartered in Virginia. *Id.* ¶ 24. It purchases, manufactures, and sells cocoa products. *Id.* Nestlé acknowledges that children and forced laborers work on the Ivorian farms "in areas where [they] source cocoa." *Id.* ¶ 62. Nestlé's responsible sourcing standard prohibits the employment of children under the age of fifteen, but the company's known suppliers violate this standard by employing children, many of whom were trafficked from Mali and Burkina Faso. *Id.* ¶¶ 64–65. Nestlé claims to monitor only one-third of its supply chain for compliance with its standards. *Id.* ¶ 67. Nestlé relies on community auditors "to spot children engaged in labor activities," and it has neither independent monitors nor consequences for farmers using child slaves." *Id.* ¶ 71.

Cargill, Inc., is a Delaware corporation headquartered in Minnesota that processes cocoa and distributes it to food producers. *Id.* ¶ 25. Cargill Cocoa is a subsidiary of Cargill, Inc., that is incorporated in Pennsylvania. *Id.* ¶ 26. This subsidiary "is a major cocoa bean originator and processor." *Id.* Cargill has exclusive relationships with "numerous cocoa cooperatives." *Id.* ¶ 79. The owner of one cooperative in Duekoue said "that a local representative from Cargill

4

visited his cooperative on a weekly basis and that a Cargill representative from the company headquarters visited about once a year." *Id.*  Cargill has an "ongoing and continued presence on the cocoa farms in Côte d'Ivoire for purposes of quality control" and technical assistance such that "Cargill has first-hand knowledge of the widespread use of child slave labor in harvesting cocoa on the farms they were working with and purchasing from." *Id.* ¶ 80.  Much like Nestlé, Cargill does not have an effective system for monitoring the use of child slaves, and it reaches only a small portion of Cargill's supply chain. *Id.* ¶ 86; *see also id.* ¶ 55, 89–90.

Barry Callebaut USA, LLC, is an American subsidiary of Barry Callebaut AG that is headquartered in Illinois. *Id.* ¶ 27.  The American company "markets and sells cocoa produced in Côte d'Ivoire in the United States." *Id.*  Barry Callebaut admits that there is currently child labor within its supply chain. *Id.* ¶ 94.  Much like Nestlé and Cargill, Barry Callebaut does not effectively monitor its farmers and exacts no consequences upon farmers who use child slaves. *Id.* ¶ 96; *see also id.* ¶ 55, 86.  Thus far, Barry Callebaut has "deployed monitoring and remediation in 21 farmer groups in Ghana and Côte d'Ivoire conjointly, covering a total of 12,018 farmers in 2017/2018," which "represents at most only 12 percent of the farmer groups from which they directly source in these two countries." *Id.* ¶ 96.  Barry Callebaut "found 4,230 cases of child labor in its supply chain during 2017–18." *Id.* ¶ 97.  There is no evidence that Barry Callebaut enforces its code of conduct that prohibits the use of child labor. *Id.* ¶ 98.

Mars, Inc. is an American corporation headquartered in Virginia that "sells and markets cocoa products all over the United States with cocoa produced in Côte d'Ivoire" through Mars Wrigley Confectionary, a subsidiary headquartered in Illinois. *Id.* ¶ 28.  Mars has a code of conduct that prohibits child slavery by its suppliers. *Id.* ¶ 99.  It also has a five-step program to end the use of child slavery by its suppliers through training, auditing, and certifying compliant

5

suppliers and terminating relationships with non-compliant ones. *Id.* ¶ 101. Nonetheless, Mars recognizes that it still obtains cocoa from farms using child slaves. *Id.* ¶¶ 102–03.

Olam International Americas, Inc., is an American corporation headquartered in New Jersey that "sells and promotes its cocoa products with cocoa produced in Côte d'Ivoire all over the United States." *Id.* ¶ 29. Although Olam claims that all of its farmer groups participate in a child labor monitoring system, it relies on the same ineffective monitoring system as Nestlé, Cargill, Barry Callebaut, and Mondelēz that lacks independent monitoring and exacts no consequences upon farmers who use child slaves. *Id.* ¶¶ 121, 126; *see also id.* ¶¶ 55, 86, 96, 113.

Hershey Company "is an international chocolate producer headquartered" in Pennsylvania that "manufactures, distributes and sells its cocoa products with cocoa produced in Côte d'Ivoire all over the United States." *Id.* ¶ 30. Hershey's code of conduct prohibits child slavery, and Hershey audits its suppliers with possible termination of business for noncompliance. *Id.* ¶¶105–09. Nonetheless, Hershey continues to profit from child slavery through its purchases of Ivorian cocoa. *Id.* ¶¶ 104, 111.

Mondelēz International, Inc., is an American corporation headquartered in Illinois that "manufactures, distributes, and sells its cocoa products with cocoa produced in Côte d'Ivoire all over the United States." *Id.* ¶ 31. Mondelēz admits that there is still child slavery in its supply chain. *Id.* ¶¶ 112–13. Much like Nestlé, Cargill, and Barry Callebaut, Mondelēz does not effectively monitor its farmers and exacts no consequences upon farmers who use child slaves. *Id.* ¶ 113; *see also id.* ¶ 55, 86, 96. What monitoring it does "applies, at most, to 20 to 30 percent of [its] supply chain." *Id.* ¶ 113. By its own study, Mondelēz recognizes that there is "a high risk of child labor in the cocoa sectors of Côte d'Ivoire and Ghana." *Id.* ¶ 115 (quoting Mondelēz International, Inc., *Child Labor*, Cocoa Life, https://www.cocoalife.org/the-

6

program/child-labor (last visited June 27, 2022). Its supplier contracts prohibit the use of forced and child labor by suppliers or any of their subcontractors. *Id.* ¶ 119. Nonetheless, Mondelēz continues to profit from child slavery through its purchases of Ivorian cocoa. *Id.* ¶¶ 113, 120.

Together, the defendants "are the architects and defenders of the cocoa production system of Côte d'Ivoire." *Id.* ¶ 154. They are members of World Cocoa Foundation (WCF) and the International Cocoa Initiative (ICI), which are industry groups with offices in Côte d'Ivoire. *Id.* ¶ 45. Through these organizations, the defendants monitor and research the conditions on cocoa farms in Côte d'Ivoire. *Id.* In 2001, they lobbied Congress to convert a proposed mandatory program to end the use of child labor into a voluntary initiative to phase out child labor by 2005. *Id.* ¶ 52. They extended their deadline for compliance several times: first to 2008, then to 2010, and then to 2020, before concluding that they would not be able to eradicate child labor even by 2025. *Id.* ¶ 53. A University of Chicago study has concluded that child labor has increased since 2015 to approximately 1.6 million children harvesting cocoa in 2020. *Id.* ¶ 54.

The defendants' monitoring efforts extends to only a small percentage of their supply chains. *Id.* ¶ 55. Approximately seventy to eighty percent of the cocoa "comes from the 'free zones' where there is no monitoring of anything and there is a high incidence of forced child labor, including trafficked child labor." *Id.* ¶ 56. In 2015, Nestlé's auditors, for example, visited 260 of the approximately 30,000 farms that supplied it. *Id.* ¶ 57. They found that there were children working hazardous jobs on some of these farms without pay. *Id.* ¶ 58.

### B. Procedural History

On February 12, 2021, the plaintiffs filed this suit on behalf of themselves and other similarly trafficked Malians. *See* Compl. ¶¶ 10–23. Coubaly brings five counts against all defendants: (1) forced labor in violation of the TVPRA, 18 U.S.C. §§ 1589, 1595, *see* Compl.

7

¶¶ 149–64; (2) trafficking with respect to forced labor in violation of the TVPRA, 18 U.S.C. §§ 1590, 1595, *see* Compl. ¶¶ 165–74; (3) unjust enrichment, *see id.* ¶¶ 175–78; (4) negligent supervision, *see id.* ¶¶ 179–85; and (5) intentional infliction of emotion distress, *see id.* ¶¶ 186–91. The defendants' joint motion to dismiss is ripe for resolution.

## II.    LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted). But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (internal quotation marks omitted). A court that lacks jurisdiction must dismiss the action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## III.   ANALYSIS

A federal court lacks subject-matter jurisdiction if the plaintiff does not establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that "[t]he party invoking federal jurisdiction bears the burden of establishing the[ three] elements" of standing). Indeed, "a showing of standing 'is an essential and unchanging' predicate to any exercise of our

jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting *Lujan*, 504 U.S. at 560). Standing's "irreducible constitutional minimum" contains three requirements. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998) (internal quotation marks omitted). First, a plaintiff must plead an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). "Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 523 U.S. at 103. "And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury." *Id.* "This triad of injury in fact, causation and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103–04.

The element relevant here is the second—causation. The plaintiffs must trace their injuries to the defendant's alleged actions. *See Lujan*, 504 U.S. at 560; *see also Fla. Audubon Soc'y*, 94 F.3d at 663–64 ("Causation may thus be said to focus on whether a particular party is appropriate."). The plaintiffs cannot show causation for three reasons. First, there is the requirement that plaintiffs must establish causation separately for each defendant. Second is *Clapper*'s prohibition on a "speculative chain of possibilities." 568 U.S. at 410–14. Third, the TVPRA's venture theory of liability cannot relieve plaintiffs of Article III's constitutional causation requirement. The Court addresses each in turn.

First, plaintiffs cannot establish standing at the industry level. Because "standing is not dispensed in gross," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks omitted), "a plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). To do so, a plaintiff

must demonstrate that he has "standing . . . separately as to each defendant," *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 900 (4th Cir. 2022), which requires showing that "each defendant caused his injury," *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017). *See also Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65 (2d Cir. 2012) (rejecting the view that "a plaintiff's injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants, even if they engaged in similar conduct that injured other parties").

Here, the complaint does not connect the defendants to any specific cocoa plantations. Although the complaint alleges that the defendants' agents visited Ivorian cocoa plantations and provided training and assistance, *see, e.g.*, Compl. ¶¶ 45–46, 50–51, 79–80, 101, 156, 167, 169, the complaint does not link the individual defendants to particular plantations, nor does it address the degree of influence that the defendants had over the plantations on which the plaintiffs worked, *see generally* Compl. *Cf. Doe I v. Apple, Inc.*, No. 19-cv-3737 (CJN), 2021 WL 5774224, at *6 (D.D.C. Nov. 2, 2021) ("Plaintiffs have pleaded no facts showing that every individual in the entire global supply chain—let alone one or more of the Defendants—controlled the mines or conditions that led to [p]laintiffs' injuries."). Rather, the complaint alleges generally that the defendants knew that their cocoa suppliers employed children. *See, e.g.*, Compl. ¶¶ 1, 39, 45–47, 50–51, 62, 68, 80–81. General industry-wide allegations, *see* Compl. ¶¶ 1–2, 34–60, fail to establish a non-speculative relationship between each plaintiff and each defendant in this case. The same is true of allegations that a group of defendants purchased cocoa from the regions in which plaintiffs labored. *See id.* ¶¶ 127, 130, 133, 136, 139, 142–43, 145–46, 148. Such allegations lack the specificity necessary to establish causation with the particularity that Article III requires.

Further, the complaint does not adequately explain what role intermediaries played in the supply chain. There is no "standing where the court 'would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct],'" *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 147 (D.D.C. 2008) (alteration in original) (quoting *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980)), or as here, with the specific defendants. The "chain of causality" cannot be "contingent on speculative assumptions about the past and future acts and motives of strangers to this suit" or "about market forces." *Prosser v. Fed. Agric. Mortg. Corp.*, 593 F. Supp. 2d 150, 155 (D.D.C. 2009) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43 (1976)); *see also Bernstein v. Kerry*, 962 F. Supp. 2d 122, 129 (D.D.C. 2013) (concluding that plaintiffs lacked standing when, "[t]o trace the alleged injury in this case to the challenged actions of defendants, th[e] Court would have to speculate on whether defendants' funding policies were in fact aiding terrorists, whether the terrorists were using these funds for activities intended to harm plaintiffs, and whether these activities are leading to a 'certainly impending' injury for plaintiffs").

On this subject, the allegations in the complaint are both conclusory and, at points, internally inconsistent. For example, the complaint alleges that there are "local buyers, who are employees and/or agents of the Defendants," Compl. ¶ 4; *see id.* ¶¶ 45, 50, but it fails to allege any facts that support those conclusions.[2] It also fails to explain the links in the supply chain between the plantations and the defendants. Not only is the complaint conclusory in these ways,

---

[2] Both agent and employee status turn on numerous factual considerations. *See, e.g.*, Restatement (Second) of Agency § 1 cmt. b (1958) ("Agency is a legal concept which depends upon the existence of required factual elements."); *Tyler v. Uber Tech., Inc.*, 487 F. Supp. 3d 27, 32–36 (D.D.C. 2020) (applying "economic realities" test to facts alleged in complaint to determine whether plaintiff was an employee). "[C]ourts 'do not assume the truth of legal conclusions.'" *Byrne v. Clinton*, 410 F. Supp. 3d 109, 117 (D.D.C. 2019) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).

11

but it also contains contradictory language, *see e.g.,* ¶¶ 55–56 (acknowledging that there is no monitoring of the "free zones"); *id.* ¶ 74 ("the vast majority of Nestlé's cocoa is sourced through untraceable channels"); *see also id.* ¶¶ 89–90 (explaining that 70–80% of Cargill's cocoa comes from outside its direct supply chain and instead from the unregulated free zone); *id.* ¶ 96 (same as to Barry Callebaut); *id.* ¶ 101 (noting that Mars has "third-party cocoa suppliers"); *id.* ¶ 126 (noting that there is no monitoring for 70–80% of Olam's supply chain).  These deficits create uncertainty in the "chain of causation," *Fla. Audubon Soc'y*, 94 F.3d at 670, sufficient to defeat standing.

The plaintiffs here face the same problems satisfying the causation prong as did the plaintiffs in *Doe I*, 2021 WL 5774224.  In *Doe I*, the plaintiffs were trafficked child miners of cobalt in the Democratic Republic of the Congo who brought TVPRA claims against Apple and other American corporate defendants that purchased refined cobalt.  *See id.* at *1–4.  The *Doe I* plaintiffs did "not allege that any [d]efendant employed any [p]laintiff, or that [d]efendants owned or operated any of the mining sites at which [p]laintiffs worked."  *Id.* at *6.  Rather, those plaintiffs alleged that non-parties supervised them working in mines operated by non-parties on land owned by non-parties.  *Id.*  The *Doe I* court thus concluded that those plaintiffs had failed to allege a traceable, causal connection between the harm the plaintiffs suffered and the defendants. *See id.* at *6–7.  The same is true of the plaintiffs here—they allege that non-parties trafficked them from Mali to Côte d'Ivoire and subjected them to forced labor on cocoa farms that were owned by non-parties. *See* Compl. ¶¶ 127, 130, 133, 136, 139, 143, 146.  As in *Doe I*, "[t]he allegations here . . . involve the actions of . . . independent third parties in the causal chain between [p]laintiffs and [d]efendants." *Doe I*, 2021 WL 5774224, at *7.  The causation requirement of standing is not satisfied by "injur[ies] that result[] from the independent action[s]

of some third part[ies] not before the court." *Klayman v. Nat'l Sec. Agency*, 280 F. Supp. 3d 39, 53 (D.D.C. 2017) (quoting *Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 203–04 (D.C. Cir. 1986)).

The plaintiffs disagree. They contend that their theory of venture liability satisfies the traceability element of standing. *See* Pl.'s Opp'n to Defs.' Mot. to Dismis at 41–42, Dkt. 33. In short, they argue that because the defendants "are in a 'venture' with each other and the cocoa plantations in their supply chains," they are "jointly and severally liable for the injuries suffered by [the] [p]laintiffs." *Id.* at 41.

But the defendants' liability under the TVPRA or the common law is a merits question distinct from the constitutional standing requirement. *See Tax Analysts & Advocs. v. Blumenthal*, 566 F.2d 130, 142 (D.C. Cir. 1977) (recognizing, in the zone-of-interests analysis, that "a primary theme in the law of standing that the question of standing is a matter apart and distinct from the merits of the substantive claims put forth"). And although Congress may create new forms of liability, it cannot eliminate the constitutional causation requirement any more than it can "relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III['s]" injury-in-fact requirement. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). In this way, the injury-in-fact and the causation prongs are similar to each other. Like the injury question, the causation inquiry—whether an injury is fairly traceable to the defendant—refers to facts about "the real world." *Id.* at 2204–05 (explaining the kinds of tangible and intangible harms that qualify as "concrete" in terms of "harms that exist in the real world" (internal quotation marks and citation omitted)).[3] "Article

---

[3] In contrast, Congress has plenary power over the remedies available in federal court. *See, e.g.*, *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 164 (1920) (recognizing Congress's "power to legislate concerning" remedies "within the maritime jurisdiction"); Anti-Injunction Act, 26 U.S.C. § 7421(a) (barring "suit[s] for the purpose of restraining the assessment or collection of any tax"). In only this manner can Congress create or eliminate standing.

13

III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Id.* (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019) (Barrett, J.)). For these reasons, the plaintiffs' attempts to evade Article III's causation requirements are unavailing.

The plaintiffs also point to hotel sex trafficking cases as evidence that the TVPRA obviates the need to trace the plaintiffs' harms to the defendants' actions. *See* Pls.' Opp'n at 41 (citing *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921 (D. Or. 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-656-BLF, 2020 WL 4368214 (N.D. Cal. July 30, 2020); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-cv-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020)). But each of those cases is distinguishable because the plaintiffs alleged the required traceability connection. In particular, they alleged a direct link between their injuries and the defendant hotel chains. Unlike in this case, those courts did not have to speculate about the role of the intermediaries or whether a particular defendant had a tie to a particular plaintiff. *See A.B.*, 484 F. Supp. 3d at 929–30 (listing hotels where plaintiff was sold for sex and the hotel chains affiliated with each); *B.M.*, 2020 WL 4368214, at *1–2 (same); *M.A.*, 425 F. Supp. 3d at 962 (listing three hotel chains); *Doe S.W.*, 2020 WL 1244192, at *1 (listing three hotel properties).

For a similar reason, the plaintiffs' reliance on *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338 (11th Cir. 2011), *see* Pls.' Opp'n at 41 n.18, is misplaced. In *Baloco*, the plaintiffs satisfied the traceability requirement by "alleg[ing] the defendants paid for and otherwise provided for their fathers' deaths." *Id.* at 1343. Specifically, the plaintiffs alleged that one of the defendants, who was an employee of each of the corporate defendants, met with a

14

leader of the paramilitary group United Self-Defense Forces of Colombia to arrange for the violent eradication of the union of which the plaintiffs' fathers were leaders. *Id.* at 1341. The plaintiffs further alleged that members of that paramilitary group thereafter murdered their fathers. *Id.* Unlike here, the relationship between the defendants and the group that harmed the plaintiffs was clearly defined, and there was no need for the court to speculate about the link between the two.

\*   \*   \*

Defendants do not dispute that children labor on cocoa plantations in Côte d'Ivoire, *see* Defs.' Mem. of P. & A. in Supp. of Defs.' Joint Mot. to Dismiss at 1–2, Dkt. 27-1, and the complaint before the Court plausibly alleges as much. Indeed, the complaint plausibly alleges that children are subjected to inhumane conditions on those plantations. Yet, at least as currently drafted, the complaint fails to allege facts sufficient to establish a "traceable connection between the plaintiff[] [childrens'] injur[ies] and the complained-of-conduct of the defendant[s]." *Steel Co.*, 523 U.S. at 103. Because the complaint does not satisfy the causation prong of Article III standing, the Court must dismiss the case without prejudice for lack of jurisdiction.[4]

---

[4] The Court also strikes the plaintiffs' Newly Discovered Factual Material to Supplement Opposition to Motion to Dismiss, Dkt. 40, because it contains new factual allegations that are not alleged in the complaint and which are not subject to judicial notice. Moreover, its contents are misleading because (1) Nestlé (or, more accurately, Nestlé S.A.), is not a party to this case and (2) the plaintiffs' counsel did not disclose his role in producing the 2022 film, *The Chocolate War*. The request for comment was sent to *Nestlé, S.A.*, not to Nestlé USA, Inc., the defendant in this case, *see* Supplement Ex. A, at 4. Nestlé USA, Inc. is five steps removed from Nestlé, S.A.—it is the subsidiary of Nestle Holdings, Inc., which is the subsidiary of NIMCO US, Inc., which is the subsidiary of Nestlé US Holdco, Inc., which is the subsidiary of Société des Produits Nestlé S.A., which is the subsidiary of Nestlé, S.A. *See* LCvR 26.1 Certificate, Dkt. 7. Further, the plaintiffs did not reveal that the filmmaker is a "partner" of plaintiffs' counsel's organization, International Rights Advocates, *see Our Partners*, International Rights Advocates, https://www.internationalrightsadvocates.org/our-partners (last visited June 27, 2022), and that counsel's organization "collaborat[ed]" on the film, *see id.* (noting that "IRAdvocates is

15

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion to dismiss. A separate order consistent with this decision accompanies this memorandum opinion.

*[signature]*
DABNEY L. FRIEDRICH
United States District Judge

June 28, 2022

---

collaborating with Miki [Mistrati] and Ange Aboa on a new film, *The Chocolate War*, focusing on IRAdvocates' legal battles against Nestlé and Cargill").